JENNIFER RAE GUNTER
Email: Jennof4@gmail.com
1601 G St., The Dalles, OR 97058
Phone: 541-993-5366
CHRISTINA LYNN MILCAREK
Email: tina.milcarke@gmail.com
1496 Foxglove Street, Woodburn, OR 97071
Phone: 708-932-0959
CHELSEA ANNE WEBER
Chels3721@yahoo.com
19000 S Pear Rd.
Oregon City, OR 97045
Phone:  503-422-0933

Plaintiff, appearing Pro Se

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

**JENNIFER RAE GUNTER, an Oregon Elector; and**
**CHRISTINA LYNN MILCAREK, an Oregon Elector;**
**And CHELSEA ANNE WEBER, an Oregon Elector**

Case No.: **3:22-CV-1252-MO**

          Plaintiff(s),

v.

                                 **FIRST AMENDMENT OF**
                                 **VERIFIED COMPLAINT**
                                 **DEMAND FOR JURY TRIAL**

**SHEMIA FAGAN, in her individual capacity**
**and as Secretary of State for the State of**
**Oregon**

          Defendant()

PAGE - 1 – FIRST AMENDMENT OF VERIFIED COMPLAINT

## FIRST AMENDMENT OF VERIFIED COMPAINT

LR 7-2 CERTIFICATION The undersigned hereby certifies that this first Amended Complaint of the FRCP 15 complies with the applicable word count limitation because it contains 8,385 words including headings, footnotes, and quotations, but excluding the caption, and signature block.

## PARTIES

1. Jennifer Rae Gunter is a legal resident of Wasco County, Christina Lynn Milcarek is a legal resident of Marion County and Chelsea Anne Weber is a legal resident of Clackamas County in the State of Oregon and all were registered voters in the state of Oregon during the November 3, 2020, elections, and voted, and plans to vote in future Oregon elections, including the upcoming November 8, 2022 election.

2. Defendant Shemia Fagan is an Oregon resident and was elected on November 3, 2020, as OREGON SECRETARY OF STATE ("SOS").  In this capacity, she is the chief elections officer and is responsible to obtain and maintain uniformity in the application, operation, and interpretation of the election laws under ORS 246.110.[1]

## JURISDICTION AND VENUE

3. Venue is proper because Defendant performs her official duties in the State of Oregon, affecting every county therein. As well as the SOS's conduct in Oregon directly impacts the outcome of federal elections held collectively in all states.

---

[1] https://oregon.public.law/statutes/ors_246.110

PAGE - 2 – FIRST AMENDMENT OF VERIFIED COMPLAINT

4.  This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 42 U.S.C §1983, 18 U.S. Code § 242.  As well seeks to protect rights under the 10th, 14th, 19th and 26th amendments of the US Constitution.

    a.  "The district courts shall have original jurisdiction of all civil actions arising under the constitution, laws, or treaties of the United States."

5.  This court has jurisdiction to grant injunctive relief based on 28 U.S.C. §§1343(a)(3) authority to do so under federal rule of civil procedure 65.

6.  This Court has authority to grant declaratory relief based on 28 U.S.C. §§ 2201, 2202, and Rule 57 of the FRCP.

7.  This court has jurisdiction to award nominal income compensatory damages under 28 U.S.C. §§1343(a)(4).

8.  Venue is proper for supplemental jurisdiction under 28 U.S.C. §1367.

9.  Venue is proper generally under 28 U.S.C 1391.


## OVERVIEW AND FACTS

10. Plaintiffs bring this motion of the First Amended Verified Complaint under FRCP 15 replacing the filed complaint on 8/24/2022, all exhibits, remain the same.

11. Plaintiffs bring this complaint to restore and preserve the integrity of Oregon elections and the voting records and machines purchased and used during the election of November 3, 2020, primary election held on May 17, 2022, and the upcoming election November 8, 2022. In support of the claims set forth herein, Plaintiffs allege and aver as follows:

12. Plaintiffs come before this court with the acquired knowledge that we are still free on paper. The Constitution affords us the right to elect the state or federal officials we want, but due to

the actions of those elected, **our** rights have been deprived and our interests in the SOS office of trust is irreparably damaged.

    a.  Democracy does not function properly if citizens do not trust the results of elections.  Our Founding Fathers intentionally excluded Congress and gave state legislatures the authority to run state elections. The state of Oregon has sovereignty to govern itself. The plaintiffs and people that reside in the state of Oregon are indeed the ultimate sovereign and have vested interest in elections and their state officials' fiduciary duties.

13. The methods by which elections at the local, state, and Federal levels in Oregon were conducted in 2020, and are being conducted in 2022, **cannot** be shown to provide 100% the fair elections guaranteed to **every citizen under U.S. and Oregon Constitutions.**

14. The secretary of state has violated the Plaintiff's by not properly caring out mandates under the HAVA act which were voluntarily participated in for election standards in Oregon which she oversees and is to be in compliance with and provides equity to all Oregonians.

15. The SOS has irreparably damaged plaintiffs **vested sovereign constitutional** rights to equal and fair voting representation by failing to meet required legally established laws and fulfill her fiduciary duties. Plaintiffs are being denied and disenfranchised by the SOS very own fiduciary failure of properly following federal and state laws.

    a.  Plaintiffs have been and remain underserved and underprivileged by all failed actions in the SOS position of trust.

16. Plaintiffs were registered voters during the national election of 2020 and elections thereafter.

17. Plaintiffs seek redress for the abuse and irreparable devastation of their **vested sovereign constitutional** rights to vote in an election that is to be performed in an equal and fair manner.

18. Plaintiffs seek redress for their vested interest and protection from potentially unelected or selected officials from elections performed on uncertified machines per the laws and rules set forth below.  Plaintiffs remain unwavering to seek redress for the violations set forth against them and for all vested interest for the people of Oregon.

    a.  Plaintiffs have suffered injury as their protected vested interest are actual or eminent, concrete, and particularized.

19. The right to vote is protected by the Equal Protection Clause and the Due Process Clause. U.S. CONST. amend. XIV, § 1, cl. 3-4. Because "the right to vote is personal," Reynolds, 377 U.S. at 561-62. "[e]very voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted." Anderson v. United States, 417 U.S. 211, 227 (1974); Baker v. Carr, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes debase or dilute the weight of each validly cast vote. Bush II, 531 U.S. at 105. The unequal treatment of votes within a state, and unequal standards for processing votes raise equal protection concerns.

20. The 10th Amendment states the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people. The 10th amendment protects states from federal intrusion.

    a.  Plaintiffs do not consent or agree to destruction of their vested property interest based on federal retention guidelines and interference. Plaintiffs have standing to protect these items of interest and property until this case is fully litigated.

    b.  Plaintiffs do not consent to the strict conflict of any involvement of federal government by the disenfranchisement with Commercial Off the Shelf (COTS) equipment, Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland

Security (DHS) but not limited only to those respectfully. It is a clear violation, of federal government being involved in states elections reserved to and for the people. These involvements restrict civil liberties, fair elections and rights to free speech cast by the American voter for their choice candidate, but rather our votes are **oppressed** and interfered, by foreign and federal government. This simply is not acceptable and cannot stand as such.

21. Department of Homeland Security (DHS) Call with State Election Officials on Cybersecurity in 2016[2] shows Federal and Private involvement.

22. As part of the ongoing effort, the Secretary also announced that **DHS is convening a Voting Infrastructure Cybersecurity Action Campaign with experts from all levels of government and the private sector** to raise awareness of cybersecurity risks potentially affecting voting infrastructure and promote the security and resilience of the electoral process.

    a. DHS under Obama scanned five states election systems in 2016[3].  Oregon was one of those states and if our machines are never connected to the internet (according to the SOS), how was this possible and why would we need all levels of government and the private sector to help with our voting infrastructure?

23. Stephen Trout Email to SOS Candidates in 2020 (see Exhibit L) shows Federal involvement.

    a. In Oregon we have created a model for the rest of the country through our TIGER (Threat Information Gathering and Election Resources) team. It is a dedicated team to help secure our elections that consists of members of the Elections Division, **Department of Homeland Security, Cybersecurity Infrastructure Security Agency, Federal Bureau of Investigations**, Oregon National Guard, Oregon Office of Emergency Management,

---

[2] https://www.p2016.org/integrity/dhs081516pr.html
[3] https://thepostmillennial.com/department-of-homeland-security-under-obama-scanned-five-states-election-systems-in-2016/

Oregon Titan Fusion Center, US Postal Service Inspector General, and the Cyber

Security Services section of the Oregon Chief Information Security Officer's office.

b.  Plaintiff Milcarek has open public records requests about DHS Conversations (SOS – no reply

since my last email to them on 8/22/22) and is still unfilled today. (**Exhibit R**)

c.  Plaintiffs Weber's and Gunter's inquiry to Oregon Department of Administrative services (DAS)

for Oregon server information being housed overseas 9/1/22 and 9/2/22 with their response

9/7/22 to Plaintiff Weber is concerning. Plaintiff Gunter has not received a reply form DAS to the

date of this filing. This is another example of official's expecting blind trust from the public and

further inciting concern for potential foreign interference with the public who employs them.

Further failing to ensure public safety and protection by allowing data to be stored outside our

country.  How do we know what data is stored where, with the current lack of transparency in our

state?



d.

e.
> From: LC Request <LC.Request@oregonlegislature.gov>
> Sent: Thursday, September 1, 2022 1:34 PM
> To: Sen Kennemer <Sen.BillKennemer@oregonlegislature.gov>
> Subject: RE: A few questions
>
> Dear Senator Kennemer,
>
> These really aren't questions for us - they should be forwarded to the Office of the Chief Information Officer at DAS, though we think it's probably the case that state contracts do not require hosting on servers based in the United States.
>
> An email address for the state CIO's office is:
>
> OSCIO.Info@das.oregon.gov

24. The 14th Amendment protects our right to vote.

   a. The 14th Amendment extends citizenship to all natural born or naturalized Americans regardless of race and guaranteed that rights of citizenship, like voting, cannot be restricted by the states. Plaintiffs are American citizens.

25. The 19th Amendment granted women the right to vote.

   a. Plaintiffs are women and have a right to vote which was passed by Congress June 4, 1919, and ratified August 18, 1920. Plaintiffs have a right to suffrage and are being underserved and are underprivileged from unlawfully certified machines.

   b. The voting system test laboratory accreditation that is required through federal and state law that the SOS used for Oregon elections has shown purportedly to not be properly accredited and voting systems not properly certified therefore depriving our fair equal right as women and denying us to cast our vote fairly and lawfully, leaving us underserved and under privileged.

   c. Plaintiffs are citizens and taxpayers of the State of Oregon.

26. The 26th Amendment extends the right to vote to everyone 18 years of age and older. Plaintiffs are over 18.

27. Plaintiffs vested interests are further harmed by intimidations, and the misuse of Government property, and mismanagement of their elected official's time under Code of Federal

PAGE - 8 – FIRST AMENDMENT OF VERIFIED COMPLAINT

Regulations Title 5 §2635.704 Use of government property and 2635.705 Use of official time.

28. Plaintiffs have standing under; Lujan v. Defenders of Wildlife, U.S. 112 s. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992) and Elmore v. McCammon (1986) 640 F Supp. 905: "…. The right to file a lawsuit pro se as one of the most important rights under the Constitution and laws." "Allegations such as those asserted by the petitioner, however in artfully pleaded, are sufficient", "which we hold to less stringent standards than formal pleading drafted by a lawyer."

29. Jenkins v. McKeithen, 395 U.S. 411,421 (1959); Picking v. Pennsylvania R. Co. 151 Fed 2nd; Pucket v Cox, 456 2nd 233 "Pro se pleadings are to be considered without regard to technicality; pro se litigants' pleadings are not to be held to the same standards of perfection as lawyers. "The plaintiffs' civil rights pleadings were 150 pages and described by a federal judge as "inept". Nevertheless, it was held "Where a plaintiff pleads pro se in a suit for protection of civil rights, the Court should endeavor to construe Plaintiffs Pleading without regard to technicalities."

30. All Oregonians **HAVE A RIGHT** to a verifiable and transparent vote count in line with these standing Supreme Court of the United States decisions.  All three cases have recognized that the right to vote consists of not only casting a ballot, but having that vote counted accurately, as it was cast.

   a.  "We regard it as equally unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box." See United States v. 13 Mosley, 238 U.S. 386 (1915).

b.  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." See Wesberry v. Sanders, 376 U.S. 17 (1964).

c.  "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." — U.S. Supreme Court Chief Justice Earl Warren, Reynolds v. Sims (1964)

d.  "No one would deny that the equal protection clause would . . . prohibit a law that would expressly give certain citizens a half-vote and others a full vote. . . . [T]he constitutionally guaranteed right to vote and the right to have one's vote counted clearly imply the policy that state election systems, no matter what their form, should be designed to give approximately equal weight to each vote cast. . . . [A] state legislature cannot deny eligible voters the right to vote for Congressmen and the right to have their vote counted." See Reynolds v. Sims, 377 U.S. 563 (1964), citing Colegrove v. Green, 328 U.S. 549, 328 U.S. 569-571.

e.  The unequal treatment of votes within a state, and unequal standards for processing votes raise equal protection concerns. Justice Thomas wrote in his dissent regarding the state of Texas v. Pennsylvania: "here we have the opportunity to do so almost 2 years before the next federal election cycle. Our refusal to do so by hearing these cases is befuddling. One wonders what this Court waits for. We failed to settle the dispute before the election, and thus providing clear rules. Now we again fail to provide clear rules for further elections. The decision to leave election law hidden beneath a shroud of doubt is baffling. By doing

nothing, we invite further confusion and erosion of voter confidence. Our fellow citizens better and expect more from us. I respectfully dissent "State of Texas vs. Commonwealth of Pennsylvania, State of Georgia, state of Michigan, and state of Wisconsin (2020). Justice Thomas went on to say; "the court was thought to be the least dangerous branch and we may have become the most dangerous." He further warned against," destroying our institutions because they don't give us what we want, when we want it."

## VIOLATIONS TO EAC, HAVA

31. The secretary of state with such high authority position over our elections has restricted, disenfranchised, and underserved plaintiffs with unproper accredited systems and machines disenfranchising all counties. One County affects the other which affects the entire state, which in turn affects the country. If one System is not properly certified by an accredited voting system test laboratory (VSTL) it therefore negates all other votes cast. **'fraud vitiate everything" in U.S. v. Throckmorton, 98 U.S. 61 (1878). Therefore, further not allowing a fair and equal voting process.**

32. Plaintiff Gunter resides in Wasco County, plaintiff Gunter's County used the Clear Ballot election voting system which was purportedly tested by voting system test laboratory (VSTL) Pro V&V and used during the 2020 elections and currently in 2022 elections. Plaintiff Gunter is underrepresented, misrepresented, and disenfranchised through fraudulent, negligent machine certification and false voting system test laboratory accreditation. Furthermore, Plaintiffs Milcarek and Weber are also underserved, disenfranchised, and misrepresented by the fraudulent and negligent machine certification and false voting system test laboratory accreditation of the VSTL, SLI Compliance.  There are 15 counties in the state of Oregon

that use the same Clear Ballot Group Clear Vote Voting System[4] who also relied on VSTL Pro V&V during the 2020 election and upcoming 2022 elections.  Clear Ballot Group and Pro V&V represent almost half of the counties in Oregon.

33. By utilizing voting machines tested by Voting System Test Laboratories (VSTL) with improper Election Assistance Commission accreditation at the time of certification and with the potential for the Trapdoor mechanism described in Exhibit A[5], Oregon has deprived its voters of the capability of knowing that their vote was accurately counted.

34. Additionally, the SOS has oversight over the Risk Limiting Audits (RLA) under OAR 165-007-0450, Section 3[6]:

   a. In order to ensure that no change or error in technology used to assist with the audit could result in an undetected change in the results of the audit, a county elections official may **only** choose to utilize risk limiting audit software that has been examined by a federally accredited voting systems testing laboratory (VSTL) and certified by the Secretary of State.

   b. To our knowledge and belief, the RLA's are supposed to be randomly chosen by county clerks but are given as directive from the Secretary of State.  Therefore, when counties do their RLA by hand and the count comes out "perfectly" … this could be by design as the SOS may have chosen precincts or batches that were **known** ahead of county tabulation.

---

[4] https://sos.oregon.gov/elections/Documents/Tally-Systems-By-County.pdf
[5] https://storage.courtlistener.com/recap/gov.uscourts.wied.92717/gov.uscourts.wied.92717.9.13.pdf
[6] https://oregon.public.law/rules/oar_165-007-0450

c.  Under ORS 254-529 Section 3 [7],  "The Secretary of State **shall** select the precincts or

batches at random."  Therefore, VSTL's accreditation are imperative to election security

when machines and software are used.

35. Voting System Test Laboratories, further known as (VSTL), Pro V&V, NTS Huntsville

(formerly Wyle Laboratories), known further as (NTS), and SLI Compliance (SLI had other

names – SysTest and SLI Global), accreditation(s) provided from the Election Assistance

Commission, further known as (EAC), for the 2020 General Election and subsequent

elections thereafter, were **not in compliance** with the HAVA act, nor within written policy of

the **EAC Voting System Test Laboratory Program Manual**, version 2.0, (OMB-3265-

0018)[8] (Exhibit B), Section 2 through 5 which violate the federal standards for laboratory

testing and accreditation set forth in the **HELP AMERICA VOTE ACT 2002**, (HAVA

ACT)[9] , Subtitle B § 231. (Exhibit C).

36. This lack of VSTL EAC accreditation not only violates Federal codes, pursuant to 52 U.S.

Code § 20971(b)(2)(a), and official policy of the EAC for accrediting VSTL, but also

violates Oregon Elections Division Chapter 165 Rule 165-007-0350[10], ORS 246.550[11] and

ORS 246.046[12].

37. These VSTLs were used in testing, certification, and approval of the Voting Machines or

vote tally systems further known as (VSM) used in the Oregon 2020 General Elections and

---

[7] https://oregon.public.law/statutes/ors_254.529
[8] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf
[9] https://www.congress.gov/107/plaws/publ252/PLAW-107publ252.pdf
[10] https://oregon.public.law/rules/oar_165-007-0350
[11] https://oregon.public.law/statutes/ors_246.550
[12] https://oregon.public.law/statutes/ors_246.046

all elections thereafter. VSM used in Oregon include but not limited to ES&S, Clear Ballot and Hart[13].

38. Oregon Elections Division Chapter 165 Rule 165-007-0350 Section 1 states: All voting systems submitted for certification pursuant to ORS 246.550 (Examination and approval of equipment by Secretary of State) **must be certified by the Elections Assistance Commission (EAC) or be examined by a federally accredited voting systems testing laboratory (VSTL)**".

    a. Section 3 states:  A complete Oregon Voting System Certification Application includes:

        1. Section 3(b) states: VSTL Test Report documenting, at a minimum that the voting system meets or exceeds the Voluntary Voting System Guidelines Version 1.0 promulgated by the U.S. Election Assistance Commission....

        2. Section 3(c) states: Oregon Test Report, documenting at a minimum that the voting system adheres to the Oregon Voting System Certification Standards contained in Appendix 1, which is incorporated into this rule by reference and also:

            a. Section 3(c)(A) states: Confirms that the voting system presented is the same as the one certified by the Elections Assistance Commission (EAC) or as the one documented in the VSTL test report submitted under (3)(b) of this rule;

39. ORS 246.550 Section 1 states:  The Secretary of State shall publicly examine all makes of voting machines or vote tally systems submitted to the secretary and determine whether the machines or systems comply with the requirements of ORS 246.560 (Requirements for approval of equipment), and can safely be used by electors.

---

[13] https://sos.oregon.gov/elections/Documents/Tally-Systems-By-County.pdf

40. ORS 246.046 states: "The Secretary of State and each county clerk shall diligently seek out **any** evidence of violation of **any** election law."

41. Per the (VSTL) Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1 and page 39 Sec 3.8[14]. Certificate of Accreditation: A Certificate of Accreditation shall be issued to each laboratory by vote of the Commissioners. **The certificate shall be signed by the CHAIR of the Commission** and state:

   a. "3.6.1.3. The effective date of the certification, **which shall not exceed a period of two (2) years**." (This is not an indefinite approval, but specific.)

   b. "3.8 A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation."



**Voting System Test Laboratory Program Manual, Version 2.0**

3.6.1.  Certificate of Accreditation. A Certificate of Accreditation shall be issued to each laboratory accredited by vote of the Commissioners. The certificate shall be signed by the Chair of the Commission and state:

    3.6.1.1.  The name of the VSTL;

    3.6.1.2.  The scope of accreditation, by stating the Federal standard or standards to which the VSTL is competent to test;

    3.6.1.3.  The effective date of the certification, which shall not exceed a period of two (2) years; and

    3.6.1.4.  The technical standards to which the laboratory was accredited.

3.6.2.  Post Information on Web Site. The Program Director shall make information pertaining to each accredited laboratory available to the public on EAC's Web site. This information shall include (but is not limited to):

    3.6.2.1.  NIST's Recommendation Letter;

    3.6.2.2.  The VSTL's Letter of Agreement;

    3.6.2.3.  The VSTL's Certification of Conditions and Practices;

    3.6.2.4.  The Commissioner's Decision on Accreditation; and

    3.6.2.5.  The Certificate of Accreditation.

---

[14] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf

PAGE - 15 – FIRST AMENDMENT OF VERIFIED COMPLAINT



c. According to the EAC website[15], the last available EAC accreditation[16] prior to 2021 for VSTL Pro V&V was signed on 2/24/2015 and was only effective through February 24, 2017. It was also signed by the Acting Executive Director and **not** by the EAC Chair as **required** per VSTL Program Manual ver. 2.0 effective May 31, 2015, Sec 3.6.1.

---

[15] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv
[16]
https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro_VandV_accreditation_certificate_2015.pdf

PAGE - 16 – FIRST AMENDMENT OF VERIFIED COMPLAINT



d.  According to the rules, the EAC is also **required** to "Post Information on the Website" per section 3.6.2.  None of these documents are listed for this time frame[17] nor can plaintiffs obtain copies of any such documents via Public Record Request or FOIA's. However, the Secretary of State noted in their Certificate of Approval[18] in February of 2020 that Pro V&V is an EAC Certified tester, even though their accreditation was only good through February 2017.

42. The (VSTL) program requires accredited laboratories to submit a renewal application package to the EAC Program Director, consistent with the procedures of Section 3.4, no earlier than 60 days before the accreditation expiration date, and no later than 30 days before

---

[17] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv
[18] https://sos.oregon.gov/elections/Documents/vote-systems/Clear-Ballot-2-1-Certification.pdf

their accreditation expire. Plaintiffs cannot find that Pro V&V and SLI Compliance

submitted an application prior to the expiration date in 2017 and possibly 2020 respectively.





6705 Odyssey Drive, Suite C
Huntsville, AL 35806
Phone (256)713-1111
Fax (256)713-1112

Test Report for State Certification Testing
Clear Ballot Group ClearVote 2.1 Voting System

Version: 00 (Initial Release)
Date: 02/05/2020

a. Circling back to the EAC Rules[19], the accreditation is valid for a period **NOT TO**

**EXCEED two years** and they are required to file a renewal application package between

30-60 days prior to February 24, 2017.  Given the lack of documentation on the EAC

website, documentation requested from the EAC and SOS, we cannot confirm that Pro

---

[19] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf

PAGE - 18 – FIRST AMENDMENT OF VERIFIED COMPLAINT

V&V was accredited to test ClearVote 2.1 in 2020 and ultimately approved by the SOS

for use in the 2020 and 2022 Elections in Oregon.

> 3.8.   **Expiration and Renewal of Accreditation**.  A grant of accreditation is valid for a period not to exceed two years.  A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation.  VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date.  Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending.  VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.

b.  If the VSTL's did not submit their renewal application packages within the guidelines to

the EAC and the Program Director, the EAC was remiss in their duties in acknowledging

the expiration of accreditation.  FOIA requests have been submitted to the EAC and

National Institute of Standards and Technology (NIST) but as of this filing, we have

received no responsive records, with an estimated EAC time of fulfillment of October 31,

2022 (**Exhibit Q**).

c.   Pro V&V and SLI Compliance may not have submitted a timely renewal application

package, thus allowing their accreditation to expire.  If true, then after expiration, they

also tested and issued test reports that were the basis for fraudulent EAC Certification and

Oregon SOS Approval of Voting systems.

43. Per the document published on the OREGON SECRETRARY OF STATES website[20]

regarding voting systems used in Oregon Counties.

a.  ES&S is allegedly approved for Baker, Benton, Clatsop, Columbia, Gilliam, Grant,

Jefferson, Lake, Lincoln, Malheur, Morrow, Polk, Sherman, Tillamook, Umatilla, Union,

Wallowa, and Wheeler Counties.

---

[20] https://sos.oregon.gov/elections/Documents/Tally-Systems-By-County.pdf

b.  Hart is allegedly approved for Clackamas, Marion and Yamhill counties.

c.  Clear Ballot is allegedly approved for Coos, Crook, Curry, Deschutes, Douglas, Harney, Hood River, Jackson, Josephine, Klamath, Lane, Linn, Multnomah, Wasco, and Washington Counties.

1.  Specifically, Plaintiffs know that ClearVote 2.1 was used in Wasco County in 2020 elections.  According the EAC Website, the EAC did NOT certify ClearVote 2.1 so it had to be examined by a federally accredited voting systems testing laboratory (VSTL).[21]

| Voting System (Name/Version) | Manufacturer | Testing Standard | Date Certified |
|---|---|---|---|
| Assure 1.3 Modification | Dominion Voting Systems Corp | VSS 2002 | 2012-06-29 |
| ClearVote 1.4 | Clear Ballot Group, Inc. | VVSG 1.0 (2005) | 2018-02-08 |
| ClearVote 1.5 | Clear Ballot Group, Inc. | VVSG 1.0 (2005) | 2019-03-19 |
| ClearVote 2.0 | Clear Ballot Group, Inc. | VVSG 1.0 (2005) | 2019-10-21 |
| ClearVote 2.2 | Clear Ballot Group, Inc. | VVSG 1.0 (2005) | 2021-12-23 |

2.  According to the SOS of Oregon Website, ClearVote 2.1 was tested by Pro V & V[22] and approved by the SOS for use in 2020[23], how could this be, when their VSTL accreditation is only effective through February 2017?

3.  According to the "CERTIFICATE OF APROVAL" (**Exhibit D**) Clear Ballot Group, Clear Vote Voting System (Clear Count 2.1 and Clear Design 2.1) was certified for

---

[21] https://www.eac.gov/voting-equipment/certified-voting-systems
[22] https://sos.oregon.gov/elections/Documents/vote-systems/CBG-ClearVote-2-1-Test%20Report-00-FINAL.pdf
[23] https://sos.oregon.gov/elections/Pages/voting-systems.aspx

PAGE - 20 – FIRST AMENDMENT OF VERIFIED COMPLAINT

sale, lease, or use in all elections in Oregon. This document published by Elections Director Stephen N. Trout on February 18, 2020 noted:

a. "Specifically, they have submitted ClearCount version 2.1 and ClearDesign version 2.1 along with their test lab report by EAC Certified tester Pro V&V.

b. According to the EAC Website[24], there is no mention of ClearCount version 2.1 or ClearDesign version 2.1 being EAC certified.

c. Plaintiff Gunter was told on 8/17/22 by the EAC they have no responsive records for information regarding ClearCount 2.1 or ClearDesign 2.1 nor has the EAC certified the system. **(Exhibit E)**

d. Plaintiff Milcarek was told on 8/18/22 by the SOS the report requested took longer to find and they posted on the SOS Web site **in a newly added section** titled, "Voting System Vendors Certified in Oregon". The report was titled, "**Test Report for State Certification Testing** - Clear Ballot Group ClearVote 2.1 Voting System". [25] **(Exhibit F)**

e. The EAC Website shows a blanketed year accreditation for Pro V&V from 2/24/15 to 2/1/21 which breaks the accreditation rules as noted in the EAC rules above. This document is also **not** signed by the EAC Chair.

---

[24] https://www.eac.gov/voting-equipment/certified-voting-systems
[25] https://sos.oregon.gov/elections/Documents/vote-systems/CBG-ClearVote-2-1-Test%20Report-00-FINAL.pdf



g.  Further stating, the bottom left corner references the accreditation is effective until revoked by the vote of the EAC pursuant to 52 USC Section 20971(c)(2)[26].

h.  Which poses the question, how can you revoke an expired accreditation if the accreditation does not exist? Accreditation and revocation are two entirely separate topics and procedures.

44. Hart is allegedly approved for Clackamas, Marion, and Yamhill Counties.  According to the "CERTIFICATE OF APPROVAL" Hart InterCivic Verity 2.4 Voting System document published by Elections Director Stephen N. Trout on June 15, 2020, "EAC Certified tester SLI Laboratories" was the VSTL used.

45. The last available EAC accreditation for VSTL NTS, was signed on May 4th, 2010 and only effective through April 27th, 2012[27] **(Exhibit G)** and no further accreditations are listed on

---

[26] https://www.law.cornell.edu/uscode/text/52/20971#:~:text=52%20U.S.%20Code%20%C2%A7%2020971%20-%20Certification%20and,voting%20system%20hardware%20and%20software%20by%20accredited%20laboratorie s.
[27]
https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Wyle%20Accreditation%20certificate%202020 10.pdf

PAGE - 22 – FIRST AMENDMENT OF VERIFIED COMPLAINT

the EAC website[28]. Furthermore, Pro V&V only shows a 2015 Accreditation Certificate which expired in 2017.  This means that the EAC Accreditations expired for the VSTL's yet were approved by the Secretary of State. **(Exhibit H)**

46. SLI Compliance's most recent EAC accreditation was signed on January 10, 2018 and despite the effective date stating through January 10, 2021, was supposed to only be effective for 2 years, expiring on January 10, 2020 per the EAC's VSTL Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1 and page 39, Sec 3.8[29] . **(Exhibit I)**

47. According to the EAC Website and a letter published on 1/27/2021[30]:

    a. **Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed** for an extended period. While this process continues, SLI retains its EAC VSTL accreditation.  EAC released their last memo on 7/22/2021[31], stating SLI compliance has yet to receive their new accreditation but that the "accreditation remains effective until revoked by a vote of the EAC pursuant to 52 US code 20971(c)(2)".  Revocation has nothing to do with the above – mentioned guidelines of the EAC VSTL program manual which state the STL accreditations are **not** to exceed 2 years.

    b. **The WHO Declared COVID-19 a Pandemic on 3/19/20[32]**

---

[28] https://www.eac.gov/voting-equipment/accredited-laboratories
[29] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf
[30] https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Accreditation_Renewal_delay_memo012721.pdf
[31] https://www.eac.gov/sites/default/files/voting_system_test_lab/files/VSTL%20Certificates%20and%20Accreditation_0.pdf
[32] https://pubmed.ncbi.nlm.nih.gov/32191675/

    c. SLI Compliance was required by the program rules to submit their renewal application package between November and December of 2019 (based on the 2-year rule) but the Covid-19 Pandemic was not declared until March of 2020.  There was not a pandemic in 2017, 2018, or even respectfully 2019.  Which leads to the reasoning that this is not a viable excuse, nor do Plaintiffs believe the EAC has the statutory authority to operate outside the Congressional scope of the HAVA act.

48. Plaintiffs are aware that in January 2017, shortly before President Donald Trump took office, Jeh Johnson, the Department of Homeland Security ("DHS") Advisor who served under former President Barak Hussein Obama, designated election infrastructure as part of the nation's critical infrastructure as a subsector under the Government Facilities sector[33].

49. This designation purportedly allowed DHS, through its Cybersecurity and Infrastructure Security Agency ("CISA") with the assistance of the Election Assistance Commission ("EAC"), to provide services on a prioritized basis at the request of state and local election officials; however, it effectively resulted in the federal government improperly usurping the authority of the respective states to manage their own elections in violation of the Tenth Amendment to the United States Constitution.

50. In addition, pursuant to Article I, Section 4 of the United States Constitution, state governments have the primary responsibility to administer elections and enforce election law, with the role of the federal government traditionally being limited to the enforcement of the protections of the Voting Rights Act and the prosecution of individuals who have committed federal election crimes.

---

[33] https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical

51. Moreover, plaintiffs are aware that federal and state election officials across the United States have taken to the process of classifying certain election-related documents as confidential, thus preventing the public from viewing the documents and diminishing the transparency of the election process. While some election officials may argue that such actions are necessary to ensure the safe operation of electronic voting machines, no safety concerns could possibly outweigh the importance of citizens being able to evaluate the integrity and impartiality of the election process by having access to all election-related information and documentation.

52. If our state's election officials insist that the involvement of federal agencies in our state's elections is necessary to ensure the integrity of electronic voting machines, then our state's election officials should cease the use of such machines in the election process.

**ELECTION SOFTWARE WHISTLEBLOWER**

53. By utilizing voting machines tested by a VSTL with **improper** Election Assistance Commission Accreditation within the United States now, and in 2020 election, they are subject to tampering through a "trapdoor" mechanism inherent in all election systems. This "trapdoor" mechanism is described in detail in Exhibit A, affidavit of Terpesehore Maras, filed under penalty of perjury on December 1, 2020 in case #2:20-cv-01771-PP in the 2nd Judicial District of the Denver District Court in Denver, Colorado and signed on November 29, 2020. (Exhibit A)

54. C-span's Washington Journal interviewed Dr. Alex J. Halderman, a professor of engineering and computer science at the University of Michigan, on electronic voting machine security. Dr. Halderman was asked about a recent headline, "Hackers can easily break into voting machines used across the U.S."[34] He agreed and further stated that "Election infrastructure

---

[34] https://www.salon.com/2019/08/14/hackers-can-easily-break-into-voting-machines-used-across-the-u-s-play-doom-nirvana/

across the United States remains weakly protected and vulnerable against sophisticated

foreign hackers."[35]  He then warned that "we have a lot of work to do as a country before

2020 and elections to come."  Dr. Halderman during his security research, rigorously tested

every single kind of voting machine.  Vulnerabilities were discovered "where someone could

hack in, put malicious software on the voting machine, cause it to be sabotaged or even

silently steal votes."[36]  Dr. Halderman submitted a sworn declaration[37] **(Exhibit J)** in Curling

v. Raffensperger[38] detailing the security vulnerabilities of the election machines in general.

He also filed a motion in support of a preliminary injunction because the vulnerabilities of

the machines were so great[39]. **(Exhibit K)**

a.   Dr. Halderman also noted under No. 9 of his Motion in Support:

1.   Components of Georgia's election system t**hat are not directly connected to the**

    **Internet might nonetheless be targeted by attackers**. Nation-state attackers have

    developed a variety of techniques for infiltrating non-Internet-connected systems,

    including by spreading malware on removable media that workers use to copy files in

    and out[40].  Attackers could employ this method to infect the state or county EMS and

    spread from there to scanners and BMDs when workers program them for the next

    election. In this way, an attack could potentially spread from a single point of

    infection to scanners and BMDs across entire counties or the whole state, in the same

---

[35] https://www.c-span.org/video/?463480-4/washington-journal-j-alex-halderman-discusses-election-security
[36] https://www.c-span.org/video/?463480-4/washington-journal-j-alex-halderman-discusses-election-security
[37] https://www.documentcloud.org/documents/21069743-2021-09-21-notice-of-filing-dckt-1177_1
[38] https://www.courtlistener.com/docket/6139924/curling-v-raffensperger/
[39] https://voterga.org/wp-content/uploads/2021/08/Public-Halderman-Findings.pdf
[40] A well-known example of this ability, which is known as "jumping an air gap," is the Stuxnet computer virus, which was created to sabotage Iran's nuclear centrifuge program by attacking factory equipment that was not directly connected to the Internet. Kim Zetter, "An Unprecedented Look at Stuxnet, the World's First Digital Weapon," Wired (Nov. 3, 2014),
https://www.wired.com/2014/11/countdown-to-zero-day-stuxnet/

PAGE - 26 – FIRST AMENDMENT OF VERIFIED COMPLAINT

way that malware could have spread through the old DRE system, which was not effectively air-gapped or otherwise reasonably secured.

55. Terpesehore Maras is a trained Cryptolinguist, holds a completed degree in Molecular and Cellular Physiology with formal training in other sciences such as Computational Linguistics, Game Theory, Algorithmic Aspects of Machine Learning, and Predictive Analytics. Terpesehore Maras, possesses more than two decades of experience in mathematical modeling and pattern analysis as well as lesser experience in network tracing and cryptography. Additionally, she has extensive involvement in overseeing OCONUS elections and the HAVA Act for CONUS elections. The information presented in the affidavit is personal, first-hand account clarifies in detail as to why EAC Accreditation is so important to ensure fair elections. Key portions of the affidavit emphasizing proper EAC Accreditation and VSTL testing are as follows:

"11. VSTL's are VERY important because equipment vulnerabilities allow for deployment of algorithms and scripts to intercept, alter, and adjust voting tallies."

"20. VSTLs are the most important component of the election machines as they examine the use of COTS (Commercial Off–The-Shelf)"

"22. COTS are preferred by many because they have been tried and tested in the open market and are most economic and readily available. COTS are also the SOURCE of vulnerability therefore VSTLs are VERY important. COTS components by voting system machine manufacturers can be used as a "Black Box" and changes to their specs and hardware make up change continuously. Some changes can be simple upgrades to make them more efficient in operation, cost efficient for production, end of life (EOL) and even complete reworks to meet new standards. They key issue in this is that MOST of the

COTS used by Election Machine Vendors like Dominion, ES&S, Hart Intercivic, Smartmatic and others is that such manufacturing for COTS have been outsourced to China which if implemented in our Election Machines make us vulnerable to BLACK BOX antics and backdoors due to hardware changes that can go undetected. This is why VSTL's are VERY important."

"23. The proprietary voting system software is done so and created with cost efficiency in mind and therefore relies on 3rd party software that is AVAILABLE and HOUSED on the HARDWARE. This is a vulnerability. Exporting system reporting using software like Crystal Reports, or PDF software allows for vulnerabilities with their constant updates."

"24. As per the COTS hardware components that are fixed, and origin may be cloaked under proprietary information a major vulnerability exists since once again third-party support software is dynamic and requires FREQUENT updates. The hardware components of the computer components, and election machines that are COTS may have slight updates that can be overlooked as they may be like those designed that support the other third-party software. COTS origin is important and the US Intelligence Community report in 2018 verifies that."

"36. The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS."

"37. The purpose of VSTL's being accredited and their importance in ensuring that there is no foreign interference/ bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity"."

(Exhibit A)

56. According to the Cybersecurity & Infrastructure Security Agency (CISA)[41];

   a.  COTS Software Presents an Attractive Point of Attack

   b.  It Is Difficult to Verify the Security of COTS Products

57. Terpesehore Maras also provides evidence of the conflict of interest in VSM software and election result reporting. Two companies in particular, Huawei and Akamai, the latter of which is partnered with SCYTL. SCYTL receives the tallied votes on behalf of Dominion and, under contract with Associated Press (AP), provides the results for reporting. This shows that voting information is under the control of the companies that provide the Voting Systems. (Exhibit A)

58. She further elaborates on the "trapdoor" mechanism available to alter votes via algorithms in shuffling or mixing process of which she observed in the 2020 election. An example of this can be found starting in point 44 of her signed affidavit.

   In her own words,

   "50. When the votes are sent to Scytl via Dominion Software EMS (Election Management System) the Trap Door is accessed by Scytl or TRAP DOOR keys (Commitment Parameters)."

   "54. Scytl and Dominion have an agreement – only the two would know the parameters. This means that access is able to occur through backdoors in hardware if the parameters of the commitments are known in order to alter the range of the algorithm deployed to satisfy the outcome sought in the case of algorithm failure."

   "55. Trapdoor is a cryptotech term that describes a state of a program that knows the commitment parameters and therefore is able change the value of the commitments

---

[41] https://www.cisa.gov/uscert/bsi/articles/best-practices/legacy-systems/security-considerations-in-managing-cots-software

however it likes. In other words, Scytl or anyone that knows the commitment parameters can take all the votes and give them to any one they want. If they have a total of 1000 votes an algorithm can distribute them among all races as it deems necessary to achieve the goals it wants. (Case Study: Estonia)"

"62. Therefore, if decryption is challenged, the administrator or software company that knows the trap door key can provide you proof that would be able to pass verification (blind). This was proven to be factually true in the case study by The University of Melbourne in March. White Hat Hackers purposely altered votes by knowing the parameters set in the commitments and there was no way to prove they did it – or any way to prove they didn't."

(Exhibit A)

59. Maras covers in great detail how 2020 Election reporting demonstrated this algorithm in key swing states as examples and further demonstrates plaintiff's claims on lack of VSTL EAC Accreditations, EAC violations of the HAVA Act, and the importance of robust testing of VSMs and EMS systems to help ensure fair elections. (**Exhibit A**)

60. CONCLUSION: This affidavit presents unambiguous evidence of:

a. foreign interference

b. Complicit behavior by the previous administrations from 1999 to present to hinder and disenfranchise the voice of the American people

c. Knowingly and willingly colluding with foreign powers to manipulate the outcome of the 2020 election

d. Foreign nationals, through investments and interests, assisted in the creation of the Dominion software

PAGE - 30 – FIRST AMENDMENT OF VERIFIED COMPLAINT

e. Akamai Technologies merged with a Chinese company that makes and distributes the COTS components of election machines hence causing foreign interference with local and national elections, why are we using foreign equipment in our United States?

f. US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections

g. The EAC failed to abide by standards set in HAVA ACT 2002

h. The IG of the EAC failed to address complaints since their appointment regarding vote integrity 15

i. Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002

j. Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then

k. The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.

l. AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations

**(Exhibit A)**

61. Stephen Trout, Oregon Elections Director in 2020, was dismissed or fired after sending an email to the SOS candidates describing a litany of challenges faced by the elections division. The Defendant was alerted to all the aging and outdated machines, systems, end of life Microsoft support and more. **(Exhibit L)**

a.  In 2014 Oregon secretary of state website breach:  ORESTAR, business registry are now online[42].

b.  In August of 2019, the Associated Press published, "Federal officials with Oregon, other states to protect elections against hackers"[43].

c.  In May of 2022, Hackers hit web hosting provider linked to Oregon elections week before May primary vote.[44]  "Secretary of State Shemia Fagan's office said people inputting records into the **ORESTAR** state campaign finance reporting system may have been affected."

d.  U.S. Department of Homeland Security (DHS) notified 21 states that they were targeted by hackers during the 2016 election. Among those states notified by DHS were: Alabama, Alaska, Colorado, Connecticut, Delaware, Florida, Illinois, Maryland, Minnesota, Ohio, Oklahoma, **Oregon**, North Dakota, Pennsylvania, Virginia, and Washington[45].

e.  Plaintiff Milcarek confirmed with Marion County Clerk they used Hart Verity 2.4 in the 2020 Election **(Exhibit M)**.  The Clerk also confirmed the exact equipment purchased and used in the 2020 Elections **(Exhibit N)**.  According to the EAC website and the Certificate of Conformance[46] for this version and Marion County's equipment (COTS Software and Firmware), Microsoft Windows Embedded Standard 7, Service Pack 1 was

---

[42] https://www.oregonlive.com/politics/2014/02/oregon_secretary_of_state_webs_1.html
[43] https://www.statesmanjournal.com/story/news/politics/2019/08/28/federal-officials-work-oregon-protect-elections-against-hackers-homeland-security-salem/2142902001/
[44] https://www.statesmanjournal.com/story/news/2022/05/10/hackers-hit-web-hosting-provider-orestar-linked-to-oregon-election-before-may-primary-ransomware/65354731007/
[45] https://www.washingtonpost.com/news/the-fix/wp/2017/09/23/what-we-know-about-the-21-states-targeted-by-russian-hackers/
[46] https://www.eac.gov/sites/default/files/voting_system/files/HRT-VERITY-2.4%20Certificate%20and%20Scope%2002-21-2020.pdf

used and as per Stephen Trout's warning letter, Senator Wyden's warning letter[47], and

Microsoft announcement[48], this version **is no longer supported as of January 2020**.

62. Senator Wyden warned Pro V&V and SLI Compliance of the importance of accreditation

prompting the EAC to release a series of memos explaining the reason why neither lab had

received their new certificates of accreditation[49] [50].

63. Plaintiffs feel devastatingly disenfranchised that they are attempting to educate themselves

on the laws and systems used in each of their counties along with state and federal rules but

Plaintiffs noting that the SOS and Country Clerks (who are under specific directives from the

SOS) are increasingly delaying or ignoring responses or using ORS 192.345[51] (23)(c) which

states the information is exempt from disclosure.  How can public records be exempt from

disclosure when it's state and county taxpayer money (electors) that pay for these systems

and property?  Note, Plaintiffs have not asked for copies of county or state security

procedures.

64. Without the SOS lawful due diligence when stepping into her role as SOS, which is a crucial

part of her fiduciary duty, she has failed the citizens of Oregon. It is unacceptable to assume

or imply a deserved acceptance from the public even without providing proper transparency

and verifications of election practices.

---

[47]

https://www.wyden.senate.gov/imo/media/doc/071219%20Wyden%20Windows%207%20Letter%20to%20EAC.pdf

[48] https://support.microsoft.com/en-us/topic/october-13-2020-kb4580387-security-only-update-9781ea5e-4fab-9f66-7528-77e9c5649081#:~:text=For%20Windows%20Embedded%20Standard%207%2C%20extended%20support%20ends,on%20the%20screen%20until%20you%20interact%20with%20it.

[49] https://www.wyden.senate.gov/imo/media/doc/wyden-pro-vandv-election-cybersecurity-letter.pdf

[50] https://www.wyden.senate.gov/imo/media/doc/wyden-sli-compliance-election-cybersecurity-letter.pdf
[51] https://oregon.public.law/statutes/ors_192.345

65. It is very disturbing and shameful that the SOS implies that the public is misinformed by their very own gathered information through public records request to the EAC and the SOS office along with their offices replies and lack thereof [52]. It is her very own fiduciary failure to keep transparency of an online public request log, with election records updated on the SOS Website.

    a. For almost 2 years information has not been available. Furthermore, invoking the public to submit records request for their vested interest in our state.  One would be led to think she is assuming a role of implying her elected job is not of, by and for the people! As you can see the date of this public post 8/19/2022 her office is a bit behind in public transparency that her employers demand. Furthering reference to line #26 above, under Code of Federal Regulations Title 5 CFR§2635.704 Use of government property and 2635.705 Use of official time.

---

[52] https://twitter.com/oregonsos/status/1560676938414313472?s=21&t=gKnmlzOX64PwPQrDp9^mTA



b.  See **Exhibit O** of Shannon Berlant's Affidavit of in-depth un-fulfilled records requests.

c.  See **Exhibit P** from Plaintiff Gunter's open records requests from the SOS in which 387 is marked completed by the SOS office when in fact ES&S and Hart InterCivic Test reports are NOT available online.

d.  The workload at county level stems from her very own offices lack of transparency and roadblocks.


## CONCLUSION

66. There is **extreme urgency** to Plaintiff's complaint with the upcoming November 8th election and all future elections. The **many** violations of the VSTL EAC accreditations do render the EAC, VSM and SOS certifications **invalid!** The reason for such policy and law is to ensure that the VSM and their software do not have vulnerabilities that could be exploited to

undermine election integrity like the trapdoor mechanism in the encryption/decryption process, the conflict of interests with Scytl, the foreign interests involved, the EAC violations, the importance of VSTLs, and testing of COTS and the RLA software. The alleged approvals of machines by the Secretary of State in Oregon have such glaring gaps in EAC policy which is open to potential vulnerabilities, does indeed violate Plaintiffs Federal and State Constitutional rights. For all the reasons above, a complete failure, dereliction of duties to provide safe and fair elections to all are observed and further irreparable disenfranchisement of plaintiffs and Oregonians.

67. Plaintiffs were/are entitled to evidence and retention of records due to current legal claims for the November 2020 Election data and all those that follow in 2022. (42 USC 1974[53]).  Due to the extreme limitations of time, Plaintiffs were forced to exert their rights to demand retention of election records from all 36 counties via a Litigation Hold letter and email to state their expectations surrounding the current litigation in Federal Court.

68. Plaintiffs, for the record, state they DO NOT CONSENT to the use of Electronic Voting Machines of any type or form.  Plaintiffs ONLY consent to the use of paper ballots that are hand counted on the date of the election.

69. Plaintiffs would like state again "fraud vitiate everything". An office of trust can't skip over or ignore years that are unlawful and imply we will get it right next time, when it **MUST** be right EVERYTIME!

a. That said, the totality of the evidence, irreparable harm and damages, along with the factors that must guide the courts determination have been met. For these reasons, plaintiffs respectfully request this court grant all lawful and equitable relief

---

[53] https://uscode.house.gov/view.xhtml?req=granuleid:USC-1999-title42-section1974&num=0&edition=1999

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgement against Defendant as follows:

70. That this Court assume jurisdiction of this Action;

71. Plaintiffs ask the court for a judicial review of the EAC under the HAVA act, citing Marbury v. Madison (1803) with the power of the Federal Court as the HAVA act has been violated because the EAC failed to certify VSTL's under HAVA's mandate.  Their actions are inconsistent with the US Constitution, therefore, depriving rights of the people.

72. That this Court compel the Secretary of State to immediately halt the use of any electronic voting machine in Oregon.

73. That this Court compel the Secretary of State to immediately address the public (at the city, county, and state level) the lack of proper election machine certification and associated election fraud to fully cooperate in an investigation that has violated Oregonians civil liberties and sovereignty through illegal activity and fraud.

74. Plaintiffs ask that this Court enter an order requiring Defendants to provide all correspondence relating to the certification of the electronic voting machines and VSTL Accreditations for 2020, 2021, and 2022.

75. Request the Court issue a referral of a complaint against the SOS under 52 U.S. Code §20511(2)(A),(B) to Attorney General Ellen R. Rosenblum and the Civil Rights Department of the Department of Justice to open an investigation of criminal and fraudulent election violations and allegations henceforth provided in this complaint including but not limited to the impounding of election materials and electronic voting system.

76. Prohibit defendants from destruction and deletion of any election records created by law, to include all paper ballots created by voting systems, USB devices, memory cards, electronic

storage devices, ballots, tabulation tapes, USB final counts from precinct and all other election records not specifically stated from the 2020, 2021, and 2022 elections:

    a.   Order Defendant to preserve in their state and counties all voting machines, correspondence, software, peripherals, and other data, paperwork, and equipment used to cast, examine, count, tabulate, modify, store, or transmit votes or voting data in the November 2020 elections held in Oregon and which are planned to be used in the same manner in the upcoming November 2022 elections to be held in Oregon.

**77.** Order the State of Oregon to immediately stop the use of election machines, tally systems, scanners, etc. and to reconfigure **all** county elections to be held exclusively with hand-counted paper ballots using a counting board as noted under ORS 254.485[54]:

    **a.**   Section 1: **Ballots may be tallied** by a vote tally system or **by a counting board.**

    **b.**   Section 3: If a counting board has been appointed, the tally of ballots may begin on the date of the election.

    **c.**   Section 5: **A counting board shall audibly announce the tally as it proceeds. The board shall use only pen and ink to tally.**

78. Order the State and counties to supply a cost analysis of said mentioned Counting Board procedures above with election volunteer's vs a cost analysis to use and maintain electronic machines and resources required for machine operations.


    Respectfully submitted this September 9th 2022.


                                */s/ Jennifer Rae Gunter*
                                1601 G St.

---

[54] https://oregon.public.law/statutes/ors_254.485

The Dalles, OR 97058
Telephone: 541-993-5366

*/s/ Christina Lynn Milcarek*
1496 Foxglove Street
Woodburn, OR 97071
Telephone:  708-932-0959

*/s/ Chelsea Anne Weber*
19000 S Pear Rd.
Oregon City, OR 97045
Phone:  503-422-0933

**Declaration of** ███████████

Pursuant to 28 U.S.C Section 1746, I, ███████████████ , make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.
2. I have been a private contractor with experience gathering and analyzing foreign intelligence and acted as a LOCALIZER during the deployment of projects and operations both OCONUS and CONUS. I am a trained Cryptolinguist, hold a completed degree in Molecular and Cellular Physiology and have FORMAL training in other sciences such as Computational Linguistics, Game Theory, Algorithmic Aspects of Machine Learning, Predictive Analytics among others.
3. I have operational experience in sources and methods of implementing operations during elections both CONUS and OCONUS
4. I am an amateur network tracer and cryptographer and have over two decades of mathematical modeling and pattern analysis.
5. In my position from 1999-2014 I was responsible for delegating implementation via other contractors sub-contracting with US or 9 EYES agencies identifying connectivity, networking and subcontractors that would manage the micro operations.
6. My information is my personal knowledge and ability to detect relationships between the companies and validate that with the cryptographic knowledge I know and attest to as well as evidence of these relationships.
7. In addition, I am WELL versed due to my assignments during my time as a private contractor of how elections OCONUS (for countries I have had an assignment at) and CONUS (well versed in HAVA ACT) and more.
8. On or about October 2017 I had reached out to the US Senate Majority Leader with an affidavit claiming that our elections in 2017 may be null and void due to lack of EAC certifications. In fact Sen. Wyden sent a letter to Jack Cobb on 31 OCT 2017 advising discreetly pointing out the importance of being CERTIFIED EAC had issued a certificate to

Exhibit A

Pro V & V and that expired on Feb 24, 2017.  No other certification has been located.



9.  Section 231(b) of the Help America Vote Act (HAVA) of 2002 (42 U.S.C. §15371(b))
    requires that the EAC provide for the accreditation and revocation of accreditation of
    independent, non-federal laboratories qualified to test voting systems to Federal standards.
    Generally, the EAC considers for accreditation those laboratories evaluated and
    recommended by the National Institute of Standards and Technology (NIST) pursuant to
    HAVA Section 231(b)(1).  However, consistent with HAVA Section 231(b)(2)(B), the
    Commission may also vote to accredit laboratories outside of those recommended by NIST
    upon publication of an explanation of the reason for any such accreditation.



**United States Department of Commerce**
**National Institute of Standards and Technology**

# NVLAP ®

## Certificate of Accreditation to ISO/IEC 17025:2017

**NVLAP LAB CODE: 200978-0**

**Pro V&V**
Huntsville, AL

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services,*
*listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017.*
*This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality*
*management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-03-26 through 2021-03-31                                        For the National Voluntary Laboratory Accreditation Program
*Effective Dates*

10.

11. VSTL's are VERY important because equipment vulnerabilities allow for deployment of algorithms and scripts to intercept, alter and adjust voting tallies.

12. There are only TWO accredited VSTLs (VOTING SYSTEM TEST LABORATORIES). In order to meet its statutory requirements under HAVA §15371(b), the EAC has developed the EAC's Voting System Test Laboratory Accreditation Program.  The procedural requirements of the program are established in the proposed information collection, the EAC **Voting System Test Laboratory Accreditation Program Manual**.  Although participation in the program is voluntary, adherence to the program's procedural requirements is mandatory for participants. The procedural requirements of this Manual will supersede any prior laboratory accreditation requirements issued by the EAC.  This manual shall be read in conjunction with the EAC's **Voting System Testing and Certification Program Manual** (OMB 3265-0019).

U.S. Election Assistance Commission

 **MICHIGAN**

| | |
|---|---|
| *State Participation:* | **Requires Testing by an Independent Testing Authority.** MI requires that voting systems are certified by an independent testing authority accredited by NASED and the board of state canvassers. |
| *Applicable Statute(s):* | "An electronic voting system shall not be used in an election unless it is approved by the board of state canvassers … and unless it meets 1 of the following conditions: (a) Is certified by an independent testing authority accredited by the national association of state election directors and by the board of state canvassers. (b) In the absence of an accredited independent testing authority, is certified by the manufacturer of the voting system as meeting or exceeding the performance and test standards referenced in subdivision (a) in a manner prescribed by the board of state canvassers." MICH. COMP. LAWS ANN § 168.795a (2009). |
| *Applicable Regulation(s):* | MI does not have a regulation regarding the federal certification process. |
| *State Certification Process:* | The Secretary of State accepts requests from persons/corporations wishing to have their voting system examined. The requestor must pay the Secretary of State an application fee of $1,500.00, file a report listing all of the states in which the voting system has been approved and any reports that these states have made regarding the performance of the voting system. The Board of State Canvassers conducts a field test involving Michigan electors and election officials in simulated election day conditions. The Board of State Canvassers shall approve the voting system if it meets all of the state requirements. MICH. COMP. LAWS ANN § 168.795a (2009). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.michigan.gov/sos/0,1607,7-127-1633_8716_45458---,00.html |

13.

U.S. Election Assistance Commission

 # WISCONSIN

| | |
|---|---|
| **State Participation:** | **Requires Testing by a Federally Accredited Laboratory.** WI requires that its voting systems receive approval from an independent testing authority accredited by NASED verifying that the voting systems meet all of the recommended FEC standards. |
| **Applicable Statute(s):** | "No ballot, voting device, automatic tabulating equipment or relating equipment and materials to be used in an electronic voting system may be utilized in this state unless it is approved by the board [of election commissioners]." WIS. STAT.ANN. § 5.91 (West 2009). |
| **Applicable Regulation(s):** | "An application for approval of an electronic voting system shall be accompanied by all of the following … [r]eports from an independent testing authority accredited by the national association of state election directors (NASED) demonstrating that the voting system conforms to all the standards recommended by the federal elections commission." WIS. ADMIN. CODE GAB § 7.01 (2009). |
| **State Certification Process:** | The Board of Election Commissioners accepts applications for the approval of electronic voting systems. Once the application is completed, the vendor must set up the voting system for three mock elections using; (1) offices, (2) referenda questions and (3) candidates. A panel of local election officials can assist the Board in the review of the voting system. The Board conducts the test using a mock election for the partisan primary, general election, and nonpartisan election. The Board may also require that the voting system be used in an actual election as a condition of the approval. WIS. ADMIN. CODE GAB §§ 7.01, 7.02 (2009). |
| **Fielded Voting Systems:** | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://elections.state.wi.us/section.asp?linkid=643&locid=47 |

State Participation in EAC Voting System Certification Program 59

14.

| U.S. Election Assistance Commission |
| --- |

 **GEORGIA**

| | |
| --- | --- |
| *State Participation:* | **Requires Federal Certification.** GA requires that its voting systems are tested to EAC standards by EAC accredited labs and certified by the EAC. |
| *Applicable Statute(s):* | "Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine may request the Secretary of State to examine the machine. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $ 250.00. The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine." GA CODE ANN. § 21-2-324 (2008). |
| *Applicable Regulation(s):* | "Prior to submitting a voting system for certification by the State of Georgia, the proposed voting system's hardware, firmware, and software must have been issued Qualification Certificates from the EAC. These EAC Qualification Certificates must indicate that the proposed voting system has successfully completed the EAC Qualification testing administered by EAC approved ITAs. If for any reason, this level of testing is not available, the Qualification tests shall be conducted by an agency designated by the Secretary of State. In either event, the Qualification tests shall comply with the specifications of the *Voting Systems Standards* published by the EAC." GA. COMP. R. & RES. 590-8-1-.01 (2009). |
| *State Certification Process:* | After the voting system has passed EAC Qualification testing, the vendor of the voting system submits a letter to the Office of the Secretary of State requesting certification for the voting system along with a technical data package to the certification agent. An evaluation proposal is created by the certification agent after a preliminary view of the Technical Data Package and sent to the vendor. Any additional EAC ITA testing identified in the evaluation proposal is arranged by the vendor and the certification agent will perform all other tests identified in the evaluation proposal. The certification agent submits a report of their findings to the Secretary of State. Based on these findings the Secretary of State will make a final determination on whether to certify the voting system. GA. COMP. R. & RES. 590-8-1-.01 (2009). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.sos.georgia.gov/Elections/ |

15.

U.S. Election Assistance Commission

 **PENNSYVANIA**

| | |
|---|---|
| *State Participation:* | **Requires Testing by a Federally Accredited Laboratory.** PA requires that its voting systems are approved by a federally recognized independent testing laboratory as meeting federal voting system standards. |
| *Applicable Statute(s):* | "Any person or corporation owning, manufacturing or selling, or being interested in the manufacture or sale of, any electronic voting system, may request the Secretary of the Commonwealth to examine such system if the voting system has been examined and approved by a federally recognized independent testing authority and if it meets any voting system performance and test standards established by the Federal Government." 25 PA. CONS. STAT. ANN. Code § 3031.5 (West 2008). |
| *Applicable Regulation(s):* | PA does not have a regulation regarding the federal certification process. |
| *State Certification Process:* | The Secretary of State examines voting systems, upon request, once the voting systems have received approval by a federally recognized independent testing authority.  The person(s) requesting the examination of the voting system are responsible for the cost of the examination.  After the examination, the Secretary of State issues a report stating whether or not the voting systems are safe and compliant with state and federal requirements.  If the voting systems are deemed safe and compliant by the Secretary of State then the systems may be adopted and approved for use in elections by each county through a majority vote of its qualified electors. 25 PA. CONS. STAT. ANN. Code §§ 3031.5, 3031.2 (West 2008). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.votespa.com/HowtoVote/tabid/74/language/en-US/Default.aspx |

State Participation in EAC Voting System Certification Program                    46

16.

| U.S. Election Assistance Commission | |
|---|---|

 **ARIZONA**

| *State Participation:* | **Requires Testing by a Federally Accredited Laboratory.** AZ requires that its voting systems are HAVA compliant and approved by a laboratory that is accredited pursuant to HAVA. |
|---|---|
| *Applicable Statute(s):* | "On completion of acquisition of machines or devices that comply with HAVA, machines or devices used at any election for federal, state or county offices may only be certified for use in this state and may only be used in this state if they comply with HAVA and if those machines or devices have been tested and approved by a laboratory that is accredited pursuant to HAVA." ARIZ. REV. STAT. § 16-442(B) (2008). |
| *Applicable Regulation(s):* | AZ does not have a regulation regarding the federal certification process. |
| *State Certification Process:* | The Secretary of State appoints a committee of three people that test different voting systems. This committee is required to submit their recommendations to the Secretary of State who then makes the final decision on which voting system(s) to adopt. ARIZ. REV. STAT. § 16-442(A) and (C) (2008). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.azsos.gov/election/equipment/default.htm |

17.

18. **Pro V& V** and **SLI Gaming** both lack evidence of EAC Accreditation as per the Voting System Testing and Certification Manual.

19. **Pro V& V** is owned and Operated by Jack Cobb. Real name is Ryan Jackson Cobb. The company ProV&V was founded and run by Jack Cobb who formerly worked under the entity of Wyle Laboratories which is an AEROSPACE DEFENSE CONTRACTING ENTITY. The address information on the EAC, NIST and other entities for Pro V & V are different than that of what is on ProV&V website. The EAC and NIST (ISO CERT) issuers all have another address.



20.  VSTLs are the most important component of the election machines as they examine the use of COTS (Commercial Off–The-Shelf)

21. "Wyle became involved with the testing of electronic voting systems in the early 1990's and has tested over 150 separate voting systems. Wyle was the first company to obtain accreditation by the National Association of State Election Directors (NASED). Wyle is accredited by the Election Assistance Commission (EAC) as a Voting System Testing Laboratory (VSTL). Our scope of accreditation as a VSTL encompasses all aspects of the hardware and software of a voting machine. Wyle also received NVLAP accreditation to ISO/IEC 17025:2005 from NIST." Testimony of Jack Cobb 2009

22. COTS are preferred by many because they have been tried and tested in the open market and are most economic and readily available. COTS are also the SOURCE of vulnerability therefore VSTLs are VERY important. COTS components by voting system machine manufacturers can be used as a "Black Box" and changes to their specs and hardware make up change continuously. Some changes can be simple upgrades to make them more efficient in operation, cost efficient for production, end of life (EOL) and even complete reworks to meet new standards. They key issue in this is that MOST of the COTS used by Election Machine Vendors like Dominion, ES&S, Hart Intercivic, Smartmatic and others is that such manufacturing for COTS have been outsourced to China which if implemented in our Election Machines make us vulnerable to BLACK BOX antics and backdoors due to hardware changes that can go undetected.  This is why VSTL's are VERY important.

23. The proprietary voting system software is done so and created with cost efficiency in mind and therefore relies on 3rd party software that is AVAILABLE and HOUSED on the HARDWARE. This is a vulnerability.  Exporting system reporting using software like Crystal Reports, or PDF software allows for vulnerabilities with their constant updates.

24. As per the COTS hardware components that are fixed, and origin may be cloaked under proprietary information a major vulnerability exists since once again third-party support software is dynamic and requires FREQUENT updates. The hardware components of the computer components, and election machines that are COTS may have slight updates that can be overlooked as they may be like those designed that support the other third -party software. COTS origin is important and the US Intelligence Community report in 2018 verifies that.

25. The Trump Administration made it clear that there is an absence of a major U.S. alternative to foreign suppliers of networking equipment. This highlights the growing dominance of

Chinese manufacturers like Huawei that are the world's LARGEST supplier of telecom and other equipment that endangers national security.

26. China, is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server that Dominion Software.

*ptt.gov* resolves to 4.30.228.74. According to our data this IP address belongs to *Level 3 Communications* and is located in *Alexandria, Virginia, United States*. Please have a look at the information provided below for further details.

| 🇺🇸 4.30.228.74 | |
|---|---|
| ISP/Organization | Level 3 Communications |
| Location | Alexandria 22304, Virginia (VA), 🇺🇸 United States (US) |
| Latitude | 38.8115 / 38°48'41" N |
| Longitude | -77.1285 / 77°7'42" W |
| Timezone | America/New_York |
| Local Time | Thu, 12 Jul 2018 19:27:40 -0400 |



27.

28. L3 Level Communications is federal contractor that is partially owned by foreign lobbyist George Soros.  An article that AP ran in 2010 – spoke out about the controversy of this that has been removed. (LINK) "As for the company's other political connections, it also appears that none other than George Soros, the billionaire funder of the country's liberal political infrastructure, owns 11,300 shares of OSI Systems Inc., the company that owns Rapiscan. Not surprisingly, OSI's stock has appreciated considerably over the course of the year. Soros certainly is a savvy investor." Washington Examiner re-write.



29.

Exhibit 3



30.

31. **L-3 Communication** Systems-East designs, develops, produces and integrates
    communication systems and support equipment for space, air, ground, and naval
    applications, including C4I systems and products; integrated Navy communication systems;
    integrated space communications and RF payloads; recording systems; secure
    communications, and information security systems. In addition, their site claims that
    MARCOM is an integrated communications system and The Marcom® is the foundation of
    the Navy's newest digital integrated voice / data switching system for affordable command
    and control equipment supporting communications and radio room automation.  The
    MarCom® uses the latest **COTS** digital technology and open systems standards to offer the
    command and control user a low cost, user friendly, solution to the complex voice, video
    and data communications needs of present and future joint / allied missions. Built in
    reliability, rugged construction, and fail-safe circuits ensure your call and messages will go
    through. Evidently a HUGE vulnerability.

32. Michigan's government site is thumped off Akamai Technologies servers which are housed on **TELIA AB** a foreign server located in Germany.

33. Scytl, who is contracted with AP that receives the results tallied BY Scytl on behalf of Dominion – During the elections the AP reporting site had a disclaimer.

AP – powered by SCYTL.



34. "Scytl was selected by the Federal Voting Assistance Program of the U.S. Department of Defense to provide a secure online ballot delivery and onscreen marking systems under a program to support overseas military and civilian voters for the 2010 election cycle and beyond.  Scytl was awarded 9 of the 20 States that agreed to participate in the program (New York, Washington, Missouri, Nebraska, Kansas, New Mexico, South Carolina, Mississippi and Indiana), making it the provider with the highest number of participating States." PDF

35. According to DOMINION : 1.4.1Software and Firmware The software and firmware employed by Dominion D-Suite 5.5-Aconsists of 2 types, custom and commercial off the shelf (COTS). COTS applications were verified to be pristine or were subjected to source code review for analysis of any modifications and verification of meeting the pertinent standards.

36. The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS.

37. The purpose of VSTL's being accredited and their importance in ensuring that there is no foreign interference/ bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" .

38. Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door.

39. The actual use of trapdoor commitments in Bayer-Groth proofs demonstrate the implications for the verifiability factor.  This means that no one can SEE what is going on during the process of the "shuffling" therefore even if you deploy an algorithms or manual scripts to fractionalize or distribute pooled votes to achieve the outcome you wish – you cannot prove they are doing it! See STUDY : "The use of trapdoor commitments in Bayer-Groth proofs and the implications for the verifiability of the Scytl-SwissPost Internet voting system"

40. **Key Terms**

41. **UNIVERSAL VERIFIABILITY**: Votes cast are the votes counted and integrity of the vote is verifiable (the vote was tallied for the candidate selected) . **SCYTL FAILS UNIVERSAL VERIFIABILITY** because no mathematical proofs can determine if any votes have been manipulated.

42. **INDIVIDUAL VERIFIABILITY**: Voter cannot verify if their ballot got correctly counted. Like, if they cast a vote for ABC they want to verify it was ABC. That notion clearly discounts the need for anonymity in the first place.

43. To understand what I observed during the 2020 I will walk you through the process of one ballot cast by a voter.

44. STEP 1 |Config Data |  All non e-voting data is sent to Scytl (offshore) for configuration of data. All e-voting is sent to CONFIGURATION OF DATA then back to the e-voting machine and then to the next phase called CLEANSING. **CONCERNS**: Here we see an "OR PROOF" as coined by mathematicians – an "or proof" is that votes that have been pre-tallied parked in the system and the algorithm then goes back to set the outcome it is set for and seeks to make adjustments if there is a partial pivot present causing it to fail demanding manual changes such as block allocation and narrowing of parameters or self-adjusts to ensure the predetermined outcome is achieved.

45.  STEP 2|CLEANSING | The Process is when all the votes come in from the software run by Dominion and get "cleansed" and put into 2 categories: invalid votes and valid votes.

46. STEP 3|Shuffling /Mixing | This step is the most nefarious and exactly where the issues arise and carry over into the decryption phase. Simply put, the software takes all the votes, literally mixes them a and then re-encrypts them.  This is where if ONE had the commitment key- TRAPDOOR KEY – one would be able to see the parameters of the algorithm deployed as the votes go into this mixing phase, and how algorithm redistributes the votes.

47. This published PAPER FROM University College London depicts how this shuffle works.  In essence, when this mixing/shuffling occurs, then one doesn't have the ability to know that vote coming out on the other end is actually their vote; therefore, ZERO integrity of the votes when mixed.

48.

# Background - ElGamal encryption

- Setup:          Group $\mathcal{G}$ of prime order q with generator g
- Public key:     $pk = y = g^x$
- Encryption:    $\mathcal{E}_{pk}(m; r) = (g^r, y^r m)$
- Decryption:    $\mathcal{D}_x(u, v) = vu^{-x}$
- Homomorphic:

$$\mathcal{E}_{pk}(m; r) \times \mathcal{E}_{pk}(M; R) = \mathcal{E}_{pk}(mM; r + R)$$

- Re-rencryption:

$$\mathcal{E}_{pk}(m; r) \times \mathcal{E}_{pk}(1; R) = \mathcal{E}_{pk}(m; r + R)$$



49. When this mixing/shuffling occurs, then one doesn't have the ability to know that vote coming out on the other end is actually their vote; therefore, ZERO integrity of the votes.

50. When the votes are sent to Scytl via Dominion Software EMS (Election Management System) the Trap Door is accessed by Scytl or TRAP DOOR keys (Commitment Parameters).



51.

52. The encrypted data is shifted into Scytl's platform in the form of ciphertexts – this means it is encrypted and a key based on commitments is needed to read the data. The ballot data can only be read if the person has a key that is set on commitments.

53. A false sense of security is provided to both parties that votes are not being "REPLACED" during the mixing phase. Basically, Scytl re-encrypts the ballot data that comes in from Dominion (or any other voting software company) as ciphertexts. Scytl is supposed to prove that votes A, B, C are indeed X, Y, Z under their new re-encryption when sending back the votes that are tallied coding them respectively. This is done by Scytl and the Election Software company that agrees to certain

"Generators" and therefore together build "commitments."

```
public CommitmentParams(final ZpSubgroup group, final int n) {
    group = group;
    h = GroupTools.getRandomElement(group);
    commitmentlength = n;
    g = GroupTools.getVectorRandomElement(group,
    this.commitmentlength);
    }

    // from getRandomElement(group)
Exponent randomExponent = ExponentTools.getRandomExponent(group.getQ());
return group.getGenerator().exponentiate(randomExponent);
```

54. Scytl and Dominion have an agreement – only the two would know the parameters. This means that access is able to occur through backdoors in hardware if the parameters of the commitments are known in order to alter the range of the algorithm deployed to satisfy the outcome sought in the case of algorithm failure.

55. Trapdoor is a cryptotech term that describes a state of a program that knows the commitment parameters and therefore is able change the value of the commitments however it likes. In other words, Scytl or anyone that knows the commitment parameters can take all the votes and give them to any one they want. If they have a total of 1000 votes an algorithm can distribute them among all races as it deems necessary to achieve the goals it wants. (Case Study: Estonia)



$$\text{Commitment}_{CRYPT} = CM_c$$

Saytl sets    commitment - simple math

$$CM_c(\vec{\alpha}; r) = H^r \prod_{i=1}^{n} = 1 \cdot G_i^{\alpha_i}$$

$$CM_c(\vec{\alpha}; r) = H^r + \sum_{i=1}^{n} (\alpha_i - z_i) e_i \prod_{i=1}^{n} H^{z_i e_i}$$

$$CM_c(\vec{\alpha}; r) = CM_c(\vec{z}; r')$$

$$r' = r + \sum_{i=1}^{n} e_i (a_i - z_i).$$

56.

57. Within the trapdoor this is how the algorithm behaves to move the goal posts in elections without being detected by this proof . During the mixing phase this is the algorithm you would use to

"reallocate" votes via an algorithm to achieve the goal set.



58. STEP 4|Decryption would be the decryption phase and temporary parking of vote tallies before reporting. In this final phase before public release the tallies are released from encrypted format into plain text. As previously explained, those that know the trapdoor can easily change any votes that the randomness is applied and used to generate the tally vote ciphertext. Thus in this case, Scytl who is the mixer can collude with their vote company clients or an agency (-------) to change votes and get away with it. This is because the receiver doesn't have the decryption key so they rely solely on Scytl to be **honest** or free from any foreign actors within their backdoor or the Election Company (like Dominion) that can have access to the key.

59. In fact, a study from the University of Bristol made claim that interference can be seen when there is a GREAT DELAY in reporting and finalizing numbers University of Bristol : How not to Prove Yourself: Pitfalls of the Fiat-Shamir Heuristic and Applications to Helios

60. "Zero-knowledge proofs of knowledge allow a prover to convince a verifier that she holds information satisfying some desirable properties without revealing anything else." David Bernhard, Olivier Pereira, and Bogdan Warinschi.

61. Hence, you can't prove anyone manipulated anything. The TRAP DOOR KEY HOLDERS can offer you enough to verify to you what you need to see without revealing anything and once again indicating the inability to detect manipulation. **ZERO PROOF of INTEGRITY OF THE VOTE.**

62. Therefore, if decryption is challenged, the administrator or software company that knows the trap door key can provide you proof that would be able to pass verification (blind). This was proven to be factually true in the case study by The University of Melbourne in March. White Hat Hackers purposely altered votes by knowing the parameters set in the commitments and there was no way to prove they did it – or any way to prove they didn't.

63. IT'S THE PERFECT THREE CARD MONTY. That's just how perfect it is. They fake a proof of ciphertexts with KNOWN "RANDOMNESS" .This rolls back to the integrity of the VOTE.  The vote is not safe using these machines not only because of the method used for ballot "cleansing" to maintain anonymity but the EXPOSURE to foreign interference and possible domestic bad actors.

64. In many circumstances, manipulation of the algorithm is NOT possible in an undetectable fashion. This is because it is one point heavy. Observing the elections in 2020 confirm the deployment of an algorithm due to the BEHAVIOR which is indicative of an algorithm in play that had no pivoting parameters applied.

65. The behavior of the algorithm is that one point (B)  is the greatest point within the allocated set. It is the greatest number within the A B points given. Point A would be the smallest. Any points outside the A B points are not necessarily factored in yet can still be applied.

66. The points outside the parameters can be utilized to a certain to degree such as in block allocation.

67. The algorithm geographically changed the parameters of the algorithm to force blue votes and ostracize red.

68. Post block allocation of votes the two points of the algorithm were narrowed ensuring a BIDEN win hence the observation of NO Trump Votes and some BIDEN votes for a period of time.



69.

70. Gaussian Elimination without pivoting explains how the algorithm would behave and the election results and data from Michigan confirm FAILURE of algorithm.



71. The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot. Normally it would be assumed that the algorithm had a Complete Pivot. Wilkinson's  demonstrated the guarantee as :

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

72.

73. Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX"

74. Observing the elections, after a review of Michigan's data a spike of 54,199 votes to Biden.  Because it is pushing and pulling and keeping a short distance between the 2 candidates; but then a spike, which is how an algorithm presents; - and this spike means there was a pause and an insert was made, where they insert an algorithm.  Block spikes in votes for JOE BIDEN were NOT paper

ballots being fed or THUMB DRIVES. The algorithm block adjusted itself and the PEOPLE were creating the evidence to BACK UP the block allocation.

75. I have witnessed the same behavior of the election software in countries outside of the United States and within the United States. In -------, the elections conducted behaved in the same manner by allocating BLOCK votes to the candidate "chosen" to win.

76. Observing the data of the contested states (and others) the algorithm deployed is identical to that which was deployed in 2012 providing Barack Hussein Obama a block allocation to win the 2012 Presidential Elections.

77. The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection.



78.

79. In Georgia during the 2016 Presidential Elections a failed attempt to deploy the scripts to block allocate votes from a centralized location where the "trap-door" key lay an attempt by someone using

the DHS servers was detected by the state of GA. The GA leadership assumed that it was "Russians" but later they found out that the IP address was that of DHS.

80. In the state of Wisconsin, we observed a considerable BLOCK vote allocation by the algorithm at the SAME TIME it happened across the nation. All systems shut down at around the same time.



81.

82. In Wisconsin there are also irregularities in respect to BALLOT requests. (names AND address Hidden for privacy)

| F | G | H | V | W | X | Y | AB | AC | AD | AG | AH | AI | AJ | AK | AL | AM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Active | Registered | Military | Brown County | 11/01/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/01/2020 | | | | |
| Active | Registered | Regular | Brown County | 10/23/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 10/23/2020 | 10/23/2020 | | | |
| Active | Registered | Military | Brown County | 11/01/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/01/2020 | | | | |
| Active | Registered | Regular | Brown County | 11/01/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/01/2020 | Email | Regular | | Official | Active | Returned | Mail | 10/31/2020 | 11/02/2020 | | | |
| Active | Registered | Regular | Brown County | 11/01/2020 | Email | Regular | | Official | Active | Returned | Mail | 10/31/2020 | 11/02/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/03/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/03/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/03/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/03/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Received in Person | Hospitaliz | | Official | Active | Returned | Appointed Agent | 11/02/2020 | 11/03/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Email | Hospitaliz | | Official | Active | Returned | Appointed Agent | 11/02/2020 | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Mail | Regular | | Official | Active | Returned | Appointed Agent | 11/02/2020 | 11/02/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Mail | Regular | | Official | Active | Returned | Appointed Agent | 11/02/2020 | | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/02/2020 | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Online | | | | | | | | | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | FPCA | Military | | Official | Active | Not Returned | Mail | 11/02/2020 | | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | FPCA | Military | | Official | Active | Returned | Email | 11/02/2020 | 11/03/2020 | | | |
| Active | Registered | Regular | Brown County | 11/03/2020 | Voted in Person | Regular | | Official | Inactive | Voter Spoiled | Voted In Person | 11/02/2020 | | | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Mail | Military | Certification insufficient | Federal Absent | Active | Returned, to be Rejected | Mail | 11/03/2020 | 11/03/2020 | | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Mail | Military | | Official | Active | Not Returned | Mail | 11/03/2020 | | | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | | |

83.

| | | | | | |
|---|---|---|---|---|---|
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/06/2020 | Online |
| Active | Registered | Regular | Brown County | 11/06/2020 | Online |

84.

85. I can personally attest that in 2013 discussions by the Obama / Biden administration were being had with various agencies in the deployment of such election software to be deployed in ----- in 2013.

86. On or about April 2013 a one year plan was set to fund and usher elections in -----.

87. Joe Biden was designated by Barack Hussein Obama to ensure the ----- accepted assistance.

88. John Owen Brennan and James (Jim) Clapper were responsible for the ushering of the intelligence surrounding the elections in -----.

89. Under the guise of Crisis support the US Federal Tax Payers funded the deployment of the election software and machines in ------ signing on with Scytl.



**The White House**
Office of the Press Secretary

For Immediate Release                                    April 21, 2014

SHARE THIS:

TWITTER

FACEBOOK

EMAIL

# FACT SHEET: U.S. Crisis Support Package for Ukraine

President Obama and Vice President Biden have made U.S. support for Ukraine an urgent priority as the Ukrainian government works to establish security and stability, pursue democratic elections and constitutional reform, revive its economy, and ensure government institutions are transparent and accountable to the Ukrainian people.  Ukraine embarks on this reform path in the face of severe challenges to its sovereignty and territorial integrity, which we are working to address together with Ukraine and our partners in the international community.  The United States is committed to ensuring that Ukrainians alone are able to determine their country's future without intimidation or coercion from outside forces.  To support Ukraine, we are today announcing a new package of assistance totaling **$50 million** to help Ukraine pursue political and economic reform and strengthen the partnership between the United States and Ukraine.

90.

91. Right before the ----- elections it was alleged that CyberBerkut a pro-Russia group infiltrated --- central election computers and **deleted key files**.  These actions supposedly rendered the vote-tallying system inoperable.

92. In fact, the KEY FILES were the Commitment keys to allow Scytl to tally the votes rather than the election machines. The group had disclosed emails and other documents proving that their election was rigged and that they tried to avoid a fixed election.

93. The elections were held on May 25, 2014 but in the early AM hours the election results were BLOCKED and the final tally was DELAYED flipping the election in favor of -----.

94. The claim was that there was a DDoS attack by Russians when in actual fact it was a mitigation of the algorithm to inject block votes as we observed was done for Joe Biden because the KEYS were unable to be deployed.  In the case of -----, the trap-door key was "altered"/deleted/ rendered ineffective. In the case of the US elections, representatives of Dominion/ ES&S/ Smartmatic/ Hart Intercivic would have to manually deploy them since if the entry points into the systems seemed to have failed.

95. The vote tallying of all states NATIONWIDE stalled and hung for days – as in the case of Alaska that has about 300K registered voters but was stuck at 56% reporting for almost a week.

96. This "hanging" indicates a failed deployment of the scripts to block allocate remotely from one location as observed in ------ on May 26, 2014.

97. This would justify the presence of the election machine software representatives making physical appearances in the states where the election results are currently being contested.

98. A Dominion Executive appeared at the polling center in Detroit after midnight.

99. Considering that the hardware of the machines has NOT been examined in Michigan since 2017 by Pro V& V according to Michigan's own reporting.  COTS are an avenue that hackers and bad actors seek to penetrate in order to control operations. Their software updates are the reason vulnerabilities to foreign interference in all operations exist.

100.    The importance of VSTLs in underrated to protect up from foreign interference by way of open access via COTS software. Pro V& V who's EAC certification EXPIRED on 24 FEB 2017 was contracted with the state of WISCONSIN.

101.    In the United States each state is tasked to conduct and IV& V (Independent Verification and Validation) to provide assurance of the integrity of the votes.

102.    If the "accredited" non-federal entities have NOT received EAC accreditation this is a failure of the states to uphold their own states standards that are federally regulated.

103.    In addition, if the entities had NIST certificates they are NOT sufficing according the HAVA ACT 2002 as the role of NIST is clear.

104.    Curiously, both companies PRO V&V and SLI GAMING received NIST certifications OUTSIDE the 24 month scope.

105.    PRO V& V received a NIST certification on 26MAR2020 for ONE YEAR. Normally the NIST
certification is good for two years to align with that of EAC certification that is good for two years.



106.

107.    The last PRO V& V EAC accreditation certificate (Item 8) of this declaration expired in
February 2017 which means that the IV & V conducted by Michigan claiming that they were
accredited is false.

108.    The significance of VSTLs being accredited and examining the HARDWARE is key. COTS
software updates are the avenues of entry.

109.    As per DOMINION'S own petition, the modems they use are COTS therefore failure to have an
accredited VSTL examine the hardware for points of entry by their software is key.

| *Compact Flash Cards | ***SanDisk Ultra: SDCFHS-004G SDCFHS-008G RiData: CFC-14A RDF8G-233XMCB2-1 RDF16G-233XMCB2-1 RDF32G-233XMCB2-1 SanDisk Extreme: SDCFX-016G SDCFX-032G SanDisk: SDFAA-008G | | Memory device for ICP and ICE tabulators. |
|---|---|---|---|
| *Modems | Verizon USB Modem Pantech UMW190NCD USB Modem MultiTech MT9234MU CellGo Cellular Modem E-Device 3GPUSUS AT&T USB Modem MultiTech GSM MTD-H5 Fax Modem US Robotics 56K V.92. | | Analog and wireless modems for transmitting unofficial election night results. |

110.

111.    For example and update of Verizon USB Modem Pantech undergoes multiple software updates a year for it's hardware. That is most likely the point of entry into the systems.

112.    During the 2014 elections in ---- it was the modems that gave access to the systems where the commitment keys were deleted.

113.    SLI Gaming is the other VSTL "accredited" by the EAC BUT there is no record of their accreditation. In fact, SLI was NIST ISO Certified 27 days before the election which means that PA IV&V was conducted without NIST cert for SLI being valid.



**United States Department of Commerce**
**National Institute of Standards and Technology**

NVLAP®

**Certificate of Accreditation to ISO/IEC 17025:2017**

NVLAP LAB CODE: 200733-0

**SLI Compliance**
Wheat Ridge, CO

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services, listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017. This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-10-07 through 2020-12-31
*Effective Dates*

*For the National Voluntary Laboratory Accreditation Program*

114.

115.    In fact SLI was NIST ISO Certified for less than 90 days.

116.    I can personally attest that high-level officials of the Obama/Biden administration and large private contracting firms met with a software company called GEMS which is ultimately the software ALL election machines run now running under the flag of DOMINION.

117.    GEMS was manifested from SOE software purchased by SCYTL developers and US Federally Funded persons to develop it.

118.    The only way GEMS can be deployed across ALL machines is IF all counties across the nation are housed under the same server networks.

119.    GEMS was tasked in 2009 to a contractor in Tampa, Fl.

120.    GEMS was also fine-tuned in Latvia, Belarus, Serbia and Spain to be localized for EU deployment as observed during the Swissport election debacle.

121.    John McCain's campaign assisted in FUNDING the development of GEMS web monitoring via WEB Services with 3EDC and Dynology.

Image# 13941014755

| SCHEDULE B–P ITEMIZED DISBURSEMENTS | Use separate schedule(s) for each category of the Detailed Summary Page | FOR LINE NUMBER: (check only one) | PAGE 7358 / 8595 |

FOR LINE NUMBER: (check only one)

| [X] 23 | [ ] 24 | [ ] 25 | [ ] 26 | [ ] 27a |
| [ ] 27b | [ ] 28a | [ ] 28b | [ ] 28c | [ ] 29 |

Any information copied from such Reports and Statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of any political committee to solicit contributions from such committee.

NAME OF COMMITTEE (In Full)
**JOHN McCAIN 2008, INC.**

**A.** Full Name (Last, First, Middle Initial)
**3EDC LLC**

Mailing Address 211 NORTH UNION ST STE 200

City ALEXANDRIA    State VA    Zip Code 22314

Purpose of Disbursement WEB SERVICE

Candidate Name

Office Sought: [ ] House [ ] Senate [ ] President    State: District:
Disbursement For: 2008 [X] Primary [ ] General [ ] Other (specify) ▼

Date of Disbursement
M M 03 / D D 17 / Y Y Y Y 2008

Transaction ID : SB23.10515

Category/Type

Amount of Each Disbursement this Period
399916.09

**B.** Full Name (Last, First, Middle Initial)
**A FARE EXTRAORDINAIRE**

Mailing Address 2035 MARSHALL

City HOUSTON    State TX    Zip Code 77098

Purpose of Disbursement FACILITY RENTAL/CATERING

Candidate Name

Office Sought: [ ] House [ ] Senate [ ] President    State: District:
Disbursement For: 2008 [X] Primary [ ] General [ ] Other (specify) ▼

Date of Disbursement
M M 03 / D D 17 / Y Y Y Y 2008

Transaction ID : SB23.10049

Category/Type

Amount of Each Disbursement this Period
23697.69

**C.** Full Name (Last, First, Middle Initial)
**ADMINISTAFF**

Mailing Address PO BOX 203332

City HOUSTON    State TX    Zip Code 77216

Purpose of Disbursement INSURANCE

Candidate Name

Office Sought: [ ] House [ ] Senate [ ] President    State: District:
Disbursement For: 2008 [X] Primary [ ] General [ ] Other (specify) ▼

Date of Disbursement
M M 03 / D D 05 / Y Y Y Y 2008

Transaction ID : SB23.10117

Category/Type

Amount of Each Disbursement this Period
483.68

Subtotal Of Receipts This Page (optional)..............................▶    424097.46

Total This Period (last page this line number only))...................▶

122.

123.

124.    AKAMAI Technologies services SCYTL.

125.    AKAMAI Technologies Houses ALL foreign government sites. (Please see White Paper by Akamai.)

126.    AKAMAI Technologies houses ALL .gov state sites. (ref Item 123 Wisconsin.gov Example)



127.

128.    Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY.

129.    Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net) Kicking it to anonymous (AKAMAI Technologies) offshore servers.



130.

131.    AKAMAI Technologies has locations around the world.

132.    AKAMAI Technologies has locations in China (ref item 22)

133.    AKAMAI Technologies has locations in Iran as of 2019.

134.    AKAMAI Technologies merged with UNICOM (CHINESE TELECOMM) in 2018.

135.    AKAMAI Technologies house all state .gov information in GERMANY via TELIA AB.

136.    In my professional opinion, this affidavit presents unambiguous evidence:

137.    That there was Foreign interference, complicit behavior by the previous administrations from 1999 up until today to hinder the voice of the people and US persons knowingly and willingly colluding with foreign powers to steer our 2020 elections that can be named in a classified setting.

138.     Foreign interference is present in the 2020 election in various means namely,

139.     Foreign nationals assisted in the creation of GEMS (Dominion Software Foundation)

140.    Akamai Technologies merged with a Chinese company that makes the COTS components of the election machines providing access to our electronic voting machines.

141.    Foreign investments and interests in the creation of the GEMS software.

142.    US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections.

143.    The EAC failed to abide by standards set in HAVA ACT 2002.

144.    The IG of the EAC failed to address complaints since their appointment regarding vote integrity

145.    Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002

146.    Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then.

147.    The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.

148.    AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations.

149.    For all the reasons above a complete failure of duty to provide safe and just elections are observed.

150.    For the people of the United States to have confidence in their elections our cybersecurity standards should not be in the hands of foreign nations.

151.    Those responsible within the Intelligence Community directly and indirectly by way of procurement of services should be held accountable for assisting in the development, implementation and promotion of GEMS.

152.    GEMS ------- General Hayden.

153.    In my opinion and from the data and events I have observed --------------------- with the assistance of SHADOWNET under the guise of L3-Communications which is MPRI. This is also confirmed by us.army.mil making the statement that shadownet has been deployed to 30 states which all

happen to be using Dominion Machines.



FAIRFAX, Va. -The Virginia National Guard's Bowling Green-based 91st Cyber
Brigade completed the nationwide rollout of its ShadowNet enterprise
solution July 19, 2019, with the integration of the 125th Cyber Protection
Battalion into the solution's virtual private network. ShadowNet is a custom-
built private cloud-based out of the brigade's data center in Fairfax, Virginia,
that uses VPN connectivity to provide its aligned units with 24-hour, seven-
days-a-week remote access to critical cyber training at both the collective
and individual levels. The brigade successfully integrated its three other
cyber protection battalions - the 123rd, 124th, and 126th Cyber Protection
Battalions - into the ShadowNet platform last January.

"I'm extremely proud to announce that the Soldiers of the 91st Cyber Brigade
have completed the construction and rollout of ShadowNet, a world-class
enterprise solution designed to propel operational innovation in the field of
cyber training," said Col. Adam C. Volant, commander of the 91st Cyber
Brigade. "ShadowNet will allow us to leverage the expertise of cyber
professionals across our four cyber protection battalions to build Soldier-
centric programs and collective training environments that deliver

OCTOBER 26, 2020
U.S. Army STAND-TO! | Army Readiness
Training

SEPTEMBER 12, 2019
September 2017 Nominative Sergeants
Major Assignments

SEPTEMBER 12, 2019
DA ANNOUNCES ROTATIONAL
DEPLOYMENTS

154.    Based on my research of voter data – it appears that there are approximately 23,000 residents of
a Department of Corrections Prison with requests for absentee ballot in Wisconsin. We are currently
reviewing and verifying the data and will supplement.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 23230 | 23230 | Gutierrez | Mary | Jane | | (202)994-9050 | |
| 23231 | 23231 | Hansen | Luann | M | | (262)994-9050 | |
| 23232 | 23232 | Neberman | John | C | | (262)994-9050 | |
| 23233 | 23233 | Reynolds | Devi | J | | (262)994-9050 | |
| 23234 | 23234 | Rieckhoff | Kathryn | Susan | | (262)994-9050 | |
| 23235 | 23235 | Edwards | Mark | Landon | | (262)994-9050 | |
| 23236 | 23236 | Pfeiffer | Joseph | Patrick | | (262)994-9050 | |
| 23237 | 23237 | Hines | Dianna | K | | (262)994-9050 | |
| 23238 | 23238 | Beachem | Janice | F | | (262)994-9050 | |
| 23239 | 23239 | Blackstone | Thomas | Wayne | | (262)994-9050 | |
| 23240 | 23240 | Braun | Patricia | Ann | | (262)994-9050 | |
| 23241 | 23241 | Smith | Raymond | L | | (262)994-9050 | |
| 23242 | 23242 | Meyer | Steven | R | | (262)994-9050 | |
| 23243 | 23243 | Vincent | Herbert | | | (262)994-9050 | |
| 23244 | 23244 | Guajardo | Juan | P | | (262)994-9050 | |
| 23245 | 23245 | Wallace | Kirk | R | | (262)994-9050 | |
| 23246 | 23246 | Kaplan | Bernard | L | | (262)994-9050 | |
| 23247 | 23247 | Bahrs | Michelle | M | | (262)994-9050 | |
| 23248 | 23248 | Shattuck | Elizabeth | L | | (262)994-9050 | |
| 23249 | 23249 | Munoz | Rosalio | S | JR | (262)994-9050 | |
| 23250 | 23250 | Strunk | Amy | C | | (262)994-9050 | |
| 23251 | 23251 | Schendel | Michael | P | JR | (262)994-9050 | |
| 23252 | 23252 | Mack | Kimberly | N | | (262)994-9050 | |
| 23253 | 23253 | Spikes | Debra | A | | (262)994-9050 | |
| 23254 | 23254 | Busarow | Suzanne | M | | (262)994-9050 | |
| 23255 | 23255 | Oliver | Timmy | | | (262)994-9050 | |
| 23256 | 23256 | Wember | Jimmy | Dean | | (262)994-9050 | |
| 23257 | 23257 | Kosterman | Michael | Richard | | (262)994-9050 | |
| 23258 | 23258 | Szaradowski | Paul | M | | (262)994-9050 | |
| 23259 | 23259 | Oliver | Dale | | | (262)994-9050 | |
| 23260 | 23260 | Derango | Nancy | | | (262)994-9050 | |
| 23261 | 23261 | Smith | Arthur | J | | (262)994-9050 | SMITH24.3059@YAHOO |
| 23262 | 23262 | Brown | Michael | Edward | | (262)994-9050 | |

155.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this November 29th, 2020.



# Voting System Test Laboratory Program Manual

## Version 2.0

### Effective May 31, 2015



**United States Election Assistance Commission**

**1335 East West Highway, Suite 4300, Silver Spring, MD 20910**

*www.eac.gov*
OMB Control # 3265-0018

Exhibit B

*The reporting requirements in this manual have been approved under the Paperwork Reduction Act of 1995, Office of Management and Budget Control (OMB) Number 3265-0018, expiring June 30, 2018. Persons are not required to respond to this collection of information unless it displays a currently valid OMB number.  Information gathered pursuant to this document and its forms will be used solely to administer the EAC Testing & Certification and Laboratory Accreditation Program.  This program is voluntary.  Individuals who wish to participate in the program, however, must meet its requirements. The estimated total annual hourly burden on the voting system manufacturing industry and election officials is 322 hours.  This estimate includes the time required for reviewing the instructions, gathering information, and completing the prescribed forms.  Send comments regarding this burden estimate or any other aspect of this collection, including suggestions for reducing this burden to the U.S. Election Assistance Commission, Voting System Testing and Certification Program, Office of the Program Director, 1335 East West Highway, Suite 4300, Silver Spring, MD, 20910.*

# Contents

INTRODUCTION ..................................................................................................................................5

1.1.    BACKGROUND .....................................................................................................................5
1.2.    AUTHORITY. ........................................................................................................................5
1.3.    ROLE OF THE NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY. .........................5
1.4.    SCOPE. ................................................................................................................................5
1.5.    MANUAL MAINTENANCE AND REVISION. ...........................................................................6
1.6.    CLARIFICATION OF PROGRAM REQUIREMENTS AND PROCEDURES. .....................................6
1.7.    PROGRAM PERSONNEL .......................................................................................................6
1.8.    SUBMISSION OF DOCUMENTS .............................................................................................6
1.9.    RECEIPT OF DOCUMENTS—VSTL. .....................................................................................7
1.10.   RECEIPT OF DOCUMENTS—EAC. ......................................................................................7
1.11.   RECORD RETENTION—EAC. ..............................................................................................7
1.12.   PUBLICATION AND RELEASE OF DOCUMENTS .....................................................................7
1.13.   REFERENCES .......................................................................................................................7
1.14.   DEFINITIONS. ......................................................................................................................8
1.15.   ACRONYMS AND ABBREVIATIONS. ....................................................................................9

PROGRAM REQUIREMENTS ...........................................................................................................11

2.1.    OVERVIEW ........................................................................................................................11
2.2.    PROGRAM REQUIREMENTS - GENERALLY .........................................................................11
2.3.    NIST RECOMMENDATION ................................................................................................11
2.4.    NVLAP ACCREDITATION .................................................................................................11
2.5.    CONFLICT OF INTEREST AND PROHIBITED PRACTICES PROGRAM. .....................................12
2.6.    PERSONNEL POLICIES. .......................................................................................................19
2.7.    NOTIFICATION OF CHANGES .............................................................................................19
2.8.    SITE VISITS .......................................................................................................................20
2.9.    NOTICE OF LAWSUITS .......................................................................................................20
2.10.   TESTING, TECHNICAL PRACTICES AND REPORTING ..........................................................20
2.11.   TEST READINESS REVIEW ..................................................................................................20
2.12.   TECHNOLOGY TESTING AGREEMENT. ...............................................................................21
2.13.   TEST PLAN PACKAGE. .......................................................................................................21
2.14.   TESTING. ...........................................................................................................................22
2.15.   TEST REPORT PACKAGE. ...................................................................................................25
2.16.   ACCEPTANCE OF PRIOR TESTING ......................................................................................26
2.17.   TERMINATION OF TESTING PRIOR TO COMPLETION ..........................................................27
2.18.   VSTL VERIFICATION OF TRUSTED BUILD. .......................................................................27
2.19.   LABORATORY INDEPENDENCE ..........................................................................................27
2.20.   AUTHORITY TO DO BUSINESS IN THE UNITED STATES .......................................................31
2.21.   COMMUNICATIONS. ..........................................................................................................31
2.22.   RESOURCES AND FINANCIAL STABILITY ...........................................................................31
2.23.   RECORDKEEPING. ..............................................................................................................31

ACCREDITATION PROCESS ............................................................................................................32

Voting System Test Laboratory Program Manual, Version 2.0

3.1.    OVERVIEW...........................................................................................................32
3.2.    NIST RECOMMENDATION....................................................................................32
3.3.    EAC INVITATION................................................................................................33
3.4.    APPLICATION.....................................................................................................33
3.5.    EAC REVIEW OF APPLICATION PACKAGE...........................................................35
3.6.    GRANT OF ACCREDITATION................................................................................37
3.7.    EFFECT OF ACCREDITATION...............................................................................38
3.8.    EXPIRATION AND RENEWAL OF ACCREDITATION.................................................39
3.9.    DENIAL OF ACCREDITATION...............................................................................39
3.10.   REQUESTING APPEAL.........................................................................................39
3.11.   EAC ACTION ON A REQUEST FOR APPEAL..........................................................40
3.12.   SUBMISSION OF APPEAL.....................................................................................40
3.13.   CONSIDERATION OF APPEAL...............................................................................40
3.14.   COMMISSIONER'S DECISION ON APPEAL.............................................................40
3.15.   EFFECT OF DENIAL OF ACCREDITATION..............................................................41

COMPLIANCE MANAGEMENT PROGRAM ..................................................................42

4.1.    PURPOSE............................................................................................................42
4.2.    COMPLIANCE MANAGEMENT PROGRAM, GENERALLY..........................................42
4.3.    VSTL NOTIFICATION OF CHANGES ....................................................................42
4.4.    REQUEST FOR DOCUMENTS AND INFORMATION ..................................................42
4.5.    PROFICIENCY TESTING.......................................................................................43
4.6.    ON SITE LABORATORY REVIEW—GENERALLY.....................................................43
4.7.    ON SITE LABORATORY REVIEW—FREQUENCY.....................................................44
4.8.    ON SITE LABORATORY REVIEW—PROCEDURE.....................................................44
4.9.    EAC COMPLIANCE MANAGEMENT REPORTS.......................................................46
4.10.   CORRECTIVE ACTION.........................................................................................47

REVOCATION OF ACCREDITATION ..............................................................................49

5.1.    OVERVIEW.........................................................................................................49
5.2.    REVOCATION POLICY..........................................................................................49
5.3.    REVOCATION—GENERALLY.................................................................................49
5.4.    NOTICE OF INTENT TO SUSPEND.........................................................................49
5.5.    SUSPENSION OF ACCREDITATION........................................................................51
5.6.    COMMISSIONERS' DECISION ON REVOCATION OF ACCREDITATION........................53
5.7.    EFFECT OF REVOCATION OF ACCREDITATION.......................................................54
5.8.    REQUESTING APPEAL.........................................................................................55
5.9.    EAC ACTION ON A REQUEST FOR APPEAL..........................................................55
5.10.   SUBMISSION OF APPEAL.....................................................................................55
5.11.   CONSIDERATION OF APPEAL...............................................................................55
5.12.   COMMISSIONER'S DECISION ON APPEAL.............................................................56

REQUESTS FOR INTERPRETATIONS ..............................................................................57

6.1.    OVERVIEW.........................................................................................................57
6.2.    POLICY..............................................................................................................57
6.3.    REQUIREMENTS FOR SUBMITTING A REQUEST FOR INTERPRETATION.....................57
6.4.    PROCEDURE FOR SUBMITTING A REQUEST FOR INTERPRETATION ..........................58
6.5.    EAC ACTION ON A REQUEST FOR INTERPRETATION.............................................59

    OMB Control Number: 3265-0018

**Voting System Test Laboratory Program Manual, Version 2.0**

6.6.    EFFECT OF INTERPRETATION ................................................................................ 60
6.7.    LIBRARY OF INTERPRETATIONS ........................................................................... 61

**RELEASE OF LABORATORY ACCREDITATION PROGRAM INFORMATION** ................... **62**

7.1.    OVERVIEW ........................................................................................................ 62
7.2.    EAC POLICY ON THE RELEASE OF CERTIFICATION PROGRAM INFORMATION ........ 62
7.3.    TRADE SECRETS ................................................................................................ 63
7.4.    PRIVILEGED OR CONFIDENTIAL COMMERCIAL INFORMATION ............................. 64
7.5.    EAC'S RESPONSIBILITIES .................................................................................. 64
7.6.    VSTL'S RESPONSIBILITIES ................................................................................ 65
7.7.    PERSONAL INFORMATION .................................................................................. 66

**APPENDIX A** ........................................................................................................... **67**

**APPENDIX B** ........................................................................................................... **70**

**APPENDIX C** ........................................................................................................... **73**

**APPENDIX D** ........................................................................................................... **75**

**APPENDIX E** ........................................................................................................... **77**

**APPENDIX F** ........................................................................................................... **80**

OMB Control Number: 3265-0018

# Introduction

1.1.  **Background**.  In late 2002, Congress passed the Help America Vote Act of 2002 (HAVA). HAVA created the U.S. Election Assistance Commission (EAC) and assigned to the EAC the responsibility for both setting voting system standards and providing for the voluntary testing and certification of voting systems.  This mandate represented the first time the Federal government provided for the voluntary testing, certification, and decertification of voting systems nationwide.  In response to this HAVA requirement, the EAC has developed the voting system standards in the form of the Voluntary Voting System Guidelines (VVSG), a voting system certification program in the form of the Voting System Testing and Certification Program Manual and this document, the Voting System Test Laboratory Manual.

1.2.  **Authority.** HAVA Section 231(b) (42 U.S.C. §15371(b)) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards.  Generally, the EAC considers for accreditation those laboratories evaluated and recommend by the National Institute of Standards and Technology (NIST) pursuant to HAVA Section 231(b)(1). However, consistent with HAVA Section 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.

1.3.  **Role of the National Institute of Standards and Technology.**  Section 231(b) (1) of HAVA requires that the National Institute of Standards and Technology "conduct an evaluation of independent, non-federal laboratories and shall submit to the Commission a list of those laboratories…to be accredited…."  Additionally, HAVA Section 231(c) requires NIST to monitor and review the performance of EAC accredited laboratories.  NIST has chosen its National Voluntary Laboratory Accreditation Program (NVLAP) to carry out these duties.  NVLAP conducts a review of applicant laboratories in order to provide a measure of confidence that such laboratories are capable of performing testing of voting systems to Federal standards.  Additionally, the NVLAP program monitors laboratories by requiring regular assessments.  Laboratories are reviewed one year after their initial accreditation and biennially thereafter.  The EAC has made NVLAP accreditation a requirement of its Laboratory Accreditation Program.  However, a NVLAP accreditation is not an EAC accreditation.  EAC is the sole Federal authority for the accreditation and revocation of accreditation of Voting System Test Laboratories (VSTL).

1.4.  **Scope.**  This Manual provides the procedural requirements of the EAC voting system Laboratory Accreditation Program.  Although participation in the program is voluntary, adherence to the program's procedural requirements is mandatory for participants.  The procedural requirements of this Manual supersede any prior laboratory accreditation requirements issued by the EAC.  This manual shall be read in conjunction with the EAC Voting System Testing and Certification Manual.

    OMB Control Number:  3265-0018

1.5. **Manual Maintenance and Revision.**  The Manual will be reviewed periodically and updated to meet the needs of the EAC, VSTLs, election officials, and public policy.  The EAC is responsible for revising this document.  All revisions will be made consistent with Federal law.  Substantive input from stakeholders and the public will be sought whenever possible.  Changes in policy requiring immediate implementation will be noticed via policy memoranda and will be issued to each VSTL and registered Manufacturers.  Changes, addendums, or updated versions will also be posted to the EAC Web site at www.eac.gov.

1.6. **Clarification of Program Requirements and Procedures.**  VSTLs and registered Manufacturers may request clarification regarding the requirements and procedures set forth in this manual.  Requests for clarification must be based upon ambiguity arising from the application of this manual.  Hypothetical questions will not be considered.  Requests shall be submitted to the Program Director in writing.  The request shall clearly identify the section of the manual and issue to be clarified, a proposed interpretation and all relevant facts.  Clarifications issued by the EAC will be provided to all EAC VSTLs, registered Manufacturers and placed on EAC's Web site.

1.7. **Program Personnel**.  All EAC personnel and contractors associated with this program will be held to the highest ethical standards.  All agents of the EAC involved in the Accreditation Program will be subject to conflict-of-interest reporting and review, consistent with Federal law and regulation.

1.8. **Submission of Documents**.  Any documents submitted pursuant to the requirements of this Manual shall be submitted:

   1.8.1.  If sent electronically, via secure e-mail or physical delivery of a compact disk, unless otherwise specified.  The submitted electronic files shall be in Microsoft Word or Adobe PDF format, formatted to protect the document from alteration.

   1.8.2.  With a proper signature when required by this Manual. Documents that require an authorized signature may be signed with an electronic representation or image of the signature of an authorized management representative.

   1.8.3.  If sent via physical delivery, by Certified Mail™ (or similar means that allows tracking) to the following address:

   Testing and Certification Program Director
   U.S. Election Assistance Commission
   1335 East West Highway
   Suite 4300
   Silver Spring, MD 20910

OMB Control Number:  3265-0018

**1.9.**   **Receipt of Documents—VSTL.**  For purposes of this Manual, a document, notice, or other communication is considered received by a VSTL upon one of the following:

   1.9.1.   The actual, documented date the correspondence was received (either electronically or physically) at the VSTL, or

   1.9.2.   If no documentation of the actual delivery date exists, the date of constructive receipt of the communication.  For electronic correspondence, documents will be constructively received the day after the date sent.  For mail correspondence, the document will be constructively received 3 days after the date sent.

   1.9.3.   The term "receipt" shall mean the date a document or correspondence arrives (either electronically or physically) at the VSTL's place of business.  Arrival does not require that an agent of the VSTL open, read, or review the correspondence.

**1.10.**   **Receipt of Documents—EAC.**  For purposes of this Manual, a document, notice, or other communication is considered received by the EAC upon its physical or electronic arrival at the agency.  All documents received by the agency will be physically or electronically date stamped.  This stamp shall serve as the date of receipt.  Documents received after the regular business day (5:00 PM Eastern Standard Time), will be treated as if received on the next business day.

**1.11.**   **Record Retention—EAC**.  The EAC shall retain all records associated with accreditation of Voting System Test Laboratories.  The records shall otherwise be retained or disposed of consistent with Federal statutes and regulations.

**1.12.**   **Publication and Release of Documents**.  The EAC will release documents consistent with the requirements of Federal law.  It is EAC policy to make the laboratory accreditation process as open and public as possible.  Any documents (or portions thereof) submitted under this program will be made available to the public unless specifically protected from release by law.  The primary means for making this information available is through the EAC Web site.  See Chapter 7 of this Manual for additional information.

**1.13.**   **References**.  The following documents are referenced in this Manual.  For dated references, only the edition cited applies.  For undated references, the latest edition of the referenced document (including any amendments) applies.

   -  ISO/IEC 17011, *Conformity assessment- General requirements for accreditation bodies accrediting conformity assessment bodies.*

   -  ISO/IEC 17025, *General requirements for the competence of testing and calibration laboratories.*

7

    - NIST Handbook 150, (*NVLAP) Procedures and General Requirements.*

    - NIST Handbook 150-22, (*NVLAP) Voting System Testing.*

**1.14. Definitions**.  For purposes of this Manual, the terms listed below have the following definitions.

    <u>Applicant Laboratory</u>.  An independent, non-Federal laboratory which has applied for EAC accreditation after receipt of an invitation.

    <u>Commission</u>.  The U.S. Election Assistance Commission, as an agency.

    <u>Commissioners</u>.  The serving commissioners of the U.S. Election Assistance Commission.

    <u>Contracted Third Party Laboratory</u>.  A laboratory contracted or otherwise providing testing services to a VSTL to meet program requirements.

    <u>Days</u>.  Calendar days, unless otherwise noted.  When counting days, for the purpose of submitting or receiving a document, the count shall begin on the first full calendar day after the date the document was received.

    <u>Election Official</u>.  A State or local government employee who has as one of his or her primary duties the management or administration of a Federal election.

    <u>Federal Election</u>.  Any primary, general, runoff, or special Election in which a candidate for Federal office (President, Senator, or Representative) appears on the ballot.

    <u>Fielded Voting System</u>.  A voting system purchased or leased by a State or local government that is being use in a Federal election.

    <u>Gift</u>.  A Gift includes any gratuity, favor, discount, entertainment, travel, service, hospitality, loan, meal, forbearance, or other item having monetary value.

    <u>Integration Testing</u>.  The end-to-end testing of a full system configured for use in an election to assure that all legitimate configurations meet applicable standards.

    <u>Key Laboratory Staff.</u>  Laboratory employees serving as approval authorities of test reports (approved signatories per NIST Handbook 150) or otherwise responsible for the supervision of individuals performing voting system testing.

OMB Control Number:  3265-0018

Lead Voting System Test Laboratory.  The accredited Voting System Test Laboratory identified on an EAC approved Application for Testing (*EAC Voting System Testing and Certification Program Manual*, Sec. 4.3, Certification Application).

Manufacturer.  The entity with ownership and control over a voting system submitted for certification.

Memorandum for the Record.  A written statement drafted to document an event or finding, without a specific addressee other than the pertinent file.

Proprietary Information.  Commercial information or trade secrets protected from release under the Freedom of Information Act (FOIA) and the Trade Secrets Act.

Recommended Laboratory.  A laboratory recommended for EAC accreditation by the Director of NIST after evaluation by NVLAP.

Scope of Accreditation.  The version or versions of the Federal voting system standards (VVSG) to which a VSTL is authorized to test.

Technical Reviewers.  Technical experts in the areas of voting system technology and conformity assessment appointed by the EAC to provide expert guidance.

Testing and Certification Decision Authority.  The EAC Executive Director or Acting Executive Director.

Testing and Certification Program Director.  The individual appointed by the EAC Executive Director to administer and manage the Testing and Certification Program.

Voting System.  The total combination of mechanical, electromechanical, and electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots, cast and count votes, report or display election results, interface the voting system to the voter registration system, and maintain and produce any audit trail information.

Voting System Test Laboratories (VSTLs).  Laboratories accredited by the EAC to test voting systems to EAC approved voting system standards.

Voluntary Voting System Guidelines.  Voluntary voting system standards developed, adopted, and published by the EAC. The guidelines are identified by version number and date.

**1.15.  Acronyms and Abbreviations**.  For purposes of this Manual, the acronyms and abbreviations listed below represent the following terms.

OMB Control Number:  3265-0018

<u>Accreditation Program</u>.  The EAC Voting System Test Laboratory Accreditation Program

<u>Certification Program</u>.  The EAC Voting System Testing and Certification Program

<u>EAC</u>.  United States Election Assistance Commission

<u>FEC</u>.  Federal Election Commission

<u>HAVA</u>.  Help America Vote Act of 2002 (42 U.S.C. §15301 et seq.)

<u>ISO/IEC.</u>  The International Organization for Standardization & The International Electrotechnical Commission.

<u>NASED</u>.  National Association of State Election Directors

<u>NIST</u>.  National Institute of Standards and Technology

<u>NVLAP</u>.  National Voluntary Laboratory Accreditation Program

<u>Program Director</u>.  Director of the EAC Testing and Certification Program

<u>VSTL</u>.  Voting System Test Laboratory

<u>VVSG</u>.  Voluntary Voting System Guidelines

OMB Control Number:  3265-0018

# Program Requirements

**2.1.**  **Overview**.  This chapter lists the requirements of the EAC's Voting System Test Laboratory Program.  Adherence to these requirements is a condition of accreditation and a continuing obligation.  Failure to demonstrate compliance with the requirements of this chapter may result in the denial of an application for accreditation, suspension of accreditation, or revocation of accreditation.

**2.2.**  **Program Requirements - Generally**.  In order to be considered for, receive, and maintain an EAC accreditation as a VSTL, laboratories must demonstrate compliance with the requirements of EAC's Voting System Test Laboratory Program.  The program requirements are set forth in this Chapter.

>    2.2.1.  <u>Continuing Compliance Obligation</u>.  VSTLs have a continuing obligation to meet the requirements set forth in this Chapter.  VSTLs are required to maintain their compliance with the program's requirements as long as they hold an EAC accreditation.

>    2.2.2.  <u>Requests to Document Compliance</u>.  VSTLs may be required by the EAC to document compliance at any time.  Such requests will be in writing and VSTLs shall respond timely, consistent with the request (see Chapter 4 of this Manual).

>    2.2.3.  <u>Failure to Comply, Effect</u>.  Failure to meet each of the program's requirements may result in the denial of an application for accreditation, suspension of accreditation, or revocation of accreditation, consistent with the procedures of Chapter 5 of this Manual.

**2.3.**  **NIST Recommendation**.  As a condition of accreditation, all laboratories must be recommended to the EAC by the National Institute of Standards and Technology (NIST), unless the emergency provisions of Chapter 3 apply.  NIST is responsible, pursuant to the Help America Vote Act of 2002, Section 231(b), for performing a technical evaluation of laboratories and identifying and recommending those competent to test voting systems.  This recommendation is provided directly to the EAC from NIST.

**2.4.**  **NVLAP Accreditation**.  As a condition of accreditation, all VSTLs must hold a valid accreditation from NIST's National Voluntary Laboratory Accreditation Program (NVLAP), unless the emergency provisions of Chapter 3 apply.  NVLAP accreditation is the primary means by which the EAC may ensure that each VSTL meets and continues to meet the technical requirements of the EAC program.  It sets the standards for each VSTL's technical, physical and personnel resources, as well as its testing, management, and quality assurance policies and protocols.  The loss or suspension of a NVLAP accreditation will result in the suspension and possible revocation of any EAC accreditation consistent with the procedures of Chapter 5 of this Manual.  VSTLs are

    OMB Control Number:  3265-0018

required to immediately report any change in their NVLAP accreditation status to the EAC. Whenever possible, the EAC will conduct the required accreditation audit and any follow up on site visits at the same time as NVLAP accreditation audit or follow up on site visits.

**2.5. Conflict of Interest and Prohibited Practices Program**. As a condition of accreditation, all laboratories must maintain and enforce policies which prohibit and prevent conflicts of interest or the appearance of conflicts of interest. A laboratory shall ensure that neither the Laboratory, its parent corporation, contracted third party laboratories, nor any individual staff member involved in the testing of voting systems have any vested interest in the outcome of the test process. Laboratories must have a written policy in place. This policy must, at a minimum, (1) prohibit conflicts of interest and other prohibited practices and (2) provide for enforcement, consistent with the subsections below.

    2.5.1. <u>Prohibited Conflicts of Interest.</u> The purpose of a conflict of interest policy is to prevent situations where the exercise of an official duty directly impacts the actor's financial interests. **For the purposes of this program, a prohibited conflict of interest exists if the duties and responsibilities of a laboratory, parent corporation, or a laboratory employee involved in the testing of voting systems under EAC's Certification Program will have a direct and predictable effect on the financial interest of that laboratory, parent corporation, or a laboratory employee.**[1] *For example, an employee who is responsible for testing a voting system on behalf of a VSTL would be prohibited from holding a financial interest in the entity whose product is being tested or a direct competitor of that entity. A prohibited conflict of interest would also include a contractual or other fiduciary relationship between a VSTL or VSTL employee and a Manufacturer (outside an agreement for State or Federal certification testing) when that VSTL or VSTL employee is concurrently responsible for conducting certification testing for that Manufacturer under this program.* **Additionally, financial interests may be imputed or attributed to a laboratory, Parent Corporation, or a laboratory employee through a relationship with a third party**. *For example, a VSTL employee responsible for the testing of a voting system would be conflicted from performing his or her duties if his or her spouse owned a financial interest in the manufacture of the voting system.*

        2.5.1.1. *Involved in Testing—Defined*. For the purposes of a financial conflict of interest, an organization is involved in the testing of a voting system any time it contractually or otherwise takes on the responsibility for testing a voting system to Federal standards under EAC's Certification Program. For the purposes of a financial conflict of interest, an

---

[1] For the purpose of this Program, agreements with voting system manufactures to provide testing pursuant to the requirements of EAC or a State's certification program do not constitute a prohibited conflict of interest. Certification testing is considered a duty and responsibility of a VSTL, not an outside financial interest.

OMB Control Number: 3265-0018

employee is involved in the testing of a voting system when the individual's duties as a VSTL employee require him or her to perform testing on the system, manage the testing process or supervise those who perform testing on the system.

2.5.1.2. *Financial Interest--Defined*. The term includes any current or contingent ownership, equity, or security interest in real or personal property or a business and may include indebtedness or compensated employment relationship. It thus includes, for example, interests in the nature of stocks, bonds, partnership interests, fee and leasehold interests, and other property rights, deeds of trust, and liens, and extends to any right to purchase or acquire any such interest, such as a stock option or commodity future.

2.5.1.3. *Direct Effect—Defined*. A matter will have a direct effect on a financial interest if there is a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest. An effect may be direct even though it does not occur immediately. A matter will not have a direct effect on a financial interest, however, if the chain of causation is attenuated or is contingent upon the occurrence of events that are speculative or that are independent of, and unrelated to, the matter. A matter that has an effect on a financial interest only as a consequence of its effects on the general economy does not have a direct effect within the meaning of this section.

2.5.1.4. *Predictable Effect—Defined*. A matter will have a predictable effect if there is a real, as opposed to a speculative possibility that the matter will affect the financial interest. It is not necessary, however, that the magnitude of the gain or loss be known, and the dollar amount of the gain or loss is immaterial.

2.5.1.5. *Imputed Interests—Defined*. An imputed interest is a financial interest held by a third party individual or organization that serves to disqualify an employee or laboratory to the same extent as if they were the employee's or laboratory's own interest. These interests include:

2.5.1.5.1.   The financial interests of a spouse or dependent child shall be imputed to an employee.

2.5.1.5.2.   The financial interest of any organization in which a laboratory, Parent Corporation, or a laboratory employee serves as an employee, officer, board member, partner,

OMB Control Number: 3265-0018

consultant, director, trustee or similar position shall be imputed.

2.5.1.5.3.   The interests of any contracted third party laboratory shall be imputed to the utilizing VSTL.

2.5.1.5.4.   The financial interest of a person or organization with whom an employee is negotiating or has an arrangement concerning prospective employment shall be imputed.

2.5.2.   <u>Prohibited Practices</u>.  Furthermore, irrespective of the existence of a conflict of interest, it is a prohibited practice for a laboratory, parent corporation, or laboratory employee to be involved in the development of a voting system or solicit or receive a gift from a voting system Manufacturer.  No laboratory, parent corporation, or laboratory employee may:

2.5.2.1.   *Voting System Development and Testing*.  Provide, or have provided, consultation, developmental testing or other services to a voting system developer such that the independence, or appearance of independence, in the testing of a particular voting system or system component would be compromised.

2.5.2.1.1.   A laboratory or individual may not be involved in both the development of a voting system and the certification of a system.  Voting system development includes any testing, consultation or design work performed in order to ready a specific system for the marketplace or the certification process.  Generally, any testing performed on behalf of a voting system manufacture that was not otherwise performed pursuant to a State or Federal voting system certification program will be considered developmental in nature.

2.5.2.1.2.   The prohibition barring participation in both development and testing is voting system specific.  An employee or laboratory that was previously involved[2] in product development with a Manufacturer is not prohibited from testing all systems produced by that Manufacturer, just those systems in which the employee or laboratory participated directly in development.  As voting systems are

---

[2] The prohibition relates to a VSTL's prior involvement in system development.  Concurrent development work and testing may constitute a prohibited conflict of interested under Section 2.5.2 of this Manual.

                    OMB Control Number:  3265-0018

subject to change over time, for the purposes of this prohibition, a voting system shall be considered altered to the degree that it is a different system when:

2.5.2.1.2.1.   A period of at least three years has passed since the VSTL or employee was involved in the system's development;

2.5.2.1.2.2.   The system has been subject to both software and hardware modification since the VSTL or employee was involved in the system's development.  De minimis changes (as defined in EAC Voting System Testing and Certification Program Manual) are not modifications; AND

2.5.2.1.2.3.   The system has received a certification after being tested by a different independent laboratory since the VSTL or employee was involved in the system's development.

2.5.2.1.3.   The prohibition barring participation in both development and testing does not prohibit a VSTL from allowing a Manufacturer to perform onsite hardware mitigation on a voting system in response to a minor system failure or anomaly.  In such cases the VSTL:

2.5.2.1.3.1.   Shall suspend all hardware testing;

2.5.2.1.3.2.   Shall not participate or assist the Manufacturer in remediation;

2.5.2.1.3.3.   May provide testing equipment and qualified operators to the Manufacturer for its use;

2.5.2.1.3.4.   Shall monitor and document the Manufacturer's access to the system consistent with Section 2.19 of this manual; and

2.5.2.1.3.5.   Shall document in the test report the failure or anomaly and remedial action taken by the Manufacturer consistent with Section

2.10.5.2.1 of this Manual and Chapter 4 of EAC's *Certification Manual* (anomaly matrix).

2.5.2.2.   *Gifts.*  Solicit or receive a gift, directly or indirectly, from any entity which holds a financial interest in the development, production, or sale of voting systems, or is otherwise impacted by the testing and certification of voting systems.  Gifts given or received under circumstances which make it clear that the gift is motivated by a family relationship or personal friendship rather than position are not prohibited.  Relevant factors in making such a determination include the history of the relationship and whether the family member or friend personally pays for the gift.

2.5.3.   Program Enforcement Elements.  Prohibited conflicts and practices shall be enforced through a written program which:

2.5.3.1.   *Regarding Employees Involved in the Testing of Voting Systems.*

2.5.3.1.1.   Annually collects standard information from each employee, including assets, debts, outside or prior activities/employment, gifts, and any work on voting system development sufficient to demonstrate compliance with Section 2.5.1. and 2.5.2. of this Manual.  The information collection must also reflect the financial interests of those individuals (like spouses and minor children) whose interests are imputed to the employee;

2.5.3.1.2.   Requires and documents the review of information collected for potential conflicts and prohibited practices; and

2.5.3.1.3.   Resolves all identified conflicts of interest or prohibited practices prior to the employee or laboratory's involvement in the testing of any voting system.  Such resolution shall be documented.  Resolutions may include the divestiture of assets or gifts, employee resignation from outside organizations, or the altering of an employee's responsibilities by prohibiting participation in Voting System Testing or the testing of a specific system.

2.5.3.2.   *Regarding the VSTL or VSTL's Parent Corporation.*

2.5.3.2.1.   Annually collects information pertaining to the holdings and activities of the VSTL and its parent corporation(s), sufficient

to demonstrate compliance with Section 2.5.1. and 2.5.2. of this Manual;

2.5.3.2.2.    Requires and documents the review of collected information for potential conflicts and prohibited practices; and

2.5.3.2.3.    Resolves all identified conflicts of interest or prohibited practices prior to the laboratory's testing of any voting system. Such resolution shall be documented. Resolutions may include the divestiture of assets or gifts, the termination or rejection of conflicted or prohibited testing work.

2.5.3.3.    *Regarding Contracted Third Party Laboratories*. The interest of a contracted third party laboratory may be imputed to a VSTL. VSTLs may meet and enforce the program requirements of this section with regard to this relationship in one of two ways:

2.5.3.3.1.    Collection of third party laboratory information, review of information and resolution of conflicts or prohibited practices:

2.5.3.3.1.1.    Collect information pertaining to the holdings and activities of the third party laboratory and its employees, sufficient to demonstrate compliance with Section 2.5.1. and 2.5.2. of this Manual. This includes gathering information concerning any involvement by the third party laboratory or its employees in the development of specific voting systems. This collection of information shall be performed prior to the execution of any contract for the testing of voting systems under this program and annually thereafter if the contract exceeds one year in duration.

2.5.3.3.1.2.    Require and document the review of collected information for potential conflicts, and

2.5.3.3.1.3.    Resolve all identified conflicts of interest prior to the laboratory's testing of any voting system.

OMB Control Number: 3265-0018

2.5.3.3.2.    VSTL Supervision of third party laboratories performing non-core testing. Where a third party laboratory is subject to direct VSTL supervision and observation, the third party laboratory's conflicts of interest or prohibited practices will not be imputed to the lead VSTL.  Direct VSTL supervision under this section requires that a VSTL employee is physically present during the third party testing and directly observes and supervises the testing.  This VSTL employee must: (1) have been properly vetted for conflict of interest and prohibited practices pursuant to Section 2.5 of this Manual, (2) be competent to supervise the testing being performed and (3) have no financial interest in the third party laboratory they are supervising.

2.5.4.    <u>Waivers</u>.  In rare circumstances, prohibited practices or conflicts of interest may be waived by the EAC after the conflict or prohibited practice is properly disclosed to the agency.  Waivers may be granted at the sole discretion of the Program Director.

2.5.4.1.    *Requesting a Waiver*.  A request for a waiver shall be made in writing to the EAC Program Director.  The request shall **fully** disclose the conflict of interest or prohibited practice for which the waiver is sought.  The request shall also describe all steps taken to resolve the conflict or prohibited practice and the reasons why such attempts were unsuccessful or otherwise untenable.  The request shall also state why the waiver should be granted, consistent with the standard in Section 2.5.4.2.

2.5.4.2.    *Waiver Standard*.  A disqualifying conflict of interest or prohibited practice is subject to waiver when the issuance of a waiver is in the best interest of the EAC Certification Program and the identified conflict or practice is unlikely to affect the integrity or impartiality of the VSTL or VSTL employee's services under the EAC Certification Program.  The Program Director may consider the following factors in making a waiver determination:

2.5.4.2.1.    The value of any disqualifying financial interest;

2.5.4.2.2.    The nature and impact of any prohibited practice;

2.5.4.2.3.    The role and responsibility of the employee subject to the conflict of interest or prohibited practice;

2.5.4.2.4.   The availability of other employees, VSTLs or laboratories to conduct the testing without a conflict or prohibited practice.

2.5.4.2.5.   The level of discretion or sensitivity required to perform the conflicted or prohibited duties under the certification program;

2.5.4.2.6.   The ability of an EAC waiver to adjust a VSTL or VSTL employee's testing process and duties or otherwise mandate additional safeguards which would limit or abrogate the impact of the conflict of interest or prohibited practice.

2.5.4.3.   *Issuing a Waiver*.  Any waiver issued by the Program Director shall be made in writing to the requestor.  The waiver shall state with specificity the conflict of interest or prohibited practice waived.  The waiver shall also clearly state any conditions for it issuance, such as mitigating processes or procedures or safeguards.  The VSTL is responsible for meeting all waiver conditions prior to engaging in the waived activity.  Failure to meet such condition may result in the revocation of a VSTLs accreditation.  The Program Director shall publish all waivers on the EAC Web site.

2.5.4.4.   *Denying a Request for a Waiver*.  Any decision denying a request for a waiver shall be made by the Program Director in writing and provided to the VSTL.  The Program Director shall publish all waiver denials on the EAC Web site.

**2.6.   Personnel Policies**.  As a condition of accreditation, all laboratories shall have in place written policies to ensure that the Laboratory does not employ individuals, in any capacity related to the testing of voting systems, who have been convicted of a felony offense or any criminal offense involving fraud, misrepresentation, or deception under either Federal or State law.  The VSTL shall have a program in place to enforce this policy and document such enforcement.

**2.7.   Notification of Changes**.  As a condition of accreditation, all laboratories shall agree to notify the EAC in writing within fifteen (15) calendar days of any significant changes in laboratory operations from what the Laboratory described in any assertion that served as the basis for its EAC accreditation, including any assertions made to NIST's NVLAP or to the EAC pursuant to Chapter 3 of this Manual.  Examples of events that require written notification include, but are not limited to:

2.7.1.   A Laboratory's decision to withdraw from the EAC's program;

    2.7.2.    Changes in ownership of the Laboratory (other than minor—less that 15%—change in stock ownership),

    2.7.3.    A change in location of the Laboratory facility, or

    2.7.4.    Personnel changes in key staff positions.

**2.8.** **Site Visits**.  As a condition of accreditation, all laboratories shall allow EAC representatives to enter their voting system testing and management facilities pursuant to the procedures and requirements of Chapter 4 of this Manual.

**2.9.** **Notice of Lawsuits.**  As a condition of accreditation, all laboratories shall provide notice to the EAC of any lawsuits or claims filed against it, its subcontractors, subsidiaries, employees, officers, owners, operators, or insurers while the Laboratory holds an EAC accreditation and which relate to the work performed in, or management of, the Laboratory's voting system testing program.

**2.10.** **Testing, Technical Practices and Reporting**.  As a condition of accreditation, each VSTL shall perform testing in conformance with the relevant standards of the applicable Federal Standards (VVSG).  Additionally, the VSTL shall create written reports of such testing consistent with the requirements of the latest version of the VVSG, EAC's *Voting System Testing and Certification Manual*, any applicable test suites mandated by the EAC, and any other written guidance published by the EAC.

**2.11.** **Test Readiness Review.**  The Test Readiness Review (TRR) is the mechanism used by the EAC to ensure that test and evaluation resources are not committed to a voting system that is not ready for testing by a VSTL.  The TRR determines if the submitted voting system and documentation are ready to enter certification testing.  The TRR shall be completed by the VSTL and the subsequent Test Readiness Acknowledgement must be received by the EAC prior to the initiation of any certification testing.  The TRR does not apply to modifications.  To assess the readiness of a voting system for certification testing, the VSTL shall review:

- **System Technical Data Package (TDP)**:  The voting system technical data package shall be reviewed to ensure all elements required by the VVSG are present.
- **System Components:**  The VSTL shall review the submitted voting system to ensure all components required to configure the voting system as defined in the system TDP are delivered to the VSTL and appear to be operational and in good working order.  System Component information should match the Manufacturer's application submitted to the EAC.  All components submitted for testing must be equivalent to the final production model of the voting system in fit, form and function.  Any component not available at the time of this review shall be delivered to the VSTL by the voting system manufacturer

OMB Control Number:  3265-0018

within 30 days of the initial TRR, or testing of the system will be halted and the EAC notified that the system is not ready for testing.

- **Preliminary Source Code Review:** The VSTL shall conduct a preliminary review of no less than 1% of the total lines of code (LOC) of every software package, module or product submitted for testing in order to ensure that the code is mature and does not contain any systematic non-conformities.

- **Mark Reading:** The system shall be able to read a fully filled mark if it is an optical scan system.

- **Summary of COTS components.** This summary should outline which components of the voting system are COTS products and shall be updated with each test campaign.

2.11.1. <u>Test Readiness Notification</u>.  Upon completion of the TRR, the VSTL shall submit a signed statement to the EAC confirming that the voting system completed the TRR and the VSTL determined that the system is ready for certification testing to applicable Voluntary Voting System Guidelines.

2.11.2. <u>Test Readiness Acknowledgement</u>.  Upon receipt of the Test Readiness Notification from the VSTL, the EAC shall issue an acknowledgement in writing stating that the VSTL and manufacturer may commence certification testing. This acknowledgement will be issued within 3 business days of receipt of the Notification.

**2.12. Technology Testing Agreement.**  The VSTL shall participate in all meetings related to development of Technology Testing Agreements.  VSTLs are expected to participate and sign on to the agreement reach between the EAC, manufacturer and VSTL.

**2.13. Test Plan Package**.  The VSTL shall submit a test plan package directly to the EAC consistent with the requirements of the *Voting System Testing and Certification Manual*, the latest version of the VVSG, this Manual and any other written guidance from the EAC.   A test plan package includes:

2.13.1. *<u>Virtual Review Tool (VRT).</u>*  The VRT is a web based application developed by the EAC which, in addition to other information, identifies each requirement found in VVSG.  VSTLs will be required to use the tool to identify the standards that apply to the system being tested, identify the testing to be performed and provide additional information as required.  The EAC will provide log-in information and grant specific access to VSTL staff upon accreditation of the laboratory, and to manufacturer representative upon the acceptance of a manufacturer's registration with the EAC.  The VRT will serve as both a tool to identify and a means to document what should be tested and how.

2.13.2. <u>Test Plan.</u>  The purpose of the Test Plan is to provide information regarding test methods.  The Test Plan contains more detail than the VRT.

2.13.2.1. *Format.* VSTLs shall format each test plan consistent with the requirements of Appendix A of this Manual.

2.13.2.2. *Content.* Each test plan shall identify applicable voting system standards and contain a description of the testing proposed to verify conformance. Also, each test plan shall contain a statement indicating the scope of the labs accreditation.

- Required Content. For each test, the test plan shall provide detailed information referencing testing to be performed, including facility requirements, test set-up, test sequence, data recording requirements and pass criteria.[3]

- Exception. Where a VSTL utilizes EAC mandated or approved test methods, the test plan may simply reference these methods and identify, with specificity, all deviations. *Mandated test methods* are those test methods required for use by the EAC. *Approved test methods* are standard, verified VSTL test methods approved by the EAC. VSTLs may submit standard test methods for approval by submitting them in writing to the Program Director.

2.13.3. <u>Test Case</u>. After approval of the VSTLs Test Plan, the VSTL shall develop Test Cases. A Test Case is a system specific, step-by-step test procedure or laboratory testing process that provides detailed test operation procedures sufficient for trained laboratory personnel to fully conduct a given test and produce repeatable results. The VSTL shall inform the EAC, in writing, when all test cases for the voting system under test have been completed. This notice shall include an index identifying each test case created to test the system. The notification should indicate if these are standard test cases, modified standard test cases, or a new test case. These test cases shall be available to the EAC for review and approval upon request.

**2.14. Testing**. The highest standards shall be applied to the testing of voting systems. VSTLs shall perform testing in conformance with the relevant standards of the applicable Federal Standards (VVSG) and consistent with any written EAC interpretations of these standards.

---

[3] This requirement is consistent with International Standards Organization requirements, which serve as a basis for NIST NVLAP's accreditation and recommendation to the EAC. Where established and approved test methods do not exist, ISO Standard 17025, Section 5.4.4., *Non-Standard Method* requires the testing to be validated by the laboratory prior to use. The EAC will review and approve the validated test methods.

VSTLs shall test system identification tools during the test campaign to make sure they function properly and as intended.  The Laboratory shall maintain its technical practices consistent with the standards which served as the basis for its NVLAP accreditation. These standards include International Standard ISO/IEC 17025, *General Requirements for the Competence of Testing and Calibration Laboratories*; NIST Handbook 150, *Procedures and General Requirement;* NIST Handbook 150-22, *Voting System Testing;* any documents supplementing, updating or replacing these standards or handbooks; and any pertinent EAC guidance.  When conducting testing under EAC's program, VSTLs shall only perform testing of voting systems consistent with the scope of their accreditation.

2.14.1. <u>Third Party Testing</u>.  Lead VSTL's may contract or otherwise provide for the testing of voting systems by third parties under this program.  However, the lead VSTL shall be responsible for the accuracy, quality assurance, and results of <u>all</u> tests performed.  Under this program, no VSTL may perform or contract for the performance of testing outside the scope of its accreditation.  Testing performed directly by lead VSTL personnel using third party contractor equipment and facilities is not considered third party testing.

2.14.1.1. *Core Testing*.  Core voting system testing may only be performed by VSTLs.  Core testing includes: Technical Data Package review, physical configuration audit, source code review, functional configuration audit, system integration testing, volume testing, and security testing (not including cryptographic testing).

2.14.1.2. *Non-Core Testing*.  Non-core testing may be performed by non-VSTLs if they hold an EAC recognized accreditation to perform the relevant testing.  The EAC recognizes two national accreditation bodies, NIST's NVLAP program and the American Association of Laboratory Accreditation (A2LA).  Generally, a VSTL may only contract or otherwise provide for the non-core testing of voting systems if it uses a NVLAP or A2LA laboratory accredited to the specific scope of testing necessary.  Non-core testing includes: electromagnetic compatibility testing, telecommunications testing, environmental testing, electrical testing, acoustical testing, accessibility testing, usability testing, and cryptographic testing.[4]  In limited circumstances, laboratories not holding a recognized accreditation may be used by VSTLs for non-core testing only after approval by EAC's Program Director.  Requests for such approval must be made in writing and demonstrate: (1) That there is no recognized laboratory available within a reasonable window of availability and geographic proximity (generally within the continental

---

[4] For the purposes of the EAC's Voting System Test Laboratory Program, non-core cryptographic testing includes all testing involving evaluation of cryptographic operation and key management.

OMB Control Number:  3265-0018

United States) and (2) that the VSTL has conducted a thorough assessment of the third party laboratory's capabilities, quality system, management system, and/or alternative accreditations and have determined and documented that the laboratory is qualified to perform testing. The EAC may visit, interview or audit any non-accredited laboratory at any time before, during, or after the testing has occurred to verify their qualifications.

2.14.1.3.  *VSTL Responsibilities.* Lead VSTLs are responsible for all tests performed on voting systems submitted to them by Manufacturers under EAC's Testing and Certification Program. This includes testing (both core and non-core) performed by third party laboratories under their direction (including third party VSTL laboratories). Any procedural or substantive irregularities or errors which occur during the third party testing process will be imputed to the responsible lead VSTL. Such failures may serve as a basis for the revocation of accreditation. Lead VSTLs using third party laboratories (consistent with Sections 2.10.4.1 through 2.10.4.2, above) shall take steps to ensure that the third party laboratories they employ meet the standards of this Program. At a minimum, the lead VSTLs shall ensure:

2.14.1.3.1.  The third party laboratory provides the lead VSTL verifiable documentation regarding its relevant accreditation;

2.14.1.3.2.  Any hardware tested by the qualified third party laboratory is first validated by the lead VSTL as the same hardware presented to it for certification;

2.14.1.3.3.  The third party laboratory provides the lead VSTL with evidence that it will direct its activities in compliance with any and all relevant VVSG requirements for testing and that the testing was, in fact, performed consistent with such specific requirements. Any special procedures, tools, or testing software necessary to meet VVSG requirements must be validated by the lead VSTL prior to use. *For example, the VVSG requires that systems be tested while operating and that such operation be in manner and under conditions that simulate election use. In such cases, the lead VSTL must ensure that the third party laboratory will properly implement the VVSG requirements, validate its election simulation tools, and properly performed the testing;*

OMB Control Number:  3265-0018

      2.14.1.3.4.  The lead VSTL performs all system accuracy, reliability, functionality and integration testing; and

      2.14.1.3.5.  The third party laboratory issues a report to the lead VSTL that fully documents its testing such that the lead VSTL may demonstrate compliance with this section and produce a report consistent with Section 2.10.5 of this Manual.

**2.15. Test Report Package.** The Test Report Package represents the culmination of the testing process. As such, it is vital that it accurately and completely document the testing performed and the results of such testing. VSTLs shall submit Test Report Packages directly to the EAC. The packages shall include:

    2.15.1.  <u>Virtual Review Tool (VRT)</u>. VSTLs shall update the VRT information originally submitted with its test plan (see Section 2.13 above). The final updates to the VRT will serve as verification that the VSTL performed the testing required to demonstrate compliance with voting system standards.

    2.15.2.  <u>Test Report</u>. VSTLs shall provide a test report.

    2.15.3.  <u>Content</u>. All test reports shall document the testing process, including the documentation and justification of any divergence from the EAC approved test plan, methods, or cases and the identification of all failures and/or anomalies along with any remedial action taken[5] (see Chapter 4 of the EAC's *Voting System Testing and Certification Manual* regarding the anomaly matrix). VSTLs shall not include any proprietary test cases in the Test Report. Test cases shall be uploaded to the VRT as requested by the EAC. Test reports shall also document any prescribed maintenance or modifications, performed by the Manufacturer, to a voting system in testing. Such maintenance or modifications shall be monitored by the VSTL consistent with Section 2.11.1 of this Manual.

    2.15.4.  <u>Format</u>. To the greatest extent possible, VSTLs shall write reports such that they are understandable to non-technical persons. As the EAC will publish these reports (barring portions prohibited by law), VSTLs shall refrain from including in them trade secrets or other commercial information protected from release unless substantively required. Where information protected from release may be included, it shall be identified consistent with Chapter 7 of this Manual. VSTLs shall format each test report consistent with the requirements of Appendix B of this Manual.

---

[5] VSTLs must report all errors and anomalies identified in the test campaign even when an error is identified during the testing of unrelated functionality.

2.15.5.  <u>VSTL Attestation</u>.  The VSTL shall provide a letter, signed by a representative authorized to take action on behalf of the VSTL (see Sections 2.13 and 3.4.1.6. of this Manual), which attests that (1) all testing prescribed by the test plan or amended test plan was performed as identified or the divergence from the test plan was properly documented, (2) all identified voting system anomalies or failures were reported and resolved, (3) that the test report is accurate and complete, and (4) the VSTL recommends the system for certification.

**2.16. Acceptance of Prior Testing**.  Testing previously performed on a voting system by a VSTL or by a third party test laboratory operating at the direction of a VSTL, may be reused at the discretion of the lead VSTL and the EAC.  The EAC encourages VSTLs to use such testing to fulfill certification requirements.  The VSTL must attain written approval from the EAC for all reuse requests.  In order for the EAC to accept prior testing, lead VSTLs must provide evidence that the requirements below are met.  Prior testing is valid when:

2.16.1.  The discrete software or hardware component of the voting system previously tested is demonstrably identical to the voting system presently offered for testing.  Lead VSTLs must examine and/or compare the components and documentation to ensure there is no change in the voting system.  When valid prior testing is used, the system presented must be subject to regression testing, functional testing and system integration testing, and any other testing deemed necessary to ensure compliance with the VVSG and this manual;

2.16.2.  The requirements, standards and relevant EAC Request for Interpretations applicable to the prior and current testing are identical;

2.16.3.  The test methods used are equivalent or identical to current test methods accepted by the EAC;

2.16.4.  The prior testing was reviewed by the VSTL, with no apparent errors or omissions and fully complies with the VVSG and this manual;

2.16.5.  Testing from previous EAC test campaigns can only be submitted for reuse if the EAC accepted a final test report for that campaign; and

2.16.6.  The use of prior testing must be noted in the test plan, with test report titles, numbers, and descriptions, along with EAC approval.

2.16.7.  The use of prior testing must be noted in the body of the test report.  Like all testing, prior testing is subject to EAC review and approval.

OMB Control Number:  3265-0018

**2.17. Termination of Testing Prior to Completion**.  In the event testing is terminated prior to completion, VSTLs are required to notify the EAC Program Director.  This notification shall be in writing and state the reasons for termination provide a list of all testing completed, and produce a matrix of test anomalies or failures pursuant to Section 4.5.2 of the *EAC Testing and Certification Program Manual*.

    2.17.1.  <u>Termination Defined</u>.  Voting system testing shall be considered terminated when the testing process is permanently ended or otherwise halted without a specific plan to recommence within 90 calendar days of the last test performed.

    2.17.2.  <u>Effect of Termination</u>.  Notification of termination will result in the suspension of the Manufacturer's Certification Application.  Additionally, the termination and VSTL's written notice shall be posted on EAC's Web site.

    2.17.3.  <u>Resubmission after Termination</u>.  Manufacturers may resubmit a system previously terminated by submitting an updated application consistent with Chapter 4 of the *Voting System Testing and Certification Program Manual*.  Pursuant to Section 2.11 of this Manual and Section 4.3.1.2 of the *Voting System Testing and Certification Program Manual*, a system resubmitted to the EAC after termination must be tested by the VSTL identified on the original application.

**2.18. VSTL Verification of Trusted Build.**  At the conclusion of each test campaign, VSTLs shall verify the trusted build and associated materials required to be escrowed in the EAC Repository (See Section 5.5 of the *Testing and Certification Program Manual*.) The verification process shall include:

    2.18.1.  Catalog all files contained in the escrow package and confirm the ability to read the media.

    2.18.2.  Test the functionality of the compile to be deposited.

**2.19. Laboratory Independence**.  As a condition of accreditation, all laboratories shall maintain their independence from voting system Manufacturers, consistent with their roles and responsibilities as a key component of the EAC Certification program.  VSTLs shall maintain an arm's length relationship with the manufactures and avoid even the appearance of improper conduct.  In order to maintain independence, VSTLs shall adhere to the following independence principles and requirements:

    2.19.1.  <u>Testing Independence.</u>  Consistent with the requirements of this Manual, only the lead VSTL identified on a voting system's application form may test or oversee the testing of that system.  Under no circumstances may a Manufacturer perform or participate in any testing which will serve as the basis of an EAC certification.  *Participation includes but is not limited to the observation of testing by*

*the Manufacturer.*[6]   Additionally, lead VSTL's shall ensure that Manufactures' do not have access to a system under test unless accompanied and monitored by a VSTL representative.  The EAC recognizes that in some cases there is value in allowing manufacturers to witness a particular test or a re-creation of a test in order to allow them to comment on the proper system set up or operation.  However, any such participation must be (1) at the discretion of the VSTL, (2) supervised by the VSTL and (3) clearly documented in order to maintain laboratory independence.  Therefore, the EAC finds the following three situations to be allowable under this Section:

*2.19.1.1.* The VSTL may at any time, and at its own discretion, halt an active certification test and bring the manufacturer into the testing room for a re-creation of the test being performed.  If the VSTL chooses to do this it **must:**

> 2.19.1.1.1.  Document the time and circumstance that cause a halt in testing.

> 2.19.1.1.2.  Document the reason why the manufacturer's presence is needed.

> 2.19.1.1.3.  Document the result of the test prior to re-creating the test for the manufacturer.

> 2.19.1.1.4.  Document any re-running of the official EAC Certification Test.  This documentation must include any change that occurred to the "as run" test case as a result of the re-creation and the result of the official test.

> 2.19.1.1.5.  Have the test supervisor in charge of the project present for the re-creation of the test.   If the test engineer conducting the test is also the test supervisor in charge of the project, one other VSTL employee must be present in the room during the re-creation of the test.   The test supervisor present should be the most senior engineer or personnel assigned to the testing engagement.  Documentation of the re-creation of the test should include lab personnel present at the time of the re-creation.

---

[6] Not all activities required for EAC Certification are "testing" activities.  Examples of certification requirements that do not fall into the category of "testing" include trusted and witness builds.

2.19.1.1.6.  All documentation must be retained according to NVLAP and EAC requirements.

*2.19.1.2.*  The VSTL may, at its own discretion, create for the manufacturer either a closed circuit video feed or web cam feed of the official EAC Certification Testing being conducted and allow for real time correspondence between test engineers and the manufacturers provided that:

2.19.1.2.1.  All correspondence (i.e., letters, emails, memos, recorded video calls, etc.) between the test engineers and the manufacturer is documented and retained.

2.19.1.2.2.  Any changes to the testing that results from correspondence between the manufacturers and the VSTL is signed off by the VSTL project manager and provided to the EAC as part of the test report package.

*2.19.1.3.*  The VSTL may, at its discretion, provide supervised access to the manufacturer prior to and during the official EAC Certification Testing to perform unscheduled and non-routine maintenance provided that:

2.19.1.3.1.  All documentation related to the maintenance activities is recorded within the "as run" test case.

2.19.1.3.2.  Any unscheduled maintenance that is performed is documented in the discrepancy report included as part of the test report materials.

2.19.2.  <u>Decision Making.</u>  Determinations regarding testing, test requirements, and test results shall be made on the basis and for the purpose of ensuring that the systems tested meet Federal voting system standards.  A VSTL's primary purpose shall be to serve the public interest through adherence to the EAC Testing and Certification Program.

2.19.3.  <u>Single Laboratory Requirement</u>.  EAC's Testing and Certification Program prohibits Manufacturers from changing laboratories during the testing process.  Once a lead VSTL is identified to the EAC by the Manufacturer to test a system, a test report will not be accepted by the EAC from any other laboratory unless authorized pursuant to Chapter 4 of the EAC's *Voting System Testing and Certification Program Manual*.  This strict policy supports VSTLs in their independent decision making role.  VSTLs shall immediately report to the EAC Certification Program Director any time a Manufacturer withdraws a product

OMB Control Number:  3265-0018

from testing or the testing is otherwise terminated (see Section 2.10.7. of this Manual).

2.19.4.  Fee for Service.  All fees paid by a Manufacturer to a VSTL shall be solely for services rendered.  No payment may be accepted by a VSTL that is not directly linked to services necessary to complete system testing.  No payment may be accepted by a VSTL that is conditioned or dependent on testing outcome.

2.19.5.  Communications.  To ensure and document the independent relationship between test laboratories and Manufacturers, all substantive discussions regarding the outcome, cost, payment and testing of a voting system shall be documented in writing by the VSTL.  This includes, but is not limited to: letters, emails, reports, meetings and telephone calls.  These records shall be maintained consistent with Section 2.23 of this Manual.  Examples of substantive discussions between the lead VSTL and a Manufacturer **include but are not limited to**:

  *2.19.5.1.* All contracts and amendments thereto;

  *2.19.5.2.* All discussions regarding the set up and operation of the voting system during testing;

  *2.19.5.3.* All discussions with the Manufacturer regarding the test plan, test cases, testing, or the test report; and

  *2.19.5.4.* All discussions regarding implementation or interpretation of the standards.

2.19.6.  Cooperation with EAC.  Cooperate with any EAC inquiries and investigations into a certified system's compliance with VVSG standards and any VSTL testing related to that system consistent with Chapter 7 of the *Testing and Certification Program Manual.*

2.19.7.  Testing Facilities.  To avoid the appearance of impropriety and otherwise maintain laboratory independence, VSTLs shall not conduct testing[7] at a Manufacturer owned or controlled facility.  If exceptional circumstances exist requiring that the VSTL use Manufacturer facilities, the VSTL may request a waiver from this prohibition.  The request must be in writing to the Program Director and clearly state why such testing is necessary.  A waiver may be granted at the sole discretion of the Program Director and may impose necessary

---

[7] As noted in footnote 6, above, this requirement only applies to "testing" and does not include other certification activities such as trusted and witness builds.

restrictions, limitations and requirements on testing.  Waivers will be granted only in exceptional circumstances.

2.19.8.  <u>Improper Influence</u>.  Any attempt by a Manufacturer to unduly influence the test process shall be immediately reported to the EAC's Certification and Testing Program Director.

**2.20. Authority to do Business in the United States**.  As a condition of accreditation, all laboratories shall be lawfully entitled or otherwise not prohibited from doing business with the United States or its citizens or operating in the United States.

**2.21. Communications.**  As a condition of accreditation, all laboratories shall designate and identify an individual or individuals who may speak for and take action on behalf of the VSTL.  VSTLs shall maintain an open line of communication with EAC's Testing and Certification Program Director, providing prompt response to requests for information regarding the Program.

**2.22. Resources and Financial Stability.**  As a condition of accreditation, all VSTLs shall allocate sufficient resources to enable the laboratory to properly use and maintain its test equipment, personnel, and facility and to satisfactorily perform all required laboratory functions.  The laboratory shall maintain insurance policies sufficient to indemnify itself against financial liabilities or penalties that may result from its operations.  VSTLs shall:

2.22.1.  Maintain insurance policies (see Section 3.4.1.8.) that indemnify the laboratory against the potential losses identified in its liability assessment (see Section 3.4.1.9.); and

2.22.2.  Document solvency through demonstrating that the laboratory's assets are greater than its liabilities in its audited financial statement (see Section 3.4.1.16.).

**2.23. Recordkeeping**.  As a condition of accreditation, all laboratories shall have a written policy regarding the proper storage, management and retention of all records relating to the testing of voting systems.  At a minimum, this policy shall require all forms, reports, test records, observations, calculations, and derived data for all tests performed on a given voting system (or component of said system) be retained for a period of at least 5 years after the last test performed on  any version of that system (or component of any version of said system).  The policy shall require that all documents are maintained in a safe and secure environment and stored in a manner that provides for organized and timely identification and retrieval.  Additionally, all records must be kept in a data format usable and available to the EAC.

OMB Control Number:  3265-0018

# Accreditation Process

**3.1.** **Overview.** This chapter sets forth the required steps Applicant Laboratories must perform in order to receive an EAC Voting System Test Laboratory Accreditation. The process generally includes an application for and receipt of a NIST recommendation; receipt of an EAC invitation to apply; and the successful submission, acceptance and review of an EAC application.

**3.2.** **NIST Recommendation**. The Election Assistance Commission (EAC) is mandated under Section 231 of the Help America Vote Act of 2002 (HAVA) (42 U.S.C. §15371(b)) to "… provide for the certification, de-certification and re-certification of voting system hardware and software by accredited laboratories." As part of this process, HAVA requires the National Institute of Standards and Technology (NIST) to evaluate independent non-Federal test laboratories. NIST selects those laboratories technically qualified to test voting systems and recommends them to the EAC for accreditation. Generally, a Laboratory must have a NIST recommendation before it may be considered for EAC accreditation.

    3.2.1. <u>NIST Recommendation Process</u>. NIST utilizes its National Voluntary Laboratory Accreditation Program (NVLAP) to perform this evaluation. NIST, through the NVLAP process, assesses laboratory technical capabilities, procedures and personnel before recommending a laboratory for EAC accreditation. The requirements, procedures and application process for requesting consideration by NIST (for recommendation to the EAC) may be found at <u>www.nist.gov/NVLAP</u> or by contacting NIST at, National Voluntary Laboratory Accreditation Program, Standards Services Division, NIST, 100 Bureau Drive, Stop 2140, Gaithersburg, MD, 20899-2140.

    3.2.2. <u>Emergency EAC Accreditation without NIST Recommendation</u>. HAVA authorizes the EAC to consider and accredit laboratories without a NIST recommendation (42 U.S.C. §15371(b)(2)(B)). The EAC will accredit laboratories without a NIST recommendation *only* as an emergency action.

        3.2.2.1. *Emergency Action—Defined*. The EAC will take emergency action only in instances where (1) there is a significant national need for accredited laboratory testing capacity that cannot be met by existing VSTL's, (2) the shortage of laboratory testing capacity may cause a disruption in the orderly administration of Federal elections, and (3) NIST is not capable of timely providing new laboratories to meet needs. Consistent with HAVA, the EAC will publish its basis for emergency action following the above standards.

        3.2.2.2.   *Emergency Action—Process*.  Laboratories shall be accredited by the EAC in an emergency action only after they have been properly assessed according to international standards and applicable NIST Guidance. These standards include International Standard ISO/IEC 17025, *General Requirements for the Competence of Testing and Calibration Laboratories*; NIST Handbook 150, *Procedures and General Requirement;* NIST Handbook 150-22, *Voting System Testing;* and/or any documents supplementing, updating or replacing these standards or handbooks.

        3.2.2.3.   *Emergency Action—Provisional*.  Any accreditation provided by the EAC through its emergency action authority will be provisional in nature and limited in scope.  All emergency accreditations must expire on a date certain.

**3.3.**  **EAC Invitation**.  After receipt of a NIST list of recommended laboratories, the EAC will send a letter to the laboratories inviting them to apply for EAC accreditation under the VSTL program.  No laboratory may apply for EAC accreditation without an invitation from the Commission.  The letter of invitation will identify the scope of accreditation for which the laboratory may apply.  The invited laboratories must follow the application procedure noted in Section 3.4, below.

**3.4.**  **Application**.  EAC is the sole authority for Voting System Test Laboratory Accreditation. While NIST's recommendation serves as a reliable indication of potential technical competency, the EAC must take additional steps to ensure that laboratory policies are in place regarding issues like conflict of interest, record maintenance, and financial stability. It must also ensure that the candidate laboratory is willing and capable to work with EAC in its Certification Program.  To that end, applicant laboratories are required to submit a Letter of Application requesting accreditation.  The letter shall be addressed to the Testing and Certification Program Director and attach (in either hard copy or on CD/DVD) (1) all required information and documentation; (2) a signed letter of agreement; and (3) a signed certification of conditions and practices.

    3.4.1.  <u>Information and Documents</u>.  The applicant laboratory must submit the information and documents identified below as a part of its application.  These documents will be reviewed by the EAC in order to determine whether the applicant laboratory meets the program requirements identified in Chapter 2. The grant of EAC accreditation is subject to receipt of the information and EAC's review and approval of the materials.  The applicant laboratory shall properly label any documents, or portions of documents, it believes are protected from release under Federal law.

        *3.4.1.1.*   The legal name of the laboratory

       OMB Control Number:  3265-0018

*3.4.1.2.*    Mailing address of the laboratory

*3.4.1.3.*    Physical location of the laboratory (if different than the mailing address).

*3.4.1.4.*    Name, phone number, fax number and e-mail address of the voting system testing program manager or individual otherwise immediately responsible for the voting system testing program.

*3.4.1.5.*    Name, phone number, fax number, and e-mail address of the individual, CEO, president or otherwise titled head of the laboratory.

*3.4.1.6.*    Name, title, phone number, fax number, and e-mail address of the individual or individuals designated to speak for and take action on behalf of the laboratory pursuant to Section 2.21 of this Manual.

*3.4.1.7.*    The business contact information (such as point of contact, address, Web site, e-mail address) to be posted by the EAC on its Web site.

*3.4.1.8.*    The identity of the laboratory's insurer(s), name of insured, and coverage limits for any comprehensive general liability policies, errors and omissions policies, professional liability policies, and bailee policies.

*3.4.1.9.*    A written assessment of the laboratory's commercial general liability.

*3.4.1.10.*    A signed statement certifying that it maintains workman's compensation policy coverage sufficient to meet the applicable State's minimum requirements.

*3.4.1.11.*    A copy of the laboratory's organizational chart which includes the names of key staff responsible for the testing of voting systems.

*3.4.1.12.*    A copy of the laboratory's conflict of interest policy which implements the standards of Section 2.5 of this Manual.

*3.4.1.13.*    A copy of the laboratory's personnel policy which implements the standards of Section 2.6 of this Manual.

*3.4.1.14.*    A copy of the laboratory's recordkeeping policy which implements the standards of Section 2.23 of this Manual.

*3.4.1.15.*    A copy of the laboratory facilities brochure.

*3.4.1.16.* A copy of the most recent annual report, the names of the current board of directors and the previous year's board of directors, the names of any majority shareholders, and audited financial statements of the companies or entities that own and operate the laboratory. Laboratories not incorporated should provide comparable information.

3.4.2. <u>Letter of Agreement</u>. The applicant laboratory must submit a signed letter of agreement as a part of its application. This letter shall be signed by an official vested with the legal authority to speak for, contract on behalf of or otherwise bind the applicant laboratory (see Section 2.21). The purpose of this letter is to document that the applicant laboratory is aware of and agrees to abide by the requirements of the EAC Voting System Testing Laboratory Accreditation Program. No applicant laboratory will be considered for accreditation unless it has properly submitted a letter of agreement. The letter shall unequivocally state the following:

> *The undersigned representative of _____ (hereinafter "Laboratory"), being lawfully authorized to bind Laboratory and having read the EAC Voting System Test Laboratory Program Manual, accepts and agrees on behalf of Laboratory to follow the program requirements as laid out in Chapter 2 of the Manual. Laboratory shall meet all program requirements as they relate to NVLAP accreditation; conflict of interest and prohibited practices; personnel policies; notification of changes; resources; site visits, notice of law suits; testing, technical practices and reporting; laboratory independence; authority to do business in the United States; VSTL communications; financial stability; and recordkeeping. Laboratory further recognizes that meeting these program requirements is a continuing responsibility. Failure to meet each of the requirements may result in the denial of an application for accreditation, a suspension of accreditation or a revocation of accreditation.*

3.4.3. <u>Certification of Laboratory Conditions and Practices</u>. The applicant laboratory must submit a signed *Certification of Laboratory Conditions and Practices* as a part of its application. No applicant laboratory will be considered for accreditation unless it has properly affirmed its conditions and practices through the certification document. A *Certification of Laboratory Conditions and Practices* form may be found at Attachment C and is available electronically at www.eac.gov. By signing the certification, a laboratory affirms that it, in fact, has in place the policies, procedures, practices, resources and personnel stated in the document. Any false representations made in the certification process may result in the revocation of accreditation and/or criminal prosecution.

**3.5. EAC Review of Application Package**. The EAC will perform a review of each Applicant Laboratory's application package to ensure that it is complete and the laboratory meets

the program requirements.  Each package will be reviewed to identify any apparent nonconformities or deficiencies.  If necessary, the Program Director will notify Applicant Laboratories of any such nonconformities or deficiencies and provide them an opportunity to cure problems prior to forwarding the package to the Commissioners.  The Program Director will issue a recommendation to the Commissioners when forwarding any application package.  Consistent with HAVA, a laboratory will receive an accreditation only upon a vote of the Commissioners.

3.5.1.  <u>Program Director Review</u>.  Application packages shall be sent to the Program Director.  The Program Director will perform a review of the packages before forwarding them to the Commissioners with a recommendation.  Upon receipt of an application package the Testing and Certification Program Director shall review the package to ensure:

3.5.1.1.  *The package is complete*.  No application may be forwarded to the Commission for a vote on accreditation unless is contains all required documentation (Section 3.4.1), a proper letter of agreement (Section 3.4.2), and a signed *Certification of Laboratory Conditions and Practices* (Section 3.4.3).

3.5.1.2.  *Evidence of compliance with program requirements*.  The Program Director shall also review the submissions to ensure that the information provided properly reflects and documents compliance with program requirements.

3.5.2.  <u>Notice of Nonconformity</u>.  In the event the Program Director identifies (1) missing documentation or information and/or (2) issues of non-compliance, the Program Director shall notify the Applicant Laboratory of the deficiencies prior to forwarding a recommendation to the Commissioners.  The written notice of nonconformity shall:

3.5.2.1.  Identify any missing documentation or information;

3.5.2.2.  Identify any issues of potential non-compliance; and

3.5.2.3.  Provide Applicant Laboratory a reasonable time period to submit additional information or amend their application package in response to identified non-conformities.

3.5.3.  <u>Applicant Laboratory Action on Notice of Nonconformity</u>.  Applicant Laboratories shall respond to a notice of nonconformity within the timeframe identified by the Program Director.  Responses shall include any missing

documents identified in the notice, as well as any additional or clarifying information or documentation responsive to an issue of non-compliance.

3.5.3.1.   *Request for Additional Time.*  Applicant Laboratories may request additional time in writing.  Such request must state the basis for the request and identify a reasonable time period for response.  The grant of additional time is at the sole discretion of the Program Director.

3.5.3.2.   *Failure to Respond—Missing Documentation or Information.*  If an Applicant Laboratory fails to provide required information or documentation within the timeframe provided in the notice of noncompliance, the Program Director shall reject the application as incomplete, returning the package to the applicant for resubmission consistent with the requirements of this Chapter.

3.5.3.3.   *Failure to Respond—Issue of Noncompliance.*  If, within the timeframe provided in the notice of noncompliance, an Applicant Laboratory (who has provide all required documentation) fails to provide additional, clarifying information or documentation in response to an identified issue of program noncompliance, the Program Director shall forward the original application to the Chair of the Commission for action.

3.5.4.   <u>Recommendation to Commissioners</u>.  After review, and if necessary an opportunity for the applicant to amend their application, the Program Director shall forward each application to the Chair of the Commission with a recommendation as to disposition.  This application package shall include all documents and correspondence between the applicant laboratory and the EAC Program Director.

3.5.5.   <u>Vote by Commissioners</u>.  Upon receipt of an application package and recommendation from the Testing and Certification Program Director, the Chair of the Commission shall forward the information to each EAC Commissioner. After a reasonable time to review the forwarded materials, the Chair of the Commission shall bring the matter to a vote, consistent with the rules of the Commission.  The measure presented for a vote shall take the form of a written Commissioners' Decision which (1) makes a clear determination as to accreditation and (2) states the basis for the determination.

**3.6.  Grant of Accreditation**.  Upon a vote of the EAC Commissioners to accredit a laboratory, the Testing and Certification Program Director shall inform the laboratory of the decision, issue a Certificate of Accreditation and post information regarding the laboratory on the EAC Web site.

3.6.1.   <u>Certificate of Accreditation</u>. A Certificate of Accreditation shall be issued to each laboratory accredited by vote of the Commissioners.  The certificate shall be signed by the Chair of the Commission and state:

      *3.6.1.1.*   The name of the VSTL;

      *3.6.1.2.*   The scope of accreditation, by stating the Federal standard or standards to which the VSTL is competent to test;

      *3.6.1.3.*   The effective date of the certification, which shall not exceed a period of two (2) years; and

      *3.6.1.4.*   The technical standards to which the laboratory was accredited.

3.6.2.   <u>Post Information on Web Site</u>.  The Program Director shall make information pertaining to each accredited laboratory available to the public on EAC's Web site.  This information shall include (but is not limited to):

      *3.6.2.1.*   NIST's Recommendation Letter;

      *3.6.2.2.*   The VSTL's Letter of Agreement;

      *3.6.2.3.*   The VSTL's Certification of Conditions and Practices;

      *3.6.2.4.*   The Commissioner's Decision on Accreditation; and

      *3.6.2.5.*   The Certificate of Accreditation.

**3.7.   Effect of Accreditation**.  Receipt of an EAC Accreditation indicates that a laboratory has met the applicable technical, procedural, management and staffing requirements and may serve as a Voting System Test Laboratory (VSTL) under EAC's Testing and Certification Program.

3.7.1.   <u>Scope of Accreditation</u>.  A laboratory shall operate within the limits of the scope of accreditation as stated on its Certificate of Accreditation.

3.7.2.   <u>Representation</u>.  No VSTL may make representations regarding its accreditation beyond its scope of accreditation.

3.7.3.   <u>No Endorsement</u>.  A Certificate of Accreditation is **not** an endorsement of the recipient laboratory.  A VSTL may not state or imply EAC endorsement.

    3.7.4.   <u>Accreditation Logo</u>.  A VSTL may display the EAC laboratory accreditation logo. Only the EAC authorized logo may be used.  The display must be used in a manner consistent Sections 3.7.1. - 3.7.3., above.  Specifications for the reproduction and use of the EAC logo are found in Appendix D.

**3.8.**  **Expiration and Renewal of Accreditation**.  A grant of accreditation is valid for a period not to exceed two years.  A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation.  VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date.  Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending.  VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.

**3.9.**  **Denial of Accreditation**.  Upon a vote of the EAC Commissioners <u>not</u> to accredit a laboratory, the Testing and Certification Program Director shall inform the laboratory of the decision and post relevant information on the EAC Web site.

    3.9.1.   <u>Notice of Denial</u>.  The Program Director shall inform the applicant laboratory (in writing) of the Commissioners' Decision.  This notice must include:

        *3.9.1.1.*   A statement of the decision and brief summary explanation of the basis for the decision;

        *3.9.1.2.*   Notice of the Applicant Laboratory's right to appeal; and

        *3.9.1.3.*   A copy of the Commissioners' Decision.

    3.9.2.   <u>Post Information on Web Site</u>.  The Program Director shall publish on EAC Web site:

        *3.9.2.1.*   A copy of the Commissioners' Decision, and

        *3.9.2.2.*   The Notice of Denial.

**3.10.**  **Requesting Appeal**.  An applicant laboratory that has been denied accreditation by a vote of the Commissioners shall have the right to appeal.  An Applicant Laboratory may appeal a Denial of Accreditation by first issuing a written request for appeal.

    3.10.1.  <u>Submission</u>.  Requests must be submitted in writing to the Program Director, addressed to the Chair of the U.S. Election Assistance Commission.

                        OMB Control Number:  3265-0018

3.10.2. <u>Timing of Appeal</u>.  The Applicant Laboratory may request an appeal within 7 calendar days of receipt of the Notice of Denial.  Late requests will not be considered.

3.10.3. <u>Contents of Request</u>.  The request must petition for reconsideration of the Commissioners' Decision and clearly state the specific conclusions of the Decision the Applicant Laboratory wishes to appeal.

**3.11. EAC Action on a Request for Appeal**.  The Program Director shall accept any request for appeal timely submitted.  Untimely requests shall be rejected.  Upon receipt of a request for appeal, the Program Director shall notify the requestor applicant laboratory, in writing, as to whether their appeal has been accepted as timely.  The notice for accepted requests shall inform the applicant laboratory of the requirements for submitting their appeal per Section 3.12 of this Manual.

**3.12. Submission of Appeal**.  After submission of a timely request for appeal, the Applicant Laboratory shall submit its appeal.  This appeal shall (1) clearly identify the specific conclusions of the Commissioners' Decision the Laboratory wishes to challenge, (2) provide the basis for its position on appeal and (3) submit a written argument in support of its appeal.  In addition, the applicant laboratory may submit documentary or other relevant, physical evidence in support of the appeal.  The Appeal and all supporting materials must be received by the EAC within 20 days of the applicant laboratory's receipt of the Program Director's notice of acceptance of the request to appeal.

**3.13. Consideration of Appeal**.  All timely appeals will be considered by the Commissioners.  Upon receipt of an appeal, the Chair of the Commission shall forward to each EAC Commissioner the Applicant Laboratory's appellate submission, along with the original application package, Commissioners' Decision, and Program Director's recommendation.  After a reasonable time to review and consider the forwarded materials, the Chair of the Commission shall bring the matter to a vote, consistent with the rules of the Commission.  The measure presented for a vote shall take the form of a written Commissioners' Decision on Appeal.

**3.14. Commissioner's Decision on Appeal**.  The Commissioners shall make a written, final Decision on Appeal and shall provide it to the Applicant Laboratory.

3.14.1. <u>Contents</u>.  The Decision on Appeal shall:

3.14.1.1. State the final determination of the Commission.

3.14.1.2. Address the matters raised by the Applicant Laboratory on appeal.

OMB Control Number:  3265-0018

*3.14.1.3.* Provide the reasoning behind the decision.

*3.14.1.4.* State that the Decision on Appeal is final.

3.14.2. <u>Determinations</u>.  The Commissioners shall make one of two determinations on appeal.

*3.14.2.1. Grant of Appeal.*  If the Commissioners determine that the previous Decision of the Commission shall be overturned *in full*, the appeal shall be granted.  In such cases, the Applicant Laboratory shall be granted accreditation.

*3.14.2.2. Denial of Appeal.*  If the Commissioners determine that *any part* of the previous Decision of the Commission shall be upheld such that the procedural requirements of Chapter 3 or the Program requirements of Chapter 2 of this manual will not be met in full, the appeal shall be denied.  In such cases, the application for appeal is finally denied.

3.14.3. <u>Effect</u>.  All Decisions on Appeal shall be final and binding on the Applicant Laboratory.  No additional request for appeal shall be granted.

**3.15. Effect of Denial of Accreditation**.  An EAC denial of accreditation indicates only that an applicant laboratory has failed to document or otherwise demonstrate that it has the procedures, policies, management or personnel in place to meet the requirements of the Accreditation Program.  A denial of accreditation is based upon current policy and procedure and is not an indicator of past performance.  Laboratories denied accreditations have the right to cure any identified defect and reapply by resubmitting their application package consistent with Section 3.4 of this Chapter.

OMB Control Number:  3265-0018

# Compliance Management Program

**4.1.**   **Purpose**.  The purpose of the Compliance Management Program is to improve EAC's Laboratory Accreditation Program and testing; increase coordination, communication and understanding between the EAC and its VSTLs; and increase public confidence in elections by facilitating VSTL accountability.  The program accomplishes this by increasing personal interaction between EAC staff and VSTL personnel, collecting information and performing reviews to ensure continued compliance with program requirements, and requiring that VSTLs promptly remedy any identified areas of noncompliance.

**4.2.**   **Compliance Management Program, Generally**.  The Compliance Management Program meets its purposes by gathering information on the procedures and practices of its VSTLs. There are three main sources of information: (1) VSTL Notifications of Changes, (2) EAC Requests for Documents or Information and (3) EAC On Site Reviews.  The information collected is reviewed by the EAC to ensure that VSTLs are meeting all program requirements.  Any areas of noncompliance or recommendations for improvement are presented to VSTLs in a Compliance Management Report.  VSTLs are required to promptly remedy any noncompliance or face revocation of accreditation.

**4.3.**   **VSTL Notification of Changes**.  VSTLs are obligated to report any significant changes regarding the information, agreements or certifications made to the EAC as a condition of accreditation (see Section 2.7).  This requirement serves as the primary means by which the EAC maintains VSTL compliance.  Failure to report changes in conditions or practices may result in suspension or revocation of accreditation consistent with the requirements and procedures of Chapter 5.

**4.4.**   **Request for Documents and Information**.  The Program Director may request a VSTL to provide the EAC information and/or documents to demonstrate the laboratory's continuing compliance with the Accreditation Program requirements noted in Chapter 2 (See Section 2.2).

   4.4.1.   <u>EAC Request</u>.  A request for documents or information shall be made in writing by the Program Director and provide a reasonable timeframe for VSTL response. The request may be for documents, information or both:

      4.4.1.1.   *Request for Documents*.  A request for documents must identify the specific documents sought.  A request for documents is not a demand for the VSTL to create a document, but to provide the EAC a copy of any existing documentation responsive to the request.

OMB Control Number:  3265-0018

    *4.4.1.2. Request for Information.* Requests for information shall take the form of interrogatories. Each inquiry shall take the form of a discrete question. VSTLs are expected to provide complete answers to each question.

4.4.2. <u>VSTL Response</u>. VSTLs shall respond within the timeframe provided by the Program Director. If additional time is needed, VSTLs may request an extension. Such requests must be made within the timeframe of the original request. The grant of additional time is at the sole discretion of the Program Director.

    *4.4.2.1. Request for Documents.* VSTLs shall respond to requests for documents by having knowledgeable staff conduct a thorough search of VSTL records. VSTLs shall provide copies of all documents responsive to the request. If any document responsive to a request is considered privileged or otherwise protected from release under Federal law, it should be properly labeled. If no documents responsive to the request are found, the VSTL shall state that no records were found.

    *4.4.2.2. Request for Information.* VSTLs shall respond to requests for information by having knowledgeable staff answer each question posed. VSTLs shall ensure that each question is answered completely and accurately. The VSTL may submit documents in support of its responses.

4.4.3. <u>Failure to Respond</u>. Failure to timely respond to a request for documents or information may result in a suspension or revocation of accreditation consistent with the requirements and procedures of Chapter 5.

**4.5. Proficiency Testing.** VSTLs will comply with any guidelines and tests developed and administered by the EAC. This will include, but is not limited to, a written test focusing on scenario based and knowledge based questions.

**4.6. On Site Laboratory Review—Generally.** The Program Director shall provide for regular on site reviews of VSTLs. There are two types of onsite review:

4.6.1. <u>On Site Review—Policy, Procedures and Practices Review</u>. The most common type of review is the Policy, Procedure and Practices Review. This type of review requires EAC personnel to enter a VSTL facility, examine a variety of documentation and meet with VSTL personnel to confirm that the VSTL's policies, procedures and practices meet the requirements of the Laboratory Accreditation Program (Chapter 2).

4.6.2. <u>On Site Review—Testing Observation and Technical Assessment</u>. A Testing Observation and Technical Assessment Review requires an expert EAC laboratory assessor to enter a VSTL facility and assess the laboratory's technical

procedures, policies, management and personnel to verify compliance with applicable laboratory standards. Additionally, the EAC assessor may observe VSTL employees during the testing of voting systems to ensure that VSTL practices match technical policies.[8]

**4.7.** **On Site Laboratory Review—Frequency**. The Program Director shall ensure that each VSTL receives an On Site Policy, Procedures and Practices Review at least once every two years. Whenever possible, the EAC will conduct the required audits or follow up on site visits at the same time as NVLAP audits or follow up visits.

**4.8.** **On Site Laboratory Review—Procedure**. The Program Director shall determine when and what type of onsite review will be conducted for each VSTL. Before any on site review, the Program Director shall provide the VSTL with reasonable notice. Reviews shall be conducted with as little impact as possible on the activities of the VSTL. The VSTL and its employees are required to participate in the review and cooperate with on site EAC personnel. Finally, the reviewer shall provide the VSTL a short exit briefing prior to the termination of the onsite review.

    4.8.1.  <u>Notice</u>. The Program Director shall coordinate on site reviews with VSTL management. As reviews require the availability of laboratory documents and key personnel, a notice of onsite review shall be in writing and be provided to the VSTL at least 15 calendar days before the onsite review date. The notice shall provide the VSTL with the following information:

        *4.8.1.1.*  *Duration of Review*. The notice shall provide an estimated timeframe during which EAC reviewers will be on site.

        *4.8.1.2.*  *Type of Review*. The notice shall identify the type of review to be performed (see Section 4.6).

        *4.8.1.3.*  *Scope of Review*. The notice shall provide information regarding the scope of review. This information shall be sufficient to allow the VSTL to identify the documents, personnel and testing it must make available to EAC reviewers. The notice shall specifically identify:

            4.8.1.3.1.    The type of documents and/or program areas to be reviewed.

---

[8] EAC's authority to observe testing and conduct technical assessments serves only as an additional tool to ensure technical compliance. The primary means by which EAC ensures technical compliance is through NIST's NVLAP program. The NVLAP program monitors laboratories by requiring regular assessments. Laboratories are reviewed one year after their initial accreditation and biennially thereafter.

                    OMB Control Number:  3265-0018

4.8.1.3.2.   The testing that is to be observed.

4.8.1.4.   *VSTL's Responsibilities.*  The notice shall briefly inform the VSTL of its responsibility to coordinate and cooperate with the EAC throughout the onsite review process.

4.8.2.   <u>VSTL Response to Notice</u>.  Upon receipt of a notice of onsite review, the VSTL shall coordinate the logistics of the review with the Program Director.  In the event the noticed date or timeframe makes access to the required personnel, documents or testing untenable, the VSTL shall contact the Program Director in writing and identify, (1) The conflict or other problem which makes the proposed date and timeframe untenable, and (2) a proposed alternative date for the onsite review.  The acceptance of an alternative on site review date is at the sole discretion of the Program Director.

4.8.3.   <u>Review</u>.  An onsite review begins upon the arrival of EAC personnel at the VSTL's facility.  EAC reviewers will ordinarily conduct reviews during the VSTL's normal working hours.  The reviewers will make every effort to work as efficiently as possible and avoid impacting the laboratory's routine operations.  The VSTL and its employees are required to cooperate with EAC reviewers.  This cooperation includes providing a private, physical location for EAC personnel to review documents and speak with VSTL employees.  Generally, the VSTL shall be responsible for ensuring:

4.8.3.1.   *Document Access and Availability.*  That the reviewers have access to all requested VSTL documents.  All documents specifically identified in the notice of onsite review shall be presented to reviewers upon arrival.

4.8.3.2.   *Personnel Access and Availability.*  That the reviewers have reasonable access to requested personnel.  The VSTL shall ensure that key personnel for each substantive area identified in the notice of onsite review be available to EAC reviewers during the noticed review period.

4.8.3.3.   *Facilities and Testing Access and Availability.*  That the reviewers have access to VSTL facilities involved in the testing of voting systems, including the facilities of third party contractor laboratories.  Additionally, VSTLs must coordinate access to view testing consistent with the notice of onsite review.

4.8.4.   <u>Exit Briefing</u>.  EAC reviewers shall provide the VSTL personnel an exit briefing.  Exit briefings shall be informal.  The briefing shall identify any documents, information or personnel which the VSTL remains responsible for making available to the reviewers; inform the VSTL of the next steps in the review

process; and provide the VSTL an opportunity to ask questions about the process.

**4.9.    EAC Compliance Management Reports**.  The EAC shall issue a written Compliance Management Report after performing <u>any</u> on site review.  A Compliance Management Report shall also be issued after a Request for Documents/Information or VSTL Notification of Change when either indicates a noncompliance with program requirements.  All reports shall be posted on the EAC Web site and (1) provide a brief summary of the review process, request for information or VSTL Notification of Change (2) state any findings resulting from the review, and (3) identify any corrective action required.

4.9.1.    <u>Purpose</u>.  The purpose of the report is to provide the VSTL with EAC's findings regarding its program so that:

*4.9.1.1.*    Items of noncompliance may be identified and rectified,

*4.9.1.2.*    Exceptional practices may be identified and encouraged, and

*4.9.1.3.*    EAC recommendations (beyond the program requirements) may be put forth in an effort to improve the VSTL's program.

4.9.2.    <u>Summary of Process</u>.  The report shall provide a brief summary of the review process, request for information or VSTL Notification of Change.  The purpose of this summary is to provide background information regarding how the information supporting EAC findings was collected.  This includes identifying sources of information, methodology and standards.  For the purposes of onsite reviews, the  summary shall state:

*4.9.2.1.*    The dates of the review,

*4.9.2.2.*    The type of review performed,

*4.9.2.3.*    The program areas reviewed, including any specific documents and personnel discussions which were integral to the report findings, and

*4.9.2.4.*    The processes used by the reviewers to determine compliance.

4.9.3.    <u>Findings</u>.  The report shall outline any findings of the review, request for information or VSTL Notification of Change.  A finding is any factual determination that the VSTL is not in compliance with the program requirements identified in Chapter 2 of this Manual or an EAC recommendation for program improvement which does not rise to the level of noncompliance.  While reports

may also contain recognition of exceptional practices, such statements are not considered findings.  Reports shall identify three types of findings:

4.9.3.1.  *Critical*.  A critical finding is a determination that the VSTL has not met a requirement of the program that is fundamentally critical to the VSTL's technical capability to test voting systems.  A critical noncompliance is a violation of program requirements that by its very nature comprises the integrity of the EAC Testing and Certification Program.

4.9.3.2.  *Required*.  A required finding is a determination that the VSTL has failed to meet a requirement of the program that is not considered technically critical pursuant to Section 4.8.3.1., above.

4.9.3.3.  *Recommended*.  A recommended finding is a determination that VSTL practices could be improved, but that the identified improvement is not required by the program.  In some cases, recommended practices may be practices the EAC plans to make program requirements.

4.9.4.  <u>Corrective Action</u>.  The report shall specify the action to be taken by the EAC and/or VSTL based upon the review findings.

**4.10.  Corrective Action**.  Based upon the Compliance Management Report, corrective action may be required.  EAC action and VSTL responsibilities will vary depending upon the nature of the report's findings.

4.10.1.  <u>Critical</u>.  Critical Findings require the EAC to initiate the immediate suspension of the VSTL consistent with the requirements and procedures of Chapter 5, *Revocation of Accreditation*.  The VSTL's rights to remedy its noncompliance or be heard are laid out in Chapter 5.

4.10.2.  <u>Required</u>.  Required Findings obligate the VSTL to resolve the identified non-compliance within 20 days.  Failure to do so within the 20 day timeframe will result in suspension or revocation of accreditation consistent with the procedures laid out in Chapter 5, *Revocation of Accreditation.*  The VSTL may resolve a Required Finding by:

4.10.2.1.  *Challenging the Finding*.  The VSTL may challenge a finding if it believes its procedures and practices were in compliance with program requirements at the time of the review.  A VSTL shall challenge a Required Finding by providing factual information which documents its claim of compliance.  Challenges must be filed within 5 days of receipt of the EAC Report.  The challenge must be in writing, state the basis for

the challenge, address the facts and conclusions in the EAC report, and provide information which unambiguously documents that the VSTL was in compliance at the time of the review, request for information or VSTL Notification of Change.  The EAC Program Director will accept or reject a VSTL's challenge in writing.  If a challenge is accepted, no corrective action will be required.  If the challenge is rejected, the VSTL will have 20 days from receipt of the notice of rejection to perform remedial action.

4.10.2.2. *Conducting Remedial Action.*  VSTLs may take corrective action by submitting a remedial plan within 20 days of receipt of the report.  The remedial plan shall (for each finding of noncompliance) identify the noncompliance, outline the steps to be taken to achieve compliance, state the timeframe for each step and identify the means and final date by which the VSTL will document compliance.  A remedial plan is subject to approval from the Program Director.  A VSTL's failure to obtain approval of a remedial plan or unauthorized deviation from an approved plan's requirements or deadlines will result in suspension or revocation of accreditation consistent with the procedures laid out in Chapter 5, *Revocation of Accreditation.*

4.10.3.  <u>Recommended</u>.  Recommended findings do not require VSTL action.  The proposed remedial actions for recommended findings are not program requirements, but EAC suggested practices.

# Revocation of Accreditation

**5.1.** **Overview**.  This chapter puts forth the process for revoking the accreditation of an EAC VSTL.  The process for revocation begins with factual findings made pursuant to the Compliance Management Program (Chapter 4).  Prior to any revocation of accreditation, VSTLs which fail to comply with program requirements are provided notice of (1) EAC's intent to suspend, (2) suspension and (3) an opportunity to be heard or cure noncompliance.  A laboratory that has its accreditation revoked has the right to appeal.

**5.2.** **Revocation Policy**.  EAC Accreditation is subject to revocation.  The EAC shall revoke an accreditation upon a factual finding that a VSTL has failed to meet a requirement of the Accreditation Program and is unable or unwilling to timely and properly remedy the non-compliance.

**5.3.** **Revocation—Generally**.  The EAC monitors its VSTLs through its Compliance Management Program (Chapter 4).  This program monitors compliance through (1) the VSTL's continuing obligation to provide EAC Notifications of Changes, (2) EAC's authority to issue Requests for Documents or Information and (3) the performance of On Site Reviews.  Determinations that a VSTL is not complying with program requirements shall be made in Compliance Management Reports (findings of non-compliance).  The process outlined in this chapter to suspend and revoke a VSTL's accreditation shall be initiated (1) immediately for Critical Findings of noncompliance and (2) after an opportunity to remedy the noncompliance for Required Findings (consistent with the process mandated by Section 4.9).  Revocation of Accreditation is a three step process:

    5.3.1.   Notice of Intent to Suspend;

    5.3.2.   Suspension of Accreditation; and

    5.3.3.   Commissioners' Decision on Revocation of Accreditation.

**5.4.** **Notice of Intent to Suspend**.  The revocation process shall be initiated by issuing a Notice of Intent to Suspend to a non-compliant VSTL.  Such notices shall be issued by the Program Director.  VSTLs shall have three days to submit a response to the notice.  The EAC will issue a decision on suspension after consideration of the VSTL's submission.

    5.4.1.   <u>Written Notice</u>.  The Notice of Intent to Suspend shall be in writing and:

        *5.4.1.1.*   Inform the VSTL of the EAC's intent to suspend the laboratory;

        *5.4.1.2.*   Identify the program requirement or requirements with which the VSTL has failed to comply;

OMB Control Number:  3265-0018

    *5.4.1.3.*  State the factual finding or findings that serve as the basis of the action;

    *5.4.1.4.*  Provide a copy of the relevant Compliance Management Report; and

    *5.4.1.5.*  Inform the VSTL of its right to file a response to the notice.

5.4.2.  <u>VSTL Response</u>.  The VSTL may respond to the notice of intent to suspend. Responses must be received by the EAC Program Director within **three days** of the VSTLs receipt of the Notice of Intent to Suspend to be eligible for consideration.  The VSTL response:

    *5.4.2.1.*  Must be in writing;

    *5.4.2.2.*  Must be timely submitted to be considered;

    *5.4.2.3.*  Must challenge the factual finding or findings that serve as the basis of the suspension;

    *5.4.2.4.*  May include relevant documentation in support of its challenge.

5.4.3.  <u>EAC Consideration of Response</u>.  The EAC shall consider the timely submission of a VSTL before issuing a Decision of Suspension.  The EAC may consult experts, perform research and request additional information from the VSTL during the consideration process.

5.4.4.  <u>EAC Decision on Suspension</u>.  The EAC shall issue a Decision on Suspension. The decision shall be made in writing by the Program Director.  A decision shall state (1) the decision of the Program Director, (2) the basis for and reasoning behind the decision and (3) the VSTL's obligations and rights during suspension (if applicable).  A Decision on Suspension shall be provided to the VSTL, issued to all registered Manufacturers and posted on EAC's Web site.  The Program Director may make one of two determinations in a Decision on Suspension:

    *5.4.4.1.*  *Program Compliance*.  Based upon the EAC's consideration of a VSTL's response to the notice of intent to suspend, the Program Director may overturn the factual findings that served as the basis of the notice.  In such cases, the Program Director shall determine that the VSTL is in compliance with all program requirements.  A decision that the VSTL is in compliance shall end the revocation process.

    *5.4.4.2.*  *Suspension*.  The Program Director shall suspend the VSTL consistent with the notice of intent to suspend when the preponderance of the

OMB Control Number:  3265-0018

evidence indicates noncompliance with program requirements. Suspension is effective as of the VSTL's receipt of the decision.

**5.5.** **Suspension of Accreditation**.  Suspension is the second step in the revocation process.  The purpose of Suspension is (1) to provide the suspended VSTL an opportunity to timely cure the noncompliance which served as the basis of Suspension or (2) grant the suspended VSTL an opportunity to be heard prior to revocation of accreditation.  A suspended VSTL shall have 20 days to either cure its noncompliance or request an opportunity to be heard.  If no action is taken by the suspended VSTL within the 20 days, the EAC Commissioners shall make a decision on revocation.

5.5.1.  <u>Effect of Suspension</u>.  A suspended VSTL shall immediately cease all testing of voting systems under the EAC's Certification Program.  Any testing performed by a suspended VSTL during its suspension will not be accepted by the EAC under its Voting System Certification Program.  Any period of suspension must be clearly documented in a VSTL's test report (see Chapter 4 of the EAC *Voting System Testing and Certification Manual*).  Testing under the EAC Certification Program shall not resume unless the suspension is lifted or the VSTL is otherwise authorized by the EAC (in writing) to recommence testing.

5.5.2.  <u>Opportunity to Cure</u>.  A suspended VSTL may request the opportunity to cure its noncompliance within 20 days of its receipt of the Program Director's Decision on Suspension.  **The request must include a detailed remedial plan**.  If this plan is accepted, properly executed and verified, the VSTL's suspension will be lifted and it may resume testing.

5.5.2.1.  *Remedial Plan*.  A request to cure noncompliance must include a plan by which the VSTL outlines how it will timely bring its laboratory into full compliance with the program.  The remedial plan shall:

5.5.2.1.1.  Identify each noncompliance which served as the basis of its suspension;

5.5.2.1.2.  For each identified noncompliance, outline the steps to be taken to achieve compliance.  This includes identifying the resources and personnel needed for each step;

5.5.2.1.3.  Provide a timeframe for the completion of each identified step and state the final date by which the VSTL will complete the compliance plan;

5.5.2.1.4.  Provide a schedule of periodic progress reports to the Program Director; and

5.5.2.1.5.   Require the VSTL to provide the EAC a written certification attesting to its completion of the remedial plan and full compliance with program requirements at close of the process.

5.5.2.2.   *EAC Action on Plan.*  A remedial plan is subject to approval by the Program Director.  The Program Director will work with the suspended VSTL to develop and approve a Remedial Plan that appropriately brings the laboratory into compliance within an acceptable timeframe.  Remedial Plans shall be approved in writing.  Ultimately, a VSTL's failure to cooperate or otherwise obtain approval of a remedial plan will result in the termination of the cure process.  A determination to terminate the cure process will be made in writing by the Program Director.  Upon receipt of a notice that the cure process has been terminated, a suspended VSTL shall have 10 days to request an opportunity to be heard on revocation of accreditation (see Section 5.5.3., below).

5.5.2.3.   *VSTL Implementation of Plan.*  After the remedial plan has been approved by the Program Director, the VSTL shall begin implementation.  The VSTL shall not deviate from an approved plan's procedures, requirements or deadlines without the written consent of the Program Director.  Failure to follow the remedial plan will result in the termination of the cure process.  A determination to terminate the cure process will be made in writing by the Program Director.  Upon receipt of a notice that the cure process has been terminated, a suspended VSTL shall have 10 days to request an opportunity to be heard on revocation of accreditation (see Section 5.5.3., below).

5.5.2.4.   *EAC Verification of Remedy.*  Upon a VSTL's timely completion of the remedial plan and receipt of the VSTL's Certification (see Section 5.5.2.1.5.), the Program Director shall verify compliance.  At the discretion of the Program Director, he or she may verify compliance through the acceptance of the VSTL's Certification or through the various components of the Compliance Management Program (Chapter 4).  If the Program Director determines that the remedial plan was not completed, he or she may terminate the cure process.  A determination to terminate the cure process will be made in writing.  Upon receipt of a notice that the cure process has been terminated, a suspended VSTL shall have 10 days to request an opportunity to be heard on revocation of accreditation (see Section 5.5.3., below).

                    OMB Control Number:  3265-0018

5.5.2.5.  *Notice of Compliance*.  The Program Director shall document his or her verification that the remedial plan was complete by providing a written notice of compliance to the VSTL.  This notice shall state that the VSTL is in compliance with program requirements and that the suspension is lifted.  The notice shall be posted on the EAC's Web site and provided to all registered Manufacturers.

5.5.3.  <u>Opportunity to be Heard on Revocation of Accreditation</u>.  A VSTL has the right to timely challenge the revocation of its accreditation prior to an EAC Decision on Revocation.  Unless otherwise noted above, a VSTL has 20 days from the date it received its Decision on Suspension to submit a challenge.  Late submissions will not be considered.  All challenges of revocation will be heard by the EAC Commissioners.  A challenge of revocation shall be submitted to the Program Director, and addressed to the Chair of the U.S. Election Assistance Commission.  Each challenge of revocation shall be in writing and:

5.5.3.1.  Shall identify each noncompliance which served as the basis of its suspension;

5.5.3.2.  Shall identify, document and provide verification of any remedial action completed;

5.5.3.3.  Shall provide, for each identified noncompliance, a written argument challenging the finding of noncompliance;  and

5.5.3.4.  May provide any documentation and information in support of the written statement.

**5.6.  Commissioners' Decision on Revocation of Accreditation**.  Pursuant to HAVA, a VSTL may have its accreditation revoked only by a vote of the EAC Commissioners.  Upon a timely receipt of a challenge of revocation, the program Director shall provide each Commissioner all relevant documentation including: (1) the VSTL's submission challenging revocation, (2) copies of any terminated cure plans (3) the Notice of Intent to Suspend, (4) the Compliance Management Report; (5) any documents pertaining to challenges or remedial plans provided by the VSTL in response to a relevant Compliance Management report; and (5) a Program Director recommendation as to disposition.

5.6.1.  <u>Consideration</u>.  Each Commissioner shall review and consider all relevant materials he or she has been provided.  A Commissioner may request the Program Director to provide additional relevant materials or information held by the EAC or VSTL.  Such requests and any responsive materials shall be provided to each Commissioner.  The Chair of the Commission shall ensure that each

OMB Control Number:  3265-0018

Commissioner has sufficient time to consider the relevant material before a vote is called.

5.6.2.  <u>Process</u>.  After a reasonable time to review the forwarded materials, the Chair of the Commission shall bring the Decision of Revocation of Accreditation to a vote, consistent with the rules of the Commission.  The measure presented for a vote shall take the form of a written Commissioners' Decision on Revocation, which:

    5.6.2.1.  *Makes a clear determination as to revocation on accreditation*.  The Commissioners shall ultimately make one of two decisions:

        5.6.2.1.1.  Program Compliance.  If the VSTL demonstrates that it meets <u>all</u> program requirements, successfully challenging <u>all</u> previous findings of noncompliance, the Commissioners shall find the VSTL compliant, reject the revocation of accreditation and lift the VSTL's suspension.

        5.6.2.1.2.  Revocation of Accreditation.  If the VSTL does not demonstrate that it meets <u>all</u> program requirements and at least one previous finding of noncompliance stands, the Commissioners shall find the VSTL noncompliant and revoke its accreditation.

    5.6.2.2.  *Provides a finding with regard to each identified noncompliance which served as the basis of suspension*; and

    5.6.2.3.  *Identifies the documents and information that served as the basis for the Decision.*

5.6.3.  <u>Decision—Notice</u>.  After a vote of the Commissioners adopting a Decision on Revocation, the Program Director shall forward the decision to the VSTL.  At that time the Program Director shall provide the VSTL notice of decision which includes a summary of the laboratory's appeal rights consistent with Section 5.8., below.

5.6.4.  <u>Decision—Publication</u>.  After a vote of the Commissioners adopting a Decision on Revocation, the Program Director shall cause the decision to be posted on the EAC's Web site, issue a copy to each registered voting system Manufacturer and provide the decision to the Director of NIST.

**5.7.  Effect of Revocation of Accreditation**.  A revocation of accreditation is effective upon the vote of the Commissioners.  Laboratories that have had their accreditation revoked may no longer test voting systems or submit test reports under the EAC certification program.

    OMB Control Number:  3265-0018

The laboratories may not represent themselves as accredited by EAC. A laboratory which has had its accreditation revoked may reapply for an EAC accreditation consistent with the requirements of Chapter 2, only after the EAC receives a new recommendation for their participation from NIST. Where a revocation of accreditation results in the termination of testing prior to completion, the laboratory which has had its accreditation revoked must provide information to the EAC consistent with 2.10.7. of this manual. Manufacturers may request the EAC grant permission to replace their lead VSTL pursuant to section 4.3.1.2. of the *Voting System Testing and Certification Program Manual*.

**5.8.** **Requesting Appeal**. A laboratory that has had its accreditation revoked by a vote of the Commissioners shall have the right to appeal. A Laboratory may appeal a Decision to Revoke an Accreditation by first issuing a written request for appeal.

    5.8.1. <u>Submission</u>. Requests must be submitted in writing to the Program Director, addressed to the Chair of the U.S. Election Assistance Commission.

    5.8.2. <u>Timing of Appeal</u>. The laboratory may request an appeal within 7 calendar days of receipt of the Notice of Decision. Late requests will not be considered.

    5.8.3. <u>Contents of Request</u>. The request must petition for reconsideration of the Commissioners' Decision on Revocation and clearly state the specific conclusions of the Decision the laboratory wishes to appeal.

**5.9.** **EAC Action on a Request for Appeal**. The Program Director shall accept any request for appeal timely submitted. Untimely requests shall be rejected. Upon receipt of a request for appeal, the Program Director shall notify the requestor laboratory, in writing, as to whether their appeal has been accepted as timely. The notice for accepted requests shall inform the applicant laboratory of the requirements for submitting their appeal per Section 5.10. of this Manual.

**5.10.** **Submission of Appeal**. After submission of a timely request for appeal, the Laboratory shall submit its appeal. This appeal shall (1) clearly identify the specific conclusions of the Commissioners' Decision the laboratory wishes to challenge, (2) provide the basis for its position on appeal and (3) submit a written argument in support of its appeal. In addition, the applicant laboratory may submit documentary or other relevant, physical evidence in support of the appeal. The Appeal and all supporting materials must be received by the EAC within 20 days of the applicant laboratory's receipt of the Program Director's notice of acceptance of the request to appeal.

**5.11.** **Consideration of Appeal**. All timely appeals will be considered by the Commissioners. Upon receipt of an appeal, the Chair of the Commission shall forward to each EAC Commissioner the laboratory's appellate submission, along with the original information considered during the Commissioners Decision on Revocation (see Section 5.6.). After a

reasonable time to review and consider the forwarded materials, the Chair of the Commission shall bring the matter to a vote, consistent with the rules of the Commission. The measure presented for a vote shall take the form of a written Commissioners' Decision on Appeal.

**5.12.** **Commissioner's Decision on Appeal**.  The Commissioners shall make a written, final Decision on Appeal and shall provide it to the laboratory.

    5.12.1.  <u>Contents</u>.  The Decision on Appeal shall:

        *5.12.1.1.* State the final determination of the Commission.

        *5.12.1.2.* Address the matters raised by the laboratory on appeal.

        *5.12.1.3.* Provide the reasoning behind the decision.

        *5.12.1.4.* State that the Decision on Appeal is final.

    5.12.2.  <u>Determinations</u>.  The Commissioners shall make one of two determinations on appeal.

        *5.12.2.1. Grant of Appeal.*  If the Commissioners determine that the previous Decision of the Commission shall be overturned *in full*, and the laboratory meets all program requirements, the appeal shall be granted.  In such cases, the laboratory shall have its accreditation immediately reinstated.

        *5.12.2.2. Denial of Appeal.*  If the Commissioners determine that *any part* of the previous Decision of the Commission shall be upheld such that the procedural requirements of Chapter 3 or the Program requirements of Chapter 2 of this manual will not be met in full, the appeal shall be denied.  In such cases, the application for appeal is finally denied.

    5.12.3.  <u>Effect</u>.  All Decisions on Appeal shall be final and binding on the Applicant Laboratory.  No additional request for appeal shall be granted.

    5.12.4.  <u>Notice</u>.  After a vote of the Commissioners adopting a Decision on Appeal, the Program Director shall forward the decision to the VSTL.

    5.12.5.  <u>Publication</u>.  After a vote of the Commissioners adopting a Decision on Appeal, the Program Director shall cause the decision to be posted on the EAC Web site, issue a copy to each registered voting system Manufacturer and provide the decision to the Director of NIST.

<span style="color:red">OMB Control Number:  3265-0018</span>

# Requests for Interpretations

**6.1.** **Overview**.  A Request for Interpretation is a means by which a registered Manufacturer or VSTL may seek clarification on a specific EAC voting system standard (VVSG).  An Interpretation is a clarification of the voting system standards and guidance on how to properly evaluate conformance to it.  Suggestions or requests for modifications to the standards are provided by other processes.  This chapter outlines the policy, requirements, and procedures for submitting a Request for Interpretation.

**6.2.** **Policy**.  Registered Manufacturers or VSTLs may request that the EAC provide a definitive Interpretation of EAC-accepted voting system standards (VVSG) when, in the course of developing or testing a voting system, facts arise that make the meaning of a particular standard ambiguous or unclear.  The EAC may self-initiate such a request when its agents identify a need for interpretation within the program.  An Interpretation issued by the EAC will serve to clarify what a given standard requires and how to properly evaluate compliance.  An Interpretation does not amend voting system standards, but serves only to clarify existing standards.

**6.3.** **Requirements for Submitting a Request for Interpretation**.  An EAC Interpretation is limited in scope.  The purpose of the Interpretation process is to provide Manufacturers or VSTLs who are in the process of developing or testing a voting system a means for resolving the meaning of a voting system standard in light of specific voting system technology without having to present a finished product to EAC for certification.  To submit a Request for Interpretation, one must (1) be a proper requester, (2) request interpretation of an applicable voting system standard, (3) present an actual controversy, and (4) seek clarification on a matter of unsettled ambiguity.

6.3.1.  <u>Proper Requestor</u>.  A Request for Interpretation may be submitted only by a registered Manufacturer or a VSTL.  Requests for Interpretation will not be accepted from any other parties.

6.3.2.  <u>Applicable Standard</u>.  A Request for Interpretation is limited to queries on EAC voting system standards (i.e., VVSG).  Moreover, a Manufacturer or VSTL may submit a Request for Interpretation only on a version of EAC voting system standards to which the EAC currently offers certification.

6.3.3.  <u>Existing Factual Controversy</u>.  To submit a Request for Interpretation, a Manufacturer or VSTL must present a question relative to a specific voting system or technology proposed for use in a voting system.  A Request for Interpretation on hypothetical issues will not be addressed by the EAC.  To submit a Request for Interpretation, the need for clarification must have arisen from the development or testing of a voting system.  A factual controversy exists

OMB Control Number:  3265-0018

when an attempt to apply a specific section of the VVSG to a specific system or piece of technology creates ambiguity.

6.3.4.  <u>Unsettled, Ambiguous Matter</u>.  Requests for Interpretation must involve actual controversies that have not been previously settled.  This requirement mandates that interpretations contain actual ambiguities not previously clarified.

6.3.4.1.  *Actual Ambiguity*.  A proper Request for Interpretation must contain an actual ambiguity.  The interpretation process is not a means for challenging a clear EAC voting system standard.  Recommended changes to voting system standards are welcome and may be forwarded to the EAC, but they are not part of this program.  An ambiguity arises (in applying a voting system standard to a specific technology) when one of the following occurs:

6.3.4.1.1.  The language of the standard is unclear on its face;

6.3.4.1.2.  One section of the standard seems to contradict another, relevant section;

6.3.4.1.3.  The language of the standard, though clear on its face, lacks sufficient detail or breadth to determine its proper application to a particular technology;

6.3.4.1.4.  The language of a particular standard, when applied to a specific technology, clearly conflicts with the established purpose or intent of the standard; or

6.3.4.1.5.  The language of the standard is clear, but the proper means to assess compliance is unclear.

6.3.4.2.  *Not Previously Clarified*.  The EAC will not accept a Request for Interpretation when the issue has previously been clarified.

**6.4.  Procedure for Submitting a Request for Interpretation**.  A Request for Interpretation shall be made in writing to the Program Director.  All requests should be complete and as detailed as possible because Interpretations issued by the EAC are based on, and limited to, the facts presented.  Failure to provide complete information may result in an Interpretation that is off point and immaterial to the issue at hand.  The following steps must be taken when writing a Request for Interpretation:

6.4.1.  <u>Establish Standing To Make the Request</u>.  To make a request, one must meet the requirements identified in Section 6.3. above.  Thus, the written request must

      OMB Control Number:  3265-0018

provide sufficient information for the Program Director to conclude that the requestor is (1) a proper requester, (2) requesting an Interpretation of an applicable voting system standard, (3) presenting an actual factual controversy, and (4) seeking clarification on a matter of unsettled ambiguity.

6.4.2.  <u>Identify the EAC Voting System Standard To Be Clarified</u>.  The request must identify the specific standard or standards for which the requestor seeks clarification.  The request must state the version of the voting system standards at issue (if applicable) and quote and correctly cite the applicable standards.

6.4.3.  <u>State the Facts Giving Rise to the Ambiguity</u>.  The request must provide the facts associated with the voting system technology that gave rise to the ambiguity in the identified standard.  The requestor must be careful to provide all necessary information in a clear, concise manner.  Any Interpretation issued by the EAC will be based on the facts provided.

6.4.4.  <u>Identify the Ambiguity</u>.  The request must identify the ambiguity it seeks to resolve.  The ambiguity shall be identified by stating a concise question that meets the following requirements:

*6.4.4.1.*  Shall be clearly stated;

*6.4.4.2.*  Shall be related to and reference the voting system standard and voting system technology information provided; and

*6.4.4.3.*  Shall be limited to a single issue.  Each question or issue arising from an ambiguous standard must be stated separately.  Compound questions are unacceptable.  If multiple issues exist, they should be presented as individual, numbered questions.

*6.4.4.4.*  Shall be stated in a way that can ultimately be answered *yes* or *no*.

6.4.5.  <u>Provide a Proposed Interpretation</u>.  A Request for Interpretation should propose an answer to the question posed.  The answer should interpret the voting system standard in the context of the facts presented.  It should also provide the basis and reasoning behind the proposal.

**6.5.  EAC Action on a Request for Interpretation**.  Upon receipt of a Request for Interpretation, the EAC shall take the following action:

6.5.1.  <u>Review the Request</u>.  The Program Director shall review the request to ensure it is complete, is clear, and meets the requirements of Section 6.3.  Upon review, the Program Director may take the following action:

OMB Control Number:  3265-0018

    6.5.1.1.   *Request Clarification*.  If the Request for Interpretation is incomplete or additional information is otherwise required, the Program Director may request that the Manufacturer or VSTL clarify its Request for Interpretation and identify any additional information required.

    6.5.1.2.   *Reject the Request for Interpretation*.  If the Request for Interpretation does not meet the requirements of Section 6.3., the Program Director may reject it.  Such rejection must be provided in writing to the Manufacturer or VSTL and must state the basis for the rejection.

    6.5.1.3.   *Notify Acceptance of the Request*.  If the Request for Interpretation is acceptable, the Program Director will notify the Manufacturer or VSTL in writing and provide it with an estimated date of completion.  A Request for Interpretation may be accepted in whole or in part.  A notice of acceptance shall state the issues accepted for interpretation.

6.5.2.   <u>Consideration of the Request</u>.  After a Request for Interpretation has been accepted, the matter shall be investigated and researched.  Such action may require the EAC to employ technical experts.  It may also require the EAC to request additional information from the Manufacturer or VSTL.  The Manufacturer or VSTL shall respond promptly to such requests.

6.5.3.   <u>Interpretation</u>.  The Decision Authority shall be responsible for making determinations on a Request for Interpretation.  After this determination has been made, a written Interpretation shall be sent to the Manufacturer or VSTL. The following actions are necessary to prepare this written Interpretation:

    6.5.3.1.   State the question or questions investigated;

    6.5.3.2.   Outline the relevant facts that served as the basis of the Interpretation;

    6.5.3.3.   Identify the voting system standards interpreted;

    6.5.3.4.   State the conclusion reached; and

    6.5.3.5.   Inform the Manufacturer or VSTL of the effect of an Interpretation (see Section 6.6.).

**6.6.   Effect of Interpretation**.  Interpretations are fact specific and case specific.  They are not tools of policy, but specific, fact-based guidance useful for resolving a particular problem. An Interpretation is determinative and conclusive only with regard to the case presented. Nevertheless, Interpretations do have some value as precedent. Interpretations published

by the EAC shall serve as reliable guidance and authority over identical or similar questions of interpretation.  These Interpretations will help users understand and apply the provisions of EAC voting system standards.

**6.7.**  **Library of Interpretations**.  To better serve Manufacturers, VSTLs, and those interested in the EAC voting system standards, the Program Director shall publish EAC Interpretations.  All proprietary information contained in an Interpretation will be redacted before publication consistent with Chapter 7 of this Manual.  The library of published opinions is posted on the EAC Web site: www.eac.gov.

OMB Control Number:  3265-0018

# Release of Laboratory Accreditation Program Information

**7.1.    Overview**.  VSTLs participating in the Certification Program will be required to provide the EAC a variety of documents.  In general, these documents will be releasable to the public.  Moreover, in many cases, the information provided will be affirmatively published by the EAC.  In limited cases, however, documents may not be released if they include trade secrets, confidential commercial information, or personal information.  While the EAC is ultimately responsible for determining which documents Federal law protects from release, VSTLs must identify the information they believe is protected and provide substantiation and a legal basis for withholding.  This chapter discusses EAC's general policy on the release of information and provides VSTL's with standards, procedures, and requirements for identifying documents as trade secrets or confidential commercial information.

**7.2.    EAC Policy on the Release of Certification Program Information.**  The EAC seeks to make its Voting System Test Laboratory Program as transparent as possible.  The agency believes that such action benefits the program by increasing public confidence in the process and creating a more informed and involved public.  As such, it is the policy of the EAC to make all documents, or severable portions thereof, available to the public consistent with Federal law (e.g. Freedom of Information Act (FOIA) and the Trade Secrets Act).

    7.2.1.    <u>Requests for information</u>.  As in any Federal program, members of the public may request access to Certification Program documents under FOIA (5 U.S.C. §552).  The EAC will promptly process such requests per the requirements of that Act.

    7.2.2.    <u>Publication of documents</u>.  Beyond the requirements of FOIA, the EAC intends to affirmatively publish program documents (or portions of documents) it believes will be of interest to the public.  This publication will be accomplished through the use of the EAC Web site (www.eac.gov).  The published documents will cover the full spectrum of the program, including information pertaining to:

        *7.2.2.1.*    Accredited Laboratories;

        *7.2.2.2.*    VSTL test plans;

        *7.2.2.3.*    VSTL test reports;

        *7.2.2.4.*    Agency decisions;

        *7.2.2.5.*    Denials of Certification;

     *7.2.2.6.*   Issuance of Certifications;

     *7.2.2.7.*   Compliance Management Reports;

     *7.2.2.8.*   Suspensions or Revocation of Accreditations;

     *7.2.2.9.*   Appeals;

     *7.2.2.10.* Official Interpretations (VVSG); and

     *7.2.2.11.* Other topics as determined by the EAC.

  7.2.3.   <u>Trade Secret and Confidential Commercial Information</u>.  Federal law places a number of restrictions on a Federal agency's authority to release information to the public.  Two such restrictions are particularly relevant to the Accreditation Program: (1) trade secrets information and (2) privileged or confidential commercial information.  Both types of information are explicitly prohibited from release by the FOIA and the Trade Secrets Act (18 U.S.C. §1905).

**7.3.**  **Trade Secrets**.  A trade secret is a secret, commercially valuable plan, process, or device that is used for the making or processing of a product and that is the end result of either innovation or substantial effort.  It relates to the productive process itself, describing how a product is made.  It does not relate to information describing end product capabilities, features, or performance.

  7.3.1.   The following examples illustrate productive processes that may be trade secrets:

     *7.3.1.1.*  Plans, schematics, and other drawings useful in production.

     *7.3.1.2.*  Specifications of materials used in production.

     *7.3.1.3.*  Voting system source code used to develop or manufacture software where release would reveal actual programming.

     *7.3.1.4.*  Technical descriptions of manufacturing processes and other secret information relating directly to the production process.

  7.3.2.   The following examples are likely not trade secrets:

     *7.3.2.1.*  Information pertaining to a finished product's capabilities or features.

     *7.3.2.2.*  Information pertaining to a finished product's performance.

OMB Control Number:  3265-0018

7.3.2.3.  Information regarding product components that would not reveal any commercially valuable information regarding production.

**7.4.**  **Privileged or Confidential Commercial Information**.  Privileged or confidential commercial information is that information submitted by a VSTL that is commercial or financial in nature and privileged or confidential.

7.4.1.  <u>Commercial or Financial Information</u>.  The terms *commercial* and *financial* should be given their ordinary meanings.  They include records in which a submitting VSTL has any *commercial interest*.

7.4.2.  <u>Privileged or Confidential Information</u>.  Commercial or financial information is privileged or confidential if its disclosure would likely cause substantial harm to the competitive position of the submitter.  The concept of harm to one's competitive position focuses on harm flowing from a competitor's affirmative use of the proprietary information.  It does not include incidental harm associated with upset customers or employees.

**7.5.**  **EAC's Responsibilities**.  The EAC is ultimately responsible for determining whether or not a document (in whole or in part) may be released pursuant to Federal law.  In doing so, however, the EAC will require information and input from the VSTL submitting the documents.  This requirement is essential for the EAC to identify, track, and make determinations on the large volume of documentation it receives.  The EAC has the following responsibilities:

7.5.1.  <u>Managing Documentation and Information</u>.  The EAC will control the documentation it receives by ensuring that documents are secure and released to third parties only after the appropriate review and determination.

7.5.2.  <u>Contacting a VSTL on Proposed Release of Potentially Protected Documents</u>.  In the event a member of the public submits a FOIA request for documents provided by a VSTL or the EAC otherwise proposes the release of such documents, the EAC will take the following actions:

7.5.2.1.  Review the documents to determine if they are potentially protected from release as trade secrets or confidential commercial information. The documents at issue may have been previously identified as protected by the VSTL when submitted (see Section 7.6.1. below) or identified by the EAC on review.

7.5.2.2.  Grant the submitting VSTL an opportunity to provide input.  In the event the information has been identified as potentially protected from release as a trade secret or confidential commercial information, the

EAC will notify the submitter and allow it an opportunity to submit its position on the issue prior to release of the information.  The submitter shall respond consistent with Section 7.6.1. below.

7.5.3.  <u>Final Determination on Release</u>.  After providing the submitter of the information an opportunity to be heard, the EAC will make a final decision on release.  The EAC will inform the submitter of this decision.

**7.6.  VSTL's Responsibilities**.  Although the EAC is ultimately responsible for determining if a document, or any portion thereof, is protected from release as a trade secret or confidential commercial information, the VSTL shall be responsible for identifying documents, or portions of documents, it believes warrant such protection.  Moreover, the VSTL will be responsible for providing the legal basis and substantiation for its determination regarding the withholding of a document.  This responsibility arises in two situations: (1) upon the initial submission of information and (2) upon notification by the EAC that it is considering the release of potentially protected information.

7.6.1.  <u>Initial Submission of Information</u>.  When a VSTL is submitting documents to the EAC as required by the Accreditation or Certification Programs, it is responsible for identifying any document or portion of a document that it believes is protected from release by Federal law.  VSTLs shall identify protected information[9] by taking the following action:

7.6.1.1.  *Submitting a Notice of Protected Information*.  This notice shall identify the document, document page, or portion of a page that the VSTL believes should be protected from release.  This identification must be done with specificity.  For each piece of information identified, the VSTL must state the legal basis for its protected status.

7.6.1.1.1.  Cite the applicable law that exempts the information from release.

7.6.1.1.2.  Clearly discuss why that legal authority applies and why the document must be protected from release.

7.6.1.1.3.  If necessary, provide additional documentation or information. For example, if the VSTL claims a document contains confidential commercial information, it would also

---

[9] Documents submitted by the VSTL may include information that is a trade secret or confidential commercial information of a Manufacturer.  The VSTL shall take steps to identify any information it believes may be protected.  The VSTL may seek the input of the Manufacturer when identifying potentially protected information pursuant to the requirements of this chapter.  All communications on this matter shall be in writing.

                                           OMB Control Number:  3265-0018

have to provide evidence and analysis of the competitive harm that would result upon release.

7.6.1.2. *Label Submissions*. Label all submissions identified in the notice as "Proprietary Commercial Information." Label only those submissions identified as protected. Attempts to indiscriminately label all materials as proprietary will render the markings moot.

7.6.2. <u>Notification of Potential Release</u>. In the event a VSTL is notified that the EAC is considering the release of information that may be protected, the VSTL shall take the following action:

7.6.2.1. Respond to the notice in writing within 15 calendar days. If additional time is needed, the VSTL must promptly notify the Program Director. Requests for additional time will be granted only for good cause and must be made before the 15-day deadline. VSTLs that do not respond in a timely manner will be viewed as not objecting to release.

7.6.2.2. Clearly state **one** of the following in the response:

7.6.2.2.1. There is no objection to release, or

7.6.2.2.2. The VSTL objects to release. In this case, the response must clearly state which portions of the document the VSTL believes should be protected from release. The VSTL shall follow the procedures discussed in Section 7.6.1 above.

7.7. **Personal Information**. Certain personal information is protected from release under FOIA and the Privacy Act (5 U.S.C. §552a). This information includes private information about a person that, if released, would cause the individual embarrassment or constitute an unwarranted invasion of personal privacy. Generally, the EAC will not require the submission of private information about individuals. The incidental submission of such information should be avoided. If a VSTL believes it is required to submit such information, it should contact the Program Director. If the information will be submitted, it must be properly identified. Examples of such information include the following:

7.7.1. Social Security Number.

7.7.2. Bank account numbers.

7.7.3. Home address.

7.7.4. Home phone number.

                    OMB Control Number: 3265-0018

## Appendix A

# Voting System Test Plan Outline

This outline is provided solely as an aid to test plan development.  Note that these items may change significantly, depending on the specific project planned.


**1 Introduction**
    1.1 References
    1.2 Terms and Abbreviations
    1.3 Testing Responsibilities
        1.3.1 Project schedule with
            1.3.1.1 Owner assignments
            1.3.1.2 Test case development
            1.3.1.3 Test procedure development and validation
            1.3.1.4 3rd party tests
            1.3.1.5 EAC and Manufacturer dependencies
    1.4 Target of Evaluation Description
        1.4.1 System Overview
        1.4.2 Block diagram
        1.4.3 System Limits
        1.4.4 Supported Languages
        1.4.5 Supported Functionality
            1.4.5.1 Standard VVSG Functionality
            1.4.5.2 Manufacturer Extensions


**2. Pre-Certification Testing and Issues**
    2.1 Evaluation of prior VSTL testing
        2.1.1 Reason for testing and results, listing of modifications from previous to current system
    2.2 Evaluation of prior non-VSTL testing
        2.2.1 Reason for testing and results, states, other 3rd party entities
    2.3 Known Field Issues
        2.3.1 Listing of relevant issues uncovered during field operations


**3 Materials Required for Testing**
    3.1 Software
    3.2 Equipment
    3.3 Test Materials
    3.4 Deliverable Materials
**4 Test Specifications**
    4.1 Requirements
        4.1.1 Mapping of requirements to equipment type and features
        4.1.2 Rationale for why some requirements are NA for this campaign
    4.2 Hardware Configuration and Design
    4.3 Software System Functions

OMB Control Number:  3265-0018

4.4 Test Case Design
    4.4.1 Hardware Qualitative Examination Design
        4.4.1.1 Mapping of requirements to specific interfaces
    4.4.2 Hardware Environmental Test Case Design
    4.4.3 Software Module Test Case Design and Data
    4.4.4 Software Functional Test Case Design and Data
    4.4.5 System-level Test Case Design
4.5 Security functions
4.6 TDP evaluation
4.7 Source Code review
4.8 QA & CM system review
**5 Test Data**
    5.1 Data Recording
    5.2 Test Data Criteria
    5.3 Test Data Reduction
**6 Test Procedure and Conditions**
    6.1 Facility Requirements
    6.2 Test Set-up
    6.3 Test Sequence
**7 Test Operations Procedures**
Proprietary Data

OMB Control Number: 3265-0018

## Appendix B

# Voting System Modification Test Plan Outline

                              OMB Control Number:  3265-0018

Test Plans submitted for modifications to previously EAC certified voting systems should be brief and structured to minimize test plan development and review, while enabling the EAC to maintain solid control of the certification process. The test plan shall *concisely* document the strategy and plan for testing those sections of the VVSG applicable to the modification or modifications submitted. The test plan shall be written with clarity that will allow all constituents to understand what testing will be conducted, to verify compliance to VVSG requirements, and to assure that the test plan will remain a living document throughout the life of the test campaign for the modification.

This outline is provided solely as an aid to test plan development. Note that these items may change significantly, depending on the specific project planned.

1. Introduction
    1.1 Description and Overview of EAC certified system being modified
        1.1.1 Complete definition of the baseline certified system.
        1.1.2 Detailed description of the engineering changes and/or modifications to the certified system and why the modification was implemented.
        1.1.3 An initial assessment of the impact that the modifications have on the system and past certification.
        1.1.4 Description of what will be regression tested to establish assurance that the modifications have no adverse impact on the compliance, integrity or performance of the system.
    1.2 References
    1.3 Terms and Abbreviations
    1.4 Project Schedule
    1.5 Scope of testing
        1.5.1 Block diagram (if applicable)
        1.5.2 System limits (if applicable)
        1.5.3 Supported Languages
        1.5.4 Supported Functionality
        1.5.5 VVSG
        1.5.6 RFIs
        1.5.7 NOCs

2. Pre-Certification Testing and Issues
    2.1 Evaluation of prior VSTL testing
    2.2 Evaluation of prior non-VSTL testing (if applicable)
    2.3 Known Field Issues (if applicable)

3. Materials Required for Testing
    3.1 Software
    3.2 Equipment

OMB Control Number: 3265-0018

3.3 Test Materials
3.4 Deliverable
3.5 Proprietary Data

4. Test Specifications
    4.1 Requirements
        4.1.1 Mapping of requirements to equipment type and features
        4.1.2 Rationale for why some requirements are NA for this campaign
    4.2 Hardware Configuration and Design (if applicable)
    4.3 Software System Functions (if applicable)
    4.4 Test Case Design
        4.4.1 Hardware Qualitative Examination Design (if applicable)
        4.4.2 Hardware Environmental Test Case Design (if applicable)
        4.4.3 Software Module Test Case Design and Data (if applicable)
        4.4.4 Software Functional Test Case Design and Data (if applicable)
        4.4.5 System-level Test Case Design
    4.5 Security functions (if applicable)
    4.6 TDP evaluation
    4.7 Source Code review (if applicable)
    4.8 QA & CM system review

5. Test Data
    5.1 Test Data Recording
    5.2 Test Data Criteria

6. Test Procedure and Conditions
    6.1 Test Facilities
    6.2 Test Set-up
    6.3 Test Sequence
    6.4 Test Operations Procedure

    OMB Control Number: 3265-0018

## Appendix C

# Voting System Test Report Outline

OMB Control Number:  3265-0018

Test Reports produced by VSTLs shall follow the format outlined below.  Deviations from this format may be used upon prior written approval of the Program Director.

1. System Identification and Overview
2. Certification Test Background
    2.1 Revision History
    2.2 Implementation Statement
3. Test Findings and Recommendation
    3.1 Summary Finding and Recommendation
    3.2 Reasons for Recommendation to Reject
    3.3 Anomalies
    3.4 Correction of Deficiencies
Appendix A. Additional Findings
Appendix B. Warrant of Accepting Change Control Responsibility
Appendix C. Trusted Build
Appendix D. Test Plan
Appendix E. State Test Reports

OMB Control Number:  3265-0018

## Appendix D

# Voting System Modification Test Report Outline

OMB Control Number: 3265-0018

Test Reports produced by VSTLs shall follow the format outlined below.  Deviations from this format may be used upon prior written approval of the Program Director.

1. Introduction
    1.1Description of EAC certified system being modified
    1.1 References
    1.2 Terms and Abbreviations

2. Certification Test Background
    2.1 Revision History
    2.2 Scope of testing
        2.2.1 Modification Overview
            2.2.1.1 Detailed list of changes
        2.2.2 Block diagram (if applicable)
        2.2.3 Supported Languages
            2.2.4 VVSG
            2.2.5 RFIs
            2.2.6 NOCs

3. Test Findings and Recommendation
    3.1 Summary Finding and Recommendation
        3.1.1 Hardware Testing
        3.1.2 System Level Testing
        3.1.3 Source code review
    3.2 Anomalies and Resolutions
    3.3 Deficiencies and Resolutions

4. Recommendation for Certification

Appendix A. Additional Findings
Appendix B. Deficiency report (if applicable)
Appendix C. Anomaly report (if applicable)
Appendix D. Test Plan
Appendix E. State Test Reports (if applicable)

## Appendix E

# Certification of Laboratory Conditions and Practices Form

Available in electronic format at www.eac.gov



# CERTIFICATION OF LABORATORY CONDITIONS AND PRACTICES

I, the undersigned, having investigated or caused to be investigated each matter, below; certify, affirm and acknowledge that each of the following numbered statements are true and otherwise accurately reflect the status, condition and operations of _____ (hereinafter "Laboratory"). I understand that by certifying the information below, I am making a statement or representation to the U.S. Election Assistance Commission required for receiving a Laboratory Accreditation under 42 U.S.C. §15371(b). I further understand, that to the extent any of the below representations or certifications are found to be materially false, the U.S. Election Assistance Commission may revoke any Accreditations granted to the above named laboratory and that I may be subject to criminal prosecution under 18 U.S.C. §1001.

1. **Signing Official**. I hereby certify that I am an officer, partner or other official vested with the legal authority to speak for, contract on behalf of, or otherwise bind the above noted company, corporation, partnership or organization (Laboratory).

2. **Personnel**. I certify, consistent with Section 2.6. of the EAC *Voting System Test Laboratory Accreditation Program Manual* (hereinafter Laboratory Manual), that the laboratory has written policies in place to ensure that it does not currently, and will not in the future, employ any individuals in any capacity related to the testing of voting systems who have been convicted of a felony offense or any criminal offense involving fraud, misrepresentation, or deception under either Federal or State law.

3. **Conflicts of Interest and Prohibited Practices**. I certify, consistent with Section 2.5. of the Laboratory Manual, that the Laboratory maintains and enforces written policies which:

    a. Prohibit conflicts of interest or the appearance of conflicts of interest pursuant to Section 2.5.1. of the Laboratory Manual.

    b. Prohibit practices such as participation in both the development and testing of a voting system or the solicitation or acceptance of gifts from a voting system manufacture pursuant to Section 2.5.2. of the Laboratory Manual.

      c.   Provide clear mechanisms for enforcement of the prohibitions noted above pursuant to Section 2.5.3. of the Laboratory Manual.

4.   **Financial Stability.**  I certify, consistent with Section 2.14. of the Laboratory Manual, that the laboratory possess sufficient resources to enable it to properly use and maintain its test equipment and facility, to satisfactorily perform all required functions, and to adequately indemnify itself against financial liabilities or penalties that may result from its operations.

5.   **Authority to do Business in the United States.**  I certify, consistent with Section 2.12. of the Laboratory Manual, that the Laboratory is lawfully entitled or otherwise not prohibited from doing business with the United States or its citizens or operating in the United States.

6.   **Recordkeeping**.  I certify, consistent with Section 2.15. of the Laboratory Manual, that the laboratory operates and manages a records system in which it maintains all forms, reports, test records, observations, calculations and derived data for all tests performed for a period of at least 5 years.

I, by signing my name below, certify, affirm and acknowledge, under penalty of Federal law, that each of the above numbered paragraphs accurately represent the operations, conditions and practices of _____ (Laboratory).

Signed this day,_____:

_____(Signature)

_____(Name of Signing Official)

_____(Title of Signing Official)

OMB Control Number: 3265-0018

**Appendix F**

# Specification for Reproduction and use of the EAC Laboratory Accreditation Logo

Accreditation Logo Available in electronic format at www.eac.gov

**Specification for Reproduction and use of the EAC Laboratory Accreditation Logo**

To maintain a high level of quality and consistency in a variety of applications, the following guidelines have been developed for VSTL use of the EAC laboratory accreditation logo.

**Use and Display**

The EAC VSTL logo contains the following elements:
The "U.S. Election Assistance Commission" and "VSTL" logotype separated by a divider rule. The EAC will provide all accredited VSTLs with high resolution digital files for use on approved written or electronic documents.

The logo may only be used by EAC accredited VSTLs and shall not misrepresent the specific standards or guidelines to which the VSTL has been accredited.  The EAC VSTL logo may be displayed on all reports and work documents that contain **exclusive** results from testing activities that have been carried out within the labs' EAC scope of accreditation.  Accredited laboratories may also incorporate the logo in publicity and/or advertising materials, including brochures and organization publications, technical literature, business reports, Web sites and quotations or proposals for work.

Only the approved version of the VSTL logo may be used.  When using the logo:

- Do not print the logo in black over a dark background.
- Do not change any colors of the logo.
- Do not configure the elements of the logo in a different format.
- Do not crop or remove any part of the logo.
- Do not distort the logo.
- Do not tilt the logo in any direction.
- Do not add shadows, effects or other elements to the logo.
- Do not change the typeface/font used in the logo.

**Minimum Size**

The full VSTL logo must remain readable in all uses and should not be reduced to a size smaller than 2.5 inch x 1 inch.

**Minimum Clear Space**

The clear space surrounding the VSTL logo is an integral part of the logo design.  An area of clear space must be maintained around the logo to prevent it from being in conflict with other design elements on the page.  The clear space should measure at least X on all sides, where X

OMB Control Number:  3265-0018

**Voting System Test Laboratory Program Manual, Version 2.0**

equals ½ the height of the upper case letters "VSTL" in the logo.  Do not place any other logo, logotype, trademark, text, or other graphic element in the minimum clear space area.

**One Color Printing**

A black version of the logo may be printed on white or light color background paper.  In these instances, the logo should appear in 100% black.

**Color Printing**

Whenever possible, the full color version of the logo should be used.  The appropriate colors are provided below for 4 color process printing or RGB for electronic use.

**Blue**

CMYK = 98/78/0/29

RGB = 0/51/153

HSL = 156/255/77

**Red**

CMYK = 5/96/98/5

RGB = 204/51/0

HSL = 10/255/102

**Embossing on "VSTL"** = CMYK 97/92/0/65

82

**Voting System Test Laboratory Program Manual, Version 2.0**

# U.S. Election Assistance Commission

# VSTL

OMB Control Number:  3265-0018

PUBLIC LAW 107–252—OCT. 29, 2002

HELP AMERICA VOTE ACT OF 2002

Exhibit C

Public Law 107–252
107th Congress

An Act

Oct. 29, 2002
[H.R. 3295]

To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

Help America
Vote Act of 2002.

42 USC 15301
note.

(a) SHORT TITLE.—This Act may be cited as the "Help America Vote Act of 2002".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—PAYMENTS TO STATES FOR ELECTION ADMINISTRATION IMPROVEMENTS AND REPLACEMENT OF PUNCH CARD AND LEVER VOTING MACHINES

Sec. 101. Payments to States for activities to improve administration of elections.
Sec. 102. Replacement of punch card or lever voting machines.
Sec. 103. Guaranteed minimum payment amount.
Sec. 104. Authorization of appropriations.
Sec. 105. Administration of programs.
Sec. 106. Effective date.

TITLE II—COMMISSION

Subtitle A—Establishment and General Organization

PART 1—ELECTION ASSISTANCE COMMISSION

Sec. 201. Establishment.
Sec. 202. Duties.
Sec. 203. Membership and appointment.
Sec. 204. Staff.
Sec. 205. Powers.
Sec. 206. Dissemination of information.
Sec. 207. Annual report.
Sec. 208. Requiring majority approval for actions.
Sec. 209. Limitation on rulemaking authority.
Sec. 210. Authorization of appropriations.

PART 2—ELECTION ASSISTANCE COMMISSION STANDARDS BOARD AND BOARD OF ADVISORS

Sec. 211. Establishment.
Sec. 212. Duties.
Sec. 213. Membership of Standards Board.
Sec. 214. Membership of Board of Advisors.
Sec. 215. Powers of Boards; no compensation for service.
Sec. 216. Status of Boards and members for purposes of claims against Board.

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1667

PART 3—TECHNICAL GUIDELINES DEVELOPMENT COMMITTEE

Sec. 221. Technical Guidelines Development Committee.
Sec. 222. Process for adoption.

Subtitle B—Testing, Certification, Decertification, and Recertification of Voting System Hardware and Software

Sec. 231. Certification and testing of voting systems.

Subtitle C—Studies and Other Activities To Promote Effective Administration of Federal Elections

Sec. 241. Periodic studies of election administration issues.
Sec. 242. Study, report, and recommendations on best practices for facilitating military and overseas voting.
Sec. 243. Report on human factor research.
Sec. 244. Study and report on voters who register by mail and use of social security information.
Sec. 245. Study and report on electronic voting and the electoral process.
Sec. 246. Study and report on free absentee ballot postage.
Sec. 247. Consultation with Standards Board and Board of Advisors.

Subtitle D—Election Assistance

PART 1—REQUIREMENTS PAYMENTS

Sec. 251. Requirements payments.
Sec. 252. Allocation of funds.
Sec. 253. Condition for receipt of funds.
Sec. 254. State plan.
Sec. 255. Process for development and filing of plan; publication by Commission.
Sec. 256. Requirement for public notice and comment.
Sec. 257. Authorization of appropriations.
Sec. 258. Reports.

PART 2—PAYMENTS TO STATES AND UNITS OF LOCAL GOVERNMENT TO ASSURE ACCESS FOR INDIVIDUALS WITH DISABILITIES

Sec. 261. Payments to States and units of local government to assure access for individuals with disabilities.
Sec. 262. Amount of payment.
Sec. 263. Requirements for eligibility.
Sec. 264. Authorization of appropriations.
Sec. 265. Reports.

PART 3—GRANTS FOR RESEARCH ON VOTING TECHNOLOGY IMPROVEMENTS

Sec. 271. Grants for research on voting technology improvements.
Sec. 272. Report.
Sec. 273. Authorization of appropriations.

PART 4—PILOT PROGRAM FOR TESTING OF EQUIPMENT AND TECHNOLOGY

Sec. 281. Pilot program.
Sec. 282. Report.
Sec. 283. Authorization of appropriations.

PART 5—PROTECTION AND ADVOCACY SYSTEMS

Sec. 291. Payments for protection and advocacy systems.
Sec. 292. Authorization of appropriations.

PART 6—NATIONAL STUDENT AND PARENT MOCK ELECTION

Sec. 295. National Student and Parent Mock Election.
Sec. 296. Authorization of appropriations.

TITLE III—UNIFORM AND NONDISCRIMINATORY ELECTION TECHNOLOGY AND ADMINISTRATION REQUIREMENTS

Subtitle A—Requirements

Sec. 301. Voting systems standards.
Sec. 302. Provisional voting and voting information requirements.
Sec. 303. Computerized statewide voter registration list requirements and requirements for voters who register by mail.
Sec. 304. Minimum requirements.

Sec. 305. Methods of implementation left to discretion of State.

Subtitle B—Voluntary Guidance

Sec. 311. Adoption of voluntary guidance by Commission.
Sec. 312. Process for adoption.

TITLE IV—ENFORCEMENT

Sec. 401. Actions by the Attorney General for declaratory and injunctive relief.
Sec. 402. Establishment of State-based administrative complaint procedures to remedy grievances.

TITLE V—HELP AMERICA VOTE COLLEGE PROGRAM

Sec. 501. Establishment of program.
Sec. 502. Activities under program.
Sec. 503. Authorization of appropriations.

TITLE VI—HELP AMERICA VOTE FOUNDATION

Sec. 601. Help America Vote Foundation.

TITLE VII—VOTING RIGHTS OF MILITARY MEMBERS AND OVERSEAS CITIZENS

Sec. 701. Voting assistance programs.
Sec. 702. Designation of single State office to provide information on registration and absentee ballots for all voters in State.
Sec. 703. Report on absentee ballots transmitted and received after general elections.
Sec. 704. Extension of period covered by single absentee ballot application.
Sec. 705. Additional duties of Presidential designee under Uniformed and Overseas Citizens Absentee Voting Act.
Sec. 706. Prohibition of refusal of voter registration and absentee ballot applications on grounds of early submission.
Sec. 707. Other requirements to promote participation of overseas and absent uniformed services voters.

TITLE VIII—TRANSITION PROVISIONS

Subtitle A—Transfer to Commission of Functions Under Certain Laws

Sec. 801. Federal Election Campaign Act of 1971.
Sec. 802. National Voter Registration Act of 1993.
Sec. 803. Transfer of property, records, and personnel.
Sec. 804. Effective date; transition.

Subtitle B—Coverage of Commission Under Certain Laws and Programs

Sec. 811. Treatment of Commission personnel under certain civil service laws.
Sec. 812. Coverage under Inspector General Act of 1978.

TITLE IX—MISCELLANEOUS PROVISIONS

Sec. 901. State defined.
Sec. 902. Audits and repayment of funds.
Sec. 903. Clarification of ability of election officials to remove registrants from official list of voters on grounds of change of residence.
Sec. 904. Review and report on adequacy of existing electoral fraud statutes and penalties.
Sec. 905. Other criminal penalties.
Sec. 906. No effect on other laws.

# TITLE I—PAYMENTS TO STATES FOR ELECTION ADMINISTRATION IMPROVEMENTS AND REPLACEMENT OF PUNCH CARD AND LEVER VOTING MACHINES

42 USC 15301.

**SEC. 101. PAYMENTS TO STATES FOR ACTIVITIES TO IMPROVE ADMINISTRATION OF ELECTIONS.**

Deadlines.
Notification.

(a) IN GENERAL.—Not later than 45 days after the date of the enactment of this Act, the Administrator of General Services

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1669

(in this title referred to as the "Administrator") shall establish a program under which the Administrator shall make a payment to each State in which the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, notifies the Administrator not later than 6 months after the date of the enactment of this Act that the State intends to use the payment in accordance with this section.

(b) USE OF PAYMENT.—

(1) IN GENERAL.—A State shall use the funds provided under a payment made under this section to carry out one or more of the following activities:

(A) Complying with the requirements under title III.

(B) Improving the administration of elections for Federal office.

(C) Educating voters concerning voting procedures, voting rights, and voting technology.

(D) Training election officials, poll workers, and election volunteers.

(E) Developing the State plan for requirements payments to be submitted under part 1 of subtitle D of title II.

(F) Improving, acquiring, leasing, modifying, or replacing voting systems and technology and methods for casting and counting votes.

(G) Improving the accessibility and quantity of polling places, including providing physical access for individuals with disabilities, providing nonvisual access for individuals with visual impairments, and providing assistance to Native Americans, Alaska Native citizens, and to individuals with limited proficiency in the English language.

(H) Establishing toll-free telephone hotlines that voters may use to report possible voting fraud and voting rights violations, to obtain general election information, and to access detailed automated information on their own voter registration status, specific polling place locations, and other relevant information.

(2) LIMITATION.—A State may not use the funds provided under a payment made under this section—

(A) to pay costs associated with any litigation, except to the extent that such costs otherwise constitute permitted uses of a payment under this section; or

(B) for the payment of any judgment.

(c) USE OF FUNDS TO BE CONSISTENT WITH OTHER LAWS AND REQUIREMENTS.—In order to receive a payment under the program under this section, the State shall provide the Administrator with certifications that—

(1) the State will use the funds provided under the payment in a manner that is consistent with each of the laws described in section 906, as such laws relate to the provisions of this Act; and

(2) the proposed uses of the funds are not inconsistent with the requirements of title III.

(d) AMOUNT OF PAYMENT.—

(1) IN GENERAL.—Subject to section 103(b), the amount of payment made to a State under this section shall be the minimum payment amount described in paragraph (2) plus

the voting age population proportion amount described in paragraph (3).

(2) MINIMUM PAYMENT AMOUNT.—The minimum payment amount described in this paragraph is—

(A) in the case of any of the several States or the District of Columbia, one-half of 1 percent of the aggregate amount made available for payments under this section; and

(B) in the case of the Commonwealth of Puerto Rico, Guam, American Samoa, or the United States Virgin Islands, one-tenth of 1 percent of such aggregate amount.

(3) VOTING AGE POPULATION PROPORTION AMOUNT.—The voting age population proportion amount described in this paragraph is the product of—

(A) the aggregate amount made available for payments under this section minus the total of all of the minimum payment amounts determined under paragraph (2); and

(B) the voting age population proportion for the State (as defined in paragraph (4)).

(4) VOTING AGE POPULATION PROPORTION DEFINED.—The term "voting age population proportion" means, with respect to a State, the amount equal to the quotient of—

(A) the voting age population of the State (as reported in the most recent decennial census); and

(B) the total voting age population of all States (as reported in the most recent decennial census).

42 USC 15302.

**SEC. 102. REPLACEMENT OF PUNCH CARD OR LEVER VOTING MACHINES.**

(a) ESTABLISHMENT OF PROGRAM.—

Deadline.

(1) IN GENERAL.—Not later than 45 days after the date of the enactment of this Act, the Administrator shall establish a program under which the Administrator shall make a payment to each State eligible under subsection (b) in which a precinct within that State used a punch card voting system or a lever voting system to administer the regularly scheduled general election for Federal office held in November 2000 (in this section referred to as a "qualifying precinct").

(2) USE OF FUNDS.—A State shall use the funds provided under a payment under this section (either directly or as reimbursement, including as reimbursement for costs incurred on or after January 1, 2001, under multiyear contracts) to replace punch card voting systems or lever voting systems (as the case may be) in qualifying precincts within that State with a voting system (by purchase, lease, or such other arrangement as may be appropriate) that—

(A) does not use punch cards or levers;

(B) is not inconsistent with the requirements of the laws described in section 906; and

(C) meets the requirements of section 301.

(3) DEADLINE.—

(A) IN GENERAL.—Except as provided in subparagraph (B), a State receiving a payment under the program under this section shall ensure that all of the punch card voting systems or lever voting systems in the qualifying precincts

within that State have been replaced in time for the regularly scheduled general election for Federal office to be held in November 2004.

(B) WAIVER.—If a State certifies to the Administrator not later than January 1, 2004, that the State will not meet the deadline described in subparagraph (A) for good cause and includes in the certification the reasons for the failure to meet such deadline, the State shall ensure that all of the punch card voting systems or lever voting systems in the qualifying precincts within that State will be replaced in time for the first election for Federal office held after January 1, 2006.

(b) ELIGIBILITY.—

(1) IN GENERAL.—A State is eligible to receive a payment under the program under this section if it submits to the Administrator a notice not later than the date that is 6 months after the date of the enactment of this Act (in such form as the Administrator may require) that contains—

(A) certifications that the State will use the payment (either directly or as reimbursement, including as reimbursement for costs incurred on or after January 1, 2001, under multiyear contracts) to replace punch card voting systems or lever voting systems (as the case may be) in the qualifying precincts within the State by the deadline described in subsection (a)(3);

(B) certifications that the State will continue to comply with the laws described in section 906;

(C) certifications that the replacement voting systems will meet the requirements of section 301; and

(D) such other information and certifications as the Administrator may require which are necessary for the administration of the program.

(2) COMPLIANCE OF STATES THAT REQUIRE CHANGES TO STATE LAW.—In the case of a State that requires State legislation to carry out an activity covered by any certification submitted under this subsection, the State shall be permitted to make the certification notwithstanding that the legislation has not been enacted at the time the certification is submitted and such State shall submit an additional certification once such legislation is enacted.

(c) AMOUNT OF PAYMENT.—

(1) IN GENERAL.—Subject to paragraph (2) and section 103(b), the amount of payment made to a State under the program under this section shall be equal to the product of—

(A) the number of the qualifying precincts within the State; and

(B) $4,000.

(2) REDUCTION.—If the amount of funds appropriated pursuant to the authority of section 104(a)(2) is insufficient to ensure that each State receives the amount of payment calculated under paragraph (1), the Administrator shall reduce the amount specified in paragraph (1)(B) to ensure that the entire amount appropriated under such section is distributed to the States.

(d) REPAYMENT OF FUNDS FOR FAILURE TO MEET DEADLINES.—

(1) IN GENERAL.—If a State receiving funds under the program under this section fails to meet the deadline applicable

to the State under subsection (a)(3), the State shall pay to the Administrator an amount equal to the noncompliant precinct percentage of the amount of the funds provided to the State under the program.

(2) NONCOMPLIANT PRECINCT PERCENTAGE DEFINED.—In this subsection, the term "noncompliant precinct percentage" means, with respect to a State, the amount (expressed as a percentage) equal to the quotient of—

(A) the number of qualifying precincts within the State for which the State failed to meet the applicable deadline; and

(B) the total number of qualifying precincts in the State.

(e) PUNCH CARD VOTING SYSTEM DEFINED.—For purposes of this section, a "punch card voting system" includes any of the following voting systems:

(1) C.E.S.
(2) Datavote.
(3) PBC Counter.
(4) Pollstar.
(5) Punch Card.
(6) Vote Recorder.
(7) Votomatic.

42 USC 15303.

**SEC. 103. GUARANTEED MINIMUM PAYMENT AMOUNT.**

(a) IN GENERAL.—In addition to any other payments made under this title, the Administrator shall make a payment to each State to which a payment is made under either section 101 or 102 and with respect to which the aggregate amount paid under such sections is less than $5,000,000 in an amount equal to the difference between the aggregate amount paid to the State under sections 101 and 102 and $5,000,000. In the case of the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands, the previous sentence shall be applied as if each reference to "$5,000,000" were a reference to "$1,000,000".

(b) PRO RATA REDUCTIONS.—The Administrator shall make such pro rata reductions to the amounts described in sections 101(d) and 102(c) as are necessary to comply with the requirements of subsection (a).

42 USC 15304.

**SEC. 104. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—There are authorized to be appropriated for payments under this title $650,000,000, of which—

(1) 50 percent shall be for payments under section 101; and

(2) 50 percent shall be for payments under section 102.

(b) CONTINUING AVAILABILITY OF FUNDS AFTER APPROPRIATION.—Any payment made to a State under this title shall be available to the State without fiscal year limitation (subject to subsection (c)(2)(B)).

(c) USE OF RETURNED FUNDS AND FUNDS REMAINING UNEXPENDED FOR REQUIREMENTS PAYMENTS.—

(1) IN GENERAL.—The amounts described in paragraph (2) shall be transferred to the Election Assistance Commission (established under title II) and used by the Commission to make requirements payments under part 1 of subtitle D of title II.

(2) AMOUNTS DESCRIBED.—The amounts referred to in this paragraph are as follows:

(A) Any amounts paid to the Administrator by a State under section 102(d)(1).

(B) Any amounts appropriated for payments under this title which remain unobligated as of September 1, 2003.

(d) DEPOSIT OF AMOUNTS IN STATE ELECTION FUND.—When a State has established an election fund described in section 254(b), the State shall ensure that any funds provided to the State under this title are deposited and maintained in such fund.

(e) AUTHORIZATION OF APPROPRIATIONS FOR ADMINISTRATOR.— In addition to the amounts authorized under subsection (a), there are authorized to be appropriated to the Administrator such sums as may be necessary to administer the programs under this title.

**SEC. 105. ADMINISTRATION OF PROGRAMS.**

42 USC 15305.

In administering the programs under this title, the Administrator shall take such actions as the Administrator considers appropriate to expedite the payment of funds to States.

**SEC. 106. EFFECTIVE DATE.**

Deadline.
42 USC 15306.

The Administrator shall implement the programs established under this title in a manner that ensures that the Administrator is able to make payments under the program not later than the expiration of the 45-day period which begins on the date of the enactment of this Act.

# TITLE II—COMMISSION

## Subtitle A—Establishment and General Organization

### PART 1—ELECTION ASSISTANCE COMMISSION

**SEC. 201. ESTABLISHMENT.**

42 USC 15321.

There is hereby established as an independent entity the Election Assistance Commission (hereafter in this title referred to as the "Commission"), consisting of the members appointed under this part. Additionally, there is established the Election Assistance Commission Standards Board (including the Executive Board of such Board) and the Election Assistance Commission Board of Advisors under part 2 (hereafter in this part referred to as the "Standards Board" and the "Board of Advisors", respectively) and the Technical Guidelines Development Committee under part 3.

**SEC. 202. DUTIES.**

42 USC 15322.

The Commission shall serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections by—

(1) carrying out the duties described in part 3 (relating to the adoption of voluntary voting system guidelines), including the maintenance of a clearinghouse of information on the experiences of State and local governments in implementing the guidelines and in operating voting systems in general;

116 STAT. 1674        PUBLIC LAW 107–252—OCT. 29, 2002

(2) carrying out the duties described in subtitle B (relating to the testing, certification, decertification, and recertification of voting system hardware and software);

(3) carrying out the duties described in subtitle C (relating to conducting studies and carrying out other activities to promote the effective administration of Federal elections);

(4) carrying out the duties described in subtitle D (relating to election assistance), and providing information and training on the management of the payments and grants provided under such subtitle;

(5) carrying out the duties described in subtitle B of title III (relating to the adoption of voluntary guidance); and

(6) developing and carrying out the Help America Vote College Program under title V.

42 USC 15323.

**SEC. 203. MEMBERSHIP AND APPOINTMENT.**

(a) MEMBERSHIP.—

President.

(1) IN GENERAL.—The Commission shall have four members appointed by the President, by and with the advice and consent of the Senate.

(2) RECOMMENDATIONS.—Before the initial appointment of the members of the Commission and before the appointment of any individual to fill a vacancy on the Commission, the Majority Leader of the Senate, the Speaker of the House of Representatives, the Minority Leader of the Senate, and the Minority Leader of the House of Representatives shall each submit to the President a candidate recommendation with respect to each vacancy on the Commission affiliated with the political party of the Member of Congress involved.

(3) QUALIFICATIONS.—Each member of the Commission shall have experience with or expertise in election administration or the study of elections.

Deadline.

(4) DATE OF APPOINTMENT.—The appointments of the members of the Commission shall be made not later than 120 days after the date of the enactment of this Act.

(b) TERM OF SERVICE.—

(1) IN GENERAL.—Except as provided in paragraphs (2) and (3), members shall serve for a term of 4 years and may be reappointed for not more than one additional term.

(2) TERMS OF INITIAL APPOINTEES.—As designated by the President at the time of nomination, of the members first appointed—

(A) two of the members (not more than one of whom may be affiliated with the same political party) shall be appointed for a term of 2 years; and

(B) two of the members (not more than one of whom may be affiliated with the same political party) shall be appointed for a term of 4 years.

(3) VACANCIES.—

(A) IN GENERAL.—A vacancy on the Commission shall be filled in the manner in which the original appointment was made and shall be subject to any conditions which applied with respect to the original appointment.

(B) EXPIRED TERMS.—A member of the Commission shall serve on the Commission after the expiration of the member's term until the successor of such member has taken office as a member of the Commission.

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1675

(C) UNEXPIRED TERMS.—An individual appointed to fill a vacancy shall be appointed for the unexpired term of the member replaced.

(c) CHAIR AND VICE CHAIR.—

(1) IN GENERAL.—The Commission shall select a chair and vice chair from among its members for a term of 1 year, except that the chair and vice chair may not be affiliated with the same political party.

(2) NUMBER OF TERMS.—A member of the Commission may serve as the chairperson and vice chairperson for only 1 term each during the term of office to which such member is appointed.

(d) COMPENSATION.—

(1) IN GENERAL.—Each member of the Commission shall be compensated at the annual rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code.

(2) OTHER ACTIVITIES.—No member appointed to the Commission under subsection (a) may engage in any other business, vocation, or employment while serving as a member of the Commission and shall terminate or liquidate such business, vocation, or employment before sitting as a member of the Commission.

## SEC. 204. STAFF.

42 USC 15324.

(a) EXECUTIVE DIRECTOR, GENERAL COUNSEL, AND OTHER STAFF.—

(1) EXECUTIVE DIRECTOR.—The Commission shall have an Executive Director, who shall be paid at a rate not to exceed the rate of basic pay for level V of the Executive Schedule under section 5316 of title 5, United States Code.

(2) TERM OF SERVICE FOR EXECUTIVE DIRECTOR.—The Executive Director shall serve for a term of 4 years. An Executive Director may serve for a longer period only if reappointed for an additional term or terms by a vote of the Commission.

(3) PROCEDURE FOR APPOINTMENT.—

(A) IN GENERAL.—When a vacancy exists in the position of the Executive Director, the Standards Board and the Board of Advisors shall each appoint a search committee to recommend at least three nominees for the position.

(B) REQUIRING CONSIDERATION OF NOMINEES.—Except as provided in subparagraph (C), the Commission shall consider the nominees recommended by the Standards Board and the Board of Advisors in appointing the Executive Director.

(C) INTERIM SERVICE OF GENERAL COUNSEL.—If a vacancy exists in the position of the Executive Director, the General Counsel of the Commission shall serve as the acting Executive Director until the Commission appoints a new Executive Director in accordance with this paragraph.

(D) SPECIAL RULES FOR INTERIM EXECUTIVE DIRECTOR.—

(i) CONVENING OF SEARCH COMMITTEES.—The Standards Board and the Board of Advisors shall each appoint a search committee and recommend nominees for the position of Executive Director in accordance

with subparagraph (A) as soon as practicable after the appointment of their members.

(ii) INTERIM INITIAL APPOINTMENT.—Notwithstanding subparagraph (B), the Commission may appoint an individual to serve as an interim Executive Director prior to the recommendation of nominees for the position by the Standards Board or the Board of Advisors, except that such individual's term of service may not exceed 6 months. Nothing in the previous sentence may be construed to prohibit the individual serving as the interim Executive Director from serving any additional term.

(4) GENERAL COUNSEL.—The Commission shall have a General Counsel, who shall be appointed by the Commission and who shall serve under the Executive Director. The General Counsel shall serve for a term of 4 years, and may serve for a longer period only if reappointed for an additional term or terms by a vote of the Commission.

(5) OTHER STAFF.—Subject to rules prescribed by the Commission, the Executive Director may appoint and fix the pay of such additional personnel as the Executive Director considers appropriate.

(6) APPLICABILITY OF CERTAIN CIVIL SERVICE LAWS.—The Executive Director, General Counsel, and staff of the Commission may be appointed without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and may be paid without regard to the provisions of chapter 51 and subchapter III of chapter 53 of that title relating to classification and General Schedule pay rates, except that an individual so appointed may not receive pay in excess of the annual rate of basic pay for level V of the Executive Schedule under section 5316 of that title.

(b) EXPERTS AND CONSULTANTS.—Subject to rules prescribed by the Commission, the Executive Director may procure temporary and intermittent services under section 3109(b) of title 5, United States Code, by a vote of the Commission.

(c) STAFF OF FEDERAL AGENCIES.—Upon request of the Commission, the head of any Federal department or agency may detail, on a reimbursable basis, any of the personnel of that department or agency to the Commission to assist it in carrying out its duties under this Act.

(d) ARRANGING FOR ASSISTANCE FOR BOARD OF ADVISORS AND STANDARDS BOARD.—At the request of the Board of Advisors or the Standards Board, the Commission may enter into such arrangements as the Commission considers appropriate to make personnel available to assist the Boards with carrying out their duties under this title (including contracts with private individuals for providing temporary personnel services or the temporary detailing of personnel of the Commission).

(e) CONSULTATION WITH BOARD OF ADVISORS AND STANDARDS BOARD ON CERTAIN MATTERS.—In preparing the program goals, long-term plans, mission statements, and related matters for the Commission, the Executive Director and staff of the Commission shall consult with the Board of Advisors and the Standards Board.

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1677

**SEC. 205. POWERS.**                                     42 USC 15325.

(a) HEARINGS AND SESSIONS.—The Commission may hold such hearings for the purpose of carrying out this Act, sit and act at such times and places, take such testimony, and receive such evidence as the Commission considers advisable to carry out this Act. The Commission may administer oaths and affirmations to witnesses appearing before the Commission.

(b) INFORMATION FROM FEDERAL AGENCIES.—The Commission may secure directly from any Federal department or agency such information as the Commission considers necessary to carry out this Act. Upon request of the Commission, the head of such department or agency shall furnish such information to the Commission.

(c) POSTAL SERVICES.—The Commission may use the United States mails in the same manner and under the same conditions as other departments and agencies of the Federal Government.

(d) ADMINISTRATIVE SUPPORT SERVICES.—Upon the request of the Commission, the Administrator of General Services shall provide to the Commission, on a reimbursable basis, the administrative support services that are necessary to enable the Commission to carry out its duties under this Act.

(e) CONTRACTS.—The Commission may contract with and compensate persons and Federal agencies for supplies and services without regard to section 3709 of the Revised Statutes of the United States (41 U.S.C. 5).

**SEC. 206. DISSEMINATION OF INFORMATION.**               42 USC 15326.

In carrying out its duties, the Commission shall, on an ongoing basis, disseminate to the public (through the Internet, published reports, and such other methods as the Commission considers appropriate) in a manner that is consistent with the requirements of chapter 19 of title 44, United States Code, information on the activities carried out under this Act.

**SEC. 207. ANNUAL REPORT.**                              42 USC 15327.

Not later than January 31 of each year (beginning with 2004),   Deadline.
the Commission shall submit a report to the Committee on House Administration of the House of Representatives and the Committee on Rules and Administration of the Senate detailing its activities during the fiscal year which ended on September 30 of the previous calendar year, and shall include in the report the following information:

(1) A detailed description of activities conducted with respect to each program carried out by the Commission under this Act, including information on each grant or other payment made under such programs.

(2) A copy of each report submitted to the Commission by a recipient of such grants or payments which is required under such a program, including reports submitted by States receiving requirements payments under part 1 of subtitle D, and each other report submitted to the Commission under this Act.

(3) Information on the voluntary voting system guidelines adopted or modified by the Commission under part 3 and information on the voluntary guidance adopted under subtitle B of title III.

(4) All votes taken by the Commission.

(5) Such other information and recommendations as the Commission considers appropriate.

42 USC 15328.

**SEC. 208. REQUIRING MAJORITY APPROVAL FOR ACTIONS.**

Any action which the Commission is authorized to carry out under this Act may be carried out only with the approval of at least three of its members.

42 USC 15329.

**SEC. 209. LIMITATION ON RULEMAKING AUTHORITY.**

The Commission shall not have any authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government, except to the extent permitted under section 9(a) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–7(a)).

42 USC 15330.

**SEC. 210. AUTHORIZATION OF APPROPRIATIONS.**

In addition to the amounts authorized for payments and grants under this title and the amounts authorized to be appropriated for the program under section 503, there are authorized to be appropriated for each of the fiscal years 2003 through 2005 such sums as may be necessary (but not to exceed $10,000,000 for each such year) for the Commission to carry out this title.

# PART 2—ELECTION ASSISTANCE COMMISSION STANDARDS BOARD AND BOARD OF ADVISORS

42 USC 15341.

**SEC. 211. ESTABLISHMENT.**

There are hereby established the Election Assistance Commission Standards Board (hereafter in this title referred to as the "Standards Board") and the Election Assistance Commission Board of Advisors (hereafter in this title referred to as the "Board of Advisors").

42 USC 15342.

**SEC. 212. DUTIES.**

The Standards Board and the Board of Advisors shall each, in accordance with the procedures described in part 3, review the voluntary voting system guidelines under such part, the voluntary guidance under title III, and the best practices recommendations contained in the report submitted under section 242(b).

42 USC 15343.

**SEC. 213. MEMBERSHIP OF STANDARDS BOARD.**

(a) COMPOSITION.—

(1) IN GENERAL.—Subject to certification by the chair of the Federal Election Commission under subsection (b), the Standards Board shall be composed of 110 members as follows:

(A) Fifty-five shall be State election officials selected by the chief State election official of each State.

(B) Fifty-five shall be local election officials selected in accordance with paragraph (2).

(2) LIST OF LOCAL ELECTION OFFICIALS.—Each State's local election officials, including the local election officials of Puerto Rico and the United States Virgin Islands, shall select (under a process supervised by the chief election official of the State) a representative local election official from the State for purposes of paragraph (1)(B). In the case of the District of Columbia, Guam, and American Samoa, the chief election official shall establish a procedure for selecting an individual to serve as a local election official for purposes of such paragraph,

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1679

except that under such a procedure the individual selected may not be a member of the same political party as the chief election official.

(3) REQUIRING MIX OF POLITICAL PARTIES REPRESENTED.— The two members of the Standards Board who represent the same State may not be members of the same political party.

(b) PROCEDURES FOR NOTICE AND CERTIFICATION OF APPOINTMENT.—

(1) NOTICE TO CHAIR OF FEDERAL ELECTION COMMISSION.— Not later than 90 days after the date of the enactment of this Act, the chief State election official of the State shall transmit a notice to the chair of the Federal Election Commission containing—

    (A) the name of the State election official who agrees to serve on the Standards Board under this title; and

    (B) the name of the representative local election official from the State selected under subsection (a)(2) who agrees to serve on the Standards Board under this title.

(2) CERTIFICATION.—Upon receiving a notice from a State under paragraph (1), the chair of the Federal Election Commission shall publish a certification that the selected State election official and the representative local election official are appointed as members of the Standards Board under this title.

(3) EFFECT OF FAILURE TO PROVIDE NOTICE.—If a State does not transmit a notice to the chair of the Federal Election Commission under paragraph (1) within the deadline described in such paragraph, no representative from the State may participate in the selection of the initial Executive Board under subsection (c).

(4) ROLE OF COMMISSION.—Upon the appointment of the members of the Election Assistance Commission, the Election Assistance Commission shall carry out the duties of the Federal Election Commission under this subsection.

(c) EXECUTIVE BOARD.—

(1) IN GENERAL.—Not later than 60 days after the last day on which the appointment of any of its members may be certified under subsection (b), the Standards Board shall select nine of its members to serve as the Executive Board of the Standards Board, of whom—

    (A) not more than five may be State election officials;

    (B) not more than five may be local election officials; and

    (C) not more than five may be members of the same political party.

(2) TERMS.—Except as provided in paragraph (3), members of the Executive Board of the Standards Board shall serve for a term of 2 years and may not serve for more than 3 consecutive terms.

(3) STAGGERING OF INITIAL TERMS.—Of the members first selected to serve on the Executive Board of the Standards Board—

    (A) three shall serve for 1 term;

    (B) three shall serve for 2 consecutive terms; and

    (C) three shall serve for 3 consecutive terms,

as determined by lot at the time the members are first appointed.

Deadline.

Publication.

Deadline.

(4) DUTIES.—In addition to any other duties assigned under this title, the Executive Board of the Standards Board may carry out such duties of the Standards Board as the Standards Board may delegate.

42 USC 15344.

**SEC. 214. MEMBERSHIP OF BOARD OF ADVISORS.**

(a) IN GENERAL.—The Board of Advisors shall be composed of 37 members appointed as follows:

(1) Two members appointed by the National Governors Association.

(2) Two members appointed by the National Conference of State Legislatures.

(3) Two members appointed by the National Association of Secretaries of State.

(4) Two members appointed by the National Association of State Election Directors.

(5) Two members appointed by the National Association of Counties.

(6) Two members appointed by the National Association of County Recorders, Election Administrators, and Clerks.

(7) Two members appointed by the United States Conference of Mayors.

(8) Two members appointed by the Election Center.

(9) Two members appointed by the International Association of County Recorders, Election Officials, and Treasurers.

(10) Two members appointed by the United States Commission on Civil Rights.

(11) Two members appointed by the Architectural and Transportation Barrier Compliance Board under section 502 of the Rehabilitation Act of 1973 (29 U.S.C. 792).

(12) The chief of the Office of Public Integrity of the Department of Justice, or the chief's designee.

(13) The chief of the Voting Section of the Civil Rights Division of the Department of Justice or the chief's designee.

(14) The director of the Federal Voting Assistance Program of the Department of Defense.

(15) Four members representing professionals in the field of science and technology, of whom—

(A) one each shall be appointed by the Speaker and the Minority Leader of the House of Representatives; and

(B) one each shall be appointed by the Majority Leader and the Minority Leader of the Senate.

(16) Eight members representing voter interests, of whom—

(A) four members shall be appointed by the Committee on House Administration of the House of Representatives, of whom two shall be appointed by the chair and two shall be appointed by the ranking minority member; and

(B) four members shall be appointed by the Committee on Rules and Administration of the Senate, of whom two shall be appointed by the chair and two shall be appointed by the ranking minority member.

(b) MANNER OF APPOINTMENTS.—Appointments shall be made to the Board of Advisors under subsection (a) in a manner which ensures that the Board of Advisors will be bipartisan in nature and will reflect the various geographic regions of the United States.

(c) TERM OF SERVICE; VACANCY.—Members of the Board of Advisors shall serve for a term of 2 years, and may be reappointed.

PUBLIC LAW 107–252—OCT. 29, 2002      116 STAT. 1681

Any vacancy in the Board of Advisors shall be filled in the manner in which the original appointment was made.

(d) CHAIR.—The Board of Advisors shall elect a Chair from among its members.

**SEC. 215. POWERS OF BOARDS; NO COMPENSATION FOR SERVICE.**       42 USC 15345.

(a) HEARINGS AND SESSIONS.—

(1) IN GENERAL.—To the extent that funds are made available by the Commission, the Standards Board (acting through the Executive Board) and the Board of Advisors may each hold such hearings for the purpose of carrying out this Act, sit and act at such times and places, take such testimony, and receive such evidence as each such Board considers advisable to carry out this title, except that the Boards may not issue subpoenas requiring the attendance and testimony of witnesses or the production of any evidence.

(2) MEETINGS.—The Standards Board and the Board of Advisors shall each hold a meeting of its members—

(A) not less frequently than once every year for purposes of voting on the voluntary voting system guidelines referred to it under section 222;

(B) in the case of the Standards Board, not less frequently than once every 2 years for purposes of selecting the Executive Board; and

(C) at such other times as it considers appropriate for purposes of conducting such other business as it considers appropriate consistent with this title.

(b) INFORMATION FROM FEDERAL AGENCIES.—The Standards Board and the Board of Advisors may each secure directly from any Federal department or agency such information as the Board considers necessary to carry out this Act. Upon request of the Executive Board (in the case of the Standards Board) or the Chair (in the case of the Board of Advisors), the head of such department or agency shall furnish such information to the Board.

(c) POSTAL SERVICES.—The Standards Board and the Board of Advisors may use the United States mails in the same manner and under the same conditions as a department or agency of the Federal Government.

(d) ADMINISTRATIVE SUPPORT SERVICES.—Upon the request of the Executive Board (in the case of the Standards Board) or the Chair (in the case of the Board of Advisors), the Administrator of the General Services Administration shall provide to the Board, on a reimbursable basis, the administrative support services that are necessary to enable the Board to carry out its duties under this title.

(e) NO COMPENSATION FOR SERVICE.—Members of the Standards Board and members of the Board of Advisors shall not receive any compensation for their service, but shall be paid travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the Board.

**SEC. 216. STATUS OF BOARDS AND MEMBERS FOR PURPOSES OF CLAIMS AGAINST BOARD.**       42 USC 15346.

(a) IN GENERAL.—The provisions of chapters 161 and 171 of title 28, United States Code, shall apply with respect to the liability       Applicability.

of the Standards Board, the Board of Advisors, and their members for acts or omissions performed pursuant to and in the course of the duties and responsibilities of the Board.

(b) EXCEPTION FOR CRIMINAL ACTS AND OTHER WILLFUL CONDUCT.—Subsection (a) may not be construed to limit personal liability for criminal acts or omissions, willful or malicious misconduct, acts or omissions for private gain, or any other act or omission outside the scope of the service of a member of the Standards Board or the Board of Advisors.

# PART 3—TECHNICAL GUIDELINES DEVELOPMENT COMMITTEE

42 USC 15361.

**SEC. 221. TECHNICAL GUIDELINES DEVELOPMENT COMMITTEE.**

(a) ESTABLISHMENT.—There is hereby established the Technical Guidelines Development Committee (hereafter in this part referred to as the "Development Committee").

(b) DUTIES.—

(1) IN GENERAL.—The Development Committee shall assist the Executive Director of the Commission in the development of the voluntary voting system guidelines.

(2) DEADLINE FOR INITIAL SET OF RECOMMENDATIONS.—The Development Committee shall provide its first set of recommendations under this section to the Executive Director of the Commission not later than 9 months after all of its members have been appointed.

(c) MEMBERSHIP.—

(1) IN GENERAL.—The Development Committee shall be composed of the Director of the National Institute of Standards and Technology (who shall serve as its chair), together with a group of 14 other individuals appointed jointly by the Commission and the Director of the National Institute of Standards and Technology, consisting of the following:

(A) An equal number of each of the following:

(i) Members of the Standards Board.

(ii) Members of the Board of Advisors.

(iii) Members of the Architectural and Transportation Barrier Compliance Board under section 502 of the Rehabilitation Act of 1973 (29 U.S.C. 792).

(B) A representative of the American National Standards Institute.

(C) A representative of the Institute of Electrical and Electronics Engineers.

(D) Two representatives of the National Association of State Election Directors selected by such Association who are not members of the Standards Board or Board of Advisors, and who are not of the same political party.

(E) Other individuals with technical and scientific expertise relating to voting systems and voting equipment.

(2) QUORUM.—A majority of the members of the Development Committee shall constitute a quorum, except that the Development Committee may not conduct any business prior to the appointment of all of its members.

(d) NO COMPENSATION FOR SERVICE.—Members of the Development Committee shall not receive any compensation for their service, but shall be paid travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies

under subchapter I of chapter 57 of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the Development Committee.

(e) TECHNICAL SUPPORT FROM NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY.—

(1) IN GENERAL.—At the request of the Development Committee, the Director of the National Institute of Standards and Technology shall provide the Development Committee with technical support necessary for the Development Committee to carry out its duties under this subtitle.

(2) TECHNICAL SUPPORT.—The technical support provided under paragraph (1) shall include intramural research and development in areas to support the development of the voluntary voting system guidelines under this part, including—

(A) the security of computers, computer networks, and computer data storage used in voting systems, including the computerized list required under section 303(a);

(B) methods to detect and prevent fraud;

(C) the protection of voter privacy;

(D) the role of human factors in the design and application of voting systems, including assistive technologies for individuals with disabilities (including blindness) and varying levels of literacy; and

(E) remote access voting, including voting through the Internet.

(3) NO PRIVATE SECTOR INTELLECTUAL PROPERTY RIGHTS IN GUIDELINES.—No private sector individual or entity shall obtain any intellectual property rights to any guideline or the contents of any guideline (or any modification to any guideline) adopted by the Commission under this Act.

(f) PUBLICATION OF RECOMMENDATIONS IN FEDERAL REGISTER.— At the time the Commission adopts any voluntary voting system guideline pursuant to section 222, the Development Committee shall cause to have published in the Federal Register the recommendations it provided under this section to the Executive Director of the Commission concerning the guideline adopted.

## SEC. 222. PROCESS FOR ADOPTION.

42 USC 15362.

Federal Register, publication.

(a) GENERAL REQUIREMENT FOR NOTICE AND COMMENT.—Consistent with the requirements of this section, the final adoption of the voluntary voting system guidelines (or modification of such a guideline) shall be carried out by the Commission in a manner that provides for each of the following:

(1) Publication of notice of the proposed guidelines in the Federal Register.

(2) An opportunity for public comment on the proposed guidelines.

(3) An opportunity for a public hearing on the record.

(4) Publication of the final guidelines in the Federal Register.

(b) CONSIDERATION OF RECOMMENDATIONS OF DEVELOPMENT COMMITTEE; SUBMISSION OF PROPOSED GUIDELINES TO BOARD OF ADVISORS AND STANDARDS BOARD.—

(1) CONSIDERATION OF RECOMMENDATIONS OF DEVELOPMENT COMMITTEE.—In developing the voluntary voting system guidelines and modifications of such guidelines under this section,

116 STAT. 1684          PUBLIC LAW 107–252—OCT. 29, 2002

the Executive Director of the Commission shall take into consideration the recommendations provided by the Technical Guidelines Development Committee under section 221.

(2) BOARD OF ADVISORS.—The Executive Director of the Commission shall submit the guidelines proposed to be adopted under this part (or any modifications to such guidelines) to the Board of Advisors.

(3) STANDARDS BOARD.—The Executive Director of the Commission shall submit the guidelines proposed to be adopted under this part (or any modifications to such guidelines) to the Executive Board of the Standards Board, which shall review the guidelines (or modifications) and forward its recommendations to the Standards Board.

(c) REVIEW.—Upon receipt of voluntary voting system guidelines described in subsection (b) (or a modification of such guidelines) from the Executive Director of the Commission, the Board of Advisors and the Standards Board shall each review and submit comments and recommendations regarding the guideline (or modification) to the Commission.

(d) FINAL ADOPTION.—

(1) IN GENERAL.—A voluntary voting system guideline described in subsection (b) (or modification of such a guideline) shall not be considered to be finally adopted by the Commission unless the Commission votes to approve the final adoption of the guideline (or modification), taking into consideration the comments and recommendations submitted by the Board of Advisors and the Standards Board under subsection (c).

(2) MINIMUM PERIOD FOR CONSIDERATION OF COMMENTS AND RECOMMENDATIONS.—The Commission may not vote on the final adoption of a guideline described in subsection (b) (or modification of such a guideline) until the expiration of the 90-day period which begins on the date the Executive Director of the Commission submits the proposed guideline (or modification) to the Board of Advisors and the Standards Board under subsection (b).

(e) SPECIAL RULE FOR INITIAL SET OF GUIDELINES.—Notwithstanding any other provision of this part, the most recent set of voting system standards adopted by the Federal Election Commission prior to the date of the enactment of this Act shall be deemed to have been adopted by the Commission as of the date of the enactment of this Act as the first set of voluntary voting system guidelines adopted under this part.

# Subtitle B—Testing, Certification, Decertification, and Recertification of Voting System Hardware and Software

42 USC 15371.   **SEC. 231. CERTIFICATION AND TESTING OF VOTING SYSTEMS.**

(a) CERTIFICATION AND TESTING.—

(1) IN GENERAL.—The Commission shall provide for the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories.

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1685

(2) OPTIONAL USE BY STATES.—At the option of a State, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software by the laboratories accredited by the Commission under this section.

(b) LABORATORY ACCREDITATION.—

(1) RECOMMENDATIONS BY NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY.—Not later than 6 months after the Commission first adopts voluntary voting system guidelines under part 3 of subtitle A, the Director of the National Institute of Standards and Technology shall conduct an evaluation of independent, non-Federal laboratories and shall submit to the Commission a list of those laboratories the Director proposes to be accredited to carry out the testing, certification, decertification, and recertification provided for under this section.

Deadline.
Records.

(2) APPROVAL BY COMMISSION.—

(A) IN GENERAL.—The Commission shall vote on the accreditation of any laboratory under this section, taking into consideration the list submitted under paragraph (1), and no laboratory may be accredited for purposes of this section unless its accreditation is approved by a vote of the Commission.

(B) ACCREDITATION LABORATORIES NOT ON DIRECTOR LIST.—The Commission shall publish an explanation for the accreditation of any laboratory not included on the list submitted by the Director of the National Institute of Standards and Technology under paragraph (1).

Publication.

(c) CONTINUING REVIEW BY NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY.—

(1) IN GENERAL.—In cooperation with the Commission and in consultation with the Standards Board and the Board of Advisors, the Director of the National Institute of Standards and Technology shall monitor and review, on an ongoing basis, the performance of the laboratories accredited by the Commission under this section, and shall make such recommendations to the Commission as it considers appropriate with respect to the continuing accreditation of such laboratories, including recommendations to revoke the accreditation of any such laboratory.

(2) APPROVAL BY COMMISSION REQUIRED FOR REVOCATION.—The accreditation of a laboratory for purposes of this section may not be revoked unless the revocation is approved by a vote of the Commission.

(d) TRANSITION.—Until such time as the Commission provides for the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories under this section, the accreditation of laboratories and the procedure for the testing, certification, decertification, and recertification of voting system hardware and software used as of the date of the enactment of this Act shall remain in effect.

116 STAT. 1686          PUBLIC LAW 107–252—OCT. 29, 2002

# Subtitle C—Studies and Other Activities To Promote Effective Administration of Federal Elections

42 USC 15381.

Public information.

**SEC. 241. PERIODIC STUDIES OF ELECTION ADMINISTRATION ISSUES.**

(a) IN GENERAL.—On such periodic basis as the Commission may determine, the Commission shall conduct and make available to the public studies regarding the election administration issues described in subsection (b), with the goal of promoting methods of voting and administering elections which—

(1) will be the most convenient, accessible, and easy to use for voters, including members of the uniformed services and overseas voters, individuals with disabilities, including the blind and visually impaired, and voters with limited proficiency in the English language;

(2) will yield the most accurate, secure, and expeditious system for voting and tabulating election results;

(3) will be nondiscriminatory and afford each registered and eligible voter an equal opportunity to vote and to have that vote counted; and

(4) will be efficient and cost-effective for use.

(b) ELECTION ADMINISTRATION ISSUES DESCRIBED.—For purposes of subsection (a), the election administration issues described in this subsection are as follows:

(1) Methods and mechanisms of election technology and voting systems used in voting and counting votes in elections for Federal office, including the over-vote and under-vote notification capabilities of such technology and systems.

(2) Ballot designs for elections for Federal office.

(3) Methods of voter registration, maintaining secure and accurate lists of registered voters (including the establishment of a centralized, interactive, statewide voter registration list linked to relevant agencies and all polling sites), and ensuring that registered voters appear on the voter registration list at the appropriate polling site.

(4) Methods of conducting provisional voting.

(5) Methods of ensuring the accessibility of voting, registration, polling places, and voting equipment to all voters, including individuals with disabilities (including the blind and visually impaired), Native American or Alaska Native citizens, and voters with limited proficiency in the English language.

(6) Nationwide statistics and methods of identifying, deterring, and investigating voting fraud in elections for Federal office.

(7) Identifying, deterring, and investigating methods of voter intimidation.

(8) Methods of recruiting, training, and improving the performance of poll workers.

(9) Methods of educating voters about the process of registering to vote and voting, the operation of voting mechanisms, the location of polling places, and all other aspects of participating in elections.

(10) The feasibility and advisability of conducting elections for Federal office on different days, at different places, and

during different hours, including the advisability of establishing a uniform poll closing time and establishing—

(A) a legal public holiday under section 6103 of title 5, United States Code, as the date on which general elections for Federal office are held;

(B) the Tuesday next after the 1st Monday in November, in every even numbered year, as a legal public holiday under such section;

(C) a date other than the Tuesday next after the 1st Monday in November, in every even numbered year as the date on which general elections for Federal office are held; and

(D) any date described in subparagraph (C) as a legal public holiday under such section.

(11) Federal and State laws governing the eligibility of persons to vote.

(12) Ways that the Federal Government can best assist State and local authorities to improve the administration of elections for Federal office and what levels of funding would be necessary to provide such assistance.

(13)(A) The laws and procedures used by each State that govern—

(i) recounts of ballots cast in elections for Federal office;

(ii) contests of determinations regarding whether votes are counted in such elections; and

(iii) standards that define what will constitute a vote on each type of voting equipment used in the State to conduct elections for Federal office.

(B) The best practices (as identified by the Commission) that are used by States with respect to the recounts and contests described in clause (i).

(C) Whether or not there is a need for more consistency among State recount and contest procedures used with respect to elections for Federal office.

(14) The technical feasibility of providing voting materials in eight or more languages for voters who speak those languages and who have limited English proficiency.

(15) Matters particularly relevant to voting and administering elections in rural and urban areas.

(16) Methods of voter registration for members of the uniformed services and overseas voters, and methods of ensuring that such voters receive timely ballots that will be properly and expeditiously handled and counted.

(17) The best methods for establishing voting system performance benchmarks, expressed as a percentage of residual vote in the Federal contest at the top of the ballot.

(18) Broadcasting practices that may result in the broadcast of false information concerning the location or time of operation of a polling place.

(19) Such other matters as the Commission determines are appropriate.

(c) REPORTS.—The Commission shall submit to the President and to the Committee on House Administration of the House of Representatives and the Committee on Rules and Administration of the Senate a report on each study conducted under subsection (a) together with such recommendations for administrative and legislative action as the Commission determines is appropriate.

116 STAT. 1688    PUBLIC LAW 107–252—OCT. 29, 2002

42 USC 15382.

**SEC. 242. STUDY, REPORT, AND RECOMMENDATIONS ON BEST PRAC-
TICES FOR FACILITATING MILITARY AND OVERSEAS
VOTING.**

(a) STUDY.—

(1) IN GENERAL.—The Commission, in consultation with
the Secretary of Defense, shall conduct a study on the best
practices for facilitating voting by absent uniformed services
voters (as defined in section 107(1) of the Uniformed and Over-
seas Citizens Absentee Voting Act) and overseas voters (as
defined in section 107(5) of such Act).

(2) ISSUES CONSIDERED.—In conducting the study under
paragraph (1) the Commission shall consider the following
issues:

(A) The rights of residence of uniformed services voters
absent due to military orders.

(B) The rights of absent uniformed services voters and
overseas voters to register to vote and cast absentee ballots,
including the right of such voters to cast a secret ballot.

(C) The rights of absent uniformed services voters and
overseas voters to submit absentee ballot applications early
during an election year.

(D) The appropriate preelection deadline for mailing
absentee ballots to absent uniformed services voters and
overseas voters.

(E) The appropriate minimum period between the
mailing of absentee ballots to absent uniformed services
voters and overseas voters and the deadline for receipt
of such ballots.

(F) The timely transmission of balloting materials to
absent uniformed services voters and overseas voters.

(G) Security and privacy concerns in the transmission,
receipt, and processing of ballots from absent uniformed
services voters and overseas voters, including the need
to protect against fraud.

(H) The use of a single application by absent uniformed
services voters and overseas voters for absentee ballots
for all Federal elections occurring during a year.

(I) The use of a single application for voter registration
and absentee ballots by absent uniformed services voters
and overseas voters.

(J) The use of facsimile machines and electronic means
of transmission of absentee ballot applications and absentee
ballots to absent uniformed services voters and overseas
voters.

(K) Other issues related to the rights of absent uni-
formed services voters and overseas voters to participate
in elections.

Deadline.

(b) REPORT AND RECOMMENDATIONS.—Not later than the date
that is 18 months after the date of the enactment of this Act,
the Commission shall submit to the President and Congress a
report on the study conducted under subsection (a)(1) together
with recommendations identifying the best practices used with
respect to the issues considered under subsection (a)(2).

42 USC 15383.

**SEC. 243. REPORT ON HUMAN FACTOR RESEARCH.**

Deadline.

Not later than 1 year after the date of the enactment of this
Act, the Commission, in consultation with the Director of the

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1689

National Institute of Standards and Technology, shall submit a report to Congress which assesses the areas of human factor research, including usability engineering and human-computer and human-machine interaction, which feasibly could be applied to voting products and systems design to ensure the usability and accuracy of voting products and systems, including methods to improve access for individuals with disabilities (including blindness) and individuals with limited proficiency in the English language and to reduce voter error and the number of spoiled ballots in elections.

**SEC. 244. STUDY AND REPORT ON VOTERS WHO REGISTER BY MAIL AND USE OF SOCIAL SECURITY INFORMATION.**          42 USC 15384.

(a) REGISTRATION BY MAIL.—

(1) STUDY.—

(A) IN GENERAL.—The Commission shall conduct a study of the impact of section 303(b) on voters who register by mail.

(B) SPECIFIC ISSUES STUDIED.—The study conducted under subparagraph (A) shall include—

(i) an examination of the impact of section 303(b) on first time mail registrant voters who vote in person, including the impact of such section on voter registration;

(ii) an examination of the impact of such section on the accuracy of voter rolls, including preventing ineligible names from being placed on voter rolls and ensuring that all eligible names are placed on voter rolls; and

(iii) an analysis of the impact of such section on existing State practices, such as the use of signature verification or attestation procedures to verify the identity of voters in elections for Federal office, and an analysis of other changes that may be made to improve the voter registration process, such as verification or additional information on the registration card.

(2) REPORT.—Not later than 18 months after the date on which section 303(b)(2) takes effect, the Commission shall submit a report to the President and Congress on the study conducted under paragraph (1)(A) together with such recommendations for administrative and legislative action as the Commission determines is appropriate.          Deadline.

(b) USE OF SOCIAL SECURITY INFORMATION.—Not later than 18 months after the date on which section 303(a)(5) takes effect, the Commission, in consultation with the Commissioner of Social Security, shall study and report to Congress on the feasibility and advisability of using Social Security identification numbers or other information compiled by the Social Security Administration to establish voter registration or other election law eligibility or identification requirements, including the matching of relevant information specific to an individual voter, the impact of such use on national security issues, and whether adequate safeguards or waiver procedures exist to protect the privacy of an individual voter.          Deadline.

42 USC 15385.

**SEC. 245. STUDY AND REPORT ON ELECTRONIC VOTING AND THE ELECTORAL PROCESS.**

(a) STUDY.—

(1) IN GENERAL.—The Commission shall conduct a thorough study of issues and challenges, specifically to include the potential for election fraud, presented by incorporating communications and Internet technologies in the Federal, State, and local electoral process.

(2) ISSUES TO BE STUDIED.—The Commission may include in the study conducted under paragraph (1) an examination of—

(A) the appropriate security measures required and minimum standards for certification of systems or technologies in order to minimize the potential for fraud in voting or in the registration of qualified citizens to register and vote;

(B) the possible methods, such as Internet or other communications technologies, that may be utilized in the electoral process, including the use of those technologies to register voters and enable citizens to vote online, and recommendations concerning statutes and rules to be adopted in order to implement an online or Internet system in the electoral process;

(C) the impact that new communications or Internet technology systems for use in the electoral process could have on voter participation rates, voter education, public accessibility, potential external influences during the elections process, voter privacy and anonymity, and other issues related to the conduct and administration of elections;

(D) whether other aspects of the electoral process, such as public availability of candidate information and citizen communication with candidates, could benefit from the increased use of online or Internet technologies;

(E) the requirements for authorization of collection, storage, and processing of electronically generated and transmitted digital messages to permit any eligible person to register to vote or vote in an election, including applying for and casting an absentee ballot;

(F) the implementation cost of an online or Internet voting or voter registration system and the costs of elections after implementation (including a comparison of total cost savings for the administration of the electoral process by using Internet technologies or systems);

(G) identification of current and foreseeable online and Internet technologies for use in the registration of voters, for voting, or for the purpose of reducing election fraud, currently available or in use by election authorities;

(H) the means by which to ensure and achieve equity of access to online or Internet voting or voter registration systems and address the fairness of such systems to all citizens; and

(I) the impact of technology on the speed, timeliness, and accuracy of vote counts in Federal, State, and local elections.

(b) REPORT.—

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1691

(1) SUBMISSION.—Not later than 20 months after the date of the enactment of this Act, the Commission shall transmit to the Committee on House Administration of the House of Representatives and the Committee on Rules and Administration of the Senate a report on the results of the study conducted under subsection (a), including such legislative recommendations or model State laws as are required to address the findings of the Commission.

(2) INTERNET POSTING.—In addition to the dissemination requirements under chapter 19 of title 44, United States Code, the Election Administration Commission shall post the report transmitted under paragraph (1) on an Internet website.

**SEC. 246. STUDY AND REPORT ON FREE ABSENTEE BALLOT POSTAGE.**

(a) STUDY ON THE ESTABLISHMENT OF A FREE ABSENTEE BALLOT POSTAGE PROGRAM.—

(1) IN GENERAL.—The Commission, in consultation with the Postal Service, shall conduct a study on the feasibility and advisability of the establishment of a program under which the Postal Service shall waive or otherwise reduce the amount of postage applicable with respect to absentee ballots submitted by voters in general elections for Federal office (other than balloting materials mailed under section 3406 of title 39, United States Code) that does not apply with respect to the postage required to send the absentee ballots to voters.

(2) PUBLIC SURVEY.—As part of the study conducted under paragraph (1), the Commission shall conduct a survey of potential beneficiaries under the program described in such paragraph, including the elderly and disabled, and shall take into account the results of such survey in determining the feasibility and advisability of establishing such a program.

(b) REPORT.—

(1) SUBMISSION.—Not later than the date that is 1 year after the date of the enactment of this Act, the Commission shall submit to Congress a report on the study conducted under subsection (a)(1) together with recommendations for such legislative and administrative action as the Commission determines appropriate.

(2) COSTS.—The report submitted under paragraph (1) shall contain an estimate of the costs of establishing the program described in subsection (a)(1).

(3) IMPLEMENTATION.—The report submitted under paragraph (1) shall contain an analysis of the feasibility of implementing the program described in subsection (a)(1) with respect to the absentee ballots to be submitted in the general election for Federal office held in 2004.

(4) RECOMMENDATIONS REGARDING THE ELDERLY AND DISABLED.—The report submitted under paragraph (1) shall—

(A) include recommendations on ways that program described in subsection (a)(1) would target elderly individuals and individuals with disabilities; and

(B) identify methods to increase the number of such individuals who vote in elections for Federal office.

(c) POSTAL SERVICE DEFINED.—The term "Postal Service" means the United States Postal Service established under section 201 of title 39, United States Code.

Deadline.

42 USC 15386.

Deadline.

116 STAT. 1692      PUBLIC LAW 107–252—OCT. 29, 2002

42 USC 15387.

**SEC. 247. CONSULTATION WITH STANDARDS BOARD AND BOARD OF ADVISORS.**

The Commission shall carry out its duties under this subtitle in consultation with the Standards Board and the Board of Advisors.

# Subtitle D—Election Assistance

## PART 1—REQUIREMENTS PAYMENTS

42 USC 15401.

**SEC. 251. REQUIREMENTS PAYMENTS.**

(a) IN GENERAL.—The Commission shall make a requirements payment each year in an amount determined under section 252 to each State which meets the conditions described in section 253 for the year.

(b) USE OF FUNDS.—

(1) IN GENERAL.—Except as provided in paragraph (2), a State receiving a requirements payment shall use the payment only to meet the requirements of title III.

(2) OTHER ACTIVITIES.—A State may use a requirements payment to carry out other activities to improve the administration of elections for Federal office if the State certifies to the Commission that—

(A) the State has implemented the requirements of title III; or

(B) the amount expended with respect to such other activities does not exceed an amount equal to the minimum payment amount applicable to the State under section 252(c).

(c) RETROACTIVE PAYMENTS.—

(1) IN GENERAL.—Notwithstanding any other provision of this subtitle, including the maintenance of effort requirements of section 254(a)(7), a State may use a requirements payment as a reimbursement for costs incurred in obtaining voting equipment which meets the requirements of section 301 if the State obtains the equipment after the regularly scheduled general election for Federal office held in November 2000.

(2) SPECIAL RULE REGARDING MULTIYEAR CONTRACTS.—A State may use a requirements payment for any costs for voting equipment which meets the requirements of section 301 that, pursuant to a multiyear contract, were incurred on or after January 1, 2001, except that the amount that the State is otherwise required to contribute under the maintenance of effort requirements of section 254(a)(7) shall be increased by the amount of the payment made with respect to such multiyear contract.

(d) ADOPTION OF COMMISSION GUIDELINES AND GUIDANCE NOT REQUIRED TO RECEIVE PAYMENT.—Nothing in this part may be construed to require a State to implement any of the voluntary voting system guidelines or any of the voluntary guidance adopted by the Commission with respect to any matter as a condition for receiving a requirements payment.

(e) SCHEDULE OF PAYMENTS.—As soon as practicable after the initial appointment of all members of the Commission (but in no event later than 6 months thereafter), and not less frequently than once each calendar year thereafter, the Commission shall make requirements payments to States under this part.

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1693

(f) LIMITATION.—A State may not use any portion of a requirements payment—

(1) to pay costs associated with any litigation, except to the extent that such costs otherwise constitute permitted uses of a requirements payment under this part; or

(2) for the payment of any judgment.

**SEC. 252. ALLOCATION OF FUNDS.**                                    42 USC 15402.

(a) IN GENERAL.—Subject to subsection (c), the amount of a requirements payment made to a State for a year shall be equal to the product of—

(1) the total amount appropriated for requirements payments for the year pursuant to the authorization under section 257; and

(2) the State allocation percentage for the State (as determined under subsection (b)).

(b) STATE ALLOCATION PERCENTAGE DEFINED.—The "State allocation percentage" for a State is the amount (expressed as a percentage) equal to the quotient of—

(1) the voting age population of the State (as reported in the most recent decennial census); and

(2) the total voting age population of all States (as reported in the most recent decennial census).

(c) MINIMUM AMOUNT OF PAYMENT.—The amount of a requirements payment made to a State for a year may not be less than—

(1) in the case of any of the several States or the District of Columbia, one-half of 1 percent of the total amount appropriated for requirements payments for the year under section 257; or

(2) in the case of the Commonwealth of Puerto Rico, Guam, American Samoa, or the United States Virgin Islands, one-tenth of 1 percent of such total amount.

(d) PRO RATA REDUCTIONS.—The Administrator shall make such pro rata reductions to the allocations determined under subsection (a) as are necessary to comply with the requirements of subsection (c).

(e) CONTINUING AVAILABILITY OF FUNDS AFTER APPROPRIATION.—A requirements payment made to a State under this part shall be available to the State without fiscal year limitation.

**SEC. 253. CONDITION FOR RECEIPT OF FUNDS.**                          42 USC 15403.

(a) IN GENERAL.—A State is eligible to receive a requirements payment for a fiscal year if the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, has filed with the Commission a statement certifying that the State is in compliance with the requirements referred to in subsection (b). A State may meet the requirement of the previous sentence by filing with the Commission a statement which reads as follows: "_____ hereby certifies that it is in compliance with the requirements referred to in section 253(b) of the Help America Vote Act of 2002." (with the blank to be filled in with the name of the State involved).

(b) STATE PLAN REQUIREMENT; CERTIFICATION OF COMPLIANCE WITH APPLICABLE LAWS AND REQUIREMENTS.—The requirements referred to in this subsection are as follows:

(1) The State has filed with the Commission a State plan covering the fiscal year which the State certifies—

(A) contains each of the elements described in section 254 with respect to the fiscal year;

(B) is developed in accordance with section 255; and

(C) meets the public notice and comment requirements of section 256.

(2) The State has filed with the Commission a plan for the implementation of the uniform, nondiscriminatory administrative complaint procedures required under section 402 (or has included such a plan in the State plan filed under paragraph (1)), and has such procedures in place for purposes of meeting the requirements of such section. If the State does not include such an implementation plan in the State plan filed under paragraph (1), the requirements of sections 255(b) and 256 shall apply to the implementation plan in the same manner as such requirements apply to the State plan.

Applicability.

(3) The State is in compliance with each of the laws described in section 906, as such laws apply with respect to this Act.

Applicability.

(4) To the extent that any portion of the requirements payment is used for activities other than meeting the requirements of title III—

(A) the State's proposed uses of the requirements payment are not inconsistent with the requirements of title III; and

(B) the use of the funds under this paragraph is consistent with the requirements of section 251(b).

(5) The State has appropriated funds for carrying out the activities for which the requirements payment is made in an amount equal to 5 percent of the total amount to be spent for such activities (taking into account the requirements payment and the amount spent by the State) and, in the case of a State that uses a requirements payment as a reimbursement under section 251(c)(2), an additional amount equal to the amount of such reimbursement.

(c) METHODS OF COMPLIANCE LEFT TO DISCRETION OF STATE.— The specific choices on the methods of complying with the elements of a State plan shall be left to the discretion of the State.

(d) TIMING FOR FILING OF CERTIFICATION.—A State may not file a statement of certification under subsection (a) until the expiration of the 45-day period (or, in the case of a fiscal year other than the first fiscal year for which a requirements payment is made to the State under this subtitle, the 30-day period) which begins on the date the State plan under this subtitle is published in the Federal Register pursuant to section 255(b).

(e) CHIEF STATE ELECTION OFFICIAL DEFINED.—In this subtitle, the "chief State election official" of a State is the individual designated by the State under section 10 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–8) to be responsible for coordination of the State's responsibilities under such Act.

42 USC 15404.

## SEC. 254. STATE PLAN.

(a) IN GENERAL.—The State plan shall contain a description of each of the following:

(1) How the State will use the requirements payment to meet the requirements of title III, and, if applicable under section 251(a)(2), to carry out other activities to improve the administration of elections.

(2) How the State will distribute and monitor the distribution of the requirements payment to units of local government or other entities in the State for carrying out the activities described in paragraph (1), including a description of—

(A) the criteria to be used to determine the eligibility of such units or entities for receiving the payment; and

(B) the methods to be used by the State to monitor the performance of the units or entities to whom the payment is distributed, consistent with the performance goals and measures adopted under paragraph (8).

(3) How the State will provide for programs for voter education, election official education and training, and poll worker training which will assist the State in meeting the requirements of title III.

(4) How the State will adopt voting system guidelines and processes which are consistent with the requirements of section 301.

(5) How the State will establish a fund described in subsection (b) for purposes of administering the State's activities under this part, including information on fund management.

(6) The State's proposed budget for activities under this part, based on the State's best estimates of the costs of such activities and the amount of funds to be made available, including specific information on—

(A) the costs of the activities required to be carried out to meet the requirements of title III;

(B) the portion of the requirements payment which will be used to carry out activities to meet such requirements; and

(C) the portion of the requirements payment which will be used to carry out other activities.

(7) How the State, in using the requirements payment, will maintain the expenditures of the State for activities funded by the payment at a level that is not less than the level of such expenditures maintained by the State for the fiscal year ending prior to November 2000.

(8) How the State will adopt performance goals and measures that will be used by the State to determine its success and the success of units of local government in the State in carrying out the plan, including timetables for meeting each of the elements of the plan, descriptions of the criteria the State will use to measure performance and the process used to develop such criteria, and a description of which official is to be held responsible for ensuring that each performance goal is met.

(9) A description of the uniform, nondiscriminatory State-based administrative complaint procedures in effect under section 402.

(10) If the State received any payment under title I, a description of how such payment will affect the activities proposed to be carried out under the plan, including the amount of funds available for such activities.

(11) How the State will conduct ongoing management of the plan, except that the State may not make any material change in the administration of the plan unless the change—

(A) is developed and published in the Federal Register in accordance with section 255 in the same manner as the State plan;

(B) is subject to public notice and comment in accordance with section 256 in the same manner as the State plan; and

(C) takes effect only after the expiration of the 30-day period which begins on the date the change is published in the Federal Register in accordance with subparagraph (A).

(12) In the case of a State with a State plan in effect under this subtitle during the previous fiscal year, a description of how the plan reflects changes from the State plan for the previous fiscal year and of how the State succeeded in carrying out the State plan for such previous fiscal year.

(13) A description of the committee which participated in the development of the State plan in accordance with section 255 and the procedures followed by the committee under such section and section 256.

(b) REQUIREMENTS FOR ELECTION FUND.—

(1) ELECTION FUND DESCRIBED.—For purposes of subsection (a)(5), a fund described in this subsection with respect to a State is a fund which is established in the treasury of the State government, which is used in accordance with paragraph (2), and which consists of the following amounts:

(A) Amounts appropriated or otherwise made available by the State for carrying out the activities for which the requirements payment is made to the State under this part.

(B) The requirements payment made to the State under this part.

(C) Such other amounts as may be appropriated under law.

(D) Interest earned on deposits of the fund.

(2) USE OF FUND.—Amounts in the fund shall be used by the State exclusively to carry out the activities for which the requirements payment is made to the State under this part.

(3) TREATMENT OF STATES THAT REQUIRE CHANGES TO STATE LAW.—In the case of a State that requires State legislation to establish the fund described in this subsection, the Commission shall defer disbursement of the requirements payment to such State until such time as legislation establishing the fund is enacted.

(c) PROTECTION AGAINST ACTIONS BASED ON INFORMATION IN PLAN.—

(1) IN GENERAL.—No action may be brought under this Act against a State or other jurisdiction on the basis of any information contained in the State plan filed under this part.

(2) EXCEPTION FOR CRIMINAL ACTS.—Paragraph (1) may not be construed to limit the liability of a State or other jurisdiction for criminal acts or omissions.

PUBLIC LAW 107–252—OCT. 29, 2002        116 STAT. 1697

**SEC. 255. PROCESS FOR DEVELOPMENT AND FILING OF PLAN; PUBLICATION BY COMMISSION.**

42 USC 15405.

(a) IN GENERAL.—The chief State election official shall develop the State plan under this subtitle through a committee of appropriate individuals, including the chief election officials of the two most populous jurisdictions within the States, other local election officials, stake holders (including representatives of groups of individuals with disabilities), and other citizens, appointed for such purpose by the chief State election official.

(b) PUBLICATION OF PLAN BY COMMISSION.—After receiving the State plan of a State under this subtitle, the Commission shall cause to have the plan published in the Federal Register.

Federal Register, publication.

**SEC. 256. REQUIREMENT FOR PUBLIC NOTICE AND COMMENT.**

42 USC 15406.

For purposes of section 251(a)(1)(C), a State plan meets the public notice and comment requirements of this section if—

(1) not later than 30 days prior to the submission of the plan, the State made a preliminary version of the plan available for public inspection and comment;

(2) the State publishes notice that the preliminary version of the plan is so available; and

(3) the State took the public comments made regarding the preliminary version of the plan into account in preparing the plan which was filed with the Commission.

**SEC. 257. AUTHORIZATION OF APPROPRIATIONS.**

42 USC 15407.

(a) IN GENERAL.—In addition to amounts transferred under section 104(c), there are authorized to be appropriated for requirements payments under this part the following amounts:

(1) For fiscal year 2003, $1,400,000,000.

(2) For fiscal year 2004, $1,000,000,000.

(3) For fiscal year 2005, $600,000,000.

(b) AVAILABILITY.—Any amounts appropriated pursuant to the authority of subsection (a) shall remain available without fiscal year limitation until expended.

**SEC. 258. REPORTS.**

42 USC 15408.

Not later than 6 months after the end of each fiscal year for which a State received a requirements payment under this part, the State shall submit a report to the Commission on the activities conducted with the funds provided during the year, and shall include in the report—

Deadline.

(1) a list of expenditures made with respect to each category of activities described in section 251(b);

(2) the number and type of articles of voting equipment obtained with the funds; and

(3) an analysis and description of the activities funded under this part to meet the requirements of this Act and an analysis and description of how such activities conform to the State plan under section 254.

# PART 2—PAYMENTS TO STATES AND UNITS OF LOCAL GOVERNMENT TO ASSURE ACCESS FOR INDIVIDUALS WITH DISABILITIES

42 USC 15421.

**SEC. 261. PAYMENTS TO STATES AND UNITS OF LOCAL GOVERNMENT TO ASSURE ACCESS FOR INDIVIDUALS WITH DISABILITIES.**

(a) IN GENERAL.—The Secretary of Health and Human Services shall make a payment to each eligible State and each eligible unit of local government (as described in section 263).

(b) USE OF FUNDS.—An eligible State and eligible unit of local government shall use the payment received under this part for—

(1) making polling places, including the path of travel, entrances, exits, and voting areas of each polling facility, accessible to individuals with disabilities, including the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters; and

(2) providing individuals with disabilities and the other individuals described in paragraph (1) with information about the accessibility of polling places, including outreach programs to inform the individuals about the availability of accessible polling places and training election officials, poll workers, and election volunteers on how best to promote the access and participation of individuals with disabilities in elections for Federal office.

(c) SCHEDULE OF PAYMENTS.—As soon as practicable after the date of the enactment of this Act (but in no event later than 6 months thereafter), and not less frequently than once each calendar year thereafter, the Secretary shall make payments under this part.

42 USC 15422.

**SEC. 262. AMOUNT OF PAYMENT.**

(a) IN GENERAL.—The amount of a payment made to an eligible State or an eligible unit of local government for a year under this part shall be determined by the Secretary.

(b) CONTINUING AVAILABILITY OF FUNDS AFTER APPROPRIATION.—A payment made to an eligible State or eligible unit of local government under this part shall be available without fiscal year limitation.

42 USC 15423.

**SEC. 263. REQUIREMENTS FOR ELIGIBILITY.**

(a) APPLICATION.—Each State or unit of local government that desires to receive a payment under this part for a fiscal year shall submit an application for the payment to the Secretary at such time and in such manner and containing such information as the Secretary shall require.

(b) CONTENTS OF APPLICATION.—Each application submitted under subsection (a) shall—

(1) describe the activities for which assistance under this section is sought; and

(2) provide such additional information and certifications as the Secretary determines to be essential to ensure compliance with the requirements of this part.

(c) PROTECTION AGAINST ACTIONS BASED ON INFORMATION IN APPLICATION.—

(1) IN GENERAL.—No action may be brought under this Act against a State or unit of local government on the basis of any information contained in the application submitted under subsection (a).

(2) EXCEPTION FOR CRIMINAL ACTS.—Paragraph (1) may not be construed to limit the liability of a State or unit of local government for criminal acts or omissions.

**SEC. 264. AUTHORIZATION OF APPROPRIATIONS.**

42 USC 15424.

(a) IN GENERAL.—There are authorized to be appropriated to carry out the provisions of this part the following amounts:

(1) For fiscal year 2003, $50,000,000.

(2) For fiscal year 2004, $25,000,000.

(3) For fiscal year 2005, $25,000,000.

(b) AVAILABILITY.—Any amounts appropriated pursuant to the authority of subsection (a) shall remain available without fiscal year limitation until expended.

**SEC. 265. REPORTS.**

42 USC 15425.

(a) REPORTS BY RECIPIENTS.—Not later than the 6 months after the end of each fiscal year for which an eligible State or eligible unit of local government received a payment under this part, the State or unit shall submit a report to the Secretary on the activities conducted with the funds provided during the year, and shall include in the report a list of expenditures made with respect to each category of activities described in section 261(b).

Deadline.

(b) REPORT BY SECRETARY TO COMMITTEES.—With respect to each fiscal year for which the Secretary makes payments under this part, the Secretary shall submit a report on the activities carried out under this part to the Committee on House Administration of the House of Representatives and the Committee on Rules and Administration of the Senate.

# PART 3—GRANTS FOR RESEARCH ON VOTING TECHNOLOGY IMPROVEMENTS

**SEC. 271. GRANTS FOR RESEARCH ON VOTING TECHNOLOGY IMPROVE-MENTS.**

42 USC 15441.

(a) IN GENERAL.—The Commission shall make grants to assist entities in carrying out research and development to improve the quality, reliability, accuracy, accessibility, affordability, and security of voting equipment, election systems, and voting technology.

(b) ELIGIBILITY.—An entity is eligible to receive a grant under this part if it submits to the Commission (at such time and in such form as the Commission may require) an application containing—

(1) certifications that the research and development funded with the grant will take into account the need to make voting equipment fully accessible for individuals with disabilities, including the blind and visually impaired, the need to ensure that such individuals can vote independently and with privacy, and the need to provide alternative language accessibility for individuals with limited proficiency in the English language (consistent with the requirements of the Voting Rights Act of 1965); and

(2) such other information and certifications as the Commission may require.

(c) APPLICABILITY OF REGULATIONS GOVERNING PATENT RIGHTS IN INVENTIONS MADE WITH FEDERAL ASSISTANCE.—Any invention made by the recipient of a grant under this part using funds provided under this part shall be subject to chapter 18 of title 35, United States Code (relating to patent rights in inventions made with Federal assistance).

(d) RECOMMENDATION OF TOPICS FOR RESEARCH.—

Records.

(1) IN GENERAL.—The Director of the National Institute of Standards and Technology (hereafter in this section referred to as the "Director") shall submit to the Commission an annual list of the Director's suggestions for issues which may be the subject of research funded with grants awarded under this part during the year.

(2) REVIEW OF GRANT APPLICATIONS RECEIVED BY COMMISSION.—The Commission shall submit each application it receives for a grant under this part to the Director, who shall review the application and provide the Commission with such comments as the Director considers appropriate.

(3) MONITORING AND ADJUSTMENT OF GRANT ACTIVITIES AT REQUEST OF COMMISSION.—After the Commission has awarded a grant under this part, the Commission may request that the Director monitor the grant, and (to the extent permitted under the terms of the grant as awarded) the Director may recommend to the Commission that the recipient of the grant modify and adjust the activities carried out under the grant.

(4) EVALUATION OF GRANTS AT REQUEST OF COMMISSION.—

(A) IN GENERAL.—In the case of a grant for which the Commission submits the application to the Director under paragraph (2) or requests that the Director monitor the grant under paragraph (3), the Director shall prepare and submit to the Commission an evaluation of the grant and the activities carried out under the grant.

(B) INCLUSION IN REPORTS.—The Commission shall include the evaluations submitted under subparagraph (A) for a year in the report submitted for the year under section 207.

(e) PROVISION OF INFORMATION ON PROJECTS.—The Commission may provide to the Technical Guidelines Development Committee under part 3 of subtitle A such information regarding the activities funded under this part as the Commission deems necessary to assist the Committee in carrying out its duties.

42 USC 15442.

**SEC. 272. REPORT.**

(a) IN GENERAL.—Each entity which receives a grant under this part shall submit to the Commission a report describing the activities carried out with the funds provided under the grant.

(b) DEADLINE.—An entity shall submit a report required under subsection (a) not later than 60 days after the end of the fiscal year for which the entity received the grant which is the subject of the report.

42 USC 15443.

**SEC. 273. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—There are authorized to be appropriated for grants under this part $20,000,000 for fiscal year 2003.

(b) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to the authorization under this section shall remain available, without fiscal year limitation, until expended.

# PART 4—PILOT PROGRAM FOR TESTING OF EQUIPMENT AND TECHNOLOGY

Grants.

## SEC. 281. PILOT PROGRAM.

42 USC 15451.

(a) IN GENERAL.—The Commission shall make grants to carry out pilot programs under which new technologies in voting systems and equipment are tested and implemented on a trial basis so that the results of such tests and trials are reported to Congress.

(b) ELIGIBILITY.—An entity is eligible to receive a grant under this part if it submits to the Commission (at such time and in such form as the Commission may require) an application containing—

(1) certifications that the pilot programs funded with the grant will take into account the need to make voting equipment fully accessible for individuals with disabilities, including the blind and visually impaired, the need to ensure that such individuals can vote independently and with privacy, and the need to provide alternative language accessibility for individuals with limited proficiency in the English language (consistent with the requirements of the Voting Rights Act of 1965 and the requirements of this Act); and

(2) such other information and certifications as the Commission may require.

(c) RECOMMENDATION OF TOPICS FOR PILOT PROGRAMS.—

(1) IN GENERAL.—The Director of the National Institute of Standards and Technology (hereafter in this section referred to as the "Director") shall submit to the Commission an annual list of the Director's suggestions for issues which may be the subject of pilot programs funded with grants awarded under this part during the year.

(2) REVIEW OF GRANT APPLICATIONS RECEIVED BY COMMISSION.—The Commission shall submit each application it receives for a grant under this part to the Director, who shall review the application and provide the Commission with such comments as the Director considers appropriate.

(3) MONITORING AND ADJUSTMENT OF GRANT ACTIVITIES AT REQUEST OF COMMISSION.—After the Commission has awarded a grant under this part, the Commission may request that the Director monitor the grant, and (to the extent permitted under the terms of the grant as awarded) the Director may recommend to the Commission that the recipient of the grant modify and adjust the activities carried out under the grant.

(4) EVALUATION OF GRANTS AT REQUEST OF COMMISSION.—

(A) IN GENERAL.—In the case of a grant for which the Commission submits the application to the Director under paragraph (2) or requests that the Director monitor the grant under paragraph (3), the Director shall prepare and submit to the Commission an evaluation of the grant and the activities carried out under the grant.

(B) INCLUSION IN REPORTS.—The Commission shall include the evaluations submitted under subparagraph (A) for a year in the report submitted for the year under section 207.

116 STAT. 1702        PUBLIC LAW 107–252—OCT. 29, 2002

(d) PROVISION OF INFORMATION ON PROJECTS.—The Commission may provide to the Technical Guidelines Development Committee under part 3 of subtitle A such information regarding the activities funded under this part as the Commission deems necessary to assist the Committee in carrying out its duties.

42 USC 15452.

**SEC. 282. REPORT.**

(a) IN GENERAL.—Each entity which receives a grant under this part shall submit to the Commission a report describing the activities carried out with the funds provided under the grant.

(b) DEADLINE.—An entity shall submit a report required under subsection (a) not later than 60 days after the end of the fiscal year for which the entity received the grant which is the subject of the report.

42 USC 15453.

**SEC. 283. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—There are authorized to be appropriated for grants under this part $10,000,000 for fiscal year 2003.

(b) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to the authorization under this section shall remain available, without fiscal year limitation, until expended.

# PART 5—PROTECTION AND ADVOCACY SYSTEMS

42 USC 15461.

**SEC. 291. PAYMENTS FOR PROTECTION AND ADVOCACY SYSTEMS.**

(a) IN GENERAL.—In addition to any other payments made under this subtitle, the Secretary of Health and Human Services shall pay the protection and advocacy system (as defined in section 102 of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15002)) of each State to ensure full participation in the electoral process for individuals with disabilities, including registering to vote, casting a vote and accessing polling places. In providing such services, protection and advocacy systems shall have the same general authorities as they are afforded under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15041 et seq.).

(b) MINIMUM GRANT AMOUNT.—The minimum amount of each grant to a protection and advocacy system shall be determined and allocated as set forth in subsections (c)(3), (c)(4), (c)(5), (e), and (g) of section 509 of the Rehabilitation Act of 1973 (29 U.S.C. 794e), except that the amount of the grants to systems referred to in subsections (c)(3)(B) and (c)(4)(B) of that section shall be not less than $70,000 and $35,000, respectively.

(c) TRAINING AND TECHNICAL ASSISTANCE PROGRAM.—

Deadline.

(1) IN GENERAL.—Not later than 90 days after the date on which the initial appropriation of funds for a fiscal year is made pursuant to the authorization under section 292, the Secretary shall set aside 7 percent of the amount appropriated under such section and use such portion to make payments to eligible entities to provide training and technical assistance with respect to the activities carried out under this section.

(2) USE OF FUNDS.—A recipient of a payment under this subsection may use the payment to support training in the use of voting systems and technologies, and to demonstrate and evaluate the use of such systems and technologies, by individuals with disabilities (including blindness) in order to

assess the availability and use of such systems and technologies for such individuals. At least one of the recipients under this subsection shall use the payment to provide training and technical assistance for nonvisual access.

(3) ELIGIBILITY.—An entity is eligible to receive a payment under this subsection if the entity—

(A) is a public or private nonprofit entity with demonstrated experience in voting issues for individuals with disabilities;

(B) is governed by a board with respect to which the majority of its members are individuals with disabilities or family members of such individuals or individuals who are blind; and

(C) submits to the Secretary an application at such time, in such manner, and containing such information as the Secretary may require.

**SEC. 292. AUTHORIZATION OF APPROPRIATIONS.**

42 USC 15462.

(a) IN GENERAL.—In addition to any other amounts authorized to be appropriated under this subtitle, there are authorized to be appropriated $10,000,000 for each of the fiscal years 2003, 2004, 2005, and 2006, and for each subsequent fiscal year such sums as may be necessary, for the purpose of making payments under section 291(a); except that none of the funds provided by this subsection shall be used to initiate or otherwise participate in any litigation related to election-related disability access, notwithstanding the general authorities that the protection and advocacy systems are otherwise afforded under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15041 et seq.).

(b) AVAILABILITY.—Any amounts appropriated pursuant to the authority of this section shall remain available until expended.

# PART 6—NATIONAL STUDENT AND PARENT MOCK ELECTION

**SEC. 295. NATIONAL STUDENT AND PARENT MOCK ELECTION.**

42 USC 15471.

Grants.

(a) IN GENERAL.—The Election Assistance Commission is authorized to award grants to the National Student and Parent Mock Election, a national nonprofit, nonpartisan organization that works to promote voter participation in American elections to enable it to carry out voter education activities for students and their parents. Such activities may—

(1) include simulated national elections at least 5 days before the actual election that permit participation by students and parents from each of the 50 States in the United States, its territories, the District of Columbia, and United States schools overseas; and

(2) consist of—

(A) school forums and local cable call-in shows on the national issues to be voted upon in an "issues forum";

(B) speeches and debates before students and parents by local candidates or stand-ins for such candidates;

(C) quiz team competitions, mock press conferences, and speech writing competitions;

(D) weekly meetings to follow the course of the campaign; or

116 STAT. 1704          PUBLIC LAW 107–252—OCT. 29, 2002

(E) school and neighborhood campaigns to increase voter turnout, including newsletters, posters, telephone chains, and transportation.

Awards.          (b) REQUIREMENT.—The National Student and Parent Mock Election shall present awards to outstanding student and parent mock election projects.

42 USC 15472.     **SEC. 296. AUTHORIZATION OF APPROPRIATIONS.**

There are authorized to be appropriated to carry out the provisions of this subtitle $200,000 for fiscal year 2003 and such sums as may be necessary for each of the 6 succeeding fiscal years.

# TITLE III—UNIFORM AND NONDISCRIMINATORY ELECTION TECHNOLOGY AND ADMINISTRATION REQUIREMENTS

## Subtitle A—Requirements

42 USC 15481.     **SEC. 301. VOTING SYSTEMS STANDARDS.**

(a) REQUIREMENTS.—Each voting system used in an election for Federal office shall meet the following requirements:

(1) IN GENERAL.—

(A) Except as provided in subparagraph (B), the voting system (including any lever voting system, optical scanning voting system, or direct recording electronic system) shall—

(i) permit the voter to verify (in a private and independent manner) the votes selected by the voter on the ballot before the ballot is cast and counted;

(ii) provide the voter with the opportunity (in a private and independent manner) to change the ballot or correct any error before the ballot is cast and counted (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error); and

(iii) if the voter selects votes for more than one candidate for a single office—

(I) notify the voter that the voter has selected more than one candidate for a single office on the ballot;

(II) notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office; and

(III) provide the voter with the opportunity to correct the ballot before the ballot is cast and counted.

(B) A State or jurisdiction that uses a paper ballot voting system, a punch card voting system, or a central count voting system (including mail-in absentee ballots and mail-in ballots), may meet the requirements of subparagraph (A)(iii) by—

(i) establishing a voter education program specific to that voting system that notifies each voter of the effect of casting multiple votes for an office; and

(ii) providing the voter with instructions on how to correct the ballot before it is cast and counted (including instructions on how to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error).

(C) The voting system shall ensure that any notification required under this paragraph preserves the privacy of the voter and the confidentiality of the ballot.

(2) AUDIT CAPACITY.—

(A) IN GENERAL.—The voting system shall produce a record with an audit capacity for such system.

(B) MANUAL AUDIT CAPACITY.—

(i) The voting system shall produce a permanent paper record with a manual audit capacity for such system.

(ii) The voting system shall provide the voter with an opportunity to change the ballot or correct any error before the permanent paper record is produced.

(iii) The paper record produced under subparagraph (A) shall be available as an official record for any recount conducted with respect to any election in which the system is used.

(3) ACCESSIBILITY FOR INDIVIDUALS WITH DISABILITIES.— The voting system shall—

(A) be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters;

(B) satisfy the requirement of subparagraph (A) through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place; and

(C) if purchased with funds made available under title II on or after January 1, 2007, meet the voting system standards for disability access (as outlined in this paragraph).

(4) ALTERNATIVE LANGUAGE ACCESSIBILITY.—The voting system shall provide alternative language accessibility pursuant to the requirements of section 203 of the Voting Rights Act of 1965 (42 U.S.C. 1973aa–1a).

(5) ERROR RATES.—The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission which are in effect on the date of the enactment of this Act.

(6) UNIFORM DEFINITION OF WHAT CONSTITUTES A VOTE.— Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be

counted as a vote for each category of voting system used in the State.

(b) VOTING SYSTEM DEFINED.—In this section, the term "voting system" means—

(1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used—

(A) to define ballots;

(B) to cast and count votes;

(C) to report or display election results; and

(D) to maintain and produce any audit trail information; and

(2) the practices and associated documentation used—

(A) to identify system components and versions of such components;

(B) to test the system during its development and maintenance;

(C) to maintain records of system errors and defects;

(D) to determine specific system changes to be made to a system after the initial qualification of the system; and

(E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).

(c) CONSTRUCTION.—

(1) IN GENERAL.—Nothing in this section shall be construed to prohibit a State or jurisdiction which used a particular type of voting system in the elections for Federal office held in November 2000 from using the same type of system after the effective date of this section, so long as the system meets or is modified to meet the requirements of this section.

(2) PROTECTION OF PAPER BALLOT VOTING SYSTEMS.—For purposes of subsection (a)(1)(A)(i), the term "verify" may not be defined in a manner that makes it impossible for a paper ballot voting system to meet the requirements of such subsection or to be modified to meet such requirements.

(d) EFFECTIVE DATE.—Each State and jurisdiction shall be required to comply with the requirements of this section on and after January 1, 2006.

42 USC 15482.

**SEC. 302. PROVISIONAL VOTING AND VOTING INFORMATION REQUIREMENTS.**

(a) PROVISIONAL VOTING REQUIREMENTS.—If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot as follows:

Notification.

(1) An election official at the polling place shall notify the individual that the individual may cast a provisional ballot in that election.

(2) The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place stating that the individual is—

(A) a registered voter in the jurisdiction in which the individual desires to vote; and

(B) eligible to vote in that election.

(3) An election official at the polling place shall transmit the ballot cast by the individual or the voter information contained in the written affirmation executed by the individual under paragraph (2) to an appropriate State or local election official for prompt verification under paragraph (4).

(4) If the appropriate State or local election official to whom the ballot or voter information is transmitted under paragraph (3) determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law.

(5)(A) At the time that an individual casts a provisional ballot, the appropriate State or local election official shall give the individual written information that states that any individual who casts a provisional ballot will be able to ascertain under the system established under subparagraph (B) whether the vote was counted, and, if the vote was not counted, the reason that the vote was not counted.

(B) The appropriate State or local election official shall establish a free access system (such as a toll-free telephone number or an Internet website) that any individual who casts a provisional ballot may access to discover whether the vote of that individual was counted, and, if the vote was not counted, the reason that the vote was not counted.

States described in section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–2(b)) may meet the requirements of this subsection using voter registration procedures established under applicable State law. The appropriate State or local official shall establish and maintain reasonable procedures necessary to protect the security, confidentiality, and integrity of personal information collected, stored, or otherwise used by the free access system established under paragraph (5)(B). Access to information about an individual provisional ballot shall be restricted to the individual who cast the ballot.

(b) VOTING INFORMATION REQUIREMENTS.—

(1) PUBLIC POSTING ON ELECTION DAY.—The appropriate State or local election official shall cause voting information to be publicly posted at each polling place on the day of each election for Federal office.

(2) VOTING INFORMATION DEFINED.—In this section, the term "voting information" means—

(A) a sample version of the ballot that will be used for that election;

(B) information regarding the date of the election and the hours during which polling places will be open;

(C) instructions on how to vote, including how to cast a vote and how to cast a provisional ballot;

(D) instructions for mail-in registrants and first-time voters under section 303(b);

(E) general information on voting rights under applicable Federal and State laws, including information on the right of an individual to cast a provisional ballot and instructions on how to contact the appropriate officials if these rights are alleged to have been violated; and

(F) general information on Federal and State laws regarding prohibitions on acts of fraud and misrepresentation.

(c) VOTERS WHO VOTE AFTER THE POLLS CLOSE.—Any individual who votes in an election for Federal office as a result of a Federal or State court order or any other order extending the time established for closing the polls by a State law in effect 10 days before the date of that election may only vote in that election by casting a provisional ballot under subsection (a). Any such ballot cast under the preceding sentence shall be separated and held apart from other provisional ballots cast by those not affected by the order.

(d) EFFECTIVE DATE FOR PROVISIONAL VOTING AND VOTING INFORMATION.—Each State and jurisdiction shall be required to comply with the requirements of this section on and after January 1, 2004.

42 USC 15483.

**SEC. 303. COMPUTERIZED STATEWIDE VOTER REGISTRATION LIST REQUIREMENTS AND REQUIREMENTS FOR VOTERS WHO REGISTER BY MAIL.**

(a) COMPUTERIZED STATEWIDE VOTER REGISTRATION LIST REQUIREMENTS.—

(1) IMPLEMENTATION.—

(A) IN GENERAL.—Except as provided in subparagraph (B), each State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State (in this subsection referred to as the "computerized list"), and includes the following:

(i) The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State.

(ii) The computerized list contains the name and registration information of every legally registered voter in the State.

(iii) Under the computerized list, a unique identifier is assigned to each legally registered voter in the State.

(iv) The computerized list shall be coordinated with other agency databases within the State.

(v) Any election official in the State, including any local election official, may obtain immediate electronic access to the information contained in the computerized list.

(vi) All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official.

(vii) The chief State election official shall provide such support as may be required so that local election

officials are able to enter information as described in clause (vi).

(viii) The computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State.

(B) EXCEPTION.—The requirement under subparagraph (A) shall not apply to a State in which, under a State law in effect continuously on and after the date of the enactment of this Act, there is no voter registration requirement for individuals in the State with respect to elections for Federal office.

(2) COMPUTERIZED LIST MAINTENANCE.—

(A) IN GENERAL.—The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis as follows:

(i) If an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.), including subsections (a)(4), (c)(2), (d), and (e) of section 8 of such Act (42 U.S.C. 1973gg–6).

(ii) For purposes of removing names of ineligible voters from the official list of eligible voters—

(I) under section 8(a)(3)(B) of such Act (42 U.S.C. 1973gg–6(a)(3)(B)), the State shall coordinate the computerized list with State agency records on felony status; and

(II) by reason of the death of the registrant under section 8(a)(4)(A) of such Act (42 U.S.C. 1973gg–6(a)(4)(A)), the State shall coordinate the computerized list with State agency records on death.

(iii) Notwithstanding the preceding provisions of this subparagraph, if a State is described in section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–2(b)), that State shall remove the names of ineligible voters from the computerized list in accordance with State law.

(B) CONDUCT.—The list maintenance performed under subparagraph (A) shall be conducted in a manner that ensures that—

(i) the name of each registered voter appears in the computerized list;

(ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list; and

(iii) duplicate names are eliminated from the computerized list.

(3) TECHNOLOGICAL SECURITY OF COMPUTERIZED LIST.—The appropriate State or local official shall provide adequate technological security measures to prevent the unauthorized access to the computerized list established under this section.

(4) MINIMUM STANDARD FOR ACCURACY OF STATE VOTER REGISTRATION RECORDS.—The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following:

(A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.), registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.

(B) Safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters.

(5) VERIFICATION OF VOTER REGISTRATION INFORMATION.—

(A) REQUIRING PROVISION OF CERTAIN INFORMATION BY APPLICANTS.—

(i) IN GENERAL.—Except as provided in clause (ii), notwithstanding any other provision of law, an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes—

(I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or

(II) in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number.

(ii) SPECIAL RULE FOR APPLICANTS WITHOUT DRIVER'S LICENSE OR SOCIAL SECURITY NUMBER.—If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number, the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes. To the extent that the State has a computerized list in effect under this subsection and the list assigns unique identifying numbers to registrants, the number assigned under this clause shall be the unique identifying number assigned under the list.

(iii) DETERMINATION OF VALIDITY OF NUMBERS PROVIDED.—The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law.

(B) REQUIREMENTS FOR STATE OFFICIALS.—

Contracts.

(i) SHARING INFORMATION IN DATABASES.—The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

(ii) AGREEMENTS WITH COMMISSIONER OF SOCIAL SECURITY.—The official responsible for the State motor vehicle authority shall enter into an agreement with

the Commissioner of Social Security under section 205(r)(8) of the Social Security Act (as added by subparagraph (C)).

(C) ACCESS TO FEDERAL INFORMATION.—Section 205(r) of the Social Security Act (42 U.S.C. 405(r)) is amended by adding at the end the following new paragraph:

"(8)(A) The Commissioner of Social Security shall, upon the request of the official responsible for a State driver's license agency pursuant to the Help America Vote Act of 2002—

"(i) enter into an agreement with such official for the purpose of verifying applicable information, so long as the requirements of subparagraphs (A) and (B) of paragraph (3) are met; and

"(ii) include in such agreement safeguards to assure the maintenance of the confidentiality of any applicable information disclosed and procedures to permit such agency to use the applicable information for the purpose of maintaining its records.

"(B) Information provided pursuant to an agreement under this paragraph shall be provided at such time, in such place, and in such manner as the Commissioner determines appropriate.

"(C) The Commissioner shall develop methods to verify the accuracy of information provided by the agency with respect to applications for voter registration, for whom the last 4 digits of a social security number are provided instead of a driver's license number.

"(D) For purposes of this paragraph—

"(i) the term 'applicable information' means information regarding whether—

"(I) the name (including the first name and any family forename or surname), the date of birth (including the month, day, and year), and social security number of an individual provided to the Commissioner match the information contained in the Commissioner's records, and

"(II) such individual is shown on the records of the Commissioner as being deceased; and

"(ii) the term 'State driver's license agency' means the State agency which issues driver's licenses to individuals within the State and maintains records relating to such licensure.

"(E) Nothing in this paragraph may be construed to require the provision of applicable information with regard to a request for a record of an individual if the Commissioner determines there are exceptional circumstances warranting an exception (such as safety of the individual or interference with an investigation).

"(F) Applicable information provided by the Commission pursuant to an agreement under this paragraph or by an individual to any agency that has entered into an agreement under this paragraph shall be considered as strictly confidential and shall be used only for the purposes described in this paragraph and for carrying out an agreement under this paragraph. Any officer or employee or former officer or employee of a State, or any officer or employee or former officer or employee of a contractor of a State who, without the written authority of the Commissioner, publishes or communicates any applicable information in such individual's possession by reason of such employment or position as such an officer, shall be guilty of a felony and upon conviction

Contracts.

Confidentiality.

Procedures.

Penalties.

thereof shall be fined or imprisoned, or both, as described in section 208.".

      (D) SPECIAL RULE FOR CERTAIN STATES.—In the case of a State which is permitted to use social security numbers, and provides for the use of social security numbers, on applications for voter registration, in accordance with section 7 of the Privacy Act of 1974 (5 U.S.C. 552a note), the provisions of this paragraph shall be optional.

(b) REQUIREMENTS FOR VOTERS WHO REGISTER BY MAIL.—

  (1) IN GENERAL.—Notwithstanding section 6(c) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4(c)) and subject to paragraph (3), a State shall, in a uniform and nondiscriminatory manner, require an individual to meet the requirements of paragraph (2) if—

    (A) the individual registered to vote in a jurisdiction by mail; and

    (B)(i) the individual has not previously voted in an election for Federal office in the State; or

    (ii) the individual has not previously voted in such an election in the jurisdiction and the jurisdiction is located in a State that does not have a computerized list that complies with the requirements of subsection (a).

  (2) REQUIREMENTS.—

    (A) IN GENERAL.—An individual meets the requirements of this paragraph if the individual—

      (i) in the case of an individual who votes in person—

        (I) presents to the appropriate State or local election official a current and valid photo identification; or

        (II) presents to the appropriate State or local election official a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

      (ii) in the case of an individual who votes by mail, submits with the ballot—

        (I) a copy of a current and valid photo identification; or

        (II) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.

    (B) FAIL-SAFE VOTING.—

      (i) IN PERSON.—An individual who desires to vote in person, but who does not meet the requirements of subparagraph (A)(i), may cast a provisional ballot under section 302(a).

      (ii) BY MAIL.—An individual who desires to vote by mail but who does not meet the requirements of subparagraph (A)(ii) may cast such a ballot by mail and the ballot shall be counted as a provisional ballot in accordance with section 302(a).

  (3) INAPPLICABILITY.—Paragraph (1) shall not apply in the case of a person—

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1713

(A) who registers to vote by mail under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4) and submits as part of such registration either—

(i) a copy of a current and valid photo identification; or

(ii) a copy of a current utility bill, bank statement, government check, paycheck, or government document that shows the name and address of the voter;

(B)(i) who registers to vote by mail under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4) and submits with such registration either—

(I) a driver's license number; or

(II) at least the last 4 digits of the individual's social security number; and

(ii) with respect to whom a State or local election official matches the information submitted under clause (i) with an existing State identification record bearing the same number, name and date of birth as provided in such registration; or

(C) who is—

(i) entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff–1 et seq.);

(ii) provided the right to vote otherwise than in person under section 3(b)(2)(B)(ii) of the Voting Accessibility for the Elderly and Handicapped Act (42 U.S.C. 1973ee–1(b)(2)(B)(ii)); or

(iii) entitled to vote otherwise than in person under any other Federal law.

(4) CONTENTS OF MAIL-IN REGISTRATION FORM.—

(A) IN GENERAL.—The mail voter registration form developed under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4) shall include the following:

(i) The question "Are you a citizen of the United States of America?" and boxes for the applicant to check to indicate whether the applicant is or is not a citizen of the United States.

(ii) The question "Will you be 18 years of age on or before election day?" and boxes for the applicant to check to indicate whether or not the applicant will be 18 years of age or older on election day.

(iii) The statement "If you checked 'no' in response to either of these questions, do not complete this form.".

(iv) A statement informing the individual that if the form is submitted by mail and the individual is registering for the first time, the appropriate information required under this section must be submitted with the mail-in registration form in order to avoid the additional identification requirements upon voting for the first time.

(B) INCOMPLETE FORMS.—If an applicant for voter registration fails to answer the question included on the mail voter registration form pursuant to subparagraph (A)(i), the registrar shall notify the applicant of the failure and provide the applicant with an opportunity to complete the form in a timely manner to allow for the completion of

Notification.

the registration form prior to the next election for Federal office (subject to State law).

(5) CONSTRUCTION.—Nothing in this subsection shall be construed to require a State that was not required to comply with a provision of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) before the date of the enactment of this Act to comply with such a provision after such date.

(c) PERMITTED USE OF LAST 4 DIGITS OF SOCIAL SECURITY NUMBERS.—The last 4 digits of a social security number described in subsections (a)(5)(A)(i)(II) and (b)(3)(B)(i)(II) shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974 (5 U.S.C. 552a note).

(d) EFFECTIVE DATE.—

(1) COMPUTERIZED STATEWIDE VOTER REGISTRATION LIST REQUIREMENTS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), each State and jurisdiction shall be required to comply with the requirements of subsection (a) on and after January 1, 2004.

Applicability.

(B) WAIVER.—If a State or jurisdiction certifies to the Commission not later than January 1, 2004, that the State or jurisdiction will not meet the deadline described in subparagraph (A) for good cause and includes in the certification the reasons for the failure to meet such deadline, subparagraph (A) shall apply to the State or jurisdiction as if the reference in such subparagraph to "January 1, 2004" were a reference to "January 1, 2006".

(2) REQUIREMENT FOR VOTERS WHO REGISTER BY MAIL.—

(A) IN GENERAL.—Each State and jurisdiction shall be required to comply with the requirements of subsection (b) on and after January 1, 2004, and shall be prepared to receive registration materials submitted by individuals described in subparagraph (B) on and after the date described in such subparagraph.

(B) APPLICABILITY WITH RESPECT TO INDIVIDUALS.—The provisions of subsection (b) shall apply to any individual who registers to vote on or after January 1, 2003.

42 USC 15484.

**SEC. 304. MINIMUM REQUIREMENTS.**

The requirements established by this title are minimum requirements and nothing in this title shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under this title so long as such State requirements are not inconsistent with the Federal requirements under this title or any law described in section 906.

42 USC 15485.

**SEC. 305. METHODS OF IMPLEMENTATION LEFT TO DISCRETION OF STATE.**

The specific choices on the methods of complying with the requirements of this title shall be left to the discretion of the State.

PUBLIC LAW 107–252—OCT. 29, 2002        116 STAT. 1715

# Subtitle B—Voluntary Guidance

**SEC. 311. ADOPTION OF VOLUNTARY GUIDANCE BY COMMISSION.**        42 USC 15501.

(a) IN GENERAL.—To assist States in meeting the requirements of subtitle A, the Commission shall adopt voluntary guidance consistent with such requirements in accordance with the procedures described in section 312.

(b) DEADLINES.—The Commission shall adopt the recommendations under this section not later than—

(1) in the case of the recommendations with respect to section 301, January 1, 2004;

(2) in the case of the recommendations with respect to section 302, October 1, 2003; and

(3) in the case of the recommendations with respect to section 303, October 1, 2003.

(c) QUADRENNIAL UPDATE.—The Commission shall review and update recommendations adopted with respect to section 301 no less frequently than once every 4 years.

**SEC. 312. PROCESS FOR ADOPTION.**        Federal Register, publication. Public information. 42 USC 15502.

The adoption of the voluntary guidance under this subtitle shall be carried out by the Commission in a manner that provides for each of the following:

(1) Publication of notice of the proposed recommendations in the Federal Register.

(2) An opportunity for public comment on the proposed recommendations.

(3) An opportunity for a public hearing on the record.

(4) Publication of the final recommendations in the Federal Register.

# TITLE IV—ENFORCEMENT

**SEC. 401. ACTIONS BY THE ATTORNEY GENERAL FOR DECLARATORY AND INJUNCTIVE RELIEF.**        42 USC 15511.

The Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 301, 302, and 303.

**SEC. 402. ESTABLISHMENT OF STATE-BASED ADMINISTRATIVE COMPLAINT PROCEDURES TO REMEDY GRIEVANCES.**        42 USC 15512.

(a) ESTABLISHMENT OF STATE-BASED ADMINISTRATIVE COMPLAINT PROCEDURES TO REMEDY GRIEVANCES.—

(1) ESTABLISHMENT OF PROCEDURES AS CONDITION OF RECEIVING FUNDS.—If a State receives any payment under a program under this Act, the State shall be required to establish and maintain State-based administrative complaint procedures which meet the requirements of paragraph (2).

(2) REQUIREMENTS FOR PROCEDURES.—The requirements of this paragraph are as follows:

(A) The procedures shall be uniform and nondiscriminatory.

(B) Under the procedures, any person who believes that there is a violation of any provision of title III (including a violation which has occurred, is occurring, or is about to occur) may file a complaint.

(C) Any complaint filed under the procedures shall be in writing and notarized, and signed and sworn by the person filing the complaint.

(D) The State may consolidate complaints filed under subparagraph (B).

(E) At the request of the complainant, there shall be a hearing on the record.

(F) If, under the procedures, the State determines that there is a violation of any provision of title III, the State shall provide the appropriate remedy.

(G) If, under the procedures, the State determines that there is no violation, the State shall dismiss the complaint and publish the results of the procedures.

*Deadline.*

(H) The State shall make a final determination with respect to a complaint prior to the expiration of the 90-day period which begins on the date the complaint is filed, unless the complainant consents to a longer period for making such a determination.

*Deadline.*

(I) If the State fails to meet the deadline applicable under subparagraph (H), the complaint shall be resolved within 60 days under alternative dispute resolution procedures established for purposes of this section. The record

*Records.*

and other materials from any proceedings conducted under the complaint procedures established under this section shall be made available for use under the alternative dispute resolution procedures.

(b) REQUIRING ATTORNEY GENERAL APPROVAL OF COMPLIANCE PLAN FOR STATES NOT RECEIVING FUNDS.—

*Deadline.*

(1) IN GENERAL.—Not later than January 1, 2004, each nonparticipating State shall elect—

(A) to certify to the Commission that the State meets the requirements of subsection (a) in the same manner as a State receiving a payment under this Act; or

(B) to submit a compliance plan to the Attorney General which provides detailed information on the steps the State will take to ensure that it meets the requirements of title III.

(2) STATES WITHOUT APPROVED PLAN DEEMED OUT OF COMPLIANCE.—A nonparticipating State (other than a State which makes the election described in paragraph (1)(A)) shall be deemed to not meet the requirements of title III if the Attorney General has not approved a compliance plan submitted by the State under this subsection.

(3) NONPARTICIPATING STATE DEFINED.—In this section, a "nonparticipating State" is a State which, during 2003, does not notify any office which is responsible for making payments to States under any program under this Act of its intent to participate in, and receive funds under, the program.

PUBLIC LAW 107–252—OCT. 29, 2002          116 STAT. 1717

# TITLE V—HELP AMERICA VOTE COLLEGE PROGRAM

**SEC. 501. ESTABLISHMENT OF PROGRAM.**

(a) IN GENERAL.—Not later than 1 year after the appointment of its members, the Election Assistance Commission shall develop a program to be known as the "Help America Vote College Program" (hereafter in this title referred to as the "Program").

(b) PURPOSES OF PROGRAM.—The purpose of the Program shall be—

(1) to encourage students enrolled at institutions of higher education (including community colleges) to assist State and local governments in the administration of elections by serving as nonpartisan poll workers or assistants; and

(2) to encourage State and local governments to use the services of the students participating in the Program.

**SEC. 502. ACTIVITIES UNDER PROGRAM.**

(a) IN GENERAL.—In carrying out the Program, the Commission (in consultation with the chief election official of each State) shall develop materials, sponsor seminars and workshops, engage in advertising targeted at students, make grants, and take such other actions as it considers appropriate to meet the purposes described in section 501(b).

(b) REQUIREMENTS FOR GRANT RECIPIENTS.—In making grants under the Program, the Commission shall ensure that the funds provided are spent for projects and activities which are carried out without partisan bias or without promoting any particular point of view regarding any issue, and that each recipient is governed in a balanced manner which does not reflect any partisan bias.

(c) COORDINATION WITH INSTITUTIONS OF HIGHER EDUCATION.— The Commission shall encourage institutions of higher education (including community colleges) to participate in the Program, and shall make all necessary materials and other assistance (including materials and assistance to enable the institution to hold workshops and poll worker training sessions) available without charge to any institution which desires to participate in the Program.

**SEC. 503. AUTHORIZATION OF APPROPRIATIONS.**

In addition to any funds authorized to be appropriated to the Commission under section 210, there are authorized to be appropriated to carry out this title—

(1) $5,000,000 for fiscal year 2003; and

(2) such sums as may be necessary for each succeeding fiscal year.

# TITLE VI—HELP AMERICA VOTE FOUNDATION

**SEC. 601. HELP AMERICA VOTE FOUNDATION.**

(a) IN GENERAL.—Part B of subtitle II of title 36, United States Code, is amended by inserting after chapter 1525 the following:

42 USC 15521.
Deadline.

42 USC 15522.

42 USC 15523.

## "CHAPTER 1526—HELP AMERICA VOTE FOUNDATION

"Sec.
"152601. Organization.
"152602. Purposes.
"152603. Board of directors.
"152604. Officers and employees.
"152605. Powers.
"152606. Principal office.
"152607. Service of process.
"152608. Annual audit.
"152609. Civil action by Attorney General for equitable relief.
"152610. Immunity of United States Government.
"152611. Authorization of appropriations.
"152612. Annual report.

## "§ 152601. Organization

"(a) FEDERAL CHARTER.—The Help America Vote Foundation (in this chapter, the 'foundation') is a federally chartered corporation.

"(b) NATURE OF FOUNDATION.—The foundation is a charitable and nonprofit corporation and is not an agency or establishment of the United States Government.

"(c) PERPETUAL EXISTENCE.—Except as otherwise provided, the foundation has perpetual existence.

## "§ 152602. Purposes

"(a) IN GENERAL.—The purposes of the foundation are to—

"(1) mobilize secondary school students (including students educated in the home) in the United States to participate in the election process in a nonpartisan manner as poll workers or assistants (to the extent permitted under applicable State law);

"(2) place secondary school students (including students educated in the home) as nonpartisan poll workers or assistants to local election officials in precinct polling places across the United States (to the extent permitted under applicable State law); and

"(3) establish cooperative efforts with State and local election officials, local educational agencies, superintendents and principals of public and private secondary schools, and other appropriate nonprofit charitable and educational organizations exempt from taxation under section 501(a) of the Internal Revenue Code of 1986 as an organization described in section 501(c)(3) of such Code to further the purposes of the foundation.

"(b) REQUIRING ACTIVITIES TO BE CARRIED OUT ON NONPARTISAN BASIS.—The foundation shall carry out its purposes without partisan bias or without promoting any particular point of view regarding any issue, and shall ensure that each participant in its activities is governed in a balanced manner which does not reflect any partisan bias.

"(c) CONSULTATION WITH STATE ELECTION OFFICIALS.—The foundation shall carry out its purposes under this section in consultation with the chief election officials of the States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.

## "§ 152603. Board of directors

"(a) GENERAL.—The board of directors is the governing body of the foundation.

"(b) MEMBERS AND APPOINTMENT.—(1) The board consists of 12 directors, who shall be appointed not later than 60 days after the date of the enactment of this chapter as follows:

Deadline.

"(A) Four directors (of whom not more than two may be members of the same political party) shall be appointed by the President.

"(B) Two directors shall be appointed by the Speaker of the House of Representatives.

"(C) Two directors shall be appointed by the Minority Leader of the House of Representatives.

"(D) Two directors shall be appointed by the Majority Leader of the Senate.

"(E) Two directors shall be appointed by the Minority Leader of the Senate.

"(2) In addition to the directors described in paragraph (1), the chair and ranking minority member of the Committee on House Administration of the House of Representatives (or their designees) and the chair and ranking minority member of the Committee on Rules and Administration of the Senate (or their designees) shall each serve as an ex officio nonvoting member of the board.

"(3) A director is not an employee of the Federal Government and appointment to the board does not constitute appointment as an officer or employee of the United States Government for the purpose of any law of the United States (except as may otherwise be provided in this chapter).

"(4) The terms of office of the directors are 4 years.

"(5) A vacancy on the board shall be filled in the manner in which the original appointment was made.

"(c) CHAIR.—The directors shall select one of the directors as the chair of the board. The individual selected may not be a current or former holder of any partisan elected office or a current or former officer of any national committee of a political party.

"(d) QUORUM.—The number of directors constituting a quorum of the board shall be established under the bylaws of the foundation.

"(e) MEETINGS.—The board shall meet at the call of the chair of the board for regularly scheduled meetings, except that the board shall meet not less often than annually.

"(f) REIMBURSEMENT OF EXPENSES.—Directors shall serve without compensation but may receive travel expenses, including per diem in lieu of subsistence, in accordance with sections 5702 and 5703 of title 5.

"(g) LIABILITY OF DIRECTORS.—Directors are not personally liable, except for gross negligence.

## "§ 152604. Officers and employees

"(a) APPOINTMENT OF OFFICERS AND EMPLOYEES.—The board of directors appoints, removes, and replaces officers and employees of the foundation.

"(b) STATUS AND COMPENSATION OF EMPLOYEES.—

"(1) IN GENERAL.—Officers and employees of the foundation—

"(A) are not employees of the Federal Government (except as may otherwise be provided in this chapter);

"(B) shall be appointed and removed without regard to the provisions of title 5 governing appointments in the competitive service; and

"(C) may be paid without regard to chapter 51 and subchapter III of chapter 53 of title 5.

"(2) AVAILABILITY OF FEDERAL EMPLOYEE RATES FOR TRAVEL.—For purposes of any schedules of rates negotiated by the Administrator of General Services for the use of employees of the Federal Government who travel on official business, officers and employees of the foundation who travel while engaged in the performance of their duties under this chapter shall be deemed to be employees of the Federal Government.

## "§ 152605. Powers

"(a) IN GENERAL.—The foundation may—

"(1) adopt a constitution and bylaws;

"(2) adopt a seal which shall be judicially noticed; and

"(3) do any other act necessary to carry out this chapter.

"(b) POWERS AS TRUSTEE.—To carry out its purposes, the foundation has the usual powers of a corporation acting as a trustee in the District of Columbia, including the power—

"(1) to accept, receive, solicit, hold, administer, and use any gift, devise, or bequest, either absolutely or in trust, of property or any income from or other interest in property;

"(2) to acquire property or an interest in property by purchase or exchange;

"(3) unless otherwise required by an instrument of transfer, to sell, donate, lease, invest, or otherwise dispose of any property or income from property;

"(4) to borrow money and issue instruments of indebtedness;

"(5) to make contracts and other arrangements with public agencies and private organizations and persons and to make payments necessary to carry out its functions;

"(6) to sue and be sued; and

"(7) to do any other act necessary and proper to carry out the purposes of the foundation.

"(c) ENCUMBERED OR RESTRICTED GIFTS.—A gift, devise, or bequest may be accepted by the foundation even though it is encumbered, restricted, or subject to beneficial interests of private persons, if any current or future interest is for the benefit of the foundation.

"(d) CONTRACTS.—The foundation may enter into such contracts with public and private entities as it considers appropriate to carry out its purposes.

"(e) ANNUAL CONFERENCE IN WASHINGTON METROPOLITAN AREA.—During each year (beginning with 2003), the foundation may sponsor a conference in the Washington, D.C. metropolitan area to honor secondary school students and other individuals who have served (or plan to serve) as poll workers and assistants and who have otherwise participated in the programs and activities of the foundation.

## "§ 152606. Principal office

"The principal office of the foundation shall be in the District of Columbia unless the board of directors determines otherwise. However, the foundation may conduct business throughout the States, territories, and possessions of the United States.

PUBLIC LAW 107–252—OCT. 29, 2002        116 STAT. 1721

**"§ 152607. Service of process**

"The foundation shall have a designated agent to receive service of process for the foundation. Notice to or service on the agent, or mailed to the business address of the agent, is notice to or service on the foundation.

**"§ 152608. Annual audit**                                         Contracts.

"The foundation shall enter into a contract with an independent auditor to conduct an annual audit of the foundation.

**"§ 152609. Civil action by Attorney General for equitable relief**

"The Attorney General may bring a civil action in the United States District Court for the District of Columbia for appropriate equitable relief if the foundation—

"(1) engages or threatens to engage in any act, practice, or policy that is inconsistent with the purposes in section 152602 of this title; or

"(2) refuses, fails, or neglects to carry out its obligations under this chapter or threatens to do so.

**"§ 152610. Immunity of United States Government**

"The United States Government is not liable for any debts, defaults, acts, or omissions of the foundation. The full faith and credit of the Government does not extend to any obligation of the foundation.

**"§ 152611. Authorization of appropriations**

"There are authorized to be appropriated to the foundation for carrying out the purposes of this chapter—

"(1) $5,000,000 for fiscal year 2003; and

"(2) such sums as may be necessary for each succeeding fiscal year.

**"§ 152612. Annual report**

"As soon as practicable after the end of each fiscal year, the foundation shall submit a report to the Commission, the President, and Congress on the activities of the foundation during the prior fiscal year, including a complete statement of its receipts, expenditures, and investments. Such report shall contain information gathered from participating secondary school students describing the nature of the work they performed in assisting local election officials and the value they derived from the experience of educating participants about the electoral process.".

(b) CLERICAL AMENDMENT.—The table of chapters for part B of subtitle II of title 36, United States Code, is amended by inserting after the item relating to chapter 1525 the following new item:

**"1526. Help America Vote Foundation** ....................................................**152601".**

116 STAT. 1722        PUBLIC LAW 107–252—OCT. 29, 2002

# TITLE VII—VOTING RIGHTS OF MILITARY MEMBERS AND OVERSEAS CITIZENS

## SEC. 701. VOTING ASSISTANCE PROGRAMS.

(a) VOTING ASSISTANCE OFFICERS.—Subsection (f) of section 1566 of title 10, United States Code, as added by section 1602(a) of the National Defense Authorization Act for Fiscal Year 2002 (Public Law 107–107; 115 Stat. 1274), is amended—

(1) by striking "Voting assistance" in the first sentence and inserting "(1) Voting assistance"; and

(2) by adding at the end the following new paragraph:

<span style="margin-left:-6em; font-variant:small-caps;">Regulations.<br>Procedures.</span>

"(2) Under regulations and procedures (including directives) prescribed by the Secretary, a member of the armed forces appointed or assigned to duty as a voting assistance officer shall, to the maximum extent practicable, be given the time and resources needed to perform the member's duties as a voting assistance officer during the period in advance of a general election when members and their dependents are preparing and submitting absentee ballots.".

Procedures.

(b) POSTMARKING OF OVERSEAS VOTING MATERIALS.—Subsection (g)(2) of such section is amended by adding at the end the following: "The Secretary shall, to the maximum extent practicable, implement measures to ensure that a postmark or other official proof of mailing date is provided on each absentee ballot collected at any overseas location or vessel at sea whenever the Department of Defense is responsible for collecting mail for return shipment to the United States. The Secretary shall ensure that the measures implemented under the preceding sentence do not result in the delivery of absentee ballots to the final destination of such ballots after the date on which the election for Federal office is held. Not later than the date that is 6 months after the date of the enactment of the Help America Vote Act of 2002, the Secretary shall submit to Congress a report describing the measures to be implemented to ensure the timely transmittal and postmarking of voting materials and identifying the persons responsible for implementing such measures.".

Deadline.<br>Reports.

(c) PROVIDING NOTICE OF DEADLINES AND REQUIREMENTS.— Such section is amended by adding at the end the following new subsection:

"(h) NOTICE OF DEADLINES AND REQUIREMENTS.—The Secretary of each military department, utilizing the voting assistance officer network established for each military installation, shall, to the maximum extent practicable, provide notice to members of the Armed Forces stationed at that installation of the last date before a general Federal election for which absentee ballots mailed from a postal facility located at that installation can reasonably be expected to be timely delivered to the appropriate State and local election officials.".

(d) REGISTRATION AND VOTING INFORMATION FOR MEMBERS AND DEPENDENTS.—Such section is further amended by adding at the end the following new subsection:

"(i) REGISTRATION AND VOTING INFORMATION FOR MEMBERS AND DEPENDENTS.—(1) The Secretary of each military department, using a variety of means including both print and electronic media, shall,

to the maximum extent practicable, ensure that members of the Armed Forces and their dependents who are qualified to vote have ready access to information regarding voter registration requirements and deadlines (including voter registration), absentee ballot application requirements and deadlines, and the availability of voting assistance officers to assist members and dependents to understand and comply with these requirements.

"(2) The Secretary of each military department shall make the national voter registration form prepared for purposes of the Uniformed and Overseas Citizens Absentee Voting Act by the Federal Election Commission available so that each person who enlists shall receive such form at the time of the enlistment, or as soon thereafter as practicable.

"(3) Where practicable, a special day or days shall be designated at each military installation for the purpose of informing members of the Armed Forces and their dependents of election timing, registration requirements, and voting procedures.".

## SEC. 702. DESIGNATION OF SINGLE STATE OFFICE TO PROVIDE INFORMATION ON REGISTRATION AND ABSENTEE BALLOTS FOR ALL VOTERS IN STATE.

Section 102 of the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff–1) is amended—

(1) by inserting "(a) IN GENERAL.—" before "Each State"; and

(2) by adding at the end the following new subsection:

"(b) DESIGNATION OF SINGLE STATE OFFICE TO PROVIDE INFORMATION ON REGISTRATION AND ABSENTEE BALLOT PROCEDURES FOR ALL VOTERS IN STATE.—

"(1) IN GENERAL.—Each State shall designate a single office which shall be responsible for providing information regarding voter registration procedures and absentee ballot procedures to be used by absent uniformed services voters and overseas voters with respect to elections for Federal office (including procedures relating to the use of the Federal write-in absentee ballot) to all absent uniformed services voters and overseas voters who wish to register to vote or vote in any jurisdiction in the State.

"(2) RECOMMENDATION REGARDING USE OF OFFICE TO ACCEPT AND PROCESS MATERIALS.—Congress recommends that the State office designated under paragraph (1) be responsible for carrying out the State's duties under this Act, including accepting valid voter registration applications, absentee ballot applications, and absentee ballots (including Federal write-in absentee ballots) from all absent uniformed services voters and overseas voters who wish to register to vote or vote in any jurisdiction in the State.".

## SEC. 703. REPORT ON ABSENTEE BALLOTS TRANSMITTED AND RECEIVED AFTER GENERAL ELECTIONS.

(a) IN GENERAL.—Section 102 of the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff–1), as amended by section 702, is amended by adding at the end the following new subsection:

"(c) REPORT ON NUMBER OF ABSENTEE BALLOTS TRANSMITTED AND RECEIVED.—Not later than 90 days after the date of each regularly scheduled general election for Federal office, each State and unit of local government which administered the election shall

Deadline.
Public
information.

116 STAT. 1724          PUBLIC LAW 107–252—OCT. 29, 2002

(through the State, in the case of a unit of local government) submit a report to the Election Assistance Commission (established under the Help America Vote Act of 2002) on the combined number of absentee ballots transmitted to absent uniformed services voters and overseas voters for the election and the combined number of such ballots which were returned by such voters and cast in the election, and shall make such report available to the general public.".

42 USC 1973ff–1 note.

(b) DEVELOPMENT OF STANDARDIZED FORMAT FOR REPORTS.— The Election Assistance Commission, working with the Election Assistance Commission Board of Advisors and the Election Assistance Commission Standards Board, shall develop a standardized format for the reports submitted by States and units of local government under section 102(c) of the Uniformed and Overseas Citizens Absentee Voting Act (as added by subsection (a)), and shall make the format available to the States and units of local government submitting such reports.

**SEC. 704. EXTENSION OF PERIOD COVERED BY SINGLE ABSENTEE BALLOT APPLICATION.**

42 USC 1973ff–3.

Section 104(a) of the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff–1), as amended by section 1606(b) of the National Defense Authorization Act for Fiscal Year 2002 (Public Law 107–107; 115 Stat. 1279), is amended by striking "during that year," and all that follows and inserting the following: "through the next 2 regularly scheduled general elections for Federal office (including any runoff elections which may occur as a result of the outcome of such general elections), the State shall provide an absentee ballot to the voter for each such subsequent election.".

**SEC. 705. ADDITIONAL DUTIES OF PRESIDENTIAL DESIGNEE UNDER UNIFORMED AND OVERSEAS CITIZENS ABSENTEE VOTING ACT.**

(a) EDUCATING ELECTION OFFICIALS ON RESPONSIBILITIES UNDER ACT.—Section 101(b)(1) of the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff(b)(1)) is amended by striking the semicolon at the end and inserting the following: ", and ensure that such officials are aware of the requirements of this Act;".

(b) DEVELOPMENT OF STANDARD OATH FOR USE WITH MATERIALS.—

(1) IN GENERAL.—Section 101(b) of such Act (42 U.S.C. 1973ff(b)) is amended—

(A) by striking "and" at the end of paragraph (5);

(B) by striking the period at the end of paragraph (6) and inserting "; and"; and

(C) by adding at the end the following new paragraph: "(7) prescribe a standard oath for use with any document under this title affirming that a material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury.".

(2) REQUIRING STATES TO USE STANDARD OATH.—Section 102(a) of such Act (42 U.S.C. 1973ff–1(b)), as amended by section 702, is amended—

(A) by striking "and" at the end of paragraph (3);

(B) by striking the period at the end of paragraph (4) and inserting "; and"; and

(C) by adding at the end the following new paragraph:

"(5) if the State requires an oath or affirmation to accompany any document under this title, use the standard oath prescribed by the Presidential designee under section 101(b)(7).".

(c) PROVIDING STATISTICAL ANALYSIS OF VOTER PARTICIPATION FOR BOTH OVERSEAS VOTERS AND ABSENT UNIFORMED SERVICES VOTERS.—Section 101(b)(6) of such Act (42 U.S.C. 1973ff(b)(6)) is amended by striking "a general assessment" and inserting "a separate statistical analysis".

## SEC. 706. PROHIBITION OF REFUSAL OF VOTER REGISTRATION AND ABSENTEE BALLOT APPLICATIONS ON GROUNDS OF EARLY SUBMISSION.

(a) IN GENERAL.—Section 104 of the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff–3), as amended by section 1606(b) of the National Defense Authorization Act for Fiscal Year 2002 (Public Law 107–107; 115 Stat. 1279), is amended by adding at the end the following new subsection:

"(e) PROHIBITION OF REFUSAL OF APPLICATIONS ON GROUNDS OF EARLY SUBMISSION.—A State may not refuse to accept or process, with respect to any election for Federal office, any otherwise valid voter registration application or absentee ballot application (including the postcard form prescribed under section 101) submitted by an absent uniformed services voter during a year on the grounds that the voter submitted the application before the first date on which the State otherwise accepts or processes such applications for that year submitted by absentee voters who are not members of the uniformed services.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply with respect to elections for Federal office that occur after January 1, 2004.

Applicability.
42 USC 1973ff–3
note.

## SEC. 707. OTHER REQUIREMENTS TO PROMOTE PARTICIPATION OF OVERSEAS AND ABSENT UNIFORMED SERVICES VOTERS.

Section 102 of the Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff–1), as amended by the preceding provisions of this title, is amended by adding at the end the following new subsection:

"(d) REGISTRATION NOTIFICATION.—With respect to each absent uniformed services voter and each overseas voter who submits a voter registration application or an absentee ballot request, if the State rejects the application or request, the State shall provide the voter with the reasons for the rejection.".

# TITLE VIII—TRANSITION PROVISIONS

# Subtitle A—Transfer to Commission of Functions Under Certain Laws

## SEC. 801. FEDERAL ELECTION CAMPAIGN ACT OF 1971.

(a) TRANSFER OF FUNCTIONS OF OFFICE OF ELECTION ADMINISTRATION OF FEDERAL ELECTION COMMISSION.—There are transferred to the Election Assistance Commission established under section 201 all functions which the Office of Election Administration,

42 USC 15531.

116 STAT. 1726        PUBLIC LAW 107–252—OCT. 29, 2002

established within the Federal Election Commission, exercised before the date of the enactment of this Act.

(b) CONFORMING AMENDMENT.—Section 311(a) of the Federal Election Campaign Act of 1971 (2 U.S.C. 438(a)) is amended—

(1) in paragraph (8), by inserting "and" at the end;

(2) in paragraph (9), by striking "; and" and inserting a period; and

(3) by striking paragraph (10) and the second and third sentences.

42 USC 15532.

**SEC. 802. NATIONAL VOTER REGISTRATION ACT OF 1993.**

(a) TRANSFER OF FUNCTIONS.—There are transferred to the Election Assistance Commission established under section 201 all functions which the Federal Election Commission exercised under section 9(a) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–7(a)) before the date of the enactment of this Act.

(b) CONFORMING AMENDMENT.—Section 9(a) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–7(a)) is amended by striking "Federal Election Commission" and inserting "Election Assistance Commission".

42 USC 15533.

**SEC. 803. TRANSFER OF PROPERTY, RECORDS, AND PERSONNEL.**

(a) PROPERTY AND RECORDS.—The contracts, liabilities, records, property, and other assets and interests of, or made available in connection with, the offices and functions of the Federal Election Commission which are transferred by this subtitle are transferred to the Election Assistance Commission for appropriate allocation.

(b) PERSONNEL.—

(1) IN GENERAL.—The personnel employed in connection with the offices and functions of the Federal Election Commission which are transferred by this subtitle are transferred to the Election Assistance Commission.

(2) EFFECT.—Any full-time or part-time personnel employed in permanent positions shall not be separated or reduced in grade or compensation because of the transfer under this subsection during the 1-year period beginning on the date of the enactment of this Act.

42 USC 15534.

**SEC. 804. EFFECTIVE DATE; TRANSITION.**

(a) EFFECTIVE DATE.—This title and the amendments made by this title shall take effect upon the appointment of all members of the Election Assistance Commission under section 203.

(b) TRANSITION.—With the consent of the entity involved, the Election Assistance Commission is authorized to utilize the services of such officers, employees, and other personnel of the entities from which functions have been transferred to the Election Assistance Commission under this title or the amendments made by this title for such period of time as may reasonably be needed to facilitate the orderly transfer of such functions.

(c) NO EFFECT ON AUTHORITIES OF OFFICE OF ELECTION ADMINISTRATION PRIOR TO APPOINTMENT OF MEMBERS OF COMMISSION.—During the period which begins on the date of the enactment of this Act and ends on the effective date described in subsection (a), the Office of Election Administration of the Federal Election Commission shall continue to have the authority to carry out any of the functions (including the development of voluntary standards for voting systems and procedures for the certification of voting

systems) which it has the authority to carry out as of the date of the enactment of this Act.

# Subtitle B—Coverage of Commission Under Certain Laws and Programs

### SEC. 811. TREATMENT OF COMMISSION PERSONNEL UNDER CERTAIN CIVIL SERVICE LAWS.

(a) COVERAGE UNDER HATCH ACT.—Section 7323(b)(2)(B)(i)(I) of title 5, United States Code, is amended by inserting "or the Election Assistance Commission" after "Commission".

(b) EXCLUSION FROM SENIOR EXECUTIVE SERVICE.—Section 3132(a)(1)(C) of title 5, United States Code, is amended by inserting "or the Election Assistance Commission" after "Commission".

### SEC. 812. COVERAGE UNDER INSPECTOR GENERAL ACT OF 1978.

(a) IN GENERAL.—Section 8G(a)(2) of the Inspector General Act of 1978 (5 U.S.C. App.) is amended by inserting "the Election Assistance Commission," after "Federal Election Commission,".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 180 days after the appointment of all members of the Election Assistance Commission under section 203.

5 USC app. 8G note.

# TITLE IX—MISCELLANEOUS PROVISIONS

### SEC. 901. STATE DEFINED.

42 USC 15541.

In this Act, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.

### SEC. 902. AUDITS AND REPAYMENT OF FUNDS.

42 USC 15542.

(a) RECORDKEEPING REQUIREMENT.—Each recipient of a grant or other payment made under this Act shall keep such records with respect to the payment as are consistent with sound accounting principles, including records which fully disclose the amount and disposition by such recipient of funds, the total cost of the project or undertaking for which such funds are used, and the amount of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit.

(b) AUDITS AND EXAMINATIONS.—

(1) AUDITS AND EXAMINATIONS.—Except as provided in paragraph (5), each office making a grant or other payment under this Act, or any duly authorized representative of such office, may audit or examine any recipient of the grant or payment and shall have access for the purpose of audit and examination to any books, documents, papers, and records of the recipient which in the opinion of the entity may be related or pertinent to the grant or payment.

(2) RECIPIENTS OF ASSISTANCE SUBJECT TO PROVISIONS OF SECTION.—The provisions of this section shall apply to all recipients of grants or other payments under this Act, whether by direct grant, cooperative agreement, or contract under this

Applicability.

Act or by subgrant or subcontract from primary grantees or contractors under this Act.

(3) MANDATORY AUDIT.—In addition to audits conducted pursuant to paragraph (1), all funds provided under this Act shall be subject to mandatory audit by the Comptroller General at least once during the lifetime of the program involved. For purposes of an audit under this paragraph, the Comptroller General shall have access to books, documents, papers, and records of recipients of funds in the same manner as the office making the grant or payment involved has access to such books, documents, papers, and records under paragraph (1).

(4) SPECIAL RULE FOR PAYMENTS BY GENERAL SERVICES ADMINISTRATION.—With respect to any grant or payment made under this Act by the Administrator of General Services, the Election Assistance Commission shall be deemed to be the office making the grant or payment for purposes of this section.

(5) SPECIAL RULE.—In the case of grants or payments made under section 251, audits and examinations conducted under paragraph (1) shall be performed on a regular basis (as determined by the Commission).

(6) SPECIAL RULES FOR AUDITS BY THE COMMISSION.—In addition to the audits described in paragraph (1), the Election Assistance Commission may conduct a special audit or special examination of a recipient described in paragraph (1) upon a vote of the Commission.

(c) RECOUPMENT OF FUNDS.—If the Comptroller General determines as a result of an audit conducted under subsection (b) that—

(1) a recipient of funds under this Act is not in compliance with each of the requirements of the program under which the funds are provided; or

(2) an excess payment has been made to the recipient under the program,

the recipient shall pay to the office which made the grant or payment involved a portion of the funds provided which reflects the proportion of the requirements with which the recipient is not in compliance, or the extent to which the payment is in excess, under the program involved.

## SEC. 903. CLARIFICATION OF ABILITY OF ELECTION OFFICIALS TO REMOVE REGISTRANTS FROM OFFICIAL LIST OF VOTERS ON GROUNDS OF CHANGE OF RESIDENCE.

Section 8(b)(2) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–6(b)(2)) is amended by striking the period at the end and inserting the following: ", except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—

"(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

"(B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.".

**SEC. 904. REVIEW AND REPORT ON ADEQUACY OF EXISTING ELEC-TORAL FRAUD STATUTES AND PENALTIES.**

42 USC 15543.

(a) REVIEW.—The Attorney General shall conduct a review of existing criminal statutes concerning election offenses to determine—

(1) whether additional statutory offenses are needed to secure the use of the Internet for election purposes; and

(2) whether existing penalties provide adequate punishment and deterrence with respect to such offenses.

(b) REPORT.—The Attorney General shall submit a report to the Committees on the Judiciary of the Senate and House of Representatives, the Committee on Rules and Administration of the Senate, and the Committee on House Administration of the House of Representatives on the review conducted under subsection (a) together with such recommendations for legislative and administrative action as the Attorney General determines appropriate.

**SEC. 905. OTHER CRIMINAL PENALTIES.**

42 USC 15544.

(a) CONSPIRACY TO DEPRIVE VOTERS OF A FAIR ELECTION.—Any individual who knowingly and willfully gives false information in registering or voting in violation of section 11(c) of the National Voting Rights Act of 1965 (42 U.S.C. 1973i(c)), or conspires with another to violate such section, shall be fined or imprisoned, or both, in accordance with such section.

(b) FALSE INFORMATION IN REGISTERING AND VOTING.—Any individual who knowingly commits fraud or knowingly makes a false statement with respect to the naturalization, citizenry, or alien registry of such individual in violation of section 1015 of title 18, United States Code, shall be fined or imprisoned, or both, in accordance with such section.

**SEC. 906. NO EFFECT ON OTHER LAWS.**

42 USC 15545.

(a) IN GENERAL.—Except as specifically provided in section 303(b) of this Act with regard to the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.), nothing in this Act may be construed to authorize or require conduct prohibited under any of the following laws, or to supersede, restrict, or limit the application of such laws:

(1) The Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.).

(2) The Voting Accessibility for the Elderly and Handicapped Act (42 U.S.C. 1973ee et seq.).

(3) The Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff et seq.).

(4) The National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.).

(5) The Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.).

(6) The Rehabilitation Act of 1973 (29 U.S.C. 701 et seq.).

116 STAT. 1730          PUBLIC LAW 107–252—OCT. 29, 2002

(b) NO EFFECT ON PRECLEARANCE OR OTHER REQUIREMENTS UNDER VOTING RIGHTS ACT.—The approval by the Administrator or the Commission of a payment or grant application under title I or title II, or any other action taken by the Commission or a State under such title, shall not be considered to have any effect on requirements for preclearance under section 5 of the Voting Rights Act of 1965 (42 U.S.C. 1973c) or any other requirements of such Act.

Approved October 29, 2002.

LEGISLATIVE HISTORY—H.R. 3295 (S. 565):

HOUSE REPORTS: Nos. 107–329, Pt. 1 (Comm. on House Administration) and 107–730 (Comm. of Conference).

CONGRESSIONAL RECORD:
        Vol. 147 (2001): Dec. 12, considered and passed House.
        Vol. 148 (2002): Apr. 11, considered and passed Senate, amended, in lieu of S. 565.
                Oct. 10, House agreed to conference report.
                Oct. 15, 16, Senate considered, receded from its amendment, and agreed to conference report.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 38 (2002):
        Oct. 29, Presidential remarks and statement.



OFFICE OF THE SECRETARY OF STATE

BEV CLARNO
SECRETARY OF STATE

ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Clear Ballot Group
### Clear Vote Voting System (Clear Count 2.1 and Clear Design 2.1)

Clear Ballot has made upgrades to their ClearVote Voting System. Specifically they have submitted ClearCount version 2.1 and ClearDesign version 2.1 along with their test lab report by EAC Certified tester Pro V&V. The test report documents that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005). Clear Ballot has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Yamhill, Marion and Multnomah counties and Pro V&V.  We have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350 in that these changes do not impair the accuracy, efficiency, or capacity of the machine or system.

Accordingly, the ClearVote Voting System consisting of ClearCount version 2.1 and ClearDesign version 2.1 is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 18 day of February 2020.

Stephen N. Trout
Director of Elections

Exhibit D



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

August 17, 2022

Jennifer Gunter
jennof4@gmail.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request (No. 22-00179):

> "Copies of all archived, all historical and all present applications and certificates of the
> EAC's Certificate of Conformance and Scope for the following voting systems
>
> Clear Vote (and Clear Ballot) 1.1
> Clear Vote (and  Clear Ballot) 1.2
> Clear Vote (and Clear Ballot) 1.3
> Clear Vote (and  Clear Ballot) 1.3.3
> Clear Vote (and Clear Ballot) 2.1
> Clear Vote (and Clear Ballot) 2.2.1."

The EAC does not possess records responsive to your request.

This letter completes the response to your request. If you interpret any portion of this response as
an adverse action, you may appeal this action to the Election Assistance Commission.  Your
appeal must be in writing and sent to the address set forth below.  Your appeal must be
postmarked or electronically transmitted within 90 days from the date of the acknowledgment to
your request.  Please include your reasons for reconsideration and attach a copy of this and
subsequent EAC responses.

> U.S. Election Assistance Commission
> FOIA Appeals
> 633 3rd Street NW, Suite 200
> Washington, DC 20001

Additionally, you may contact the Office of Government Information Services (OGIS) at the
National Archives and Records Administration to inquire about the FOIA mediation services
they offer.  The contact information for OGIS is as follows: Office of Government Information
Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College
Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-
877-684-6448; or facsimile at 202-741-5769.

Exhibit E

If you have any questions please contact my office at your convenience.

Sincerely,

*Camden Kelliher*

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

August 17, 2022

Jennifer Gunter
jennof4@gmail.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request (No. 22-00171):

> "Please forward and supply web links and or pdf copies of the EAC test reports for Clear
> Ballot and also named/referred to as Clear Vote for the Version 2.1."

The EAC does not possess records responsive to your request. EAC Testing and Certification has
confirmed that ClearVote 2.1 is not an EAC certified system and the EAC does not possess
documents for it.

This letter completes the response to your request. If you interpret any portion of this response as
an adverse action, you may appeal this action to the Election Assistance Commission.  Your
appeal must be in writing and sent to the address set forth below.  Your appeal must be
postmarked or electronically transmitted within 90 days from the date of the acknowledgment to
your request.  Please include your reasons for reconsideration and attach a copy of this and
subsequent EAC responses.

> U.S. Election Assistance Commission
> FOIA Appeals
> 633 3rd Street NW, Suite 200
> Washington, DC 20001

Additionally, you may contact the Office of Government Information Services (OGIS) at the
National Archives and Records Administration to inquire about the FOIA mediation services
they offer.  The contact information for OGIS is as follows: Office of Government Information
Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College
Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-
877-684-6448; or facsimile at 202-741-5769.

If you have any questions please contact my office at your convenience.

Sincerely,



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

*Camden Kelliher*

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov

 Gmail

Tina Milcarek <tina.milcarek@gmail.com>

**Re: Public Records Request - Tina Milcarek**
5 messages

---

**PublicRecords SOS * SOS** <SOS.PublicRecordsSOS@sos.oregon.gov>                                      Wed, Jun 22, 2022 at 10:58 AM
To: "Tina.milcarek@gmail.com" <Tina.milcarek@gmail.com>

Hello Tina,

Thank you for contacting the Oregon Secretary of State.
I have forwarded your request to the Elections Division. A staff person will let you know if we have any
additional questions or need additional time to fulfill the request. Otherwise, you will receive the documents
responsive to this request via email.

--

Oregon Secretary of State
Public Records Inbox
Managed by the Public Records Officer or Deputy

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Wednesday, June 22, 2022 4:45 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State
## Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or
other Agencies to answer questions or provide feedback.

---

### Entry Details

| | |
|---|---|
| **NAME** | Tina Milcarek |
| **ADDRESS** | 1496 Foxglove St, Woodburn 97071 |
| **PHONE** | (708) 932-0959 |
| **EMAIL** | Tina.milcarek@gmail.com |
| **DESCRIBE YOUR REQUEST** | I need a copy of the exact equipment that Marion County purchased in 2020 for the November election.<br><br>According to ORS 246.550:<br><br>1)The Secretary of State shall publicly examine all makes of voting machines or vote tally systems submitted to the secretary and determine whether the machines or systems comply with the requirements of ORS 246.560 (Requirements for approval of equipment), and can safely be used by electors.<br><br>https://oregon.public.law/statutes/ors_246.550<br><br>If the SOS examined and approved the new machines, I need a copy of that documentation along with the machine names and models certified - All equipment. |

Exhibit F

---

To: "Tina.milcarek@gmail.com" <Tina.milcarek@gmail.com>
Cc: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>

Good Morning,

I wanted to let you know we are still working on your request. We have had several requests for this information and are working to get the data together in one place so that it is easy for everyone to access. We expect to be done soon and will let you know as soon as we are able to provide access to the data.

Thank you,

**Greg Bergerson**

Direct Line: 971-358-3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov



www.oregonvotes.gov

[Quoted text hidden]

---

**SOS OCVRSupport * SOS** <OCVRSupport.SOS@sos.oregon.gov>                     Thu, Aug 18, 2022 at 8:22 AM
To: "Tina.milcarek@gmail.com" <Tina.milcarek@gmail.com>
Cc: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>, PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>

Good Morning,

We have received many requests for information regarding the voting systems used in the State of Oregon. To make it easier for everyone to access the information and to keep it all in one place we have created a webpage on our website.

You can access the information through the link on the Election Integrity page or by clicking this direct link:
https://sos.oregon.gov/elections/Pages/voting-systems.aspx

We will keep the page updated as we receive new certifications.

Thank you,

**Greg Bergerson**

Direct Line: 971-358-3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov



www.oregonvotes.gov

[Quoted text hidden]

---

**Tina Gmail** <tina.milcarek@gmail.com>
To: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>
Cc: PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>

Hi Greg,

Although this webpage is somewhat helpful, it does NOT fill my request as asked.

Your web pages infer that Clear Ballot was authorized for Wasco County. Webpage screenshot attached.

Your web pages on Clear Ballot infer that 2.1 was certified yet you don't list a test report or certificate of conformance for that version as you do the other versions. Webpage snapshot attached

1.  Did Wasco County use Clear Ballots ClearVote 2.1 systems in the 2020 election?

2. If so, please provide the test lab report provided by Pro V&V as noted in your Certificate of Approval for the use of ClearVote 2.1 Systems.  Screenshot attached.

3. If Wasco County used another version in the 2020 election, please advise the version number.

Failure to answer my 3 questions as asked with proper documentation implies you are refusing to fill my public records requests.

Respectfully,

 AT&T 🛜 ❄️   8:49 AM    9

🔒 sos.oregon.gov

| | | X | | |
|---|---|---|---|---|
| 21 | LINCOLN | X | | |
| 22 | LINN | | X | |

January 2019    Page 1



| | County | ES&S | Clear Ballot | HART |
|---|---|---|---|---|
| 23 | MALHEUR | X | | |
| 24 | MARION | | | X |
| 25 | MORROW | X | | |
| 26 | MULTNOMAH | | X | |
| 27 | POLK | X | | |
| 28 | SHERMAN | X | | |
| 29 | TILLAMOOK | X | | |
| 30 | UMATILLA | X | | |
| 31 | UNION | X | | |
| 32 | WALLOWA | X | | |
| 33 | WASCO | | X | |
| 34 | WASHINGTON | | X | |
| 35 | WHEELER | X | | |
| 36 | YAMHILL | | | X |

**CERTIFICATE**

**Clear Bal**

**Clear Vote Voting System (Clear**

Clear Ballot has made upgrades to their ClearVote
ClearCount version 2.1 and ClearDesign version 2
tester Pro V&V. The test report documents that the
are conformant with the federal Voluntary Voting S
Clear Ballot has requested approval of this change

◀ Mail ▫▫ 🛜 ❄                    8:26 AM                    ➚ ⏰ 9

🔒 sos.oregon.gov

# Voting System Vendors Certified i Oregon

### Clear Ballot

### ClearVote 1.3

📄 Clear Ballot 1.3 Certification

📄 ClearVote 1.3 Voting System Test Report

# ClearVote 1.4

📄 Clear Ballot 1.4 Certification

📄 ClearVote 1.4 Voting System Test Report

## ClearVote 2.1

📄 Clear Ballot 2.1 Certification

## ClearVote 2.2

📄 Clear Ballot 2.2 Certification

📄 Clear Ballot ClearVote 2.2 Certificate of Conformance

January 20, 2021: 📄 Approval of ClearVote 2.2 Voting System Testing Application Package

April 27, 2020: 📄 Approval of Clear Ballot ClearVote 2.2 Test Plan

Tina Milcarek

On Aug 18, 2022, at 8:22 AM, SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov> wrote:

Good Morning,

We have received many requests for information regarding the voting systems used in the State of Oregon. To make it easier for everyone to access the information and to keep it all in

You can access the information through the link on the Election Integrity page or by clicking this direct link:
https://sos.oregon.gov/elections/Pages/voting-systems.aspx

We will keep the page updated as we receive new certifications.

Thank you,

**Greg Bergerson**

Direct Line: 971-358-3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov

<image001.png>

www.oregonvotes.gov

---

**From:** SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>
**Sent:** Thursday, July 14, 2022 9:31 AM
**To:** Tina.milcarek@gmail.com
**Cc:** SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>
**Subject:** RE: Public Records Request - Tina Milcarek

Good Morning,

I wanted to let you know we are still working on your request. We have had several requests for this information and are working to get the data together in one place so that it is easy f

Thank you,

**Greg Bergerson**

Direct Line: 971-358-3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov

<image001.png>

www.oregonvotes.gov

[Quoted text hidden]

---

SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>                                              Thu, Aug 18, 2022 at 9:27 AM
To: Tina Gmail <tina.milcarek@gmail.com>
Cc: PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>, SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>

Good Morning,

It took longer to locate the files for that test report but we have already sent them to our webteam to be added to the site.

I expect to see them posted later today or tomorrow.

Sorry for the delay.

**Greg Bergerson**

Direct Line: 971-358-3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov



www.oregonvotes.gov

[Quoted text hidden]



**United States Election Assistance Commission**



**Certificate of Accreditation**

# Wyle Laboratories, Inc.
## Huntsville, Alabama

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Wyle is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*
_____

April 27, 2012

*Donetta Davidson* Date: 5/04//10
_____

*Chair, U.S. Election Assistance Commission*

EAC Lab Code: **0704**

Exhibit G



**United States Election Assistance Commission**

## Certificate of Accreditation

# Pro V&V, Inc.
## Huntsville, Alabama

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Pro V&V is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

February 24, 2017

Date: 2/24/15

*Acting Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **1501**

Exhibit H



**United States Election Assistance Commission**

## Certificate of Accreditation

# SLI Compliance,
# Division of Gaming Laboratories International, LLC
## Wheat Ridge, Colorado

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards, the Voluntary Voting Systems Guidelines versions 1.0 and 1.1 under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. SLI Compliance is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

**Effective Through**

January 10, 2021

Date: 1/10/18

*Brian Newby,*
*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **0701**

Exhibit I

# EXHIBIT A

Exhibit J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN**<br><br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1.      I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2.      My July 1, 2021, expert report describes numerous security vulnerabilities in Georgia's Dominion ICX BMDs. These include flaws that would allow attackers to install malicious software on the ICX, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. They are not general weaknesses or theoretical problems, but

rather specific flaws in the ICX software, and I am prepared to demonstrate proof-of-concept malware that can exploit them to steal votes cast on ICX devices.

3.     Some of these critical vulnerabilities could be at least partially mitigated through changes to the ICX software if Dominion implemented such changes and jurisdictions deployed them. However, it would likely take months for Dominion to assess the problems, develop responsive software updates, test them, obtain any necessary approvals from the EAC and state-level certification authorities, and distribute the new software to states, as well as additional time for localities to install the changes. But Dominion cannot begin this process, because (to my knowledge) they have yet to learn what is in my report.

4.     My analysis also concludes that the ICX is very likely to contain other, equally critical flaws that are yet to be discovered. Jurisdictions can mitigate this serious risk through procedural changes, such as reserving BMDs for voters who need or request them. Election officials cannot make an informed decision about such urgent policy changes or any other mitigations until they have assessed the technical findings in my report. However, to my knowledge, the Georgia Secretary of State's Office has yet to even request access to it, despite Plaintiffs' repeated offers to make it available to appropriate individuals at the Secretary's Office.

5. Nor do these problems affect Georgia alone. In 2022, the ICX will be used in parts of 16 states.[1] Nevada will use it as the primary method of in-person voting in certain areas of the state. Louisiana is slated to use it for early voting in a DRE configuration where there is not even a paper trail. It will be used for accessible voting in Alaska and large parts of Arizona, California, Colorado, and Michigan. It will also see some use in parts of Illinois, Kansas, Ohio, Missouri, New Jersey, Pennsylvania, Tennessee, and Washington State. Officials in these jurisdictions too must act to update the software and their procedures, but they cannot do so without information about the problems. Continuing to conceal those problems from those who can—and are authorized to—address them, to the extent possible, serves no one and only hurts voters (and heightens the risk of compromise in future elections).

6. The most effective way to ensure that the necessary information gets to the parties responsible (without also falling into the wrong hands) would be to share my report with the Cybersecurity and Infrastructure Security Agency (CISA), which operates a Coordinated Vulnerability Disclosure (CVD) program for just this purpose. CISA is a federal agency that collaborates with state and local governments, election officials, federal partners, and vendors to manage risks to U.S. election

---

[1] See Verified Voting, "Verifier Search – November 2022," https://verifiedvoting. org/verifier/#mode/search/year/2022/model/ImageCast%20X.

infrastructure.[2] Under CISA's CVD process, agency staff would independently validate the vulnerabilities, work with Dominion to develop software updates as necessary, and facilitate sufficient time for affected states and localities to apply mitigation strategies.[3] CISA strives to disclose "accurate, neutral, objective information focused on technical remediation and mitigation" and to "correct misinformation where necessary,"[4] making it well qualified to coordinate the disclosure of such sensitive vulnerabilities.

7.      Geoff Hale, Director of CISA's Election Security Initiative, has confirmed to me that, if the Court permits it, the agency would be willing to receive my expert report and carry out coordinated vulnerability disclosure activities as appropriate (see Exhibit 1). Mr. Hale requests that I and my assistant Drew Springall be available for consultation with CISA during the CVD process, which we would be willing to do subject to the Court's permission.

8.      Informing responsible parties about the ICX's vulnerabilities is becoming more urgent by the day. Foreign or domestic adversaries who are intent on

---

[2] Cybersecurity and Infrastructure Security Agency, "Election Infrastructure Initiative," https://www.cisa.gov/election-security.
[3] Cybersecurity and Infrastructure Security Agency, "Coordinated Vulnerability Disclosure Process," https://www.cisa.gov/coordinated-vulnerability-disclosure-process.
[4] *Id.*

attacking elections certainly could have already discovered the same problems I did, yet Georgia's 2022 primaries are less than nine months away, and other states that use the ICX will conduct high-profile elections even sooner. It is important to recognize the possibility that nefarious actors already have discovered the same problems I detail in my report and are preparing to exploit them in future elections. Providing my report to CISA through its CVD program will ensure that Dominion and affected jurisdictions are able to begin appropriate mitigations as soon as possible. Continuing to withhold my report from CISA puts voters and election outcomes in numerous states at unnecessary, and avoidable, risk.

9.      I understand that State Defendants object to disclosure to CISA on the argument that my report should be used only for this lawsuit. But this ignores the implications of my report and my role in this matter. I am not a party to this lawsuit. I am an independent expert who was engaged to conduct an impartial assessment of the security and reliability of the Dominion BMD system, using (in part) election equipment that the Court ordered I be provided. I have done that, as reflected in my lengthy, detailed report and other submissions in this matter. As an independent expert and member of the election integrity community, I have a professional obligation to take appropriate steps to ensure that the severe vulnerabilities my report describes are properly remediated, to the extent possible, and that those tasked with

election security and administration across the country have the information they need to make responsible, informed decisions about election procedures, including the equipment used, the manner and purposes for which it is used (including whether it is used at all), the steps needed to secure that equipment and other aspects of the election systems in which it is used, and more. In short, my professional obligations do not end at the boundaries of this lawsuit, nor do the serious risks to voters and elections that my report discusses in depth. Additionally, I can imagine no prejudice to anyone in this lawsuit (or beyond) from disclosure of my report to CISA, nor am I aware of any claim of prejudice from any of the parties.

10.    I of course have complied, and will continue to comply, with all directives from the Court regarding disclosure of my work in this matter. I submit this declaration to explain why I believe disclosure of my report to CISA is critically important (and not just for Georgia) and to respectfully ask that the Court allow that disclosure, rather than accept State Defendants' position that my findings must not be shared beyond the confines of this lawsuit, including with those who are authorized to address the vulnerabilities with the ICX and stand ready to do so. If my findings regarding the ICX actually present no meaningful risks to voters and election outcomes and therefore require no remediation, as I gather State Defendants would have the Court believe, CISA is well positioned to determine that. If, on the other

hand, my findings do warrant remediation, as I believe they do, then CISA is well positioned to work with Dominion and the appropriate authorities around the country to implement remedial measures. I can see no reason to prevent (or further delay) that important work for future elections. And I note that none of State Defendants' experts have disputed my findings regarding the ICX machines. Only Dr. Juan Gilbert has responded to my sealed report, and he has not examined the machines (or used them) to my knowledge.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 21st day of September, 2021 in Ann Arbor, Michigan.

J. ALEX HALDERMAN

# EXHIBIT 1

 Gmail

J. Alex Halderman <halderman@gmail.com>

## Vulnerability Disclosure

**Hale, Geoffrey** <Geoffrey.Hale@cisa.dhs.gov>                              Thu, Aug 19, 2021 at 12:15 PM
To: "J. Alex Halderman" <jhalderm@umich.edu>
Cc: Andrew Springall <andrew.springall@gmail.com>

Prof. Halderman,

Thank you for your email.  Yes, CISA would be willing to receive the report regarding possible vulnerabilities in election infrastructure for inclusion in CISA's Coordinated Vulnerability Disclosure (CVD) process and would carry out any further coordinated disclosures activities as appropriate.  As we share on our public website (https://www.cisa.gov/coordinated-vulnerability-disclosure-process), CISA's CVD program coordinates the remediation and public disclosure of newly identified cybersecurity vulnerabilities in products and services with the affected vendor(s).  Note that part of our process may also involve validating any alleged vulnerabilities, planned mitigations, remediations, or patches with the security researcher who discovered the alleged vulnerability, so we would appreciate if you could continue to be available for consultation during the CVD process as well.

As shared on our website, please submit any vulnerability reports for CVD coordination using the form here: https://www.kb.cert.org/vuls/report/

Best,

Geoff

---

**From:** J. Alex Halderman <jhalderm@umich.edu>
**Sent:** Wednesday, August 18, 2021 4:37 PM
**To:** Hale, Geoffrey <Geoffrey.Hale@cisa.dhs.gov>
**Cc:** Andrew Springall <andrew.springall@gmail.com>
**Subject:** Vulnerability Disclosure

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Dear Mr. Hale,

We are writing to you in your capacity as Director of the Election Security Initiative at the federal Cybersecurity and Infrastructure Security Agency (CISA).

We understand that the Election Security Initiative at CISA works to ensure the physical security and cybersecurity of the systems and assets that support the Nation's elections, including through detection and prevention, information sharing and awareness, and incident response.

As you may be aware from recent press reports, one of us (Halderman) is presently serving as an expert witness for the plaintiffs in Curling v. Raffensperger (Civil action no. 1:17-CV-2989-AT, N.D. Ga.), a case that concerns the security of Georgia's election system. A year ago, the court granted plaintiffs access to an ICP ballot scanner and ICX ballot marking device as used in Georgia in order to test their security. Following months of analysis, on July 1, Dr. Halderman submitted an expert report that describes several very serious vulnerabilities we found in the equipment, which, to our knowledge, have not been previously documented or disclosed.

Given the nature of the vulnerabilities and the time that would be necessary to mitigate them before the 2022 midterm elections, we believe it is critical for Dominion and affected jurisdictions (which include Georgia and parts of many other states) to begin taking responsive action soon. It is also vitally important to prevent information sufficient to exploit the vulnerabilities from falling into the wrong hands, and to avoid fueling election-related misinformation if possible.

Currently, disclosure of the expert report to anyone other than outside litigation counsel for the parties is strictly prohibited by the Court's protective order and by recent directives from the judge. However, if permitted by the Court, we would like to share the report with CISA and ask your agency to carry out appropriate further disclosure of the information it contains to Dominion and affected jurisdictions as you see fit, under CISA's coordinated vulnerability disclosure (CVD) program (https://www.cisa.gov/coordinated-vulnerability-disclosure-process).

We understand that under this process, CISA will work with the vendor (Dominion) for mitigation development and the issuance of patches or updates and to facilitate sufficient time for affected end users to obtain, test, and apply mitigation strategies. We further understand that CISA strives to disclose "accurate, neutral, objective information focused on technical remediation and mitigation" and to "correct misinformation where necessary".

Please confirm that CISA would be an appropriate agency to handle coordinated vulnerability disclosure for election infrastructure under these circumstances, and that you would be willing to receive the report (subject to the Court's permission) and carry out further disclosures as you deem appropriate.

Sincerely,

J. Alex Halderman

Drew Springall

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN IN**<br>**SUPPORT OF MOTION FOR**<br>**PRELIMINARY INJUNCTION**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1.     I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

## Georgia's Current Election Technology

2.     Georgia recently deployed new voting equipment and software manufactured by Dominion Voting Systems, Inc. ("Dominion"). These components include ImageCast X Prime ("ICX") ballot marking devices ("BMDs"), ImageCast Precinct ("ICP") precinct-count scanners, ImageCast Central ("ICC") central-count scanners, and the Democracy Suite election management system ("EMS"). Georgia

Exhibit K

Secretary of State Brad Raffensperger certified these components in August 2019,[1]
and they were first used statewide during the June 20, 2020 election.[2]

3.      Under this new system (the "BMD-based Election System"), Georgia
generally requires all in-person voters to select candidates on Dominion ICX BMDs.
These devices are computer tablets connected to off-the-shelf laser printers. They do
not record votes but instead print paper records that are supposed to contain the
voter's selections in both human-readable text and as a type of machine-readable
barcode called a QR code. Voters insert these printouts into Dominion ICP optical
scanners, which read the barcodes and count the votes encoded in them.[3]

4.      Absentee voters do not use BMDs but instead complete hand-marked
paper ballots ("HMPBs"), which are tabulated at central locations by Dominion ICC
scanners. While Georgia's precinct-based ICP scanners have the capability to count
hand-marked paper ballots,[4] the State only uses them to count BMD printouts.

---

[1] Georgia Dominion certification (Aug. 9, 2019),
https://sos.ga.gov/admin/uploads/Dominion_Certification.pdf.
[2] Mark Niesse, "How Georgia's new voting machines work," *The Atlanta Journal-Constitution* (June 9, 2020), https://www.ajc.com/news/state--regional-govt--
politics/how-georgia-new-electronic-voting-machines-
work/RyIOJuHYQgktcCNGL9sEoK/.
[3] Decl. of Dr. Eric Coomer, Dckt. 658-2, at 10.
[4] *Id* at 9.

5.      Pre- and post-election procedures in the BMD-based election system closely parallel those under the old DRE-based election system. Before every election, the Secretary of State's office prepares election programming files using Dominion EMS software, which is a collection of client and server programs that run on commercial-off-the-shelf (COTS) computers and servers. The Secretary of State transmits the election programming files to county officials, who use another instance of the Dominion EMS to prepare memory cards and USB sticks for every scanner and ballot marking device used in the county. These removable media contain the ballot design, including the names of the races and candidates, and rules for counting the ballots. Election workers install a memory card or USB stick into each BMD and ICP scanner prior to the start of voting.

6.      After polls close, election workers remove the memory cards from every ICP scanner and return them to the county. At that point, the memory cards contain a digital image of each scan as well as the scanner's interpretation of the votes contained in the barcode. County workers use the Dominion EMS to retrieve data from the cards and prepare the final election results based on the barcode readings.

**Attacks Against the BMD-based Election System**

7.      Attackers could alter election outcomes under Georgia's BMD-based election system in several ways:

(a) Attacks on the BMDs could cause them to print barcodes that differ from voters' selections. These changes would be undetectable to voters, who cannot read the encrypted barcodes. Since the barcodes are the only thing the scanners count, the impact would be a change to the election results. The only known safeguard that can reliably detect such an attack is to rigorously audit both the human-readable portion of the printouts and the barcodes, which Georgia does not currently do.

(b) Attacks on the BMDs could also change *both* the barcode and the human-readable text on some of the printouts. Research shows that few voters carefully review their BMD printouts, and, consequently, changes to enough printouts to change the winner of a close race would likely go undetected. No audit or recount could detect this fraud, since both the digital and paper records of the votes would reflect the same selections but not the ones the voters intended.

(c) Attacks on the scanners could also cause fraudulent election results by changing the digital records of the votes. The only known safeguard that can reliably detect such an attack is a sufficiently rigorous manual audit or recount of the paper records, which Georgia does not currently require.

8. One way that attackers could carry out attacks against the BMD-based election system is by infecting the election equipment with malicious software ("malware"). Malware could potentially be introduced in several ways, including: (a) with physical access to any of the many electronic components that compose the system, (b) through an attack on the hardware or software supply-chain, or (c) by spreading virally via the election management systems to polling place equipment during routine pre-election procedures.

9. Components of Georgia's election system that are not directly connected to the Internet might nonetheless be targeted by attackers. Nation-state attackers have developed a variety of techniques for infiltrating non-Internet-connected systems, including by spreading malware on removable media that workers use to copy files in and out.[5] Attackers could employ this method to infect the state or county EMS and spread from there to scanners and BMDs when workers program them for the next election. In this way, an attack could potentially spread from a single point of infection to scanners and BMDs across entire counties or the whole

---

[5] A well-known example of this ability, which is known as "jumping an air gap," is the Stuxnet computer virus, which was created to sabotage Iran's nuclear centrifuge program by attacking factory equipment that was not directly connected to the Internet. Kim Zetter, "An Unprecedented Look at Stuxnet, the World's First Digital Weapon," *Wired* (Nov. 3, 2014), https://www.wired.com/2014/11/countdown-to-zero-day-stuxnet/.

state, in the same way that malware could have spread through the old DRE system, which was not effectively air-gapped or otherwise reasonably secured.

10.    The BMD-based election system is at further heightened risk of attack because of the legacy of poor security in Georgia's old DRE-based election system and its associated computers and networks. If attackers infiltrated the DRE-based system, they likely did so by first infiltrating components such as the Secretary of State's computer network, the voter registration database software developed by PCC, Inc., or the non-"air gapped" computers and removable media used by state and county workers and outside contractors to transfer data into and out of the EMS. The record in this matter contains abundant evidence about vulnerabilities in all these components, some of which were unmitigated for years and may still be unmitigated. Responsibility for their security continues to rest with many of the same technicians and managers who oversaw the security of the old system and were unable or unwilling to implement effective security measures.

11.    These components continue to be used with the new voting system, including to process data that is copied to polling-place equipment. If attackers breached any of them to attack the DRE-based system, those attackers may continue to have such access under the BMD-based system. Technologies that the State has highlighted as key defenses for these legacy components, such as anti-malware

scans, anti-virus scans, and endpoint protection, provide little defense against sophisticated attackers like hostile foreign governments.

12.    Importantly, apart from the examinations Fortalice conducted that found significant vulnerabilities with the Secretary of State's information technology infrastructure including components of the election management network, there is no indication that Georgia has ever forensically or otherwise rigorously examined the current election system, including components from the prior DRE-based system that are used with the current BMD-based system. In an environment of advanced persistent threats to both election systems, coupled with the critical known vulnerabilities with those systems, the lack of any such examination raises serious concerns about the reliability of the current system and election outcomes.

**Georgia's New Dominion Equipment has Critical Security Flaws**

13.    Dominion does not dispute that its products can be hacked by sufficiently capable adversaries.[6]

14.    One reason why this is true is the complexity of the software, which far exceeds the complexity of the DRE-based system. The Dominion software used in

---

[6] Decl. of Dr. Eric Coomer, Director of Product Strategy and Security for Dominion ¶ 13, Dckt. No. 658-2 ("all computers can be hacked with enough time and access").

Georgia contains nearly 2.75 million lines of source code (equivalent to about 45,000 printed pages), excluding the Windows and Android operating systems and other off-the-shelf software packages.[7] The ICP scanner alone contains about 475,000 lines of source code, and its software is written in C/C++,[8] a programming language that is particularly susceptible to some of the most dangerous types of vulnerabilities.

15.    Software of the size and complexity of the Dominion code inevitably has exploitable vulnerabilities. As a source-code review team working for the California Secretary of State concluded in a study of a voting system with only 10% as much code as Dominion's, "If the [system] were secure, it would be the first computing system of this complexity that is fully secure."[9] Nation-state attackers often discover and exploit novel vulnerabilities in complex software.[10]

---

[7] SLI Compliance, "Dominion Democracy Suite 5.10 Voting System Software Test Report for California Secretary of State" (Aug. 2019), https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510software-report.pdf.
[8] *Id.*
[9] Joseph A. Calandrino, Ariel J. Feldman, J. Alex Halderman, David Wagner, Harlan Yu, and William Zeller, "Source Code Review of the Diebold Voting System," in *California Secretary of State's Top-to-Bottom Review of Voting Systems* (July 20, 2007), https://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-source-public-jul29.pdf.
[10] Andrew Springall, *Nation-State Attackers and their Effects on Computer Security* (2019), Ph.D. dissertation, University of Michigan, https://deepblue.lib.umich.edu/handle/2027.42/143907.

16.    In addition to its complexity, the Dominion software used in Georgia utilizes a wide range of outdated off-the-shelf software modules, including some that perform essential security functions, such as the operating system and modules that process files an attacker might have manipulated.[11] The oldest third-party software components appear not to have been updated in more than 15 years. This is unfortunately consistent with the DRE-based system, which relied on software so out of date that the manufacturer stopped providing updates and patches more than a decade ago.

17.    Outdated software components are a security risk because they frequently contain known, publicly documented vulnerabilities that have been corrected in later versions. Old or outdated software used in Georgia's Dominion equipment includes a version of Microsoft SQL Server dating from 2016, Adobe Acrobat from around 2015, barcode scanner software from 2015, μClinux operating system software from 2007, COLILO bootloader software from 2004, and a version of the Apache Avalon component framework dating from 2002. Georgia's BMDs

---

[11] SLI Compliance, "Dominion Voting Systems Democracy Suite 5.5-A Certification Test Plan" 16-19 (Dec. 2018), https://www.eac.gov/sites/default/files/voting_system/files/DVS_Democracy_D-Suite_5.5-A_Modification_Test_Plan_v1.2.pdf.

use the Android 5.1.1 operating system,[12] which is almost six years old and has not received security updates since March 2018; as of August 2020, it contained 254 documented vulnerabilities.[13]

18.   Georgia certified the Dominion system without performing its own security testing or source-code review. The certification was preceded by tests that were limited to checking functional compliance with Georgia requirements.[14] The test report states that the testing "was not intended to result in exhaustive tests of system hardware and software attributes."[15] The term "security" does not appear in the report.

19.   Several months before Georgia certified the Dominion system, the State of Texas performed its own certification tests. The Texas certification was more comprehensive and included test reports from five examiners appointed by the Texas

_____

[12] Certificate of Conformance, Dominion Voting Systems Democracy Suite 5.5-A (Jan. 30, 2019) at pp. 3-4, https://www.eac.gov/file.aspx?A= TQycVTA%2BOLpxoCbwCFjQJmJdRP1dq9sFO3oVUWJl5u4%3D.
[13] CVE Details, "Google Android 5.1.1 Security Vulnerabilities," https://www.cvedetails.com/vulnerability-list/vendor_id-1224/product_id-19997/version_id-186573/Google-Android-5.1.1.html (last visited Aug. 19, 2020).
[14] Pro V&V, "Test Report: Dominion Voting Systems D-Suite 5.5-A Voting System Georgia State Certification Testing" (Aug. 7, 2019), https://sos.ga.gov/admin/uploads/Dominion_Test_Cert_Report.pdf.
[15] *Id*. at 3.

Secretary of State.[16] All of the examiners highlighted deficiencies with the Dominion system, including issues affecting its reliability, accessibility, and security. These problems led Texas to deny certification of the Dominion system in 2019.[17]

20.    Several of the serious deficiencies noted by the Texas examiners affect system components used in Georgia, including the BMDs. One examiner noted that "the ICXs [BMDs] are built with a [commercial off-the-shelf] tablet and printer. The Android OS versions used on the tablets are several years old[;] therefore they do not have the latest security feature [*sic*.] as later Android releases."[18] A second examiner found that "[t]he doors covering data and power ports on the [BMD] tablets do not provide sufficient protection. […] a bad actor could add a USB device to the tablet while powered down that could remain undetected until after the election had ended."[19] A third examiner concluded that "[t]he ICX [BMD] also presented problems during the accessibility testing portion of the exam which demonstrate that it may not be suitable as an accessible voting system."[20]

_____

[16] "Examiner Reports of Dominion Voting System Democracy Suite 5.5" (Jan. 16-17, 2019), https://www.sos.state.tx.us/elections/laws/jan2019_dominion.shtml.
[17] "Report of Review of Dominion Voting Systems Democracy Suite 5.5" (June 20, 2019), https://www.sos.state.tx.us/elections/forms/sysexam/dominion-democracy-suite-5.5.pdf
[18] Report of Texas examiner Tom Watson.
[19] Report of Texas examiner Brian Mechler.
[20] Report of Texas examiner Chuck Pinney.

21.     Around the same time that Georgia certified the Dominion system, the State of California performed tests on a more recent version of the Dominion software, version 5.10, as part of its own certification process.[21]

22.     In contrast to Georgia's tests, California's included some source code review and security testing. Like all security testing, the California tests were necessarily limited in scope and could not be expected to find all exploitable vulnerabilities. Nevertheless, they did uncover several serious flaws. These problems very likely apply to the version of the Dominion system used in Georgia given that it precedes the version tested in California.

23.     The California testers found that attackers could modify the Dominion software installation files and believed that "it would be possible to inject more lethal payloads into the installers given the opportunity."[22] This implies that attackers could modify the Dominion installation files to infect election system components with malicious software.

---

[21] SLI Compliance, "Dominion Democracy Suite 5.10 Security and Telecommunications Test Report" (Aug. 2019), https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510security-report.pdf ("California Certification Security and Telecomm Test Report").
[22] *Id*. at 25.

24.     Furthermore, the California testers found that the Dominion system's antivirus protection was insufficient or non-existent. "[O]n the EMS server, the AVAST Antivirus (AV) File Shield (the real time AV monitor) was only able to detect and clean one of the four [test] files. This potentially leaves the system open to zipped and double zipped viruses as well as infection strings in plain text."[23] Moreover, the ICX BMD and ICP scanner have no antivirus software at all.[24] As a result, malware that infected the Dominion components could evade antivirus detection.

25.     One of the ways that attackers might affect election equipment is by physically accessing the devices. In the case of the Dominion BMD, the California source code reviewers found a vulnerability that can be exploited with physical access to the USB port that "would be open to a variety of actors including a voter, a poll worker, an election official insider, and a vendor insider."[25] This implies that no passwords or keys would be needed to exploit the problem, given physical access. California testers also found that "the ICX device does not provide monitoring of

---

[23] *Id*. at 19-20.
[24] *Id*. at 20.
[25] California Secretary of State's Office of Voting Systems Technology Assessment, "Dominion Voting Systems Democracy Suite 5.10 Staff Report" (Aug. 19, 2019) at 29, https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510staff-report.pdf.

physical security,"[26] and that, for all the polling place devices, including the ICX, "[s]ecurity seals, locks, and security screws can be circumvented."[27]

26.   Other weaknesses found in the California tests include that "a number of passwords were able to be recovered that were stored in plain text,"[28] that the network switch used to connect EMS clients and servers was "determined to have twelve medium [severity] vulnerabilities and four low [severity] vulnerabilities,"[29] and that, if an authentication device used by poll workers and administrators was lost or stolen shortly before an election, revoking its access would require a logistically difficult process to reprogram the election files for the polling place devices throughout the jurisdiction.[30] These problems indicate that the Dominion system was designed without sufficient attention to security.

27.   Although California ultimately permitted the Dominion system to be used, its certification requirements impose much more stringent security conditions

---

[26] California Certification Security and Telecomm Test Report at 11.
[27] *Id*. at 17.
[28] *Id*. at 15.
[29] *Id.* at 30.
[30] *Id.* at 15.

than those in Georgia, and no California jurisdiction uses Dominion BMDs for all voters as Georgia does.[31]

28.     Dominion's response to Georgia's RFP lists among "key personnel" a "Chief Security Officer" (CSO) whose responsibilities for the voting system project were to be "Oversight of key security development and implementation."[32] Appointing a C-level executive to oversee a company's security posture is widely regarded as an industry best practice. However, at the time of the RFP, the CSO position was vacant, and to my knowledge Dominion has yet to fill the role.

## BMDs and Ballot Barcodes Create Elevated Hacking Risks

29.     Georgia's optical scanners use barcodes as the exclusive means of reading voters' choices. This increases the likelihood that attackers will be able to manipulate election results. The use of barcodes makes it possible for attackers to change how votes are recorded by hacking *either* the scanners or the BMDs. This

---

[31] California Secretary of State, "Conditional Approval of Dominion Voting Systems, Inc. Democracy Suite Version 5.10 Voting System" (Oct. 18, 2019), https://votingsystems.cdn.sos.ca.gov/vendors/dominion/ds510-cert.pdf.
[32] See "Original\0-4 Org Structure_Dominion and KNOWiNK - Redacted .pdf" at 3 *available at* https://sos.ga.gov/admin/uploads/Dominion.zip (last visited Aug. 19, 2020).

increases the "attack surface" of the election system: with two potentially vulnerable components to target instead of just one, attackers are more likely to succeed.

30.    Georgia's Dominion ICX BMDs are computers, they run outdated and vulnerable software, and they must be programmed using the State's election management system before every election. Attackers could potentially infect Georgia's BMDs with malware in several ways, including by spreading it from the election management system (EMS).

31.    An attacker who infected the BMDs with malware could change a fraction of the printouts so that the barcodes encoded fraudulent votes but the human-readable text showed the voters' true selections.

32.    Voters would have no way to detect this attack. They cannot read the Dominion barcodes, which are encrypted, so it is impossible for them to verify whether the barcodes really match their selections. However, when the Dominion scanners tabulate BMD printouts, they ignore the printed text entirely and count only the votes encoded in the barcodes. This means that voters cannot verify the portion of their ballots that gets counted.

33.    Such barcode attacks cannot be reliably detected using pre-election testing or parallel testing.[33] An attacker could decide which votes to modify based on a very large number of variables, including the time of day, the number of ballots cast, the voter's selections, and whether the voter used options such as a large font size or an audio ballot. It is impossible for any practical amount of testing to examine all sets of conditions under which attackers might choose to cheat.

34.    In principle, a sufficiently rigorous audit that compared the human-readable portion of the printouts to the barcodes could detect such an attack. However, since attackers might choose to target any race in any election, every race and every election would need to be rigorously audited to rule out barcode-based fraud.

35.    To my knowledge, Georgia has not announced plans to perform any kind of audit that would compare the barcodes and the printed text, nor what specific measures would be taken to render any potential audit sufficiently comprehensive and reliable.

36.    Even if officials did detect that some ballots showed different choices in the barcode than in the text, there might be no way to determine the correct election

---

[33] *See* Philip B. Stark and Ran Xie, "Testing Cannot Tell Whether Ballot-Marking Devices Alter Election Outcomes" (2020), https://arxiv.org/pdf/1908.08144.pdf.

results. If the discrepancies resulted from an attack, this would cast doubt on *both* the barcodes and the ballot text. An attacker who was able to alter the barcode would be equally capable of altering the ballot text. Malware might be designed to sometimes alter only the barcode and sometimes only the text. This means that officials could not simply ignore the barcodes and count only the text if they suspected the BMDs had been compromised.

37.   BMDs do not need to use barcodes. Several kinds of modern, EAC-certified BMDs deployed in other states do not use barcodes to encode votes. These include the Clear Ballot ClearAccess system[34] and the Hart Verity Touch Writer.[35] Instead of a barcode for vote tabulation, these systems print a ballot that looks like a hand-marked paper ballot but has scan targets filled in for the selected candidates.

38.   In Dominion's response to the State's request for proposals, the company represented that an upcoming version of its BMD software would not need to print barcodes on ballots.[36] Instead, the BMDs would produce (and the scanners

---

[34] *See* Clear Ballot, "ClearAccess Accessible Voting," https://clearballot.com/products/clear-access.
[35] *See* Hart Intercivic, "Verity Touch Writer Ballot Marking Device," https://www.hartintercivic.com/wp-content/uploads/VerityTouchWriter.pdf.
[36] "Clarification Questions\MS 16-1 Supply Chain_Dominion and KNOWiNK Final.docx" *available at* https://sos.ga.gov/admin/uploads/Dominion.zip (last visited Aug. 19, 2020).

would count) an entirely human-readable ballot capable of verification by the voter. However, this option is described as an "upgrade" available only after "certification is complete at the EAC."

39.    The Secretary of State's office and Dominion portray Georgia's BMDs as having this ability to print such a human-readable, "full-face" ballot. A video portraying such a capability is part of the "Important Voter Information" available to the public on the Secretary of State's elections security web page.[37] The video portrays a voter making her selections on a BMD displaying a mock ballot using Georgia state and local races and constitutional questions or referenda. At the end of the video, the voter selects "Print Ballot," and the attached printer produces a double-sided ballot with a darkened oval appearing next to the voter's selections.[38]

40.    Dominion's in-precinct optical scanners already are capable of and certified to read such full-face paper ballots that do not encode votes using barcodes.

---

[37] https://www.dropbox.com/s/u0lc21u82ye2qpg/ICX%20BMD%20Cart.mp4, available through "Voting Cart" hyperlink at https://sos.ga.gov/securevoting (last visited Aug. 18, 2020).
[38] *Id.*

**<u>BMDs Limit the Effectiveness of Voter Verification</u>**

41.    Even if Georgia were to implement rigorous post-election audits, BMDs make it possible for an attacker to compromise the auditability of the ballots and thereby undermine the primary goal of the paper trail. To do so, malware would cause the BMDs to sometimes print fraudulent selections in *both* the barcode and the human-readable text. This attack would be impossible to detect by auditing the printouts, because all records of the voter's intent would be wrong. Pre-election testing and parallel testing also cannot reliably detect such cheating.

42.    Unlike the security of hand-marked paper ballots, the security of BMDs relies critically on voters themselves. The only practical way to discover a BMD attack that altered both the barcodes and the printed text would be if enough voters reviewed the printouts, noticed the errors, and alerted election officials. Yet several recent studies, including my own peer-reviewed research, have concluded that few

voters carefully review BMD printouts.[39,40,41] As a result, the BMD paper trail is not a reliable record of the votes expressed by the voters, and changes to enough printouts to change the winner of a close race would likely go undetected.

43.   Even if some voters did notice that their selections were misprinted, these voters would have no way to prove that the BMDs were at fault. From an election official's perspective, the reporting voters might be mistaken or lying. Many voters would need to report that the BMDs misprinted their ballots before officials could be sure there was a systemic problem.

44.   There are no protocols or policies in Georgia that I have found that address how many voter complaints, or other conditions, involving BMDs would be required within or across polling places to support a finding—or even a robust investigation—of a systemic problem. Moreover, it would be virtually impossible

_____

[39] R. DeMillo, R. Kadel, and M. Marks, "What voters are asked to verify affects ballot verification: A quantitative analysis of voters' memories of their ballots" (2018). Available at https://ssrn.com/abstract=3292208.

[40] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" in *Proceedings of the 41st IEEE Symposium on Security and Privacy* (Jan. 2020), https://jhalderm.com/pub/papers/bmd-verifiability-sp20.pdf.

[41] Philip Kortum, Michael D. Byrne, and Julie Whitmore, "Voter Verification of BMD Ballots Is a Two-Part Question: Can They? Mostly, They Can. Do They? Mostly, They Don't" (Mar. 2020), https://arxiv.org/ftp/arxiv/papers/2003/2003.04997.pdf.

for officials to recognize the subtle signs of a BMD misprinting attack during a chaotic election in which there were widespread equipment malfunctions and other problems, as occurred in Georgia during the June 9, 2020 primary.[42]

45.   Even if officials did suspect that the BMDs had been attacked, there would be no straightforward way to respond or recover. One possible response would be to delay certifying the election results and conduct a forensic analysis to understand why ballots were misprinted and how many BMDs and votes were affected. Such an analysis might take months and would not be guaranteed to uncover a sophisticated attack. Yet if an attack were confirmed, there is little chance that its effects could be undone. The only recourse might be to rerun the election, which could be statewide involving millions of voters across Georgia.

46.   Election officials are unlikely to take disruptive actions, like a protracted and expensive forensic investigation, unless a large enough fraction of BMD voters report problems. Suppose officials would launch an investigation if more than 1% of BMD voters reported a problem. If outcome-changing fraud occurred in an election with a 1% margin of victory, voters would need to verify their ballots so

---

[42] Richard Fausset, Reid J. Epstein, and Rick Rojas, "'I Refuse Not to Be Heard': Georgia in Uproar Over Voting Meltdown," *The New York Times* (June 9, 2020), https://www.nytimes.com/2020/06/09/us/politics/atlanta-voting-georgia-primary.html.

carefully that they would report 67% of the modified BMD printouts. This is *ten times* greater than the rate of error reporting measured in my peer-reviewed research.

## **Reserving BMDs for Voters Who Request Them Would Strengthen Security**

47.    When BMDs are used by all in-person voters, as in Georgia, there is a high risk that attackers could manipulate enough BMD votes to change the outcome of a close election without detection. Georgia is an outlier in adopting BMDs for all voters. As of December 2019, only 403 counties in the United States planned to do so, and almost 40% of them were in Georgia.[43] In contrast, the majority of election jurisdictions across the U.S. (representing nearly two-thirds of registered voters) provide BMDs exclusively for voters who request them (e.g., those with certain disabilities),[44] which is much safer.

48.    Georgia can greatly strengthen the security of future elections through a straightforward procedural change. Rather than directing all in-person voters to use BMDs, the State could have in-person voters mark paper ballots by hand and reserve BMDs for voters who request to use them. This approach would require no additional equipment and would result in no loss in accessibility. Hand-marked

---

[43] Decl. of Warren Stewart, Dckt. 681-2.
[44] Verified Voting, *The Verifier*, https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/2020 (last visited Aug. 18, 2020).

paper ballots are already used in Georgia for absentee voting, and so they are prepared and printed for every ballot style in every election. The state's new Dominion scanners are already capable of counting hand-marked ballots. BMDs would continue to be available for voters who need them. Yet the risk that election outcomes could be hacked would be far less than under Georgia's planned system.

49.   Securing against misprinting attacks is much easier if only a small fraction of voters uses BMDs (without barcodes) and the rest use hand-marked paper ballots. This is because an attacker would be forced to cheat on a much larger fraction of BMD ballots in order to achieve the same level of fraud. In Maryland, which uses hand-marked paper ballots but makes BMDs available to voters who request them, about 2% of voters use BMDs. If only 2% of voters used BMDs in the scenario above (¶ 46), 1% of BMD voters would report a problem even if voters noticed only 3.8% of errors. Empirical studies suggest that voters really do achieve this modest rate of verification accuracy, even though it is unlikely they can achieve the far greater accuracy required to detect fraud when all voters use BMDs.

50.   Using BMDs for all voters has no practical security advantages compared to reserving BMDs for voters who request them. On the contrary, it makes BMDs a much more attractive target for attackers and leads to greatly increased risks

for all voters—including the disabled—that their right to vote will be subverted by an attack on the BMDs. And regardless, there is no need for barcodes at all.

## Georgia's Audits Provide Insufficient Protection

51.     Rigorous post-election audits are necessary in order to reliably prevent attacks that compromise election results by manipulating ballot scanners. A rigorous audit would also serve to correct errors caused by scanners misreading ballots, to the extent that these errors resulted in an incorrect election outcome. However, as I have explained, post-election audits are not sufficient to detect attacks against BMDs, since such attacks could change both the printed and electronic records of the votes.

52.     For an audit to reliably detect outcome-changing attacks, several requirements must be met. Among them are: (i) the paper ballots being audited must correctly reflect voters' selections; (ii) the audit needs to be conducted manually, by having people inspect the ballots without reliance on potentially compromised electronic systems or records; (iii) the auditors need to inspect sufficiently many ballots to ensure that the probability that outcome-changing fraud could go undetected is low. In general, the closer the election result in a particular race, the more ballots need to be audited in order to confidently rule out fraud. Audits that constrain the probability that the reported outcome differs from the outcome that

would be obtained by a full manual recount to no more than a pre-defined level (the "risk limit") are called risk-limiting audits ("RLAs").[45]

53.    I understand that Georgia statute requires a state-wide post-election audit to be conducted no later than the November 2020 election.[46] However, that audit is not required to be risk-limiting. If it is not, and there are close races in which an attacker changes the outcome by hacking the election equipment, there is a high probability that the audit will fail to uncover the attack.

54.    A proposed rule change recently noticed by the State Elections Board would require all counties to participate in a risk-limiting audit, but only following November general elections in even-numbered years.[47] Other elections, including state-wide primaries and runoffs, are not included in the requirement. Moreover, under the proposed rule, the RLA would target only one contest, which would be selected by the Secretary of State. Adversaries could choose to attack any race in

---

[45] *See* Mark Lindeman and Philip B. Stark, "A Gentle Introduction to Risk-limiting Audits," in *IEEE Security and Privacy* (2012), https://www.stat.berkeley.edu/~stark/Preprints/gentle12.pdf.
[46] *See* O.C.G.A. § 21-2-498(b).
[47] Georgia State Elections Board, "Notice of Intent to Post a Rule of the State Election Board, Title 183-1, *Rules of State Election Board*, Chapter 183-1-15, *Returns of Primaries and Elections* and Notice of Public Hearing" (Aug. 11, 2020), https://sos.ga.gov/admin/files/SEB%20Rule%20183-1-15-.02(2)%20and%20.04%20-%20To%20Post%20For%20Public%20Comment.pdf.

any election, and an attack would likely not be detected if it occurred in a contest that was not the target of the RLA or during an election for which no RLA was conducted. Even for the one contest every two years that would be audited, the proposed rule does not describe the auditing procedure in enough detail to evaluate its sufficiency. The specific process that election superintendents would follow to carry out the audit is yet to be defined.

55.   No matter what auditing procedures Georgia applies, the state's widespread use of BMDs makes it possible for an attacker to undermine the integrity of the paper trail. Malware could cause the BMDs to print fraudulent selections, both in the barcode and the human-readable text. Such an attack would be impossible to detect by auditing the ballots, even with an RLA, because all records of the voter's intent would be wrong.

**Hand-Marked Paper Ballots Are Much More Secure**

56.   Hand-marked paper ballots (HMPBs) are the most widely used voting technology in the United States. More than 65% of voters live in jurisdictions that use HMPBs as their primary in-person voting technology,[48] and all 50 states, including Georgia, use them for absentee voting. When used with modern precinct-

---

[48] Verified Voting, *The Verifier.*

count optical scanners and rigorous RLAs, HMPBs can provide much stronger security than BMD-printed ballots, especially those based on barcodes.

57.   Virtually every class of attack that affects HMPBs also affects BMDs, but BMDs—especially those that use barcodes—additionally suffer from the serious possibility that malicious software will alter the voter's choices without detection. In contrast, HMPBs can be well secured using existing election technology and procedural controls.

58.   It is true that voters using hand-marked paper ballots sometimes make errors. However, modern ballot scanners, such as Georgia's Dominion ICPs, can be programmed to detect the most common types of errors by voters, such as overvotes and undervotes. Where ballots are scanned in-precinct, and the scanners are programmed correctly, voters then have the opportunity to correct their ballots once the scanners report the errors. Scanners also sometimes misread voters' marks, but such errors—to the extent that they affected an election outcome—would be detected and corrected during risk-limiting audits, which are necessary in any event in order to safeguard against outcome-changing attacks.

**Georgia Elections Continue to be Threatened by Sophisticated Adversaries**

59.   Georgia's election system continues to face a high risk of being targeted by sophisticated adversaries, including Russia and other hostile foreign

governments. These adversaries could attempt to hack the election system to achieve a variety of goals, including undermining the legitimacy of the democratic process and causing fraudulent election outcomes.

60. The Mueller Report recently outlined the scale and sophistication of Russia's efforts to interfere in the 2016 election, leaving no doubt that Russia and other adversaries will strike again.[49] The Special Counsel concluded principally that "[t]he Russian government interfered in the 2016 presidential election in sweeping and systematic fashion."[50] The report further explained that foreign actors "sought access to state and local computer networks by exploiting known software vulnerabilities on websites of state and local governmental entities."[51] The report also found that these foreign agents were successful in attacking at least one state and that their activities involved "more than two dozen states."[52] As noted prior to the Special Counsel's final report, Georgia was among the states that Russia targeted.[53]

---

[49] Special Counsel Robert S. Mueller III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election (Volume I of II)*, United States Department of Justice (Mar. 2019), https://www.justice.gov/storage/report.pdf.
[50] *Id.* at 1.
[51] *Id.* at 50.
[52] *Id.*
[53] *See* Indictment ¶ 75, *United States v. Netyksho*, No. 1:18-cr-00215-ABJ, (D.D.C. July 13, 2018), ECF No. 1.

61.   Russia has sophisticated cyber-offensive capabilities, and it has shown a willingness to use them to hack elections elsewhere even before 2016. For instance, according to published reports, during the 2014 presidential election in Ukraine, attackers linked to Russia sabotaged Ukraine's vote counting infrastructure, and Ukrainian officials succeeded only at the last minute in defusing vote-stealing malware that would have caused the wrong winner to be announced.[54]

62.   Russia and other foreign governments continue to threaten Georgia's elections in 2020. As recently as this month, the U.S. Intelligence Community assessed that foreign threats to the 2020 election include "ongoing and potential activity" from Russia, China, and Iran, concluding that "[f]oreign efforts to influence or interfere with our elections are a direct threat to the fabric of our democracy."[55] These adversarial governments may "seek to compromise our election infrastructure

---

[54] Mark Clayton, "Ukraine election narrowly avoided 'wanton destruction' from hackers," *The Christian Science Monitor* (June 17, 2014), https://www.csmonitor.com/World/Passcode/2014/0617/Ukraine-election-narrowly-avoided-wanton-destruction-from-hackers.

[55] Office of the Director of National Intelligence, "Statement by NCSC Director William Evanina: Election Threat Update for the American Public" (Aug. 7, 2020), https://www.dni.gov/index.php/newsroom/press-releases/item/2139-statement-by-ncsc-director-william-evanina-election-threat-update-for-the-american-public.

for a range of possible purposes, such as interfering with the voting process, stealing sensitive data, or calling into question the validity of the election results."[56]

63.   Georgia's BMD-based election system does not achieve the level of security necessary to withstand an attack by these sophisticated adversaries. Despite the addition of a paper trail, it suffers from severe security risks much like those of the DRE-based election system it replaced. Like paperless DREs, Georgia's BMDs are vulnerable to attacks that have the potential to change all records of a vote.


I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 19th day of August, 2020 in Rushland, Pennsylvania.

_____
J. ALEX HALDERMAN

---

[56] *Id.*

                                    **Tina Milcarek <tina.milcarek@gmail.com>**

---

## Public Records Request

6 messages

---

**Tina Gmail** <tina.milcarek@gmail.com>                    Thu, Jun 30, 2022 at 5:33 PM
To: Sen.KimThatcher@oregonlegislature.gov

Dear Senator Thatcher,

Can you please provide me a copy of the Memo you received from Stephen Trout in November 2020 outlining the challenges faced by the elections Division?

https://www.opb.org/article/2020/11/09/oregon-elections-director-resigns-after-penning-a-blistering-memo/

A memo Trout sent last week to secretary of state candidates provides more context to his dismissal. In the damning letter to Secretary of State-elect Shemia Fagan and her opponent, state Sen. Kim Thatcher, Trout laid out a litany of challenges faced by the elections division.

Thanks in advance.

Tina Milcarek

---

**Sen Thatcher** <Sen.KimThatcher@oregonlegislature.gov>                    Fri, Jul 1, 2022 at 3:07 PM
To: Tina Gmail <tina.milcarek@gmail.com>

Here you go! If you want me to forward the email to you, I can.


*Linda Heimdahl*

Chief of Staff

State Senator Kim Thatcher


900 Court Strreet NE

Salem OR 97301

503.986.1713

www.oregonlegislature.gov/thatcher

sen.kimthatcher@oregonlegislature.gov


Bad governments are elected….by the people who did not vote.

Please note that all email sent to and from this email may be accessed by
Senator Thatcher's personal staff, and may be subject to disclosure under
public records law.

Exhibit L

**From:** Tina Gmail <tina.milcarek@gmail.com>
**Sent:** Thursday, June 30, 2022 5:34 PM
**To:** Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov>
**Subject:** Public Records Request

---

**CAUTION: This email originated from outside the Legislature. Use caution clicking any links or attachments.**

---

[Quoted text hidden]

---------- Forwarded message ----------
From: "TROUT Steve * SOS" <Steve.TROUT@oregon.gov>
To: Sen Fagan <Sen.ShemiaFagan@oregonlegislature.gov>, Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov>
Cc: "steve@electionlaw.us" <steve@electionlaw.us>
Bcc:
Date: Tue, 3 Nov 2020 01:25:46 +0000
Subject: State of Oregon Elections

Good luck to both of you in the final hours of this campaign.  The finish line is in sight.


I have attached a State of Oregon Elections analysis that I wanted to share with both of you in the spirit of transparency before the results are known.  I don't expect you to read it right away but do want you to have the information.  I am happy to discuss with you in the coming weeks.


Steve


Stephen N. Trout

Director of Elections

Oregon Secretary of State

503-986-2339

steve.trout@oregon.gov




www.oregonvotes.gov


---

**2 attachments**

**State of Elections.pdf**
82K

**State of Oregon Elections.eml**
134K

---

**Tina Gmail** <tina.milcarek@gmail.com>                                         Sat, Jul 2, 2022 at 9:37 AM
To: Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov>

Hi Linda,

Thanks for sending so quickly and yes, please forward the email as well.

Have a Great 4th!

Tina Milcarek

On Jul 1, 2022, at 3:07 PM, Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov> wrote:

[Quoted text hidden]
<mime-attachment>

---

**Sen Thatcher** <Sen.KimThatcher@oregonlegislature.gov>                        Tue, Jul 5, 2022 at 1:24 PM
To: Tina Gmail <tina.milcarek@gmail.com>

Were you able to open the attachment I sent last week? If so, it IS the email I am talking about. I thought that if you could NOT open the attachment, I would forward the email (which is the same as the attachment).

Linda

[Quoted text hidden]

---

**Tina Milcarek** <tina.milcarek@gmail.com>                                      Tue, Jul 5, 2022 at 4:58 PM
To: Jennifer Gunter <jennof4@gmail.com>, Jennifer Gunter <capturednation2020@gmail.com>

Stephen Trout email - look at the attachment
[Quoted text hidden]

---------- Forwarded message ----------
From: "TROUT Steve * SOS" <Steve.TROUT@oregon.gov>
To: Sen Fagan <Sen.ShemiaFagan@oregonlegislature.gov>, Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov>
Cc: "steve@electionlaw.us" <steve@electionlaw.us>
Bcc:
Date: Tue, 3 Nov 2020 01:25:46 +0000
Subject: State of Oregon Elections

Good luck to both of you in the final hours of this campaign.  The finish line is in sight.


I have attached a State of Oregon Elections analysis that I wanted to share with both of you in the spirit of transparency before the results are known.  I don't expect you to read it right away but do want you to have the information.  I am happy to discuss with you in the coming weeks.

Steve

Stephen N. Trout

Director of Elections

Oregon Secretary of State

503-986-2339

steve.trout@oregon.gov



www.oregonvotes.gov

---

**2 attachments**

 **State of Elections.pdf**
82K

**State of Oregon Elections.eml**
134K

---

**Tina Gmail** <tina.milcarek@gmail.com>                                    Wed, Jul 6, 2022 at 3:13 PM
To: Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov>

Hi Linda,

Nope, I was able to open and I'm shocked to read how vulnerable we are...

Marion County Clerk and the SOS is getting a lot if public records request 😕.

Thanks again!

Tina Milcarek

On Jul 5, 2022, at 1:24 PM, Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov> wrote:

[Quoted text hidden]

State of Oregon Elections

I am writing to you before the election results are known to be fully transparent to both of you as to the state of elections in our state.  I am not writing to tell you what I think you want to hear, but rather I feel it is my duty to inform you as to the current status of elections in Oregon.  Thank you both for throwing your hat in the ring to serve the voters of Oregon as Secretary of State.  Public service is a noble profession.

When one of you takes office in January you will be the fourth Secretary we have had in 4 years and one month, and the fifth Secretary in the past six years.  During that time, we have also had four Deputy Secretaries and three Information Services (ISD) directors.  As a result of this constant change in the executive team there is a lack of strategic vision and plans for the agency, and staff are not focused due to that lack of vision and leadership.  I am not stating this to attach blame because Secretary Richardson's cancer was no one's fault, but simply to recognize that that lack of vision and leadership over the past few years has really set the agency back.

The Election Division's relationship with county election officials has never been stronger and I am confident they have shared that with you.  There exist relationships of trust and partnership that are essential to successful elections in any state.

Our relationship with federal partners also has never been stronger.  We have great support and partnership with the Cybersecurity and Infrastructure Security Agency (CISA) which is part of the Department of Homeland Security both through our local representatives and from headquarters in DC.  CISA has done onsite security assessments in each of our 36 counties and has also helped us with tabletop exercises and COVID planning.  Our partnership with them has really helped to improve the security understanding and posture of our counties.

We also have enjoyed a productive partnership with the FBI.  They have worked with us on voter education and battling mis/disinformation.  They partnered with us for our Cyber Summit back in February.  Most importantly they were a great resource when Tillamook County was taken down with ransomware earlier this year.  We have participated in tabletop exercises with them and received classified briefings at their secure facility.

In Oregon we have created a model for the rest of the country through our TIGER (Threat Information Gathering and Election Resources) team.  It is a dedicated team to help secure our elections that consists of members of the Elections Division, Department of Homeland Security, Cybersecurity Infrastructure Security Agency, Federal Bureau of Investigations, Oregon National Guard, Oregon Office of Emergency Management, Oregon Titan Fusion Center, US Postal Service Inspector General, and

the Cyber Security Services section of the Oregon Chief Information Security Officer's office.

Even with all these successful partnerships, the Elections Division struggles to get support from the agency support divisions.  There are major technology challenges ahead in elections.  We have a lot of technical debt, meaning systems that are old and out of date versions some of which are no longer supported.   A sampling of requested projects is listed below.

Existing requested improvements:

  ➢ Multifactor authentication for security of all OCVR users. (Requested 2/2017)
  ➢ Resiliency for public facing election systems. (Requested 2/2018)
  ➢ Ballot tracking subscription service. (Requested 2/2018)
  ➢ Voter registration change subscription service. (Requested 2/2018)
  ➢ Adding "accepted" to the list of statuses in the MyVote tracking screen.
  ➢ OCVR replacement.
  ➢ ORESTAR replacement.
  ➢ OCVR system auditing tool.
  ➢ Integrating Electronic Registration Information Center (ERIC) information automatically into OCVR.
  ➢ Create an API (application program interface) between the ORESTAR Campaign Finance database and Data.gov to increase transparency without risking failure to the application.
  ➢ Real time data transfers with DMV for online registration and Oregon Motor Voter.
  ➢ There is a list of 56 known bugs or problems with election systems that was provided to the Information Services Director in January.

Many of these projects have been talked about and/or worked on for years but never completed and successfully deployed.  Most of the projects that have been completed and rolled out in the past couple of years have had to be undone because there were changes made that resulted in breaking other things.

Some of our election systems are running on Windows Server 2008.  End-of-life mainstream support from Microsoft ended back on January 13, 2015, and all support ended on January 14, 2020.  Our public facing websites are single threaded through one power supply on the capitol mall and one internet connection.  There is no redundancy or resiliency or plan to provide either.

ORESTAR is outdated, not user friendly, and most important there is no resiliency.  This is our main connection with Oregonians for election services.  ORESTAR includes campaign finance transactions, online voter registration, candidate filing, voters

pamphlet statement submissions, ballot tracking, dropbox locator, accessible ballots and all languages and features of MyVote.

OCVR is outdated and unable to accommodate many modern tools that we need to add for our operations and those of the 36 counties.  OCVR was built back in 2004.  It is the central voter registration database for all voters in the state and is a vital part of each county's election administration.  The counties rely on this system to administer their elections and they were promised that it would be kept up to current technology standards when they gave up their own databases 15 years ago.  OCVR uses old technology that requires transactions to be done in batches instead of real time.  When files are transferred, say from DMV for online registration, a batch is sent over every night.  People who register online often go to check that their registration was received immediately thereafter only to find that none of the changes show on the screen.  With batch processing it can take one or more days for the information to post.

Major legislative changes in elections are upon us.  Campaign finance limits will likely be passed and need to be implemented in 2021.  New district lines will need to be setup after redistricting.  This is the election administration part or redistricting, not the drawing of the lines that may also end up on your plate.  There is the major rollback of automatic registration that will take place after HB 2015 takes effect on January 4th.  Only those seeking a Real ID compliant license will be automatically registered.  We reached out to the Governor about technology solution options at DMV in the spring but have not had any update on what she has been able to do.  There will also likely be several legislative proposals in the 2021 session.  More bills regarding elections are introduced in the session after a presidential election than any other.

This year, the Elections Division received $6,029,047 in Help America Vote Act funds and $5,656,663 in CARES Act funds from the federal government but were not authorized by the Oregon legislature to spend a penny of the $11.7 million.  All of the CARES Act funds must be returned by 12/31/2020 because they were not used.

The Elections Division had three positions cut during this summer's budget cuts.  Being reliant on general funds, Elections usually takes the biggest hit in the agency when there are across the board budget cuts.  This session the legislature rejected our request for a social media/public records position.  We have had more public records requests this election cycle than the previous couple combined.  With all of the misinformation about elections, especially on social media, we were hoping to have someone to monitor that and educate voters and call out misinformation like most other states have.

Finally, I don't want you to be surprised if you hear I am interviewing for new jobs.  It is not because I don't want to work for either of you, but rather because I cannot succeed with the current state of technology and lack of support in the agency.  I don't believe

anyone will be able to succeed.  I believe the best path forward for a new Secretary of State is to prioritize those issues I identified above and to implement them in a nonpartisan manner with the full cooperation of county election officials.  There are exciting opportunities in elections; but in order to succeed a major culture shift will be required in the support divisions and a long term strategic plan established.  If you agree with these priorities and strategy, I would be willing to discuss staying on as a part of your administration.  There are so many opportunities for improving elections right now throughout the country that I want to use my talents and abilities to effectuate the most good.  As things currently stand, I cannot do that in Oregon, but with your leadership anything is possible.

If either of you have any questions or concerns about this election over the next month while we certify the results, or if there is any assistance I can provide in a transition, please don't hesitate to call my personal cell at 503-932-4200.

 Gmail

**Tina Milcarek <tina.milcarek@gmail.com>**

## Counting Machine Information

**Bill Burgess** <BBurgess@co.marion.or.us>                                    Thu, Apr 15, 2021 at 4:48 PM
To: Tina's GMail <tina.milcarek@gmail.com>
Cc: Connie Higgins <CHiggins@co.marion.or.us>, Daniel Brummer <DBrummer@co.marion.or.us>, Julie Fuge
<JFuge@co.marion.or.us>

Hi Tina,

Thank you for your interest in elections .

Sorry for the delay in your information request.  I've been back in town from Montana and Wyoming since April 5, but
must have missed this.

We used Verity 2.4 for the November 3, 2021 General Election.  Please contact the Oregon Secretary of State
Elections Division at 503-986-1518 for the certification you requested.  They are the "Certifier".

Since you accepted invoices from Lane County, I assume you would accept invoices instead of Purchase Orders from
us. Let me know if this is correct. Are you asking for the invoices from our ballot printer and our ballot mailers for this
election?  Do you want just the major ones for mailing the bulk of the ballots? Or do you also want invoices for
supplemental mailings? We mail ballots several times from the time we mail the military and overseas at about 46 days
before election day up to about 5 days before election day. Some of the ballots go out with the general county mail
through Garten Services. Do you really want invoices for these mailings too? I suppose we can gather up all the
Garten mailing invoices over the time period covering ballot mailing. Are you asking for invoices just for ballot mailings,
or for our elections-related mailings?

Contracts will need to be reviewed by our legal counsel before releasing to redact possible confidential trade secrets
and security information.  Just which contracts would you like reviewed? Or will invoices be sufficient as you indicated
they were with Lane County?

There will be charges both for time and pages copied. Once we can determine just what you are asking for, we can
provide a cost estimate.

I'll ask our legal department to review your request. They may contact you directly to clarify just what you need.

Since the May 18 Special District Election is coming up, let me know if you would like to see our ballot processing
process in action. We will hold a public certification test of the vote tally system the morning of May 11. We will also be
swearing in and instructing Election Board Workers that morning. We will also be processing ballot packets
and scanning ballots.

Here is the link to the voter pamphlet for this May Special District Election: https://www.co.marion.or.us/
CO/elections/Results/Documents/20210518/Final%20May%202021%20Voter%20Pamphlet.pdf

Once you clarify just what you are looking for, we will respond.

Thanks,

Bill

Exhibit M

Bill Burgess
Marion County Clerk
Salem, Oregon
503-588-3579  Courthouse
503-588-5041  Elections
503-932-1708  Mobile

* * * CONFIDENTIALITY NOTICE * * *
This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law.  If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system.

* * * * * * * * * * * * * * * * * * * * * * *


>>> Tina's GMail <tina.milcarek@gmail.com> 4/15/2021 5:12 AM >>>
[Quoted text hidden]

M Gmail

Tina Milcarek <tina.milcarek@gmail.com>

---

**Re: Counting Machine Information (Bill's 6/8/21 response, resending since original file is lost in cyber space)**
1 message

**Bill Burgess** <BBurgess@co.marion.or.us>                                                    Wed, Jun 9, 2021 at 11:04 AM
To: Tina's GMail <tina.milcarek@gmail.com>
Cc: Connie Higgins <CHiggins@co.marion.or.us>, Daniel Brummer <DBrummer@co.marion.or.us>, Julie Fuge <JFuge@co.marion.or.us>

Hi Tina,

Interesting video link. Thanks for sharing.

Keeping voter rolls clean can be a 90 minute presentation. My Election Manager Connie Higgins presented best prectices on this topic to a national association, either NACRC or IACREOT in Savannah, Georgia a few years ago. These associations merged into iGO or www.iaogo.org.

I'll attach an email response to Ian Watts (Re: Follow up question) where some of the many steps of voter roll hygiene are covered.

We used to move voters to "inactive status" if they had not voted in 5 or more years. This could only be done, I believe, at least 60 or 90 days before an election. Then, after 2 general elections, the inactive voter's registration could be canceled if far enough away from the next election. So it actually took 7 or more years to remove a voter. This was a handy way to remove voters who had died or had moved out of state without us being notified by the normal ways specified in my email to Ian Watts. Oregon Secretary of State Dennis Richardson increased the time to keep a person active without activity to 10 years a few years ago. Enrolled legislation in the Oregon 2021 legislature calls for us to never inactivate a voter due to inactivity.

As far as hardware used in the 2020 November Election, we used Canon ImageForumla DR-G1130 scanners and HP Z 230 Tower work stations. We developed our ballots with an HP Z 240 Tower work station.

We do not have working wireless modems in our workstations or our scanners. Since we do not conduct poll elections with ballots being processed off-campus, we have no need to transmit data from a polling station to our office.

Stay well, stay sane,

Bill

Bill Burgess
Marion County Clerk
Salem, Oregon
503-588-3579 Courthouse
503-588-5041 Elections
503-932-1708 Mobile

>>> Tina's GMail <tina.milcarek@gmail.com> 6/7/2021 9:49 PM >>>
Hi Bill,

Thanks again for allowing me to watch the process and ask my questions last month.

After further research, I'd like to ask for more information.

I read that under the National Voter Registration Act (NVRA) of 1993 that all states are required to remove inactive voters.

Can you provide the work process and timing (annually, etc.) of how you keep the voter rolls clean?

Also, can you tell me the make and models of all your scanners and tabulating machines used in the 2020 election?

I understand that Hart InterCivic has acknowledged they put modems in some of their tabulators and scanners based on an NBC news article which was cited as part of a major lawsuit that was filed last week.

https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436

Thanks in advance for your time.

Tina Milcarek
708-932-0959

On May 8, 2021, at 2:30 AM, Bill Burgess <bburgess@co.marion.or.us> wrote:

Hi Tina,

First of all, yes, we are open for business and you are welcome to come watch our processes. We still plan to perform the public certification of the counting system Tuesday, May 11 at 10 am. And we will have our Election Board Workers in to begin processing ballots. I'd be glad to give you a tour. A couple of other observers will likely join us. Feel free to bring a friend.

On to the data you requested:

Machine-rejected Ballots. Eventually, all "Machine-rejected ballots" are counted.

Sometimes these ballots need to go through a duplication process. A team of two Election Board Workers, each from a different party, will stamp the top of the original ballot and the top of a "duplicate" ballot of the identical "style" (contest content) with a red stamp, uniquely numbering and initialing this pair alike while logging this on the specific precinct ballot tracking sheet. This election we have 245 ballot styles and 123 precincts. Then, one person reads the original ballot while the other marks the "duplicate" ballot.  Before the machine-readable duplicate can be counted, the ballot pair

Exhibit N

must be inspected by a verification team of two more Election Board Workers, each from a different party. The original ballot stays in the precinct envelope. If this precinct is recounted by hand, when the counting team sees the red stamp, they will stop and go back to the envelope to use the original, not the duplicate, for the recount.

Most of the ballots that need to be duplicated are identified and set aside by the pre-inspection board before going to the tally room and through a scanner.  There may be a number for all we duplicated last November.  I do not have it readily available. Nor do I have an exact number of the ballots that were not able to be read by the scanners. Since they all are eventually read, this may not matter. Dan may have a close estimation on the number of ballots that could not be scanned until duplicated and Sherrill may have a close estimate on the total number of ballots duplicated.

Challenged Ballots: 2,085 ballot return envelopes were still "unaccepted" at certification 20 days after election day. (BP-35). There were more earlier, but some ballot return envelopes missing a signature or with a no-matching signature were "cured" and accepted by the "cure" deadline 14 days after election day.

Write-ins: This is reported in the Cumulative Final Election Results for each race in this election, https://www.co.marion.or.us/CO/elections/Results/Documents/20201103/Official%20Cumulative%20Results%2011-23-20.pdf from www.co.marion.or.us/CO  "Miscellaneous write-in votes"and the votes of listed candidates with a (W) after their name will need to be added to get the total number of write-ins of the particular race in question. All the write-ins of each race will need to be added to get the total number of write-ins for this election.

Ballots in Provisional Envelopes: Zero according to report BP-44. Generally, it seems we have six or less.

Reissued Ballots: 4992  (BP-37). Most, if not all of these were due to voter address updates.

Ballots from other Counties: 1,723 (BP-26)

Replacement Ballots: 1,789 (BP-37). Requested by voters.

Unsigned Ballots (return envelopes): 217 at the end of the election, at certification 20 days after election day. (BP-35). The number was quite higher before voters responded to our letters and "cured" their missing signature issue by the deadline 14 days after election day.

We mailed out 2,259 letters to voters notifying them that a signature was required to "cure" mis-matched signatures and for missing signatures. We got 800 responses back by the deadline to respond. There were 1,685 signature mismatch envelopes where we did not receive a response. There were 92 responses that still did not resolve or "cure" the signature mismatch issue. Julie can explain our challenge letter mailing and challenged ballot envelope "cure" process on your visit Tuesday.

See you Tuesday,

Bill


Bill Burgess
Marion County Clerk
Salem, Oregon
503-588-3579  Courthouse
503-588-5041  Elections
503-932-1708  Mobile

* * * CONFIDENTIALITY NOTICE * * *
This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law.  If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system.

* * * * * * * * * * * * * * * * * * * * * * * *


>>> Tina's GMail <tina.milcarek@gmail.com> 5/3/2021 12:40 PM >>>
Hi Bill,

I do have more questions regarding the election.

Can I have all the data (number counts) on the Nov 3, 2020 election for:

- Machine-rejected Ballots
- Challenged Ballots
- Write-ins
- Ballots in Provisional Envelopes
- Reissued Ballots
- Ballots from other Counties
- Replacement Ballots
- Unsigned Ballots

Also, did you have any Federal only ballots?

Given the extended lockdown, am I still able to come on 5/11 to view the process?

Thanks in advance.

Tina Milcarek


On Apr 25, 2021, at 9:40 PM, Tina's GMail <tina.milcarek@gmail.com> wrote:

Thanks Bill for the information.

I'll review and see if I have any other questions.

I also look forward to meeting you during the public testing.

Tina Milcarek

> On Apr 22, 2021, at 6:51 PM, Bill Burgess <bburgess@co.marion.or.us> wrote:

Hi Tina,

I do not have legal counsel clearance to share contracts that contain protected confidential security information. This would require review and redaction before copying. They will likely contact you directly.

I'll attach the ballot printing invoices to this email if I can. Main ballot mailing invoice and larger supplemental ballot mailings too. This will give a rough number. Does not include ballots issued over the counter or mailed in small quantities.

We are on the 2nd floor at Courthouse Square, 555 Court St NE, Salem, Oregon, 97301. Public Certification is scheduled to start at 10 am. See you then.

Not voted printed ballots are kept in the secure elections processing room under camera until picked up by Garten Services and shredded.

Thanks,

Bill


Bill Burgess
Marion County Clerk
Salem, Oregon
503-588-3579  Courthouse
503-588-5041  Elections
503-932-1708  Mobile

* * * CONFIDENTIALITY NOTICE * * *
This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law.  If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system.

* * * * * * * * * * * * * * * * * * * * * * * *

>>> Tina's GMail <tina.milcarek@gmail.com> 4/22/2021 5:41 PM >>>
Hi Bill,

Please update me on the status of my request no later than tomorrow.

I've already obtained the certificate from the state so I'm only waiting on your reply.

Can you tell me what time and the location on the 11th as I'd be interested to see the process.

If contracts (agreements) exist with the vendors that did the ballot printing and mailing for the Nov 2020 election, I'd like copies.  If they don't exist, a copy of the purchase order(s) or invoices would suffice as long as it shows the quantity, pricing, and terms.  I'm looking to see how many total ballots were printed and mailed for the Nov 2020 election.

And one last question.  Can you tell me what the election office does with the left over printed ballots?  For instance, who's in charge of them and is there a chain of custody process?


Respectfully,
Tina Milcarek

> On Apr 15, 2021, at 10:10 PM, Tina's GMail <tina.milcarek@gmail.com> wrote:

Hi Bill,

Thanks for reaching back out and letting me know about the public certification test.

Can you tell me what time and the location on the 11th as I'd be interested to see the process.

If contracts (agreements) exist with the vendors that did the ballot printing and mailing for the Nov 2020 election, I'd like copies.  If they don't exist, a copy of the purchase order(s) or invoices would suffice as long as it shows the quantity, pricing, and terms.  I'm looking to see how many total ballots were printed and mailed for the Nov 2020 election.

And one last question.  Can you tell me what the election office does with the left over printed ballots?  For instance, who's in charge of them and is there a chain of custody process?

Thanks in advance for your comments and time.

Tina Milcarek
708-932-0959

On Apr 15, 2021, at 4:49 PM, Bill Burgess <bburgess@co.marion.or.us> wrote:

Hi Tina,

Thank you for your interest in elections .

Sorry for the delay in your information request.  I've been back in town from Montana and Wyoming since April 5, but must have missed this.

We used Verity 2.4 for the November 3, 2021 General Election.  Please contact the Oregon Secretary of State Elections Division at 503-986-1518 for the certification you requested.  They are the "Certifier".

Since you accepted invoices from Lane County, I assume you would accept invoices instead of Purchase Orders from us. Let me know if this is correct. Are you asking for the invoices from our ballot printer and our ballot mailers for this election?  Do you want just the major ones for mailing the bulk of the ballots? Or do you also want invoices for supplemental mailings? We mail ballots several times from the time we mail the military and overseas at about 46 days before election day up to about 5 days before election day. Some of the ballots go out with the general county mail through Garten Services. Do you really want invoices for these mailings too? I suppose we can gather up all the Garten mailing invoices over the time period covering ballot mailing. Are you asking for invoices just for ballot mailings, or for our elections-related mailings?

Contracts will need to be reviewed by our legal counsel before releasing to redact possible confidential trade secrets and security information.  Just which contracts would you like reviewed? Or will invoices be sufficient as you indicated they were with Lane County?

There will be charges both for time and pages copied. Once we can determine just what you are asking for, we can provide a cost estimate.

I'll ask our legal department to review your request. They may contact you directly to clarify just what you need.

Since the May 18 Special District Election is coming up, let me know if you would like to see our ballot processing process in action. We will hold a public certification test of the vote tally system the morning of May 11. We will also be swearing in and instructing Election Board Workers that morning. We will also be processing ballot packets and scanning ballots.

Here is the link to the voter pamphlet for this May Special District Election:
https://www.co.marion.or.us/CO/elections/Results/Documents/20210518/Final%20May%202021%20Voter%20Pamphlet.pdf

Once you clarify just what you are looking for, we will respond.

Thanks,

Bill

Bill Burgess
Marion County Clerk
Salem, Oregon
503-588-3579  Courthouse
503-588-5041  Elections
503-932-1708  Mobile

* * * CONFIDENTIALITY NOTICE * * *
This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure
under applicable law.  If you are not the addressee or it appears from the context or otherwise that you
have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents
confidential, and immediately delete the message and any attachments from your system.

* * * * * * * * * * * * * * * * * * * * * * * *

>>> Tina's GMail <tina.milcarek@gmail.com> 4/15/2021 5:12 AM >>>
Dear Bill and Connie,

After your Initial response on March 21, I have emailed your office 3 times and have not had one reply.

According to your Policy 213, you commit to reply as follows.
**3.5. As soon as reasonably possible, but not later than 15 business days after a public records officer has received a written public records request, the county shall complete its response to the request, or inform the requester in writing that the county is still processing the request and provide a reasonable estimated date when its response will be complete.**

https://www.co.marion.or.us/BOC/Policies/213.pdf

Based on business days, Mar 22 - Apr 15 reflects **19 business days.**

I've given you reasonable time and been as patient as possible but your office has failed to respond and are in breach of your own policy.

Please supply me with the information I've requested by Friday, 4/16 or designate a reasonable date you will comply.

Respectfully,
Tina Milcarek
Citizen of Marion County
<IMAGE.jpeg>

> On Apr 12, 2021, at 11:21 AM, Tina's GMail <tina.milcarek@gmail.com> wrote:
>
> Hi Bill and Connie,
>
> Please update me on your progress.
>
> Here is a quick recap of my needs:
>
>> What Version of the Hart Verity system was certified for the 11/3/2020 election?
>>
>> I've found a 2017 document that states 2.0 however, according to eac.gov, Marion County may have used 2.3.
>>
>> Please provide the signed certification approval for the version used on 11/3/2020.
>>
>> 2. Please provide the contract and purchase order for the recent election ballot/paper/printing/mailing.
>
> Lane County was able to provide me with a copy of the invoice they paid for ballot printing, mailing, etc. Please provide this same document, Purchase Order, or contract.
>
> Thanks in advance,
>
> Tina Milcarek
>
>> On Apr 4, 2021, at 8:34 AM, Tina Gmail <tina.milcarek@gmail.com> wrote:
>>
>> Hi Bill and Connie,
>>
>> Please let me know when I can expect the details I've requested below.
>>
>> Thanks in advance,
>>
>> Tina Milcarek
>>
>>> On Mar 21, 2021, at 10:36 PM, Tina Gmail <tina.milcarek@gmail.com> wrote:
>>>
>>> Hi Bill and Connie,
>>>
>>> Thanks so much for your quick reply.
>>>
>>> Although I appreciate the offer for a tour, I'm only looking for information at this time.
>>>
>>> You have answered most of my questions but I would still need the information noted below so I would appreciate Connies assistance in your absence.
>>>
>>> 1. What Version of the Hart Verity system was certified for the 11/3/2020 election?
>>>
>>> I've found a 2017 document that states 2.0 however, according to eac.gov, Marion County may have used 2.3.
>>>
>>> Please provide the signed certification approval for the version used on 11/3/2020.
>>>
>>> 2. Please provide the contract and purchase order for the recent election ballot/paper/printing/mailing.
>>>
>>> Thanks in advance for your assistance.

Tina Milcarek

On Mar 21, 2021, at 1:14 AM, Bill
Burgess <bburgess@co.marion.or.us>
wrote:

Hi Tina Milcarek,

Thank you for your interest in election
integrity. We've had very similar
information requests.  I'm presently
visiting family in Montana. I'd be glad to
give you a tour of our election operation
sometime after my return on April 5.

Our hardware and software vendor is
Hart. We use the Verity central count
system. It is authorized and certified by
the Oregon Secretary of State. It has also
undergone examination and testing by a
lab certified by the federal Election
Assistance Commission. We conduct
logic and accuracy tests before, during
and after each election. Additionally, we
perform hand recount audits.  All Hart
Verity system updates must be approved
by the SOS. Certification lasts until the
SOS determines otherwise. Our current
version was last used in the November 3,
2020 election.

I look forward to further addressing your
questions on your visit if this works for
you. In my absence, feel free to contact
my Elecions and Recording Manager
Connie Higgins.

Thanks,

Bill Burgess
Marion County Clerk
Salem, Oregon
503-588-5041

Sent from my iPhone

On Mar 20, 2021, at 7:40
AM, Tina's GMail
<tina.milcarek@gmail.com>
wrote:

Dear Bill Burgess:

As a registered voter of
Marion county I am writing
and requesting information
related to the counting
machines used during the
2020 election on November
3rd, 2020. For every machine
used during this election
please include the following
specific information:

1. What are the names of
hardware and software
companies used?

2. When were the machines
certified?

3. What version was
certified?

4. What is the name of the
Company that certified the
machines?

5. When does/did the certification expire? If the current certification occurred after 11/03/2020 election, please provide the requested information for the certification in place on 11/03/2020.

6. Please provide contract and purchase order for the recent election ballot/paper/printing/mailing.

Thank you in advance for your participation in our quest for election integrity. We need our advocates now more than ever to ensure our state is protected from foreign adversaries, transparency is the key. Please respond promptly as this is a very time sensitive matter.

Sincerely,

Tina Milcarek

**WARNING:** This email originated outside of Marion County. **DO NOT CLICK** links or attachments unless you trust the sender and know the content is safe.

Click here to learn more or Click here to report as spam.

**WARNING:** This email originated outside of Marion County.
**DO NOT CLICK** links or attachments unless you trust the sender and know the content is safe.

Click here to learn more or Click here to report as spam.

**WARNING:** This email originated outside of Marion County.
**DO NOT CLICK** links or attachments unless you trust the sender and know the content is safe.

Click here to learn more or Click here to report as spam.

<mime-attachment>
<mime-attachment>
<mime-attachment>

**WARNING:** This email originated outside of Marion County.
**DO NOT CLICK** links or attachments unless you trust the sender and know the content is safe.

Click here to learn more or Click here to report as spam.

**WARNING:** This email originated outside of Marion County.
**DO NOT CLICK** links or attachments unless you trust the sender and know the content is safe.

Click here to learn more or Click here to report as spam.

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| JENNIFER RAE GUNTER, an Oregon Elector; and CHRISTINA LYNN MILCAREK, an Oregon Elector; and CHELSEA ANNE WEBER, an Oregon Elector | Case No. <u>3:22-CV-1252-MO</u> |
| Plaintiff(s), | |
| v. | <u>Affidavit Of:</u><br><u>Shannon Berlant</u> |
| SHEMIA FAGAN, in her individual capacity and as Secretary of State for the state of Oregon, | |
| Defendant. | |

# AFFIDAVIT

State of Oregon

County of *Washington*

I, <u>  Shannon Berlant  </u>, being first duly sworn according to law, hereby declare, under penalty of perjury, that I have full personal knowledge of the events and matters set forth herein, and that the following is true and accurate to the best of my knowledge:

1. I am over 18 years of age and competent to make the following representations.

2. I am a legal resident and registered voter in Washington County in the state of Oregon.

3. I am filing this Affidavit in support of the Plaintiffs in the above-captioned matter.

4. In early January 2021, I accessed the sworn affidavit of Tore Maras on the Court Listener website (https://www.courtlistener.com/docket/18702085/feehan-v-wisconsin-elections-commission/), Attachment 13, under filing nine (Dec 3, 2020). This affidavit shows clear and convincing evidence that none of the Election Assistance Commission (EAC) federal

"accredited" Voting System Test Laboratories (VSTL) were actually accredited for large periods of time extending from February 25, 2017 through to December of 2020.

5. In early January 2021, I accessed a document on the EAC website (uploaded August 18, 2009) titled State Requirements and the Federal Voting System Testing and Certification Program.

(https://www.eac.gov/sites/default/files/eac_assets/1/1/State%20Requirements%20and%20the%20Federal%20Voting%20System%20Testing%20and%20Certification%20Program.pdf) Pages 3-5 along with page 45 provide EAC information about Oregon's participation under the federal Help America Vote Act (HAVA), in the EAC's federal vote system testing & certification program.

6. In early January 2021, I accessed the Oregon Legislature website (https://www.oregonlegislature.gov/bills_laws/ors/ors246.html), and found Oregon Revised Statute (ORS) 246.150 and 246.520 through 246.600 providing some of the state laws surrounding use, purchase, certification and approval of voting systems/machines within Oregon. In particular, it appears that a vote system may not be purchased or used in any election, UNLESS it has already been approved by the Oregon Secretary of State (SOS). Also, there are several requirements that must be met in order for the SOS to approve a vote system; and the SOS may adopt rules to assist in achieving maximum correctness.

7. In early January 2021, I accessed the Oregon SOS website (https://secure.sos.state.or.us/oard/view.action?ruleNumber=165-007-0350) to view the Oregon Administrative Rule (OAR) for Oregon Voting System Certification, 165-007-0350 (1), which states, "All voting systems submitted for certification pursuant to ORS 246.550 must be certified by the Elections Assistance Commission (EAC) or be examined by a federally accredited voting systems testing laboratory (VSTL)."

8. In early January 2021, I accessed a document on the EAC website (uploaded October 17, 2002) which is commonly known as HAVA, or H.R. 3295 (107th US Congress) (https://www.eac.gov/sites/default/files/eac_assets/1/6/hava.PDF). Subtitle B, Section 231, are where the federal HAVA laws surrounding federal vote system certification, federal testing and federal VSTL accreditation are specified.

9. In early January 2021, I accessed a document on the EAC website (uploaded July 8, 2015) titled Testing & Certification Program Manual Version 2.0 (https://www.eac.gov/sites/default/files/eac_assets/1/6/Cert_Manual_7_8_15_FINAL.pdf). This manual describes the EAC's program for the EAC's own certification of a vote system, which includes a precise description of the make, model, version, and other system information of the exact system being EAC certified. Sections 3 through 5 provide that EAC certification is dependent upon vote system testing & review by an EAC accredited VSTL.

10. In early January 2021, I accessed a document on the EAC website (created July 8, 2015, but modified/uploaded November 13, 2017) titled Voting System Test Laboratory Program Manual Version 2.0 (https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf). This manual describes the EAC's program for EAC accreditation of a VSTL. Consistent with HAVA, the EAC Commissioners must vote to accredit VSTLs. Section 3.6 details some of the provisions surrounding the EAC's grant of VSTL accreditation, namely "3.6.1.3 The effective date of the certification, which shall not exceed a period of two (2) years; and…". Section 3.8 details the provisions surrounding expiration & renewal of VSTL accreditation.

11. Because both the EAC Certificate of Compliance and the Oregon SOS' own "approval" rely entirely upon validly accredited VSTLs to do extensive inspection and testing of voting machines - in early January 2021, I accessed the EAC website to find every

possible Certificate of Accreditation for VSTL Pro V&V. The only Certificate of Accreditation I found on the EAC's website was issued February 24, 2015, and expired two years later on February 24, 2017. (archived - https://archive.ph/FpJwW). I also noted that this accreditation certificate only provides for the scope of Pro V&V's testing ability to conform with 2005 Voluntary Voting Systems Guidelines (VVSG), which is also referred to as VVSG version 1.0. (see Exhibit SB-11)

12. Also, in early January 2021, I accessed the EAC website to find every possible Certificate of Accreditation for VSTL SLI Compliance. The only Certificate of Accreditation I found on the EAC's website was issued January 10, 2018, and expired THREE years later on January 10, 2021. Strangely, the certificate references the scope of SLI's testing ability as those being for VVSG versions 1.0 and 1.1, yet claims that those voting system standards are from 2002, when in fact they are actually from 2005 (v. 1.0) and 2015 (v. 1.1) respectively.  When viewing the certificate's document properties, it shows (as shown in this Affidavit's Exhibit SB-17) the document was issued January 16, 2018 and was modified November 6, 2019. Curiously, this is contrary to the EAC's history with respect to the listed expiration date when they have issued Certificate(s) of Accreditation to ALL other VSTLs (that could be found on their website); and in violation of their Voting System Test Laboratory Program Manual, Version 2.0 (see this Affidavit's point 10 above). Every other historical Certificate of Accreditation on the EAC's website expired two years (or less) from the issue date. (see Exhibit SB-12)

13. In January 2021, I accessed the EAC website to find all National Institute of Standards and Technology (NIST) lab recommendations as well as EAC invitations to labs to apply to join the EAC VSTL program. The NIST recommendation for SLI Compliance is issued under an old company name (SysTest Labs), but the EAC invitation to apply for accreditation is missing. (archived - https://archive.ph/amL9q)

14. An archived version (from December 17, 2020) of the EAC's VSTL website
    (https://archive.ph/FpJwW) shows that the VSTL SysTest Labs, was re-named SLI
    Global Solutions (see October 10, 2010 letter
    https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLIGlobal_ltr_name_
    change-10.01.10.pdf). Then, it appears that SLI Global Solutions changed their name
    again to SLI Compliance (see January 11, 2016 letter
    https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI%20Org%20Updat
    es%20EAC%202016-01-11.pdf). Additional archival material can be found
    https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/sli-global-
    solutions-formerly-systest-labs. Without the organization charts & ownership information
    for each of the company changes, it is difficult to ascertain whether these are the same
    company (for certain).

15. January 27, 2021, Mr. Jerome Lovato, EAC testing & certification director for voting
    systems issued a memo for both Pro V&V and SLI Compliance, which states that both
    VSTLs have completed all requirements to remain in good standing with the EAC's
    Testing and Certification program per: "section 3.8 of the Voting System Test Laboratory
    Manual, version 2.0:

    > Expiration and Renewal of Accreditation. A grant of accreditation is valid for a
    > period not to exceed two years. A VSTL's accreditation expires on the date
    > annotated on the Certificate of Accreditation. VSTLs in good standing shall renew
    > their accreditation by submitting an application package to the Program Director,
    > consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60
    > days before the accreditation expiration date and no later than 30 days before
    > that date. Laboratories that timely file the renewal application package shall
    > retain their accreditation while the review and processing of their application is
    > pending. VSTLs in good standing shall also retain their accreditation should

circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.

Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed for an extended period." The memo continues on explaining - while this process continues, both VSTLs retain their EAC VSTL accreditation. I am not aware of COVID-19 having taken place in 2017-2019. (see https://www.oregon.gov/gov/eo/eo_20-03.pdf and

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro_VandV_Accreditation_Renewal_delay_memo012721.pdf and

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Accreditation_Renewal_delay_memo012721.pdf)

16. February 1, 2021, the EAC issued new Certificate(s) of Accreditation to both SLI Compliance and Pro V&V. Curiously neither of these certificates have an expiration date. SLI Compliance lists an original accreditation date of February 28, 2007. Pro V&V lists an original accreditation date of February 24, 2015. SLI's original accreditation date seems to correspond to the company's prior name SysTest Labs as outlined in point 14 above. (see

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI%20Certificate%20of%20Accreditation%202021.pdf and

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro%20V%26V%20Accreditation%20Certificate.pdf)

17. Around February 9, 2021, I submitted a request directly on the Election Assistance Commission (EAC) website contact form for Mr. Jerome Lovato, requesting information (or records) from Mr. Lovato. On that same date, I also sent a letter via USPS requesting the same records relating to VSTL SLI Compliance's EAC issued Certificate of Accreditation. On March 5, 2021 the EAC acknowledged this FOIA, which particularly

requested the original copy of SLI's 2018 Certificate of Accreditation originally issued (unmodified) (EAC FOIA number 21-00037). (see Exhibit SB-17)

18. On February 24, 2021, I emailed Ms. Amanda Joiner (ajoiner@eac.gov) requesting public records under FOIA for additional VSTL documentation for both Pro V&V and SLI Compliance. The anticipated record production from the EAC will show: a) whether the EAC issued any intervening Certificate(s) of Accreditation between the only two listed for Pro V&V on the EAC website (one expired 2017 & the other issued 2021); b) whether the EAC issued an earlier version of their 2018 Certificate of Accreditation for SLI Compliance, which may have had an expiration that was more in line with the EAC's VSTL manual (two year expiry, which would have expired January 10, 2020); c) whether either Pro V&V or SLI Compliance timely filed their accreditation renewal applications; AND d) whether the Commissioners voted in favor of extending accreditation renewal to both Pro V&V and SLI Compliance. This FOIA request was acknowledged on March 23, 2021 via email from Ms. Amanda Stevens Joiner (numbered 21-00040). (see Exhibit SB-18)

19. January 4, 2022, Ms. Amanda Joiner advised via email that responsive records under FOIA 21-00037 were estimated to be produced in July 2022; and FOIA 21-00040 were estimated to be produced in August 2022. (see Exhibit SB-19)

20. June 30, 2022, Camden Kelliher with the EAC advised (via email) that responsive records under FOIA 21-00037 were estimated to be produced in September 2022; and FOIA 21-00040 were estimated to be produced in October 2022. (see Exhibit SB-20)

21. July 8, 2022, Camden Kelliher sent the EAC's denial of my request to have FOIAs 21-00037 & 21-00040 processed on an expedited basis. (see Exhibit SB-21)

22. July 1, 2022, I emailed Camden Kelliher (ckelliher@eac.gov) requesting public records under FOIA for all of the EAC's issued Certificate of Accreditation for the VSTL named NTS that covers the years 2011-2015. July 11, 2022 Camden Kelliher acknowledged

receipt as FOIA number 22-00076. An earlier FOIA (22-00066) had claimed to not have any responsive records when asked for Certificate of Accreditation for VSTL NTS covering the time period 2015-2017. (see Exhibit SB-22)

23. July 22, 2021, the EAC posted a memorandum that explained that VSTL Pro V&V was not issued an updated accreditation certificate between 2017-2019 due to administrative error, and further that both Pro V&V and SLI Compliance remained in good standing and retained their accreditation. The memo also states that accreditation of a laboratory cannot be revoked unless the EAC Commissioners vote to revoke the accreditation. (see https://www.eac.gov/sites/default/files/voting_system_test_lab/files/VSTL%20Certificates%20and%20Accreditation.pdf and

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/VSTL%20Certificates%20and%20Accreditation_0.pdf)

24. July 23, 2021, the EAC issued a Notice of Clarification (NOC) 21-01 on VSTL accreditation status. This NOC purports to single-handedly change the EAC's VSTL manual (point 10 above) section 3.8 on accreditation expiration and renewal entirely. I am unaware of any posting in the Federal Register announcing this proposed change; nor am I aware of the EAC announcing opening of public comment for this proposed change; nor am I aware of a vote of the EAC Commissioners in making this change. (see Exhibit SB-24 and https://www.eac.gov/sites/default/files/2021-07/NOC%2021.01_VSTL%20Accreditation%20Status.pdf)

25. July 30, 2022, I emailed NIST a FOIA, which they acknowledged on August 4, 2022, and numbered 2022-002261. My request included records of all NIST National Voluntary Laboratory Accreditation Program (NVLAP) Certificate(s) of Accreditation issued to Pro V&V, NTS, Wyle and SLI. Also included was a request for each of the same labs' renewal applications and the NIST renewal reminder letter. I noted both HAVA section 231(c) and the EAC VSTL manual (point 10 above) section 3.2 through 3.5 illustrate that

NIST NVLAP accreditation and NIST monitoring are CRITICAL to the EAC's VSTL accreditation program. Also that item 113-115 in Tore Maras' sworn Affidavit mentioned above in point number 4 illustrates that NIST NVLAP accreditation for SLI Compliance is also problematic and lacking proper documentation. I also accessed SLI Compliance's website & found two different NVLAP Certificate of Accreditations that overlap in December of 2020, without any explanation. (see Exhibit SB-25)

26. February 24, 2021, I began emailing the Oregon SOS office, requesting various pieces of information about the voting machines used throughout Oregon. Amongst other information & records, the request covered all voting machines' used in the state for the 2017 primary election through the 2020 general election: manufacturer name(s), model & version information, certification information, independent lab/tester name & report date. March 23, 2021 Alma Whalen interim elections manager replied with no voting machine model or version information, no certification or independent lab/tester records. (see Exhibit SB-26)

27. May 5, 2021, I sent a letter via USPS to the SOS requesting records for all 38 election sites used throughout the state for the 2017 primary election through the 2020 general election: purchase & upgrade/update records (as I hoped this would have the manufacturer name(s), model & version information), certification & testing records. May 12, 2021 Sean Foster from the SOS elections division sent an email explaining that the purchase records needed to be obtained from each county elections office. His letter did not provide any certification or lab testing records. (see Exhibit SB-27)

28. May 20, 2021, Sean Foster replies that the certification records can be compiled by June 4, 2021, but that the other records require approximately 60 hours of research, with an estimated cost of $1,500. (see Exhibit SB-28)

29. December 15, 2021, in front of the SOS office in Salem, I hand-delivered Sean Foster payment ($1,500), along with a letter that reminded of my original record request and provided my priority list for a rolling records production. (see Exhibit SB-29)

30. February 11, 2022, After some back & forth communication, Alma Whalen, SOS elections program manager emails the SOS issued Certificate of Approval for all vote systems used in the 2017 primary – 2020 general elections. (see Exhibit SB-30)

31. June 24, 2022, I sent via USPS another record request to the Oregon SOS requesting additional EAC, SOS & VSTL records that lead to the SOS' office issuing their own Certificate of Approval, this time extending to the vote systems used in the 2017-2022 primary elections. (see Exhibit SB-31)

32. July 22, 2022, I followed up with a record request asking the SOS for an accounting of the time spent compiling the records (above point 28, where I was charged $1,500) and further asked for an estimated timeline for the remaining records to be produced. July 27, 2022 Alma Whalen responded that the actual cost was $75 and that the remainder of $1,425 would be refunded.  August 3, 2022 I received a check from the State of Oregon for $1,425, where the description said, "unable to fulfill request". (see Exhibit SB-32)

33. Between July 22, 2022 through August 18, 2022, I requested multiple records from both the Oregon SOS and the Department of Administrative Services (DAS) which will shed light on not only improper: SOS vote system approval, likely knowingly relying upon improper EAC vote system certification and lack of proper EAC VSTL accreditation – BUT will also validate large portions on the sworn affidavit of Tore Maras, mentioned above at point 4, relating to Oregon's .gov server location and website network trails & connections with all 36 counties. Also, records requests for vote systems used for handicapped, overseas and military voters – will shed light on whether any of these systems were "approved" by the Oregon SOS, as is required by Oregon law. (see Exhibit SB-33)

34. June 23-26, 2022, I sent two records request via USPS to every one of Oregon's 36 county election offices requesting records for the vote system: purchase, any updates/upgrades, maintenance, certification and testing. I followed up with many emails to counties requesting the same records. While I have received some purchase and upgrade contracts, these largely do not mention the vote system version, and NONE of the county responses have responded with ANY EAC accreditation records, VSTL inspection/test report/records, nor have any provided EAC Certificate of Compliance.  (for samples see Exhibit SB-34)

35. July 18, 2022, I, along plaintiff Jennifer Gunter and a small group of ladies met in-person with Wasco County clerk Lisa Gambee. We toured the election portion of the facilities, asked questions and received wonderful and transparent information along the tour, about the election and ballot processing. When asked when the current Clear Ballot system was purchased, Lisa told us that it was 2017. I asked what version of Clear Ballot that was (2017) and Lisa told us it was 1.3.3.  I also asked what Clear Ballot version was used for the November 2020 general election, and Lisa told us that it was version 2.1.  I specifically told her that I had concerns that the voting systems in the state were not properly EAC certified, not properly Oregon SOS approved, and that the VSTL lacked proper EAC accreditation.  At this meeting, we took the opportunity to leave a great deal of printed matter for Ms. Gambee.  The printed materials that were left with Ms. Gambee were: a) a full copy of the sworn affidavit of Ms. Tore Maras mentioned above at point 4; b) a full copy of OAR 165-007-0350 mentioned above at point 7; c) a full copy of HAVA mentioned above at point 8; d) a full copy of EAC's vote system testing & certification manual mentioned above at point 9; e) a full copy of the EAC's VSTL manual mentioned above at point 10; f) all available copies of VSTL (EAC) Certificate of Accreditation, for both Pro V&V and SLI Compliance; g) full copies of the EAC memos mentioned above at points 15 & 23; h) most of the communications mentioned above in points 26-30

(including all copies of the Oregon SOS issued Certificate of Approval); and i) all 2018-2021 EAC issued Certificate of Compliance for Clear Ballot Clear Vote systems as shown in point 40 below.

36. July 26, 2022, I, along plaintiff Jennifer Gunter and a small group of ladies met in-person with Douglas County clerk Dan Loomis. We toured the election portion of the facilities, asked questions and received wonderful and transparent information along the tour, about the election and ballot processing. I specifically told him that I had concerns that the voting systems in the state were not properly EAC certified, not properly Oregon SOS approved, and that the VSTL lacked proper EAC accreditation.  At this meeting, we took the opportunity to leave a great deal of printed matter for Mr. Loomis.  The printed materials that were left with Mr. Loomis were: a) a full copy of the sworn affidavit of Ms. Tore Maras mentioned above at point 4; b) a full copy of OAR 165-007-0350 mentioned above at point 7; c) a full copy of HAVA mentioned above at point 8; d) a full copy of EAC's vote system testing & certification manual mentioned above at point 9; e) a full copy of the EAC's VSTL manual mentioned above at point 10; f) all available copies of VSTL (EAC) Certificate of Accreditation, for both Pro V&V and SLI Compliance; g) full copies of the EAC memos mentioned above at points 15 & 23; h) most of the communications mentioned above in points 26-30 (including all copies of the Oregon SOS issued Certificate of Approval); and i) all 2018-2021 EAC issued Certificate of Compliance for Clear Ballot Clear Vote systems as shown in point 40 below.

37. July 29, 2022, I, along plaintiff Jennifer Gunter and a small group of ladies met in-person with Deschutes County clerk Steve Dennison. We toured the election portion of the facilities, asked questions and received wonderful and transparent information along the tour, about the election and ballot processing. When asked what version of Clear Ballot was used for the November 2020 general election, Mr. Dennison told us that it was version 2.1. I specifically told him that I had concerns that the voting systems in the state

were not properly EAC certified, not properly Oregon SOS approved, and that the VSTL lacked proper EAC accreditation.  At this meeting, we took the opportunity to leave a great deal of printed matter for Mr. Dennison.  The printed materials that were left with Mr. Dennison were: a) a full copy of the sworn affidavit of Ms. Tore Maras mentioned above at point 4; b) a full copy of OAR 165-007-0350 mentioned above at point 7; c) a full copy of HAVA mentioned above at point 8; d) a full copy of EAC's vote system testing & certification manual mentioned above at point 9; e) a full copy of the EAC's VSTL manual mentioned above at point 10; f) all available copies of VSTL (EAC) Certificate of Accreditation, for both Pro V&V and SLI Compliance; g) full copies of the EAC memos mentioned above at points 15 & 23; h) most of the communications mentioned above in points 26-30 (including all copies of the Oregon SOS issued Certificate of Approval); and i) all 2018-2021 EAC issued Certificate of Compliance for Clear Ballot Clear Vote systems as shown in point 40 below.

38. August 1, 2022, I, along with a small group of ladies met in-person with Washington County election manager Dan Forester. We toured the election portion of the facilities, asked questions and received wonderful and transparent information along the tour, about the election and ballot processing. I specifically told him that I had concerns that the voting systems in the state were not properly EAC certified, not properly Oregon SOS approved, and that the VSTL lacked proper EAC accreditation.  When discussing election result reporting, Mr. Forester conveyed that because the Clear Ballot system was not connected to the internet, while tabulating (or counting), they would periodically take secure USB (or thumb) sticks and download onto them, the cumulative results from the Clear Ballot system and then transfer the USB stick to another computer that was connected to the internet (and the back-end of the SOS's results website), to then periodically upload their county's results.  When I asked if their office still had the November 2020 general election (unofficial result) USB sticks, I was surprised to learn

that Mr. Forester said they didn't keep them (he said they re-use them at the next election and/or write over them with the results from the next election). When questioned about record retention, Mr. Forester further asserted that the USB sticks were not part of the election records that are required to be kept. At this meeting, we took the opportunity to leave a great deal of printed matter for Mr. Forester.  The printed materials that were left with Mr. Forester were: a) a full copy of the sworn affidavit of Ms. Tore Maras mentioned above at point 4; b) a full copy of OAR 165-007-0350 mentioned above at point 7; c) a full copy of HAVA mentioned above at point 8; d) a full copy of EAC's vote system testing & certification manual mentioned above at point 9; e) a full copy of the EAC's VSTL manual mentioned above at point 10; f) all available copies of VSTL (EAC) Certificate of Accreditation, for both Pro V&V and SLI Compliance; g) full copies of the EAC memos mentioned above at points 15 & 23; h) most of the communications mentioned above in points 26-30 (including all copies of the Oregon SOS issued Certificate of Approval); and i) all 2018-2021 EAC issued Certificate of Compliance for Clear Ballot Clear Vote systems as shown in point 40 below.

39. August 8, 2022, I, along with a small group of ladies met in-person with Clackamas County election manager Rebekah Stern Doll. We toured the election portion of the facilities, asked questions and received wonderful and transparent information along the tour, about the election and ballot processing. I specifically told Rebekah that I had concerns that the voting systems in the state were not properly EAC certified, not properly Oregon SOS approved, and that the VSTL lacked proper EAC accreditation.  At this meeting, we took the opportunity to leave a great deal of printed matter for Rebekah. The printed materials that were left with Rebekah were: a) a full copy of the sworn affidavit of Ms. Tore Maras mentioned above at point 4; b) a full copy of OAR 165-007-0350 mentioned above at point 7; c) a full copy of HAVA mentioned above at point 8; d) a full copy of EAC's vote system testing & certification manual mentioned above at point 9;

e) a full copy of the EAC's VSTL manual mentioned above at point 10; f) all available copies of VSTL (EAC) Certificate of Accreditation, for both Pro V&V and SLI Compliance; g) full copies of the EAC memos mentioned above at points 15 & 23; h) most of the communications mentioned above in points 26-30 (including all copies of the Oregon SOS issued Certificate of Approval); and i) all 2018-2022 EAC issued Certificate of Compliance for Hart Intercivic systems as shown in point 40 below.

40. In July and August of 2022, I accessed the EAC website to download various voting system certifications (Certificate of Compliance) for manufacturers: ES&S, Hart Intercivic and Clear Ballot. I noted that some certificates referenced conformance with VVSG from 2002, which were standards that preceded VVSG version 1.0 (approved by the EAC commissioners on Dec. 13, 2005). Some certificates referenced conformance with VVSG from 2005, which is identical to version 1.0. BUT none of the certificates referenced that the vote systems were in conformance with VVSG 1.1, which are the set of revised standards that were unanimously approved by the EAC commissioners on March 31, 2015 (see https://www.eac.gov/voting-equipment/voluntary-voting-system-guidelines). (see Exhibit SB-40)

41. August 3, 2022, I emailed Senator Kim Thatcher requesting her help gathering a list of all vote systems: version, model and manufacturer information for all 36 counties in the state (**used in the November 2020 general election**) from the Oregon SOS office. Her staff emailed the Oregon SOS office, whom responded with a 35-county list of the vote systems used in Oregon in the November 2020 general election. Interestingly, the Clear Ballot Clear Vote version listed in the SOS response to Sen. Thatcher (2.2) is different than the version that I was provided from a Washington County record request and also, what both the Deschutes & Wasco County Clerks verbally told me in above point 35 & 37. Also, I don't see how it would have been legal for any county in Oregon to use the Clear Ballot Clear Vote 2.2 system prior to the system's approval by the Oregon SOS on

2/14/2022 – OR prior to the EAC's certification on 12/23/2021 (see

https://sos.oregon.gov/elections/Documents/vote-systems/Clear-Ballot-2-2-

Certification.pdf and https://sos.oregon.gov/elections/Documents/vote-systems/CBG-

ClearVote-2-2-Certificate-Scope-of-Conformance-12-23-2021.pdf and Exhibit SB-41)

42. In early February 2021, it was brought to my attention that the EAC has gone through

periods of time where the Commission did lack a quorum, so could not have conducted

commission business, including votes on VSTL accreditation & accreditation renewal.

According to Wikipedia, the lack of quorum (3 is a quorum) plagued the EAC from 2010

to December 15, 2014.

> In 2010, the EAC lost its quorum of Commissioners, after the resignation or end of term of Hunter (2008), Rodriguez (2009) and Hillman (2010), preventing many normal operational duties; and was without any Commissioners by 2011 after the resignation of Davidson. Bills were subsequently drafted to end the Commission. Specifically, Representative Gregg Harper introduced a bill to windup the EAC and transfer some of its functions to the Federal Election Commission.[5]

> The EAC did not regain a quorum until December 16, 2014, when the U.S. Senate confirmed three Commissioners, Thomas Hicks, Matthew V. Masterson, and Christy McCormick.[6] Masterson resigned in 2018; and on January 2, 2019, President Donald Trump's nominees, Benjamin Hovland and Donald Palmer, were confirmed by the US Senate,[7] and took office in February 2019.

(screen capture from Wikipedia)

I presume the EAC held a quorum from 12/16/2014 to 3/22/2018, because I didn't find

news of the EAC lacking a quorum again until the EAC 2018-2019 Update (see the

graphic on page 43/60

https://www.eac.gov/sites/default/files/event_document/files/BrianNewbyEACUpdatesSB

Presentation.pdf). Also, politico.com reports -



(screen capture from politico.com)

It appears the EAC lacked a full quorum from 2/23/2018 to 2/5/2019. Beginning on

2/6/2019 the EAC again had a full quorum and has not lacked a quorum again, since that

time (that I can find news of).

43. The morning of August 18, 2022, I discovered that the Oregon SOS posted a new

webpage to their website (https://sos.oregon.gov/elections/Pages/voting-systems.aspx).

After researching in archive.org, it appears that the SOS did not post this as a "live"

webpage until sometime 8/12/2022 to 8/13/2022 (archived versions

https://archive.ph/https://sos.oregon.gov/elections/Pages/security.aspx). Based upon this

new SOS webpage and the information provided to Senator Thatcher (mentioned above

in point 41), I believe it is likely that the SOS omitted their office's Certificate of Approval

for the ES&S Unity 3.4.1.0, which is NOT a specifically named vote tally system as being

"approved" by the SOS on any of their Certificate(s) of Approval. (see Exhibit SB-43)

44. One of the most prolific SOS Certificate of Approval signatories for the biggest gap in

EAC VSTL accreditation (for Pro V&V, spanning Feb 2017-Dec 2020) was Mr. Stephen

N. Trout. I found that he should have KNOWN better, as he was also a member of the

EAC Standards Board. (archived https://archive.ph/Clf5G)


I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of

August, 2022.

_____
Signature

**NOTARY ACKNOWLEDGMENT**

State of Oregon                    )
                                   )
County of Washington               )

The foregoing instrument was acknowledged before me this 23rd day of
August_____, 2022, by the undersigned, Shannon Berlant , who is personally
known to me or satisfactorily proven to me to be the person whose name is subscribed within
the instrument.

_____
Signature

Allyssah Annette Brown
Notary Public

My Commission Expires: 8/23/2022

OFFICIAL STAMP
ALLYSSAH BROWN
NOTARY PUBLIC - OREGON
COMMISSION NO. 1013748
MY COMMISSION EXPIRES JUNE 21, 2026



**United States Election Assistance Commission**

## Certificate of  Accreditation

# Pro V&V, Inc.
## Huntsville, Alabama

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Pro V&V is  also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

**Effective Through**

February 24, 2017

Date:  2/24/15

**Acting Executive Director, U.S. Election Assistance Commission**

EAC Lab Code:  **1501**

Exhibit SB-11



**United States Election Assistance Commission**

## Certificate of  Accreditation

# SLI Compliance,
# Division of Gaming Laboratories International, LLC
## Wheat Ridge, Colorado

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards, the Voluntary Voting Systems Guidelines versions 1.0 and 1.1 under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. SLI Compliance is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

January 10, 2021

Date:  1/10/18

*Brian Newby,*
*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code:  **0701**

Exhibit SB-12



**United States Election Assistance Commission**



## Certificate of Accreditation

# Wyle Laboratories, Inc.
## Huntsville, Alabama

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards and the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Wyle is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

**Effective Through**

October 4, 2009

Date: 10/04/2007

*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code:  0704

# Exhibit SB-12



**United States Election Assistance Commission**



## Certificate of Accreditation

# Wyle Laboratories, Inc.
## Huntsville, Alabama

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Wyle is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

April 27, 2012

Date: 5/04//10

*Chair, U.S. Election Assistance Commission*

EAC Lab Code: **0704**

Exhibit SB-12



**United States Election Assistance Commission**

## Certificate of Accreditation

# SysTest Labs, LLC
## Denver, CO

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards and the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. SysTest is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

February 28, 2009

Date: 2/28/07

*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **0701**

Exhibit SB-12



**United States Election Assistance Commission**



**Certificate of Accreditation**

# SysTest Labs, LLC
## Denver, CO

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. SysTest is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

***Effective Through***
_____

July 16, 2011

Date: 7/16/09

***Chair, U.S. Election Assistance Commission***

EAC Lab Code: **0701**

Exhibit SB-12



**United States Election Assistance Commission**



**Certificate of Accreditation**

# InfoGard Laboratories, Inc.
## San Luis Obispo, California

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards and the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. InfoGard is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

June 20, 2009

Date: 6/20/07

*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **0703**

Exhibit SB-12



**United States Election Assistance Commission**

## Certificate of Accreditation

# iBeta Quality Assurance
## Aurora, Colorado

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards and the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. iBeta is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

February 28, 2009

Date: 2/28/07

*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **0702**

Exhibit SB-12



**United States Election Assistance Commission**



**Certificate of Accreditation**

# iBeta Quality Assurance
## Aurora, Colorado

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. iBeta is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

_____

July 16, 2011

Date: 7/16//09

**Chair, U.S. Election Assistance Commission**

EAC Lab Code:  **0702**

Exhibit SB-12

February 9, 2021


U.S. Election Assistance Commission
Attn: Public Information / FOIA Office
633 3rd Street N.W., Suite 200
Washington, DC 20001


RE: Voting Systems Testing Laboratories and Manuals


To Whom It May Concern,

First, please know that I submitted this request for information, directly on your website contact form
here - https://www.eac.gov/jerome-lovato

Your current webpage https://www.eac.gov/voting-equipment/certified-voting-systems has a document
entitled "Voting System Testing and Certification Program Manual" (the hyperlinked text points to this
document https://www.eac.gov/sites/default/files/eac_assets/1/28/Cert.Manual.4.1.15.FINAL.pdf). Is
this the most recent version of this manual, or is there a more recent one?  I ask, because a different
part of your website (this webpage https://www.eac.gov/voting-equipment/voting-system-test-
laboratories-vstl) has linked text to what appears to be a different version of this manual (linked text
points to https://www.eac.gov/sites/default/files/eac_assets/1/6/Cert_Manual_7_8_15_FINAL.pdf). I
would like you to forward the current version of this manual which was in effect as of 11/3/2020; AND,
the current manual effective as of today, February 9, 2021. Please send both and make it clear which is
which.

The second issue I am writing you about has to do with the current Certificate of Accreditation for the
VSTL SLI Compliance Division of Gaming Laboratories International, LLC dated January 10, 2018 signed
by Brian Newby. (linked in the text of this page https://www.eac.gov/voting-equipment/voting-system-
test-laboratories-vstl/sli-compliance-division-gaming-laboratories and points to this document
https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Certificate_of_A
ccreditation011018.pdf). Please provide a copy of the most up-to-date certificate, as this certificate
expired January 10, 2020. Also, the meta data on the file at the captioned document link indicates that
the file was created January 16, 2018 10:32:31 am, yet the file was modified November 6, 2019 10:53:44
am.  Please forward a copy of the original, un-modified file dated January 16, 2018 10:32:31 am.

Thank you for your attention to this matter.

Sincerely,

Exhibit SB-17



Exhibit SB-17



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

March 5, 2021

Shannon Berlant
8290 SW Peters Rd.
Portland, OR 97224
smberlant@yahoo.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request:

> The current version of the "Voting System Testing and Certification Program Manual" which
> was in effect as of 11/3/2020 and the current manual effective as of February 9, 2021.

> Additionally, you request a copy of the most recent Certificate of Accreditation for the VSTL
> SLI Compliance Division of Gaming Laboratories International, LLC and a copy of the
> original, un-modified filed dated January 16, 2018 10:32:31 am.

Pursuant to the Freedom of Information Act and EAC regulations, the EAC will process your
request. Please be advised that due to the coronavirus pandemic we are experiencing additional
delays in processing Freedom of Information Act requests. If you have any questions or concerns
please contact my office at your convenience.

Sincerely,

Amanda Stevens Joiner, FOIA Officer
Associate Counsel
U.S. Election Assistance Commission
ajoiner@eac.gov

Exhibit SB-17



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

March 23, 2021

Shannon Berlant
503.335.3453
smberlant@yahoo.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request:

"For both VSTLs Pro V&V, as well as SLI Compliance (and under their previous names) -
please provide:

1) From 2016 thru December 2020 - all original emails, with official EAC-issued (unedited)
Certificate of Accreditation as attachment to both listed VSTLs

2) From 2016 thru December 2020 -all original (unedited) EAC-issued Certificate of
Accreditation for the listed VSTLs

3) From 2016 thru December 2020 - all EAC commissioner meeting minutes, where VSTL
accreditation was discussed

4) From 2016 thru December 2020 - all applications for accreditation renewal or
supplemental information the VSTLs provided to the EAC."

The EAC will process your request in accordance with the Freedom of Information Act and EAC
regulations. Please be advised that due to the coronavirus pandemic we are experiencing
additional delays in processing Freedom of Information Act requests. If you have any questions
or concerns please contact my office at your convenience.

Sincerely,

Amanda Stevens Joiner, FOIA Officer
Associate Counsel
U.S. Election Assistance Commission
ajoiner@eac.gov

Exhibit SB-18

RE: Public Record Request - # 21-00040

From:  Amanda Joiner (ajoiner@eac.gov)

To:    smberlant@yahoo.com

Date:  Tuesday, January 4, 2022 at 07:26 AM PST

Good Morning Ms. Berlant,

Thank you for contacting me for an update on 21-00037 and 21-00040. I apologize for missing your call and am happy to provide you with an update on your requests.

<u>21-00037</u>

-

FOIA request 21-00037 was received on February 9, 2021 and acknowledged on March 5, 2021. There are currently 50 requests pending prior to 21-00037. Based on your position in the queue we estimate sending a completed response by July 2022. Note this is an estimate and subject to change.

<u>21-00040</u>

-

FOIA request 21-00040 was received on February 25, 2021 and acknowledged on March 23, 2021. There are currently 53 requests pending prior to 21-00037. Based on your position in the queue we estimate sending a completed response by August 2022. Note this is an estimate and subject to change.

If you have any additional questions please do not hesitate to contact my office.

Thank you,

-----------------------------------------------------------------

Amanda Joiner | Associate Counsel

U.S. Election Assistance Commission

633 3rd Street NW, Suite 200 | Washington, DC 20001

www.eac.gov …

Exhibit SB-19

Re: Checking on status on prior FOIA's

| | |
|---|---|
| From: | Camden Kelliher (ckelliher@eac.gov) |
| To: | smberlant@yahoo.com |
| Date: | Thursday, June 30, 2022 at 11:22 AM PDT |

Good afternoon,

Please see below for an updated estimate.

21-00037

FOIA request 21-00037 was received on February 9, 2021 and acknowledged on March 5, 2021. There are currently 35 requests pending prior to 21-00037. Based on your position in the queue we estimate sending a completed response by September 2022. Note this is an estimate and subject to change.

21-00040

FOIA request 21-00040 was received on February 25, 2021 and acknowledged on March 23, 2021. There are currently 38 requests pending prior to 21-00040. Based on your position in the queue we estimate sending a completed response by October 2022. Note this is an estimate and subject to change.

If you have any additional questions please do not hesitate to contact my office

**Camden Kelliher** | Associate Counsel
U.S. Election Assistance Commission
633 3rd Street NW, Suite 200 | Washington, DC 20001

Exhibit SB-20



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

                                                            VIA EMAIL

July 8, 2022

Shannon Berlant
smberlant@yahoo.com

Greetings:

This letter is in response to your request to expedite FOIA requests 21-00037 and 21-00040.

FOIA request 21-00037 was received on February 9, 2021 and acknowledged on March 5, 2021. The records requested in 21-00037 include:

"The current version of the "Voting System Testing and Certification Program Manual" which was in effect as of 11/3/2020 and the current manual effective as of February 9, 2021.

Additionally, you request a copy of the most recent Certificate of Accreditation for the VSTL SLI Compliance Division of Gaming Laboratories International, LLC and a copy of the original, un-modified filed dated January 16, 2018 10:32:31 am."

FOIA request 21-00040 was received on February 25, 2021 and acknowledged on March 23, 2021. The records requested in 21-00040 include:

"For both VSTLs Pro V&V, as well as SLI Compliance (and under their previous names) - please provide:

1) From 2016 thru December 2020 - all original emails, with official EAC-issued (unedited) Certificate of Accreditation as attachment to both listed VSTLs

2) From 2016 thru December 2020 -all original (unedited) EAC-issued Certificate of Accreditation for the listed VSTLs

3) From 2016 thru December 2020 - all EAC commissioner meeting minutes, where VSTL accreditation was discussed

4) From 2016 thru December 2020 - all applications for accreditation renewal or supplemental information the VSTLs provided to the EAC."

Neither original request included a request for expedited processing. In both FOIA acknowledgment letters the EAC informed you that the requests would be processed pursuant to

Exhibit SB-21



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

the Freedom of Information Act and EAC regulations. The EAC processes FOIA requests on a first-in, first-out basis. The acknowledgment letters also informed you that due to the coronavirus pandemic we are experiencing additional delays in processing Freedom of Information Act requests.

On June 30, 2022 you submitted a request for an update on the status of these requests. On June 30, 2022 the EAC provided the following update:

> "21-00037
>
> FOIA request 21-00037 was received on February 9, 2021 and acknowledged on March 5, 2021. There are currently 35 requests pending prior to 21-00037. Based on your position in the queue we estimate sending a completed response by September 2022. Note this is an estimate and subject to change.
>
> 21-00040
>
> FOIA request 21-00040 was received on February 25, 2021 and acknowledged on March 23, 2021. There are currently 38 requests pending prior to 21-00040. Based on your position in the queue we estimate sending a completed response by October 2022. Note this is an estimate and subject to change."

On June 30, 2022 you responded to the update with the following:

> "This is unacceptable. The federal laws surrounding record retention will make it so that the records for the 2020 general election will be destroyed before I am even able to receive a FOIA response from your agency. I REQUEST THAT BOTH FOIAS (21-00037 and 21-00040) BE EXPEDITED TO IMMEDIATELY BE FULFILLED."

On July 6, 2022 the EAC requested additional information in order to process your request for updated information:

> "In order to consider your request for expedited processing, the EAC requires additional information.  Pursuant to FOIA and EAC regulations, requesters for expedited processing must include in their requests a statement setting forth the basis for the claim that a "compelling need" exists for the requested information, certified by the requester to be true and correct to the best of his or her knowledge and belief. 11 CFR § 9405.7(h)(2). 'Compelling need' means, with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal government activity. 11 CFR § 9405.7(h)(1). Pursuant to FOIA and EAC policy, no records potentially responsive to this request would be destroyed. Therefore, to

Exhibit SB-21



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

consider expedition for either request, please provide a statement setting forth the basis
for the claim that a 'compelling need' exists for the requested information."

On July 6, 2022 you responded to the request for additional information with the following:

"While I am a member of the general public, I had made this FOIA request, so that I can
distribute the produced records to several media organizations and election integrity
groups that I volunteer with; I also have every intention of distributing the information of
improper VSTL accreditation and/or improper EAC vote system certification and/or
improper certification by our state's Secretary of State. Our state's Secretary of State
relied upon either improper VSTL accreditation by the EAC and/or she relied upon
improper EAC vote system certification to issue her own state agency certification.
There is a compelling need for the information to be released well in advance of the
federal records retention expiration for the 2020 general election. Jurisdictions will not be
required to keep the election records beyond September 2022, so I need this request
expedited ASAP.

Further, neither of these record requests are complex, they should be an easy search of
your agency emails.

Please immediately process my request to expedite my FOIAs 21-00037 and 21-00040."

Your request for expedited processing has been denied pursuant to 11 C.F.R. § 9405.7(h). The
request for expedition does not adequately demonstrate that you are a "person primarily engaged
in disseminating information". The determination of whether a requester "qualifies as a person
primarily engaged in information dissemination is based solely on the record before the
[agency]." *Energy Pol'y Advocs. v. U.S. Dep't of the Interior*, 2021 WL 4306079, at *3 (D.D.C.
Sept. 22, 2021). Pursuant to caselaw and legislative history, the standard of "primarily engaged"
requires that information dissemination be the main activity of the requestor," and "[a] requestor
who only incidentally engages in information dissemination ... would not satisfy this
requirement." *Landmark Legal Found. v. E.P.A.*, 910 F. Supp. 2d 270, 276 (D.D.C. 2012) (citing
H.R. Rep. No. 104–795, at 26 (1996). Your request notes that as a member of the general public,
you intend to distribute the information to organizations that you volunteer with. These
statements do not sufficiently establish that information dissemination is your main activity.

If you interpret any portion of this response as an adverse action, you may appeal this action to
the Election Assistance Commission.  Your appeal must be in writing and sent to the address set
forth below.  Your appeal must be postmarked or electronically transmitted within 90 days from
the date of the acknowledgment to your request.  Please include your reasons for reconsideration
and attach a copy of this and subsequent EAC responses.

U.S. Election Assistance Commission

Exhibit SB-21



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

FOIA Appeals
633 3rd Street NW, Suite 200
Washington, DC 20001

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you have any questions please contact my office at your convenience.

Sincerely,

*Camden Kelliher*

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov

Exhibit SB-21



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

July 11, 2022

Shannon Berlant
smberlant@yahoo.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request:

"This is a request for public records under FOIA.  At your earliest convenience, please
provide and electronic copy of the EAC's Certificate of Accreditation for the VSTL named
NTS that covers the years 2011-2015"

Pursuant to 11 CFR § 9405.10 as a requester designated as "other," you will be charged search
and duplication fees. However, the first two hours of search time and the first 100 pages of
duplication are free. You will not be charged fees for review of documents.  The EAC estimates
that this FOIA request will not require more than 2 free hours of search time. Therefore, the EAC
does not anticipate that there will be fees associated with this request

We have determined we will process your request pursuant to the Freedom of Information Act
and EAC regulations. This request has been assigned file number 22-00076. Please be advised
that due to the coronavirus pandemic we are experiencing additional delays in processing
Freedom of Information Act requests. You have the right to seek assistance from the EAC FOIA
Public Liaison if you have questions regarding processing delays, transparency, request status,
and dispute resolution.

Amanda Joiner, FOIA Public Liaison
ajoiner@eac.gov
301-563-3919

If you have any questions please contact my office at your convenience.

Sincerely,

*Camden Kelliher*

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov

Exhibit SB-22



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

June 30, 2022



Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of Information Act request (No. 22-00066):

> "Please provide an electronic copy of the NTS Huntsville Laboratory Certificate of Accreditation from the EAC for the dates of 2015-2017."

The EAC does not possesses records responsive to your request.

This letter completes the response to your request. If you interpret any portion of this response as an adverse action, you may appeal this action to the Election Assistance Commission. Your appeal must be in writing and sent to the address set forth below. Your appeal must be postmarked or electronically transmitted within 90 days from the date of the acknowledgment to your request. Please include your reasons for reconsideration and attach a copy of this and subsequent EAC responses.

> U.S. Election Assistance Commission
> FOIA Appeals
> 633 3rd Street NW, Suite 200
> Washington, DC 20001

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you have any questions please contact my office at your convenience.

Sincerely,

*Camden Kelliher*

Exhibit SB-22



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov

Exhibit SB-22



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

August 17, 2022

Shannon Berlant
smberlant@yahoo.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request:

"I would like a copy of all communication(s) from any VSTL and/or vote system
manufacturer that submitted a request for clarification, which lead to the EAC issuing NOC
21-01 (https://www.eac.gov/sites/default/files/2021-
07/NOC%2021.01_VSTL%20Accreditation%20Status_1.pdf)"

Pursuant to 11 CFR § 9405.10 as a requester designated as "other," you will be charged search
and duplication fees. However, the first two hours of search time and the first 100 pages of
duplication are free. You will not be charged fees for review of documents.  The EAC estimates
that this FOIA request will not require more than 2 free hours of search time. Therefore, the EAC
does not anticipate that there will be fees associated with this request.

We have determined we will process your request pursuant to the Freedom of Information Act
and EAC regulations. This request has been assigned file number 22-00175. Please be advised
that due to the coronavirus pandemic we are experiencing additional delays in processing
Freedom of Information Act requests. You have the right to seek assistance from the EAC FOIA
Public Liaison if you have questions regarding processing delays, transparency, request status,
and dispute resolution.

Amanda Joiner, FOIA Public Liaison
ajoiner@eac.gov
301-563-3919

If you have any questions please contact my office at your convenience.

Sincerely,

*Camden Kelliher*

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov

Exhibit SB-24



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Institute of Standards and Technology**
Gaithersburg, Maryland 20899-0001

Shannon Berlant
Delivered via email to: smberlant@yahoo.com

Dear Ms. Berlant:

This acknowledges receipt of your July 30, 2022, Freedom of Information Act (FOIA) request to the National Institute of Standards and Technology (NIST) in which you requested a copy of the following:

**"1) For the lab SLI, that applied to be part of NIST's NVLAP program, please provide a copy of their completed initial application form.**
**2) For the labs Pro V&V, Wyle and NTS - please provide a copy of their completed initial application form.**
**3) For the labs Pro V&V, SLI, Wyle and NTS - please provide a copy of all letters issued by NIST (Dept of Commerce) advising them that they were approved and/or receiving NVLAP Accreditation, along with a copy of the certificate.**
**4) For the labs Pro V&V, SLI, Wyle and NTS - please provide a copy of the letter sent by NIST (Dept of Commerce) reminding the lab that they must renew their accreditation.**
**5) For the labs Pro V&V, SLI, Wyle and NTS - please provide a copy of the lab's completed renewal application form, for each renewal."**

Your request was received at the FOIA Control Desk on August 1, 2022, and was assigned FOIA Log # DOC-NIST-2022-002261.

FOIA allows agencies twenty working days to make a determination on the request.  However, it may not always be possible to provide the documents within this time period.  In some cases, we may take an extension and will advise you.  Please be advised that your request may be subject to fees for search, review, and reproduction costs.  Should this be the case, you will be given an estimate of the costs.  Fee estimates are developed in good faith and are based on our reasonable judgment.  However, due to the unique nature of each request and complexity of documents involved, actual costs to search and review the material may vary from the original estimate.

Nina Argent, Management Analyst of my office, is the contact point for processing your request. If you have any questions regarding your pending FOIA request, she may be reached by email at nina.argent@nist.gov.

Sincerely,

CATHERINE
FLETCHER
Digitally signed by CATHERINE
FLETCHER
Date: 2022.08.03 11:49:56 -04'00'

Catherine S. Fletcher
Freedom of Information Act Officer



Exhibit SB-25

**United States Department of Commerce**
**National Institute of Standards and Technology**



# Certificate of Accreditation to ISO/IEC 17025:2017

**NVLAP LAB CODE: 200733-0**

## SLI Compliance
Wheat Ridge, CO

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services,*
*listed on the Scope of Accreditation, for:*

## Voting System Testing

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017.*
*This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality*
*management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*



2020-10-07 through 2020-12-31

*Effective Dates*

*For the National Voluntary Laboratory Accreditation Program*

Exhibit SB-25

 **National Voluntary Laboratory Accreditation Program** 

## SCOPE OF ACCREDITATION TO ISO/IEC 17025:2017

**SLI Compliance**
4720 Independence Street
Wheat Ridge, CO 80033
Ms. Traci Mapps
Phone: 303-384-5602
Email: tmapps@slicompliance.com
http://www.slicompliance.com

**VOTING SYSTEM TESTING**                    **NVLAP LAB CODE 200733-0**

| Code | Description |
|---|---|
| 22/V01 | Federal Election Commission (FEC) Voting System Standard of 2002 (VSS-2002), including the Help America Vote Act (HAVA) requirements and the Election Assistance Commission (EAC) Voluntary Voting System Guidelines of 2005 (VVSG-2005) and EAC VVSG 1.1 (2015), for core test methods involving: |
| 22/V01a | a.  Technical Data Package review; |
| 22/V01b | b.  Physical Configuration Audit (including examination of hardware components for safety, usability/accessibility, maintainability/operability of the equipment, and operational validation against user documentation); |
| 22/V01c | c.  Source Code Review; |
| 22/V01d | d.  Witnessed Build and System Installation Testing; |
| 22/V01e | e.  Functional Configuration Audit (including the operational testing of hardware and software components and validation against user documentation); |
| 22/V01f | f.  System Integration testing (including validation of accuracy, reliability, other high volume tests, and validation of processes and tools provided to support the election operation); and |
| 22/V01g | g.  Telecommunication and Security testing. |

_For the National Voluntary Laboratory Accreditation Program_

Exhibit SB-25

**United States Department of Commerce**
**National Institute of Standards and Technology**



# Certificate of Accreditation to ISO/IEC 17025:2017

**NVLAP LAB CODE: 200733-0**

**SLI Compliance**

Wheat Ridge, CO

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services,*
*listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017.*
*This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality*
*management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*



2020-12-17 through 2021-12-31
*Effective Dates*

*For the National Voluntary Laboratory Accreditation Program*

Exhibit SB-25

# National Voluntary
# Laboratory Accreditation Program



## SCOPE OF ACCREDITATION TO ISO/IEC 17025:2017

### SLI Compliance
4720 Independence Street
Wheat Ridge, CO 80033
Ms. Traci Mapps
Phone: 303-384-5602
Email: tmapps@slicompliance.com
http://www.slicompliance.com

## VOTING SYSTEM TESTING                    NVLAP LAB CODE 200733-0

| Code | Description |
|---|---|
| 22/V01 | Federal Election Commission (FEC) Voting System Standard of 2002 (VSS-2002), including the Help America Vote Act (HAVA) requirements and the Election Assistance Commission (EAC) Voluntary Voting System Guidelines of 2005 (VVSG-2005) and EAC VVSG 1.1 (2015), for core test methods involving: |
| 22/V01a | a.  Technical Data Package review; |
| 22/V01b | b.  Physical Configuration Audit (including examination of hardware components for safety, usability/accessibility, maintainability/operability of the equipment, and operational validation against user documentation); |
| 22/V01c | c.  Source Code Review; |
| 22/V01d | d.  Witnessed Build and System Installation Testing; |
| 22/V01e | e.  Functional Configuration Audit (including the operational testing of hardware and software components and validation against user documentation); |
| 22/V01f | f.  System Integration testing (including validation of accuracy, reliability, other high volume tests, and validation of processes and tools provided to support the election operation); and |
| 22/V01g | g.  Telecommunication and Security testing. |

_____

_For the National Voluntary Laboratory Accreditation Program_

Exhibit SB-25

public information request

From: S M B (smberlant@yahoo.com)
To:     alma.whalen@oregon.gov
Date: Wednesday, February 24, 2021 at 01:59 PM PST

Ms. Whalen,

Free, fair and open elections are the bedrock of our democratic process. I looked over your website and was quite surprised that most of this information wasn't transparent for the public. It should be easily and publicly available there, on your website.  Per ORS 192.314, the information should be disclosed, should the public request it. My preferred method of receipt of this information is via link to website or cloud storage folder, but if need be - I can bring a USB stick to your office.  This is my request for public information.

I am working with several other concerned Oregonians, requesting the below information from each of Oregon's 36 county elections offices.  Since the Oregon Secretary of State operates or oversees two additional election sites - this request is for those two additional election sites.

For elections occurring from the 2017 Primary election, thru the 2020 General election, please provide:

Copies of all purchase orders, contracts, agreements, memorandums of understanding, etc. - RELATING TO ALL election machines, equipment and/or systems used to: cast ballots, mark ballots, scan, tabulate or adjudicate the captioned elections for your county. This should include information about the machine, equipment or system's: purchase, certification(s), testing, calibration, source code escrow, update(s), upgrade(s), trouble report(s), initial RFQ; irregardless of whether the document or communication was: internal, external, inter-agency or intra-agency.

In addition to the above information, please answer for each election machine, equipment or system:

1) Acquisition date
2) First date of use
3) Last date of use
4) Will it continue to be used?
5) Name of company/agency acquired from
6) Manufacturer's name
7) Model and version
8) Any additional description, ie machine type
9) voting machine last update (hardware or firmware)
10) voting machine software name
11) voting machine software version
12) voting machine software last update
13) if this listing is for a voting system and it includes COTS, for each COTS item in the system, please provide the manufacturer's name, model/version, brief item description.
17) Name of any (and all) certification company(ies)
18) last certification date
19) Name of independent labs/testers
20) last lab/test report date
21) In which election(s) was utilized
22) Does this equipment/system have network capabilities?
23) Before election scanning/tabulation, is this connected to a network?
24) During election scanning/tabulation, is this connected to a network?
25) After election scanning/tabulation, is this connected to a network?
26) If ever connected to a network, are other devices on the same network connected to the intranet or internet?
27) Does any part of this equipment/system have built-in cellular or wifi capability?
28) If cellular or wifi capability, does the machine utilize this function?
29) Is the product build manual available for inspection?
30) Is the product operation and maintenance manual available for inspection?
31) Are there any external USB or other storage device capabilities?
32) Are the USB (or other storage device) capability utilized for elections?
33) If yes, how many USB or other storage devices are there and what is their chain of custody?

Per ORS 192.368 I hereby request that my name, address, email address or any other personally identifiable information which you might receive as a result of this public information request, ARE NOT to be disclosed to anyone.

Thank you,
Shannon Berlant

Exhibit SB-26

RE: public information request

From: WHALEN Alma * SOS (alma.whalen@oregon.gov)

To:     smberlant@yahoo.com

Cc:     SOS.PublicRecordsSOS@oregon.gov

Date:  Tuesday, March 23, 2021 at 02:17 PM PDT

Good afternoon,

I apologize for the delay in providing a substantive response, I wanted to ensure I passed on correct information. I am unsure what you are referring to when you say "the Oregon Secretary of State operates or oversees two additional election sites." To the extent that you are referring to data centers, there are no tally machines located at those sites.

Below is additional information that you may find responsive to your request.

- A list of tally systems by county can be found here: https://sos.oregon.gov/elections/Documents/Tally-Systems-By-County.pdf
- The Secretary of State certifies vote tally systems in accordance with the provisions of ORS chapter 246 and OAR 165-007-0350. The certification expires when it is revoked by the Secretary of State, or after the Secretary has determined that a another certification should be conducted because changes were made to the machine or system. ORS 246.550(5). Clear Ballot was last certified on 2/18/2020. ES&S was last certified on 8/7/2020. HART was last certified on 8/25/2020.
- More information can be found in our Vote By Mail Manual: https://sos.oregon.gov/elections/Documents/vbm_manual.pdf

Based on the information you provided, we do not have enough information to determine that we may exempt your information. Thus, this email may be subject to disclosure upon request.

Thank you,

Alma Whalen

Interim Elections Manager

Elections Division |Oregon Secretary of State

Desk: 503.986.2303 | Fax: 503.373.7414

pronouns: she/hers



---

**From:** WHALEN Alma * SOS
**Sent:** Monday, March 1, 2021 2:29 PM
**To:** S M B <smberlant@yahoo.com>
**Cc:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@oregon.gov>
**Subject:** RE: public information request

Good afternoon,

Exhibit SB-26

We received your request and are working on it.  I expect we will have a response by March 19th. I will follow-up if I think it will take longer.

Thank you,

Alma Whalen

Interim Elections Manager

Elections Division |Oregon Secretary of State

Desk: 503.986.2303 | Fax: 503.373.7414

pronouns: she/hers



Exhibit SB-26

May 5, 2021

Oregon Secretary of State
Elections Division – Public Records Request
255 Capitol Street NE
Public Service Building Suite 501
Salem, Oregon 97310

RE:  Public Records Request

To Whom It May Concern,

Free, fair and open elections are a bedrock of Oregon's democratic process. I looked over the state's website and was quite surprised that most of this information was not easily accessible for the public. This is not only a lack of transparency, but because our vote IS OUR VOICE, this directly attacks the democratic process itself, undermining confidence in elections. Citizens have a right to see every contract or agreement, the state has signed on their behalf. We also have a right to transparency of the various functions and type of equipment and vote systems that were PURCHASED ON OUR BEHALF.

This is a public information request.

I am working with several other concerned Oregonians, requesting the below information from each of Oregon's 36 county elections offices.  For some of the information, counties have referred us to the office of the Secretary of State. We also understand that the Secretary of State operates or oversees two additional election sites (source: https://www.youtube.com/watch?v=RnEqS1x2sn8).

For elections occurring from the 2017 Primary election, thru the 2020 General election, please provide all available information for each of the 38 election sites:

Copies of all purchase orders, contracts, agreements, memorandums of understanding, amendments, exhibits, attachments, addendums, etc. - RELATING TO ALL election machines, equipment and/or systems used to: cast ballots, mark ballots, scan, tabulate, adjudicate or aggregate results for the captioned elections. This should include information about the machine, equipment or system's: purchase, certification(s), testing, calibration, initial RFQ response, **source code escrow**; additionally any reports or logs for update(s), upgrade(s), and trouble report(s) -- regardless of whether the document or communication was: internal, external, inter-agency or intra-agency.

My preferred method of contact for questions, and for receipt of records responsive to this request is via linked cloud document storage to email: smberlant@yahoo.com

Sincerely,

Exhibit SB-27

Re: Public Records Request

From:  Shannon Berlant (smberlant@yahoo.com)

To:    Elections.SOS@oregon.gov

Date:  Wednesday, May 12, 2021 at 06:03 PM PDT

Mr. Foster,

Your below response does not in any way satisfy my public record request. I did not ask for information, I requested specific records.

I am aware that from time to time the counties contact the SOS office and correspond about voting systems or equipment- whatever you have on file with regard to my request, would be considered responsive. In addition, your office is the only record holder for several of the records requested (ie source code escrow, testing and certification). I am willing to accept a "rolling production" of responsive records if it will facilitate a more timely response.

I look forward to receipt of the requested documents at your earliest convenience.

Thank you!

Sent from my iPhone

> On May 12, 2021, at 4:07 PM, SOS Elections * SOS <Elections.SOS@oregon.gov> wrote:
>
>
>
> Hello Shannon,
>
>
> Thank you for contacting our office. You will need to contact the county elections offices to obtain more information about theirvote tally machine purchases. In addition, we are unsure what you are referring to when you say "the Secretary of State operates or oversees two additional election sites." To the extent that you are referring to data centers, there are no tally machines located at those sites.
>
>
> Below is additional information that you may find responsive to your request.
>
>
> - A list of tally systems by county can be found here: https://sos.oregon.gov/elections/Documents/Tally-Systems-By-County.pdf
>
>
> - The Secretary of State certifies vote tally systems in accordance with the provisions of ORS chapter 246 and OAR 165-007-0350. The certification expires when it is revoked by the Secretary of State, or after the Secretary has determined that a another certification should be conducted because changes were made to the machine or system. ORS 246.550(5). Clear Ballot was last certified on 2/18/2020. ES&S was last certified on 8/7/2020. HART was last certified on 8/25/2020.
>
>
> - More information can be found in our Vote By Mail Manual: https://sos.oregon.gov/elections/Documents/vbm_manual.pdf
>
>
> Thanks,
>
>
> Sean Foster
>
> Public Service Representative
>
> Elections Division
>
> Secretary of State
>
> elections.sos@oregon.gov

Exhibit SB-27

RE: Public Records Request

| | |
|---|---|
| From: | SOS Elections * SOS (elections.sos@oregon.gov) |
| To: | smberlant@yahoo.com |
| Date: | Thursday, May 20, 2021 at 03:05 PM PDT |

Hello Shannon,

We can compile and provide you the certification letters for the vote tally machines by June 4, 2021. The other information will require some research. We are estimating that compiling the other records will cost approximately $1,500 or 60 hours at a cost of $25 per hour.

Here is a link to the Elections administrative rule that governs how we charge/what we charge for public records request: https://secure.sos.state.or.us/oard/viewSingleRule.action?ruleVrsnRsn=24097. Please let us know if you would like to proceed with compiling the other records.

Thanks,

Sean Foster

Public Service Representative

Elections Division

Secretary of State

elections.sos@oregon.gov

Exhibit SB-28

RE: Public Records Request

From:   SOS Elections * SOS (elections.sos@sos.oregon.gov)

To:     smberlant@yahoo.com

Date:   Tuesday, December 14, 2021 at 09:52 AM PST

Shannon,

I can meet you outside of either the Capitol Street doors or the doors on the Capitol mall when you call.

Thanks,

Sean

---

**From:** Shannon Berlant <smberlant@yahoo.com>
**Sent:** Tuesday, December 14, 2021 9:47 AM
**To:** SOS Elections * SOS <Elections.SOS@sos.oregon.gov>
**Subject:** Re: Public Records Request

Sean,

Noted that I need to call when I arrive… Suite 501 here- correct?

Public Service Building
255 Capitol St. NE
Salem OR 97310

Sent from my iPhone

On Dec 14, 2021, at 9:30 AM, SOS Elections * SOS <Elections.SOS@sos.oregon.gov> wrote:

Shannon,

Yes, I would be glad to meet you for an in-person appointment tomorrow at 10:30. I could also take payment over the phone if that would be easier. Please call the main number of 503-986-1518 when you arrive.

Thanks,

Sean Foster

Public Service Representative

Elections Division

Exhibit SB-29

Secretary of State

elections.sos@oregon.gov

---

**From:** Shannon Berlant <smberlant@yahoo.com>
**Sent:** Tuesday, December 14, 2021 8:54 AM
**To:** SOS Elections * SOS <Elections.SOS@sos.oregon.gov>
**Subject:** Re: Public Records Request

Sean,

I saved up the money and attempted to pay this at the SOS offices in Salem in person, only to find that the offices are closed.

May I have an in-person appointment tomorrow to make the payment? Around 10:30 am would work perfectly.

Thank you,

Shannon

Sent from my iPhone

Exhibit SB-29

December 15, 2021


Oregon Secretary of State
Elections Division – Public Records Request
255 Capitol Street NE
Public Service Building Suite 501
Salem, Oregon 97310


RE:  Public Records Request – Order of priority


This was the original records request:

Copies of all purchase orders, contracts, agreements, memorandums of understanding, amendments, exhibits, attachments, addendums, etc. - RELATING TO ALL election machines, equipment and/or systems used to: cast ballots, mark ballots, scan, tabulate, adjudicate or aggregate results for the captioned elections. This should include information about the machine, equipment or system's: purchase, certification(s), testing, calibration, initial RFQ response, **source code escrow**; additionally any reports or logs for update(s), upgrade(s), and trouble report(s) -- regardless of whether the document or communication was: internal, external, inter-agency or intra-agency.


This letter is to give your office <u>instructions of priority</u>. If, it is easier to produce the requested records on a rolling record production basis – then as they are "found", they can be emailed directly to <u>smberlant@yahoo.com</u>; OR a link to a cloud file sharing service may be sent to the same email address. My preferred priority, should you provide the records on a rolling record production basis:

1) EAC Certifications, Oregon SOS Certifications, any other certifications
2) Source Code Escrow
3) Purchase orders, contracts, addendums, exhibits, change orders, etc. relating to the acquisition and/or upgrade/maintenance of the machine/equipment
4) Testing and calibration
5) Any MOU's
6) Update or upgrade (or de minimus changes)
7) Anything else

Sincerely,


Shannon Berlant


Exhibit SB-29

OFFICE OF THE SECRETARY OF STATE

SHEMIA FAGAN
SECRETARY OF STATE

CHERYL MYERS
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

DEBORAH SCROGGIN
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

## RECEIPT

December 15, 2021

Shannon Berlant

smberlant@yahoo.com

No.  ELT 2021-009

### Payment Method

☑ Cash          ☐ Check No.

| Transaction Type | PCA | AOB | Amount |
|---|---|---|---|
| ☐ **Candidate Filings**<br>US Senator $150; US Representative or Statewide Office $100; State Senator or Representative $25; Circuit Court Judge, District Attorney or County Judge $50 | 62280 | 8149 | = $ |
| ☐ **C&E Penalty**<br>Campaign finance late or insufficient penalty<br>**Case No.** | 62180 | 8991 | = $ |
| ☐ **Other Penalty**<br>Non-campaign finance civil penalty election law violations<br>**Case No.** | 62180 | 8992 | = $ |
| ☑ **Public Records**<br>Research projects, copies, certified copies, fax, etc | 63034 | 8109 | = $1,500.00 |
| ☐ **Voter Lists**<br>Voter file, less than statewide voter file, voted not voted report, etc | 69213 | 8049 | = $ |
| ☐ **Election Supplies**<br>Printed election material supplied to counties – Desk calendar, military/overseas citizens ballot envelopes, etc | 63034 | 8110 | = $ |
| ☐ **Recount Deposit**<br>$15 for each precinct to be recounted, up to $8,000 | BSD | BSD | = $ |

**TOTAL AMOUNT RECEIVED: $1,500.00**
   Received by:   Sean Foster

Update Total     = $1,500.00

### Additional Notes (if any)

Exhibit SB-29

SECRETARY OF STATE
2021 DEC 15 AM 10:4?

December 15, 2021

Oregon Secretary of State
Elections Division – Public Records Request
255 Capitol Street NE
Public Service Building Suite 501
Salem, Oregon 97310

RE:  Public Records Request – Order of priority

This was the original records request:

Copies of all purchase orders, contracts, agreements, memorandums of understanding, amendments, exhibits, attachments, addendums, etc. - RELATING TO ALL election machines, equipment and/or systems used to: cast ballots, mark ballots, scan, tabulate, adjudicate or aggregate results for the captioned elections. This should include information about the machine, equipment or system's: purchase, certification(s), testing, calibration, initial RFQ response, **source code escrow**; additionally any reports or logs for update(s), upgrade(s), and trouble report(s) -- regardless of whether the document or communication was: internal, external, inter-agency or intra-agency.

This letter is to give your office <u>instructions of priority</u>. If, it is easier to produce the requested records on a rolling record production basis – then as they are "found", they can be emailed directly to smberlant@yahoo.com; OR a link to a cloud file sharing service may be sent to the same email address. My preferred priority, should you provide the records on a rolling record production basis:

1) EAC Certifications, Oregon SOS Certifications, any other certifications
2) Source Code Escrow
3) Purchase orders, contracts, addendums, exhibits, change orders, etc. relating to the acquisition and/or upgrade/maintenance of the machine/equipment
4) Testing and calibration
5) Any MOU's
6) Update or upgrade (or de minimus changes)
7) Anything else

Sincerely,

Shannon Berlant

Exhibit SB-29

RE: Public Records Request - Oregon State Elections Division

From: SOS Elections * SOS (elections.sos@sos.oregon.gov)

To:     smberlant@yahoo.com

Cc:     SOS.PublicRecordsSOS@sos.oregon.gov

Date:   Tuesday, January 25, 2022 at 12:31 PM PST

Hello,

Thank you for including your original request. That helps me understand a full picture of what you're requesting and we will start compiling the Oregon SOS certifications from 2017 through 2020. Our office works to fulfill public records requests as soon as possible while also performing our other core functions. We estimate that we will be able to provide you with the Oregon SOS certifications by February 11, 2022. If they are available sooner we will send them to you.

I also understand that you requested a copy of the statewide voter list. Below are the fields that are available in our standard list which costs $500. I believe you were interested in having additional fields included as well. Please let us know what those fields are and we will see if the information requested is public record. The fee for building special reports is $35 per hour in addition to the $500. Since you already paid $1,500 we could apply that towards the cost of the voter list. We estimate that we will be able to provide you with the list within 10 business days of your approval to proceed.

| VOTER ID | STATUS | STREET NAME | ZIP CODE | EFF ZIP CODE |
|---|---|---|---|---|
| FIRST NAME | PARTY CODE | STREET TYPE | ZIP PLUS FOUR | EFF ZIP PLUS FOUR |
| MIDDLE NAME | COUNTY | POST DIRECTION | EFF ADDRESS 1 | ABSENTEE TYPE |
| LAST NAME | RES ADDRESS 1 | UNIT TYPE | EFF ADDRESS 2 | PRECINCT NAME |
| NAME SUFFIX | RES ADDRESS 2 | UNIT NUM | EFF ADDRESS 3 | PRECINCT |
| BIRTHDATE | HOUSE NUM | ADDR NON STD | EFF ADDRESS 4 | SPLIT |
| CONFIDENTIAL | HOUSE SUFFIX | CITY | EFF CITY | |
| EFF REGN DATE | PRE DIRECTION | STATE | EFF STATE | |

Going forward please direct all correspondence about your requests on this email thread.

Thank you,

Alma Whalen

Elections Program Manager

Elections Division | Oregon Secretary of State

Mobile: 971.388.1510

pronouns: she/her/ella



**From:** S M B <smberlant@yahoo.com>
**Sent:** Thursday, January 13, 2022 1:32 PM
**To:** SOS Elections * SOS <Elections.SOS@sos.oregon.gov>
**Subject:** Re: Public Records Request - Oregon State Elections Division

Ms. Whalen,

This was the text of my original public record request:

> I am working with several other concerned Oregonians, requesting the below information from
> each of Oregon's 36 county elections offices.  For some of the information, counties have
> referred us to the office of the Secretary of State. We also understand that the Secretary of
> State operates or oversees two additional election sites (source: https://www.youtube.com

Exhibit SB-30

/watch?v=RnEqS1x2sn8).

For elections occurring from the 2017 Primary election, thru the 2020 General election, please provide all available information for each of the 38 election sites:

Copies of all purchase orders, contracts, agreements, memorandums of understanding, amendments, exhibits, attachments, addendums, etc. - <u>RELATING TO ALL election machines</u>, <u>equipment and/or systems</u> used to: cast ballots, mark ballots, scan, tabulate, adjudicate or aggregate results for the captioned elections. This should include information about the machine, equipment or system's: purchase, certification(s), testing, calibration, initial RFQ response, **source code escrow**; additionally any reports or logs for update(s), upgrade(s), and trouble report(s) -- regardless of whether the document or communication was: internal, external, inter-agency or intra-agency.

Along with the payment submitted for the record request, I provided your office with a priority list for production of records, so they may be released on a rolling production basis. This was the text of that priority list:

This letter is to give your office instructions of priority. If, it is easier to produce the requested records on a rolling record production basis – then as they are "found", they can be emailed directly to smberlant@yahoo.com; OR a link to a cloud file sharing service may be sent to the same email address. My preferred priority, should you provide the records on a rolling record production basis:

1)  EAC Certifications, Oregon SOS Certifications, any other certifications

2)  Source Code Escrow

3)  Purchase orders, contracts, addendums, exhibits, change orders, etc. relating to the acquisition and/or upgrade/maintenance of the machine/equipment

4)  Testing and calibration

5)  Any MOU's

6)  Update or upgrade (or de minimus changes)

7) Anything else

As you can see, the <u>time frame</u> requested was to cover the election equipment/machine software/hardware versions that were utilized in the 2017 Primary election - on thru those used in the 2020 General election.

The public record request DID NOT ASK FOR a copy of any County's, nor the Secretary of State's security plan under ORS 254.074(2). Please do not conflate the requested records with a security plan, because security plans were NOT REQUESTED.

The Oregon Secretary of State <u>DOES NOT CERTIFY TALLY SYSTEM VENDORS</u>, BUT THE SOS CERTIFIES THE ACTUAL MACHINE(S) OR TALLY SYSTEM themselves. ORS chapter 246 definitions at 246.012(10) and 246.012(11) clearly illustrate that your office is not certifying solely the vendors, but the machines themselves. I'll also quote a portion of the text directly from <u>OAR 165-007-0350</u>, which further illustrates that the SOS office is not relying upon a certification of the tally system vendor, but of each machine/tally system's itself:

*(1) All voting systems submitted for certification pursuant to ORS 246.550 must be certified by the Elections Assistance Commission (EAC) or be examined by a federally accredited voting systems testing laboratory (VSTL).*

Your office is required to keep any records relating to voting in Oregon, so whether you are the initial custodian of the record or not, if you received a draft copy (from the County for your office to review, for example), then you must disclose that record if the public requests it. I have already requested this information from your office multiple times, received  inadequate or unreasonable response from your office... Finally I had saved up the money to pay for the record request and now your office appears to be stalling. I really hope your office will proceed with transparency.  I am happy to answer questions that are MORE SPECIFIC about a specific item on the record request list, but making FALSE general statements that the request is for things that weren't listed (like a security plan); or making FALSE statements about what certifications the SOS office is responsible for (like certifying a vendor) is very discouraging to see.

Previous communications from your office indicated that the certifications would be easily at hand to provide, and the certifications were the first item mentioned on my priority list. Should your office not provide the first item on the priority list

Exhibit SB-30

(certifications) by January 20, 2022, then further action to force compliance will be undertaken.

Thank you for your time and attention,
Shannon Berlant

On Monday, December 27, 2021, 11:32:21 AM PST, SOS Elections * SOS <elections.sos@sos.oregon.gov> wrote:

Good morning,

I was informed that you recently paid for a records request that you originally filed in May of this year. Since then we have researched this matter further because of similar requests received and have determined that we are only able to provide you records which we are the custodians for. For example, though the Secretary of State certifies tally system vendors, we do not maintain the type of detailed information about each tally machine that you seem interested in obtaining. For detailed information about tally machines you will need to contact each of Oregon's 36 county elections officials. However, please be aware that your request is very broad which makes it difficult to know which documents would be responsive. Further, some of the information you appear to be requesting is not disclosable as a public record per ORS 254.074(2).

To the extent that we are the custodians of records we will be able to provide you with the following:

- Oregon SOS Certifications – are you seeking records for a specific date range?
- Records relating to acquisition of tally machines if they exist and to the extent allowable under public records law. I will need to look into this to find out what we are able to provide. Are you seeking records for a specific date range?

Knowing a date range will allow us to give you an estimate for fulfilling the request, both in terms of staff time and providing the records. If the cost to compile records and research this request is under $1,500 we will reimburse the difference.

I look forward to hearing from you and will wait for direction from you relating to date ranges prior to starting work on this request.

Thank you,

Alma Whalen

Elections Program Manager

Elections Division | Oregon Secretary of State

Mobile: 971.388.1510

pronouns: she/her/ella



Exhibit SB-30

RE: Public Records Request - Oregon State Elections Division

From:  SOS Elections * SOS (elections.sos@sos.oregon.gov)
To:  smberlant@yahoo.com
Cc:  SOS.PublicRecordsSOS@sos.oregon.gov
Date:  Tuesday, February 1, 2022 at 12:53 PM PST

Hello,

For #1: we have the most updated statewide voter registration list ready for you. Please call our office at 503-986-1518 to pay for the data. Once payment is received a member of our staff will reach out to you separately to provide instructions on how to download the data from our secure file transfer site.

For #2: we are working to compile the Oregon SOS certifications by February 11. However, if they are available sooner we will send them to you.

Below I'm outlining my understanding of your request and our response to each:

| Record Requested | Elections Division Response |
|---|---|
| EAC Certifications | We are not the custodians of certifications issued by the EAC. |
| SOS Certifications | We are working to compile and provide you with all certifications issued to tally system vendors between 2017 through 2020. |
| Any other certifications | Please clarify which certifications you are requesting in addition to the two categories above. |
| Records relating to the acquisition and/or upgrade/maintenance of the machine/equipment/systems used to cast ballots, mark ballots, scan, tabulate, adjudicate or aggregate results:<br><br>• Purchase orders/certifications<br>• Contracts<br>• Addendums<br>• Exhibits<br>• Memorandums of understanding<br>• Change orders, etc.<br>• Testing<br>• Calibration<br>• Initial RFQ response<br>• Source code escrow<br>• Any reports or logs for update(s), upgrade(s), and trouble report(s) | The Elections Division certifies types of voting tally machines, but it does not purchase or maintain any voting tally machines. We will be providing you with the certifications issued by the Elections Division. Detailed information about individual tally machines is maintained by each of Oregon's 36 county elections officials. |

Alma Whalen

Elections Program Manager

Elections Division | Oregon Secretary of State

Mobile: 971.388.1510

pronouns: she/her/ella

Exhibit SB-30



**From:** Shannon Berlant <smberlant@yahoo.com>
**Sent:** Wednesday, January 26, 2022 1:57 PM
**To:** SOS Elections * SOS <Elections.SOS@sos.oregon.gov>
**Cc:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Re: Public Records Request - Oregon State Elections Division

Alma,

There are two separate requests here. Let's number them 1) and 2).

1) is for the Voter Registration data that was requested back in May 2021. This request was snail mailed to your offices. Just because I happened to inquire about the status of this record request, does not tie it in ANY way to the payment and information submitted on request number 2). The Oregon law says that I can request and receive Voter Registration information for the entire state . The law says nothing about only certain data fields being available from your system. There are other Oregon laws that say that your office can filter out the exact date of birth (year is available), and the address of certain people that apply and qualify for exclusion. Further the Oregon law states that the maximum you can charge for voter registration data is $500. So, let me know when the full data extract (with all the data fields is available and I will submit the $500 for this.

2) This separate request was detailed in a snail mailed written letter, which was a separate letter from the above. It's for the election system/machine certifications and the various other testing, machine/system updating and purchasing records for all of them (statewide). Your office had previously sent inadequate response, yet indicated that certification information was easily at hand, and that the other records outside of the certifications requested (pertaining to the voting machines/systems throughout the state) would require extensive research and further that the cost would be $1500. First of all, many other states have the board of election or Secretary of State certifications freely available directly on their website. >>> Please immediately send the various certifications.<<< Secondly, it took some time for me to save the amount your office had quoted for this record request (and note it's separate, as in separate from the voter registration data request above). Once I had the dollar amount, I had gone to your office in person, only to find that it was closed. I went again after the Governor had lifted all covid restrictions in June 2021, only to again find your office closed. So I emailed to set an in-person appointment to make payment. Your office was entirely paid and along with payment, I enclosed both a copy of the original record request, as well as a priority list for a rolling production of records. Then your office emails me stating that basically, hey we can't provide the security plans you asked for and we only provide election vendor certification. Both of WHICH WERE FALSE! Quit stalling and send the records.

Tomorrow I file a complaint with the AG's office!

Shannon

Sent from my iPhone

> On Jan 25, 2022, at 12:31 PM, SOS Elections * SOS <Elections.SOS@sos.oregon.gov> wrote:
>
> Hello,
>
> Thank you for including your original request. That helps me understand a full picture of what you're requesting and we will start compiling the Oregon SOS certifications from 2017 through 2020. Our office works to fulfill public records requests as soon as possible while also performing our other core functions. We estimate that we will be able to provide you with the Oregon SOS certifications by February 11, 2022. If they are available sooner we will send them to you.
>
> I also understand that you requested a copy of the statewide voter list. Below are the fields that are available in our standard list which costs $500. I believe you were interested in having additional fields included as well. Please let us know what those fields are and we will see if the information requested is public record. The fee for building special reports is $35 per hour in addition to the $500. Since you already paid $1,500 we could apply that towards the cost of the voter list. We estimate that we will be able to provide you with the list within 10 business days of your approval to proceed.

Exhibit SB-30

RE: Public Records Request - Oregon State Elections Division

From:  SOS Elections * SOS (elections.sos@sos.oregon.gov)
To:    smberlant@yahoo.com
Cc:    SOS.PublicRecordsSOS@sos.oregon.gov
Date:  Friday, February 11, 2022 at 03:36 PM PST

Good afternoon,

Attached are the signed statements showing which voting systems were certified by the state Elections Division from 2017 through 2020.

Alma Whalen

Elections Program Manager

Elections Division | Oregon Secretary of State

Mobile: 971.388.1510

pronouns: she/her/ella



Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

**DENNIS RICHARDSON**
SECRETARY OF STATE

**LESLIE CUMMINGS, PhD**
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Clear Ballot Group
### Clear Vote Voting System (Clear Count 1.3.2 and Clear Design 1.3.1)

Clear Ballot has made upgrades to their ClearVote Voting System. Specifically they have submitted ClearCount version 1.3.2 and ClearDesign version1.3.1 along with their test lab report by EAC Certified tester Pro V&V. The test report documents that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Clear Ballot has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Deschutes and Multnomah counties and Pro V&V.  We have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350 in that these changes do not impair the accuracy, efficiency, or capacity of the machine or system.

Accordingly, the ClearVote Voting System consisting of ClearCount version 1.3.2 and ClearDesign version1.3.1 is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 3rd day of March 2017.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

**DENNIS RICHARDSON**
SECRETARY OF STATE

**LESLIE CUMMINGS, PhD**
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Clear Ballot Group
### Clear Vote Voting System (Clear Count 1.4 and Clear Design 1.4)

Clear Ballot has made upgrades to their ClearVote Voting System. Specifically they have submitted ClearCount version 1.4 and ClearDesign version1.4 along with their test lab report by EAC Certified tester Pro V&V. The test report documents that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005). Clear Ballot has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Deschutes, Marion, Yamhill and Multnomah counties and Pro V&V. We have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350 in that these changes do not impair the accuracy, efficiency, or capacity of the machine or system.

Accordingly, the ClearVote Voting System consisting of ClearCount version 1.4 and ClearDesign version1.4 is certified for sale, lease or use in all elections in Oregon. The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 30th day of August 2017.

Stephen N. Trout
Director of Elections

# Exhibit SB-30

<small>OFFICE OF THE SECRETARY OF STATE</small>

**DENNIS RICHARDSON**
<small>SECRETARY OF STATE</small>

**LESLIE CUMMINGS, PhD**
<small>DEPUTY SECRETARY OF STATE</small>



<small>ELECTIONS DIVISION</small>

STEPHEN N. TROUT
<small>DIRECTOR</small>

<small>255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722</small>

<small>(503) 986-1518</small>

# CERTIFICATE OF APPROVAL

## Clear Ballot Group
### Clear Vote Voting System (Clear Count 1.4.2 and Clear Design 1.4.3)

Clear Ballot has made upgrades to their ClearVote Voting System. Specifically they have submitted ClearCount version 1.4.2 and ClearDesign version1.4.3 along with their test lab report by EAC Certified tester Pro V&V. The test report documents that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005). Clear Ballot has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Yamhill, Marion and Multnomah counties and Pro V&V. We have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350 in that these changes do not impair the accuracy, efficiency, or capacity of the machine or system.

Accordingly, the ClearVote Voting System consisting of ClearCount version 1.4.2 and ClearDesign version1.4.3 is certified for sale, lease or use in all elections in Oregon. The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 11th day of December 2017.

Stephen N. Trout
Director of Elections

# Exhibit SB-30



OFFICE OF THE SECRETARY OF STATE

**DENNIS RICHARDSON**
SECRETARY OF STATE

**LESLIE CUMMINGS, PhD**
DEPUTY SECRETARY OF STATE

ELECTIONS DIVISION

**STEPHEN N. TROUT**
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Clear Ballot Group
### Clear Vote Voting System (Clear Count 1.4.3)

Clear Ballot has made upgrades to their ClearVote Voting System. Specifically they have submitted ClearCount version 1.4.3 along with their test lab report by EAC Certified tester Pro V&V. The test report documents that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Clear Ballot has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Yamhill, Marion and Multnomah counties and Pro V&V.  We have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350 in that these changes do not impair the accuracy, efficiency, or capacity of the machine or system.

Accordingly, the ClearVote Voting System consisting of ClearCount version 1.4.3 is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 22nd day of May 2018.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

**BEV CLARNO**
SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Clear Ballot Group
### Clear Vote Voting System (Clear Count 2.1 and Clear Design 2.1)

Clear Ballot has made upgrades to their ClearVote Voting System. Specifically they have submitted ClearCount version 2.1 and ClearDesign version 2.1 along with their test lab report by EAC Certified tester Pro V&V. The test report documents that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005). Clear Ballot has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Yamhill, Marion and Multnomah counties and Pro V&V.  We have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350 in that these changes do not impair the accuracy, efficiency, or capacity of the machine or system.

Accordingly, the ClearVote Voting System consisting of ClearCount version 2.1 and ClearDesign version 2.1 is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 18 day of February 2020.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

**DENNIS RICHARDSON**
SECRETARY OF STATE

**LESLIE CUMMINGS, PhD**
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Election Systems & Software
### EVS 5.2.2.0 Voting System

Election Systems and Software has made upgrades to their EVS Voting System. Specifically they have submitted EVS version 5.2.2.0 consisting of the DS850 version 2.10.2.0, DS450 version 3.0.0.0, and ExpressVote version 1.4.1.2 along with their EAC Certificate. The EAC certificate and test reports document that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Election Systems and Software has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Marion, Linn, Deschutes and Multnomah counties and Pro V&V.  After  reviewing the EAC certificate and testing the system in Salem, Oregon on March 29, 2017, we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the ES&S EVS 5.2.2.0 Voting System consisting of the DS850, DS450, and ExpressVote is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 31st day of March 2017.

Stephen N. Trout
Director of Election

**Exhibit SB-30**

OFFICE OF THE SECRETARY OF STATE

**DENNIS RICHARDSON**
SECRETARY OF STATE

**LESLIE CUMMINGS, PhD**
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Election Systems & Software
### EVS 6.0.0.0 Voting System

Election Systems and Software has made upgrades to their EVS Voting System. Specifically they have submitted EVS version 6.0.0.0 consisting of the DS850 version 3.1.0.0, DS450 version 3.1.0.0, ExpressVote version 2.4.0.0, ElectionWare 5.0.0.0, Event Log Service 1.6.0.0, ExpressVote Previewer 2.4.0.0, and Removable Media Service 1.5.0.0 along with their federal test lab report. The test reports document that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005). Election Systems and Software has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Marion, Linn, Yamhill, Clackamas and Multnomah counties and Pro V&V. After reviewing the certification application and test lab reports we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the ES&S EVS 6.0.0.0 Voting System, not including ExpressRunOff version 1.0.0.0, is certified for sale, lease or use in all elections in Oregon. The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 7th day of June 2018.

Stephen N. Trout
Director of Election

# Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

BEV CLARNO
SECRETARY OF STATE

A. RICHARD VIAL
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Election Systems & Software

### EVS 6.0.4.0 Voting System

Election Systems and Software has made upgrades to their EVS Voting System. Specifically they have submitted EVS version 6.0.4.0 consisting of the DS850 version 3.1.1.0, DS450 version 3.1.1.0, ExpressRunOff version 1.0.0.0, ExpressVote version 2.4.5.0, ElectionWare 5.0.4.0, Event Log Service 1.6.0.0, ExpressVote Previewer 2.4.5.0, and Removable Media Service 1.5.1.0 along with their federal test lab report. The test reports document that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Election Systems and Software has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Marion, Linn, Yamhill, Clackamas and Multnomah counties.  After reviewing the certification application and test lab reports we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the ES&S EVS 6.0.4.0 Voting System is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 1st day of August 2019.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

BEV CLARNO
SECRETARY OF STATE

A. RICHARD VIAL
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Election Systems & Software
### EVS 6.1.0.0 Voting System

Election Systems and Software has made upgrades to their EVS Voting System. Specifically they have submitted EVS version 6.1.0.0 consisting of the DS850 version 3.4.0.0, DS450 version 3.4.0.0, ExpressRunOff version 1.0.0.0, ExpressVote version 4.0.0.0, ElectionWare 6.0.0.0, Event Log Service 2.0.0.0, ExpressVote Previewer 4.0.0.0, and Removable Media Service 2.0.0.0 along with their federal test lab report. The test reports document that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Election Systems and Software has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Marion, Linn, Yamhill, Clackamas and Multnomah counties.  After reviewing the certification application and test lab reports we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the ES&S EVS 6.1.0.0 Voting System is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 2nd day of October 2019.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

**BEV CLARNO**
SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Election Systems & Software
### EVS 6.1.1.0 Voting System

Election Systems and Software has made upgrades to their EVS Voting System. Specifically they have submitted EVS version 6.1.1.0 consisting solely of ElectionWare 6.0.1.0, along with their federal test lab report. The test reports document that the systems meet all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).  Election Systems and Software has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Marion, Linn, Yamhill, Clackamas and Multnomah counties.  After reviewing the certification application and test lab reports we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the ES&S EVS 6.1.1.0 Voting System is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 7th day of August 2020.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

**DENNIS RICHARDSON**
SECRETARY OF STATE

LESLIE CUMMINGS, PhD
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Hart InterCivic Verity 2.0
### Description Software & COTS Components
Verity Data 2.0.2, Verity Build 2.0.2, Verity Central 2.0.2, Verity Count 2.02,
Verity User Management 2.02., Verity Election Management 2.0.2
Verity Touch Writer/Print/Ballot/Report Printer B431d
Verity Build/Print Printer C831dn and C911dn
Verity Central Scanner DR-G1100, DR-G1130
Verity Application, Workstation Computer Z230

Hart InterCivic is requesting approval of HART Verity Voting 2.0 as a vote tally operating system for use in Oregon elections.  Their application states that Verity Voting 2.0 is certified by the US Election Assistance Commission as conformant with the federal *Voluntary Voting System Guidelines* (VVSG), Version 1.0 (2005).

The Secretary of State partnered with Benton, Washington, Linn and Multnomah counties and Pro V&V to review the submitted request.  It was requested that an additional list of system limitations be provided.  The list is provided in this document as an attachment.  We have determined that the system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the Hart InterCivic Verity 2.0 voting system is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 7th day of February 2017.

Stephen N. Trout
Director of Elections

# Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

**DENNIS RICHARDSON**
SECRETARY OF STATE

**LESLIE CUMMINGS, PhD**
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

**STEPHEN N. TROUT**
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Hart InterCivic
Verity 2.2.2 Voting System

Hart InterCivic has made upgrades to their Verity Voting System. Specifically they have submitted Verity version 2.2.2 along with their test lab report by EAC Certified tester SLI Laboratories. The test report documents that the system meets all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Hart Intercivic has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Marion, Yamhill, Clackamas and Multnomah counties and Pro V&V. We have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350 in that this change in operating system does not impair the accuracy, efficiency, or capacity of the machine or system.

Accordingly, the Hart InterCivic Verity 2.2.2 operating system, with the above described enhancement, is certified for use in all elections in Oregon. The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election's Division rules and directives.

Dated this 20th day of March 2018.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

BEV CLARNO
SECRETARY OF STATE

A. RICHARD VIAL
DEPUTY SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

# CERTIFICATE OF APPROVAL

## Hart InterCivic
Verity 2.3 Voting System

Hart InterCivic has made upgrades to their Verity Voting System. Specifically they have submitted Verity version 2.3 along with their test lab report by EAC Certified tester SLI Laboratories. The test report documents that the system meets all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Hart Intercivic has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Marion, Yamhill, Clackamas and Multnomah counties.  After reviewing the certification application and test lab reports we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the Hart InterCivic Verity 2.3 Voting System is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.·

Dated this 1st day of August 2019.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

BEV CLARNO
SECRETARY OF STATE



ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518

## CERTIFICATE OF APPROVAL

**Hart InterCivic**
Verity 2.4 Voting System

Hart InterCivic has made upgrades to their Verity Voting System. Specifically they have submitted Verity version 2.4 along with their test lab report by EAC Certified tester SLI Laboratories. The test report documents that the system meets all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Hart Intercivic has requested approval of this change for use in Oregon elections.

The Secretary of State partnered with Benton, Washington, Linn, Marion, Yamhill, Clackamas and Multnomah counties.  After reviewing the certification application and test lab reports we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the Hart InterCivic Verity 2.4 Voting System is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.·

Dated this 15th day of June 2020.

Stephen N. Trout
Director of Elections

Exhibit SB-30

OFFICE OF THE SECRETARY OF STATE

BEV CLARNO
SECRETARY OF STATE

ELECTIONS DIVISION

STEPHEN N. TROUT
DIRECTOR

255 CAPITOL STREET NE, SUITE 501
SALEM, OREGON 97310-0722

(503) 986-1518



# CERTIFICATE OF APPROVAL

**Hart InterCivic**

Verity 2.4 Voting System

Hart InterCivic has made upgrades to their Verity Voting System. Specifically they have submitted ECO-01393 along with their test lab report by EAC Certified tester SLI Laboratories. The test report documents that the system meets all of the Oregon requirements and are conformant with the federal Voluntary Voting System Guidelines (VVSG), Version 1.0 (2005).   Hart Intercivic has requested approval of this change for use in Oregon elections.

After reviewing the certification application and test lab reports we have determined that the upgraded system complies with the statutory requirements of Oregon Revised Statutes 246.550 and 246.560, specifically ORS 246.550(4) and Oregon Administrative Rule 165-007-0350.

Accordingly, the Hart InterCivic Verity 2.4 Voting System with ECO-01393 is certified for sale, lease or use in all elections in Oregon.  The system must be used in compliance with the provisions of applicable Oregon statutes and all Secretary of State, Election Division rules and directives.

Dated this 25th day of August 2020.

Stephen N. Trout
Director of Elections

Exhibit SB-30

June 24, 2022

Oregon Secretary of State
Attn: Elections Division
255 Capitol Street NE
Salem, Oregon 97301

RE:  Public Records Request

To Whom It May Concern,

This is a public record request. For the below items, the covered **time period** for requested records, would be for vote systems / equipment in use for the <u>2017 primary election – through the 2022 Primary election</u>:

1. Copies of any source code escrow agreement(s)
2. Copies of the Oregon Secretary of State Certificate of Approval for all vote systems utilized after the 2020 General Election (as your office has already provided the Certificates for those utilized prior to this election)
3. Copies of the vote system EAC Certification (if this is what your office relied upon in order to issue the Certificates of Approval in item 2. above)
4. Copies of the vote system examination report issued by the EAC Accredited VSTL (if this is what your office relied upon in order to issue the Certificates of Approval in item 2. above)
5. Copies of the EAC Certificate of Accreditation for the VSTLs utilized in 4. above, being sure to show all Accreditation certificates for the entire time period (2017-2022)
6. Copies of any contracts or purchase orders (as well as any subsequently executed addendum, exhibits, attachments, memorandum of understanding, change orders, etc.) for any component(s) of the vote system/equipment. To include any changes, addendum, exhibits, attachment, memorandum of understanding, etc. I understand your office may not have every record, but I would like all records that your office does have.
7. Copies of any vote system changes, including de minimus changes.

My preferred method of contact for questions, and for receipt of records responsive to this request is via linked cloud document storage to my email: smberlant@yahoo.com.  You have 14 days to respond.

Sincerely,

Shannon Berlant

cc: Oregon Attorney General Ellen Rosenblum

Exhibit SB-31

June 24, 2022

Oregon Attorney General Ellen Rosenblum
255 Capitol Street NE
Salem, Oregon 97301

RE:  COMPLAINT AGAINST Oregon Secretary of State's Office

To Whom It May Concern,

As you can see from the attached correspondence, I have made multiple requests of the Secretary of State's Elections Division office to provide me with copies of all source code escrow agreements, as well as ALL certifications for Oregon's voting system(s) in each of the 36 counties.  Her office is required by federal law (including HAVA), as well as Oregon law (OAR & ORS) to keep all of the records in the attached public record request letter. What I find most troubling, is that despite multiple requests for simple records relating to the certifications of the vote systems, records which her office would need in order to issue their own Certificate of Approval – THEIR OFFICE CONTINUOUSLY dodges and does not supply ANY OF the requested records that are the basis for the Secretary's own "Approval".

My requests on the source code escrow and vote system certifications began on February 24, 2021. The delay for which I bear responsibility is approx. 7 months, while I raised the obscene amount of $1,500 her office required in order to provide the requested records. Her office supplied me with a mere 15 pages of the various Certificates of Approval the Oregon SOS office itself issued. The purpose of public records and open meeting laws is to provide transparency and accountability for Oregon taxpayers. To require the ransom that I already paid their office on December 15, 2021 – and still not provide me with a majority of the requested records should be a crime in Oregon.

I suggest that you inquire with the Secretary of State's office whether they have provided the requested records within the next 14 days. If their office has not provided the records by that time, I further suggest that you investigate the office of the Secretary of State for FRAUDULENTLY certifying every Oregon election since 2018.  If her office fraudulently issued Certificates of Approval, without any underlying basis (VSTL testing and/or EAC & VSTL certifications that are required by both state and federal laws), then any state election result certification is a fraud.

My preferred method of contact for questions, and for receipt of records responsive to this request is via linked cloud document storage to my email: smberlant@yahoo.com

Sincerely,


Shannon Berlant

cc: Oregon Secretary of State – Elections Division

Exhibit SB-31

Public Records Request

From: Oregon Secretary of State (notifications@cognitoforms.com)

To:     smberlant@yahoo.com

Date:   Friday, July 22, 2022 at 02:59 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | An accounting of the hours actually spent compiling the responsive records that have been provided thus far to the requestor. Here I am referring to the SOS office receipt of funds on Dec. 15, 2021 - receipt No. ELT2021-009<br><br>Can you provide an estimation of the timeline it will take for the SOS office to produce the remaining responsive records from records request referenced above, paid on Dec. 15, 2021 ? |

Exhibit SB-32

RE: Public Records Request - Oregon State Elections Division

From:   SOS Elections * SOS (elections.sos@sos.oregon.gov)

To:     smberlant@yahoo.com

Cc:     SOS.PublicRecordsSOS@sos.oregon.gov

Date:   Wednesday, July 27, 2022 at 04:57 PM PDT

Ms. Berlant,

I'm sending this email to follow up on the status this public records request. We provided all responsive records about voting system certifications on February 11, 2022. The cost of fulfilling that request was $75 (3 hours at $25 per hour). A check to refund $1,425 will be placed in the mail by our accounting department tomorrow morning. The check will be sent to the address on your voter registration record. The Secretary of State is not the custodian of county records relating to purchase contracts.

Please note that all future records requests must be submitted through the online form on our website. This is the only mechanism by which we will receive and respond to records requests. Any other method of submission will not initiate the public records request process.

Thank you,

**Alma Whalen** (she/her/ella)

Elections Program Manager

Elections Division | Oregon Secretary of State

Cell: 971.388.1510

We like feedback. [Tell us how we're doing](#).



Exhibit SB-32

## STATE OF OREGON REMITTANCE ADVICE

TO SIGN UP FOR DIRECT DEPOSIT PAYMENT SERVICE AND RECEIVE CONVENIENT,ELECTRONIC
PAYMENTS. LOG IN TO HTTP://WWW.OREGON.GOV/DAS/EGS/FBS/SFMS/PAGES/ACH.ASPX ON THE
INTERNET. CLICK ON FORMS AND BROCHURES. THEN SELECT DIRECT DEPOSIT (ACH)
AUTHORIZATION FORM.

WARRANT NO.
126397051

SECRETARY OF STATE                                    (503) 986-6371

| INVOICE NO. | INVOICE DATE | INVOICE DESCRIPTION | AGY | DOCUMENT | AMOUNT |
|---|---|---|---|---|---|
| 154544001 | | UPS: UNABLE TO FULFILL REQUEST | 165 | VI518162 | $1,425.00 |

| VENDOR NAME | ISSUE DATE | WARRANT AMOUNT |
|---|---|---|
| SHANNON BERLANT | 07/28/22 | $1,425.00 |

FOLD ON PERFORATION LINE BELOW ⊓ BEFORE DETACHING.

Exhibit SB-32

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:    smberlant@yahoo.com

Date:  Friday, July 22, 2022 at 02:43 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Any email, record or log or report that provides the following information for vote system used in all 36 counties from the 2016 primary election though the 2022 primary election. By information on the vote system in use, I expect to learn the make/model/version of each county's vote system utilized in each of the aforementioned elections. |

Exhibit SB-33

| NAME | Shannon Berlant |
| --- | --- |
| PHONE | (503) 335-3453 |
| EMAIL | smberlant@yahoo.com |

**DESCRIBE YOUR REQUEST**

The below record request was sent via USPS to the SOS Election Division on 24 Jun 2022, but I have not received any acknowledgement, nor any responsive records.

This is a public record request. For the below items, the covered time period for requested records, would be for vote systems / equipment in use for the 2017 primary election – through the 2022 Primary election:
1. Copies of any source code escrow agreement(s)
2. Copies of the Oregon Secretary of State Certificate of Approval for all vote systems utilized after the 2020 General Election (as your office has already provided the Certificates for those utilized prior to this election)
3. Copies of the vote system EAC Certification (if this is what your office relied upon in order to issue the Certificates of Approval in item 2. above)
4. Copies of the vote system examination report issued by the EAC Accredited VSTL (if this is what your office relied upon in order to issue the Certificates of Approval in item 2. above)
5. Copies of the EAC Certificate of Accreditation for the VSTLs utilized in 4. above, being sure to show all Accreditation certificates for the entire time period (2017-2022)
6. Copies of any contracts or purchase orders (as well as any subsequently executed addendum, exhibits, attachments, memorandum of understanding, change orders, etc.) for any component(s) of the vote system/equipment. To include any changes, addendum, exhibits, attachment, memorandum of understanding, etc. I understand your office may not have every record, but I would like all records that your office does have.
7. Copies of any vote system changes, including de minimus changes.
My preferred method of contact for questions, and for receipt of records responsive to this request is via linked cloud document storage to my email.

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:    smberlant@yahoo.com

Date:  Friday, July 22, 2022 at 03:17 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | This is a request for public records. |
| | Please provide a copy of ALL full contracts, agreements or memorandums of understanding that your office has with any organizations for election night reporting (Nov. 2020 general election). Some of the possible firms that you may have contracted with - might be: Scytl,Paragon Group, Service Point Solutions, Akira Systems, Wavelength, Supervisors of Elections (SOE), Gov2U, Clarity. |
| | Please provide the visitor record for any CISA or DHS employee visits between 1/1/2018-1/20/2021. Please provide any email or other documentation that might explain why they "visited". |

Exhibit SB-33

Re: Public Records Request - Shannon Berlant

From:  Shannon Berlant (smberlant@yahoo.com)
To:    SOS.PublicRecordsSOS@sos.oregon.gov
Cc:    greg.bergerson@sos.oregon.gov
Date:  Friday, August 5, 2022 at 04:45 PM PDT

Thank you!

For now, agree to limit scope to email communications (and their attachments). However, the records may be in the elections division, or other divisions- so not wanting to limit by department.

Any record that is solely under charity and business registration can be excluded.

All of the terms mentioned relate to Intelligence, information, security, IT and elections.

I have made FOIA requests and usually am provided with a number of "search hits" - can you do that for the two phases and each of the other words?

Shannon

Sent from my iPhone

> On Aug 5, 2022, at 4:21 PM, PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov> wrote:

Thanks for the quick response. My concern is that even the act of running all these searches to determine how many records we have will be prohibitively expensive.

Limiting the scope to email communications would significantly reduce the cost because that's a single database we can look at. Limiting the scope to the Elections Division may help some. But what I believe would be most effective is for me to know what you're hoping to accomplish with the request. So let me know if there is any additional information you can provide.

--

Oregon Secretary of State
Public Records Inbox
Managed by the Public Records Officer or Deputy

**From:** S M B <smberlant@yahoo.com>
**Sent:** Friday, August 5, 2022 4:08 PM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Cc:** BERGERSON Greg * SOS <Greg.BERGERSON@sos.oregon.gov>
**Subject:** Re: Public Records Request - Shannon Berlant

Ben,

You provided no number of search hits for each of the phrases or terms - so I really don't know what to exclude....  Maybe that's something you can do?

Also, I am quite certain that the portion of the SOS records that solely deals with Business and Charity registrations can be excluded.

Let me know,
Shannon

On Friday, August 5, 2022 at 03:47:57 PM PDT, PublicRecords SOS * SOS <sos.publicrecordssos@sos.oregon.gov> wrote:

Good afternoon,

I have reviewed this request and I am concerned with the scope. A keyword search for these terms could produce a very high volume of documents, many of which are likely irrelevant to what you're looking for. This would result in a large fee for producing them.

If you could let me know what you're hoping to accomplish with this request, I may be able to help you narrow your search to avoid large fees and speed up our response.

I'll await your response.

Thanks,

Exhibit SB-33

Ben Morris, Communications Director

--

Oregon Secretary of State
Public Records Inbox
Managed by the Public Records Officer or Deputy

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Friday, July 22, 2022 3:35 PM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Shannon Berlant

# Oregon Secretary of State
## Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

---

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Any record with any of the words:<br><br>"highlands" or<br>"mineralize" or<br>"egotisticalgiraffe" or<br>"frog"<br>"ciphertext"<br><br>OR any of the phrases:<br>"egotistical giraffe" or<br>"block cipher"<br><br>between the time frame 6/30/2012-1/20/2021 |

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)
To:    smberlant@yahoo.com
Date:  Thursday, July 28, 2022 at 01:24 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide all records that show your office complied with OAR 165-007-0350(1) for all vote system(s) used in the state for the November 2020 general election. |

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)
To:    smberlant@yahoo.com
Date:  Thursday, July 28, 2022 at 01:26 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide all records that show your office complied with OAR 165-007-0350(1) for all vote system(s) used in the state for the 2022 primary election. |

Exhibit SB-33

Public Records Request

From: Oregon Secretary of State (notifications@cognitoforms.com)
To:   smberlant@yahoo.com
Date: Thursday, July 28, 2022 at 01:26 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide all records that show your office complied with OAR 165-007-0350(1) for all vote system(s) used in the state for the 2018 general election. |

Exhibit SB-33

Public Records Request

From: Oregon Secretary of State (notifications@cognitoforms.com)

To:     smberlant@yahoo.com

Date: Thursday, July 28, 2022 at 05:17 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide the blank form called "Oregon Voting System Certification Application" and any instructions for the form that your office typically provides to those making application (even if they have to request it). I would like the most recent version of these, as well as any versions that would have been "in effect" during the years 2017-2021.<br><br>The form described might go by another name, but I my intention is the one described in OAR 165-007-0350 (2) |

Exhibit SB-33

**Entry Details**

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | This is a public record request. |

Based on the below information, I would like the following public records:
- SOS Certificate of Approval for all vote systems used in the state during the 2022 primary
- SOS Certificate of Approval for all ADA/handicapped systems used in the state 2016 primary - 2022 primary
- SOS Certificate of Approval for Clear Ballot Clear Vote 1.3.3
- Is there some other system that is used for military or overseas voters that's also approved by the SOS? If so, provide the Certificate of Approval. All systems in use 2016 primary - 2022 primary
- Any other OR SOS "certificates" or "approval" for vote systems requested, but were not provided under prior record request paid for with receipt # ELT 2021-009
- For all voting systems used in the state for the November 2020 general election: copies of the VSTL testing (or sometimes called inspection) plans and/or reports that were one of the basis of the SOS issuance of the Certificate of Approval. These are likely issued by companies by the name of: Pro V&V, or SLI, or Wyle, or NTS, or Systest, etc.
- Any records of source code escrow contract or agreement for any vote system used in the state during the November 2020 general election
- Any agreement or memorandum of understanding with the federal agency: DHS or CISA.

++++++++++++++++++++++++++++++++

On Wednesday, July 27, 2022 at 04:57:23 PM PDT, SOS Elections * SOS wrote:


Ms. XXXXXX,

I'm sending this email to follow up on the status this public records request. We provided all responsive records about voting system certifications on February 11, 2022. The cost of fulfilling that request was $75 (3 hours at $25 per hour). A check to refund $1,425 will be placed in the mail by our accounting department tomorrow morning. The check will be sent to the address on your voter registration record. The Secretary of State is not the custodian of county records relating to purchase contracts.



Please note that all future records requests must be submitted through the online form on our website. This is the only mechanism by which we will receive and respond to records requests. Any other method of submission will not initiate the public records request process.


Thank you,
Alma Whalen

Exhibit SB-33

Input Received: DAS public records request

From: orprdsupport@egov.com
To:   smberlant@yahoo.com
Date: Sunday, July 31, 2022 at 10:22 PM PDT

## DAS public records request

Submitted: 7/31/2022 10:22:39 PM

| | |
|---|---|
| Name | Shannon Berlant |
| Organization or business name | |
| Address | , United States |
| Email | smberlant@yahoo.com |
| Phone | (503) 335-3453 |
| Description of records you seek (please be specific): | Please provide the records showing the typical network path (including addresses) of any oregon.gov website from the SERVER(S) where the website is housed, up to the oregon.gov website. This might include records of one or more of the following networks: Akamai Technologies, Hurricane Electric (he.net), other anonymous Akamai Technologies offshore servers, L3 Communications, Telia AB I would like a copy of the contract between the state of Oregon and the server space provider for the oregon.gov website (likely Telia AB, but there could be an intermediary that is paid, but Telia AB could be a sub-contractor) |
| Please choose one option: | I would like electronic copies of records |

 DAS public records request - Entries.csv
1.1kB

Exhibit SB-33

Re: NEW FOIA

---

From: Camden Kelliher (ckelliher@eac.gov)

To:    smberlant@yahoo.com

Date: Monday, August 8, 2022 at 01:19 PM PDT

---

Good afternoon,

Please find attached the EAC's acknowledgement to your submitted FOIA request.

Additionally, in regard to FOIA 22-00155, EAC Testing and Certification has confirmed that the systems you listed in that request are not EAC certified systems.

Sincerely,

Camden Kelliher

**Camden Kelliher** | Associate Counsel
U.S. Election Assistance Commission
633 3rd Street NW, Suite 200 | Washington, DC 20001

Exhibit SB-33



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

July 27, 2022

Shannon Berlant
smberlant@yahoo.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request (No. 22-00155):

"This is a request for public records pursuant to FOIA.  At your earliest convenience, please
forward a copy of the EAC's Certificate of Conformance and Scope for the following voting
systems:

Clear Vote (or Clear Ballot) 1.1
Clear Vote (or Clear Ballot) 1.2
Clear Vote (or Clear Ballot) 1.3
Clear Vote (or Clear Ballot) 1.3.3
Clear Vote (or Clear Ballot) 2.1
Clear Vote (or Clear Ballot) 2.2.1."

The EAC does not possess records responsive to your request. Please note that information on
EAC Certified Systems is available here: https://www.eac.gov/voting-equipment/certified-
voting-systems. Additionally, please see here for Frequently Asked Questions on EAC
Certification: https://www.eac.gov/voting-equipment/frequently-asked-questions.

This letter completes the response to your request. If you interpret any portion of this response as
an adverse action, you may appeal this action to the Election Assistance Commission.  Your
appeal must be in writing and sent to the address set forth below.  Your appeal must be
postmarked or electronically transmitted within 90 days from the date of the acknowledgment to
your request.  Please include your reasons for reconsideration and attach a copy of this and
subsequent EAC responses.

U.S. Election Assistance Commission
FOIA Appeals
633 3rd Street NW, Suite 200
Washington, DC 20001

Additionally, you may contact the Office of Government Information Services (OGIS) at the
National Archives and Records Administration to inquire about the FOIA mediation services

Exhibit SB-33



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

they offer.  The contact information for OGIS is as follows: Office of Government Information
Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College
Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you have any questions please contact my office at your convenience.

Sincerely,

*Camden Kelliher*

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov

Exhibit SB-33

From:   Oregon Secretary of State (notifications@cognitoforms.com)
To:     smberlant@yahoo.com
Date:   Thursday, August 4, 2022 at 05:52 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide a copy of the Oregon Secretary of State's "Certificate of Approval" for all vote systems used in the state from Nov. 5, 2020 thru to the current date that your office processes the request. |

Exhibit SB-33

Input Received: DAS public records request

From: orprdsupport@egov.com
To:   smberlant@yahoo.com
Date: Tuesday, August 9, 2022 at 02:22 PM PDT

## DAS public records request

Submitted: 8/9/2022 2:22:36 PM

| | |
|---|---|
| Name | Shannon Berlant |
| Organization or business name | self |
| Address | 8290 SW Peters Road Portland, or 97224 United States |
| Email | smberlant@yahoo.com |
| Phone | (503) 335-3453 |
| Description of records you seek (please be specific): | Please provide the record(s) showing the typical network path (including addresses) of any oregon.gov website from the SERVER(S) where the website is housed, up someone accessing the oregon.gov website at any Oregon state office. This might include records of one or more of the following networks: Akamai Technologies, Hurricane Electric (he.net), other anonymous Akamai Technologies offshore servers, L3 Communications, Telia** . I would like a copy of the contract between the state of Oregon and the server space provider for the oregon.gov website (likely Telia AB, but there could be an intermediary that is paid, but Telia** could be a sub-contractor). **note: Telia might now be called Arelion or Polhem Infra. Some functions moved from telia.net to twelve99.net in 2021/2022 |
| Please choose one option: | I would like electronic copies of records |

 DAS public records request - Entries.csv
1.3kB

Exhibit SB-33

Input Received: DAS public records request

From:  orprdsupport@egov.com
To:    smberlant@yahoo.com
Date:  Tuesday, August 9, 2022 at 02:33 PM PDT

## DAS public records request

Submitted: 8/9/2022 2:33:51 PM

| | |
|---|---|
| Name | Shannon Berlant |
| Organization or business name | self |
| Address | 8290 SW Peters Road Portland, or 97224 United States |
| Email | smberlant@yahoo.com |
| Phone | (503) 335-3453 |
| Description of records you seek (please be specific): | Please provide copies of all CURRENT agreement(s), contract(s), memorandum of agreement(s), memorandum of understanding(s) or Intragovernmental Agreement(s) between Oregon's DAS and any of Oregon's 36 counties and/or the Oregon Secretary of State and/or the EI-ISAC and/or CIS and/or Crowdstrike (also "crowd strike"). These would be for any of these services: cyber security , endpoint detection and response, elections infrastructure, albert monitoring. I would also like information and records about any third parties that might be partnered, contracted or sub-contracted for same above services. Especially any that are located OUTSIDE of the continental United States. |
| Please choose one option: | I would like electronic copies of records |

 DAS public records request - Entries.csv
1.2kB

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:     smberlant@yahoo.com

Date:  Thursday, August 11, 2022 at 04:05 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide the Oregon Secretary of State's Certificate of Approval for all Five Cedars voting system(s) used throughout the state of Oregon for the November 2020 election. |

Exhibit SB-33

Public Records Request

From:   Oregon Secretary of State (notifications@cognitoforms.com)
To:     smberlant@yahoo.com
Date:   Thursday, August 11, 2022 at 04:06 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide the Oregon Secretary of State's Certificate of Approval for all Five Cedars voting system(s) used throughout the state of Oregon for the May 2022 primary election. |

Exhibit SB-33

Public Records Request

From: Oregon Secretary of State (notifications@cognitoforms.com)
To:      smberlant@yahoo.com
Date:   Thursday, August 11, 2022 at 04:08 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide all records that show that the Oregon Secretary of State complied with OAR 165-007-0350(1) when the Oregon SOS office issued their Certificate of Approval for all Five Cedars voting system(s) used throughout the state of Oregon for the November 2020 election. |

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:    smberlant@yahoo.com

Date:  Thursday, August 11, 2022 at 04:09 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide all records that show that the Oregon Secretary of State complied with OAR 165-007-0350(1) when the Oregon SOS office issued their Certificate of Approval for all Five Cedars voting system(s) used throughout the state of Oregon for the May 2022 primary election. |

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:    smberlant@yahoo.com

Date:  Thursday, August 11, 2022 at 04:12 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide a copy of the EAC accredited VSTL test / inspection plan, as well as the test / inspection report for all Oregon SOS "Approved" voting systems used throughout the state of Oregon for the November 2020 general election. |

Exhibit SB-33

Public Records Request

From: Oregon Secretary of State (notifications@cognitoforms.com)
To:   smberlant@yahoo.com
Date: Thursday, August 11, 2022 at 04:13 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide a copy of the EAC accredited VSTL test / inspection plan, as well as the test / inspection report for all Oregon SOS "Approved" voting systems used throughout the state of Oregon for the May 2022 primary election. |

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:    smberlant@yahoo.com

Date:  Thursday, August 11, 2022 at 04:15 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide a copy of the Oregon Secretary of State's Certificate of Approval for the Clear Ballot Clear Vote (or Clear Count) 1.3.3 vote tally system |

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)
To:    smberlant@yahoo.com
Date:  Thursday, August 11, 2022 at 04:25 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | Please provide a copy of any CURRENT contract, agreement, memorandum of agreement, memorandum of understanding, and/or intergovernmental agreement and/or intragovernmental agreement FOR cyber security services and/or endpoint detection and response services and/or other election related infrastructure. Whether for the Oregon SOS, DAS, any of Oregon's 36 counties, or with these entities: Crowstrike (or "crowd strike"), Department of Homeland Security, CISA, EI-ISAC, MS-ISAC, CIS. |

Exhibit SB-33

Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:    smberlant@yahoo.com

Date:  Thursday, August 11, 2022 at 04:27 PM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

## Entry Details

| | |
|---|---|
| **NAME** | Shannon Berlant |
| **PHONE** | (503) 335-3453 |
| **EMAIL** | smberlant@yahoo.com |
| **DESCRIBE YOUR REQUEST** | All emails (including attachments), whether sent/received/cc/bcc -- between the dates: 1/21/2016 thru to when you process this record request.... THAT CONTAIN the word "crowdstrike" or phrase "crowd strike". |

Exhibit SB-33

Public Records Request

From:   Oregon Secretary of State (notifications@cognitoforms.com)

To:     smberlant@yahoo.com

Date:   Thursday, August 18, 2022 at 10:01 AM PDT

# Oregon Secretary of State
## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15 business days to provide records unless your request is non-routine. We will notify you if we expect our response to take longer.

Exhibit SB-33

## Entry Details

**NAME**

Shannon Berlant

**PHONE**

(503) 335-3453

**EMAIL**

smberlant@yahoo.com

**DESCRIBE YOUR REQUEST**

Your website (https://sos.oregon.gov/elections/Pages/voting-systems.aspx) lists the Clear Ballot Clear Vote 2.2 system.

The Oregon SOS issued approval (https://sos.oregon.gov/elections/Documents/vote-systems/Clear-Ballot-2-2-Certification.pdf) is in the document properties is showing that the document was created 2/12/2022 at 6:14:56 PM; yet was modified on8/8/2022 at 1:31:39 PM. The Voting System Test Report is missing.

This is a public record request. I would like a copy of the voting system inspection/test report that the Oregon SOS relied upon to issue their own Certificate of Approval. I would also like a copy of the Oregon Secretary of State Certificate of Approval, that is the earliest version in your records, closest to the purported document's date of signature -February 14, 2022.

Thank you!

Exhibit SB-33

June 23, 2022


«County» County Elections Clerk
«Address_1»
«Address_2»


RE:  Public Records Request


To Whom It May Concern,

Free, fair and open elections are a bedrock of Oregon's democratic process. I looked over your county's website and was quite surprised that most of this information was not easily accessible for the public. This is not only a lack of transparency, but because our vote IS OUR VOICE, this directly attacks the democratic process itself, undermining confidence in elections. Citizens have a right to see every document showing that tabulation systems comply with both Oregon and Federal (HAVA act) laws. Oregonians also have a right to inspect any contract or agreement, the government has signed on their behalf, as well as an expectation of transparency of the various functions and type(s) of equipment and vote systems that were PURCHASED ON OUR BEHALF.

This is a public information request.

For all below items, the covered time period for requested records, would be for vote systems / equipment in use for the 2016 primary election – through the 2022 Primary election:

1. All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (6). This should include any log of modifications made: with date(s); name of persons and/or companies involved in making the modification; version number(s); and any other information that describes the modification or changes made.
2. All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (1). This should include a copy of the EAC Certificate of the voting system itself; and/or the EAC Certification of the accredited VSTL.
3. All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (3)(b)(A-C)
4. All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (3)(c)(A-C)

Copies of all purchase orders, contracts, agreements, memorandums of understanding, amendments, exhibits, attachments, addendums, etc. - RELATING TO ALL election machines, equipment and/or systems used to: cast ballots, mark ballots, scan, tabulate, adjudicate or aggregate results for the captioned elections. This should include information about the machine, equipment or system's: purchase, certification(s), testing, calibration, initial RFQ response, **source code escrow**; additionally any reports or logs for update(s), upgrade(s), and trouble report(s) -- regardless of whether the document or communication was: internal, external, inter-agency or intra-agency.

Exhibit SB-34

My preferred method of contact for questions, and for receipt of records responsive to this request is via linked cloud document storage to email: smberlant@yahoo.com

Sincerely,


Shannon Berlant

Exhibit SB-34

June 26, 2022


«County» County
Attn: Purchasing public records
«Address_1»
«Address_2»


RE:  Public Records Request


To Whom It May Concern,

This is a public record request. For the below items, the covered time period for requested records, would be for vote systems / equipment in use for the 2016 primary election – through the 2022 Primary election:

1. Copies of the source code escrow agreement
2. Copies of the executed initial purchase order or contract (as well as any subsequently executed addendum, exhibits, attachments, memorandum of understanding, change orders, etc.) for any component(s) of the vote system/equipment. To include any changes, addendum, exhibits, attachment, memorandum of understanding, etc.
3. Copies of the initial (as well as any subsequently issued) maintenance agreement(s)

My preferred method of contact for questions, and for receipt of records responsive to this request is via linked cloud document storage to my email: smberlant@yahoo.com

Sincerely,


Shannon Berlant

Exhibit SB-34

public record request

From: S M B (smberlant@yahoo.com)
To: derrin.robinson@co.harney.or.us; kerry.opie@co.harney.or.us; tammy.attleberger@co.harney.or.us
Date: Tuesday, August 9, 2022 at 12:39 PM PDT

Hello,

Around the end of June 2022, I had sent two separate letters via USPS requesting most of these public records.  Since I haven't received any acknowledgement, I assume both letters were lost.  (sorry in advance, if they weren't lost and some of these are a duplicate request, but I had not heard back)


This is a public records request

1. Please provide records that provide the information of vote system's make/model/hardware version/software version for system(s) used in all elections from 2016 primary thru to the 2022 primary. This is not a request for your security plan. Responsive records might include: maintenance log, certain pages of the user manual (not asking for the entire manual, just the pages that show the information; redact other sensitive information on the page(s)), email or document from delivery or installation of the system (or it's upgrades), or you might have other responsive records with the information sought.

2. Please provide a copy of the purchase contract (including any changes or additions; and especially the source code escrow agreement portion) and maintenance agreement for the vote system used in each election from the 2016 primary thru the 2022 primary election.  These are often already in the public domain, as they are usually attached to the meeting packet for the county commissioners, from when they approved the purchase.

3. Any records showing that the vote system(s) used in the 2016 primary thru the 2022 primary election were:
  a. EAC certified; or inspected/tested by an EAC accredited VSTL;
  b. that the VSTL was properly accredited by the EAC;
  c. that the vote system(s) were approved by the Oregon Secretary of State.  While county clerks are not required to use vote tally systems in Oregon, if a county clerk chooses to use such a vote system, the county clerk is required by Oregon law to ONLY use and procure vote systems that have been approved by the Secretary of State - so there must be some record, document, email or other communication that the system(s) and/or upgrades your office chose and used were SOS "approved".

4. A copy of the inspection/test report issued by the EAC accredited VSTL for the vote system used in the 2016 primary thru the 2022 primary elections.

5. A copy of the most recent contract or agreement or memorandum of agreement or memorandum of understanding between County and any of these entities:  DHS / CIS / CISA / MS-ISAC / EI-ISAC - and/or Oregon's DAS for service(s) for EDR and/or CIS and/or Albert monitoring services.

6. A copy of the Election Activity Log for the November 2020 general election.


Please let me know if you need clarification or have questions,
Shannon Berlant
503.335.3453

Exhibit SB-34

public record request

---

From: S M B (smberlant@yahoo.com)

To: publicrecords@lanecountyor.gov; elections@lanecountyor.gov

Date: Tuesday, August 9, 2022 at 01:30 PM PDT

---

This is a public records request

1. Please provide a copy of the purchase contract (including any changes or additions; and especially the source code escrow agreement portion) and maintenance agreement for the vote system used in each election from the 2016 primary thru the 2022 primary election.  These are often already in the public domain, as they are usually attached to the meeting packet for the county commissioners, from when they approved the purchase.

2. A copy of the Election Activity Log for the November 2020 general election.

3. A copy of the most recent contract or agreement or memorandum of agreement or memorandum of understanding between County and any of these entities:  DHS / CIS / CISA / MS-ISAC / EI-ISAC - and/or Oregon's DAS for service(s) for EDR and/or CIS and/or Albert monitoring services.

4. Please provide records that provide the information of vote system's make/model/hardware version/software version for system(s) used in all elections from 2016 primary thru to the 2022 primary. This is not a request for your security plan. Responsive records might include: maintenance log, certain pages of the user manual (not asking for the entire manual, just the pages that show the information; redact other sensitive information on the page(s)), email or document from delivery or installation of the system (or it's upgrades), or you might have other responsive records with the information sought.

5. Any records showing that the vote system(s) used in the 2016 primary thru the 2022 primary election were:
   a. EAC certified; or inspected/tested by an EAC accredited VSTL;
   b. that the VSTL was properly accredited by the EAC;
   c. that the vote system(s) were approved by the Oregon Secretary of State.  While county clerks are not required to use vote tally systems in Oregon, if a county clerk chooses to use such a vote system, the county clerk is required by Oregon law to ONLY use and procure vote systems that have been approved by the Secretary of State - so there must be some record, document, email or other communication that the system(s) and/or upgrades your office chose and used were SOS "approved".

6. A copy of the inspection/test report issued by the EAC accredited VSTL for the vote system used in the 2016 primary thru the 2022 primary elections.


Please ask for clarification or any questions via either phone or email.  I prefer to receive the responsive records via email.

Please let me know if you need clarification or have questions,
Shannon Berlant
503.335.3453


 Lane Form.pdf
137.4kB

Exhibit SB-34

Public Records Request Response

From:  skirby@bakercounty.org (skirby@bakercounty.org)

To:     smberlant@yahoo.com

Date:  Tuesday, July 12, 2022 at 01:04 PM PDT

Hi Shannon,

This email is a response to your two public records requests.

In response to the request dated June 26, 2022 which I received in the mail July 5, 2022 you  requested the following information:

For the below items, the covered time period for requested records, would be for vote systems / equipment in use for the 2016 primary election - through the 2022 Primary election:
1. Copies of the source code escrow agreement
2. Copies of the executed initial purchase order or contract (as well as any subsequently executed addendum, exhibits, attachments, memorandum of understanding, change orders, etc.) for any component(s) of the vote system / equipment.  To include any changes, addendum, exhibits, attachment, memorandum of understanding, etc.
3. Copies of the initial (as well as any subsequently issued) maintenance agreement(s)

Requested record #1, source code escrow agreement, is a non-existent record within Baker County records so it is not provided.

Requested records #2 and #3 are covered within the attached Sales Order Agreement for the ES&S DS450 Scanner, which includes the maintenance agreement within that document.  There is also a System Purchase Order for a stand alone reporting computer system which is used for results reporting purposes.

Baker County is waiving the fees for the records provided in this request due to the fact that minimal time was spent locating these documents.  Please note that any future requests will be subject to applicable fees.  This completes the public records request dated June 26, 2022 and received by mail July 5, 2022 as any requested records in Baker County custody have been provided.

In response to the request dated and received via e-mail July 6, 2022 you requested the following information:

As far as the records, again the covered time period I am seeking public records for - would be for vote systems / equipment in use for the 2016 primary election – through the 2022 Primary election. Please clarify and/or modify the original records request (letter dated Jun 23, 2022):

1. Since initial purchase have any upgrades, changes or modifications to the machines taken place?

2. Do you have records as to whom showed up and when they showed up and what modifications they made (including version numbers) to the voting systems that your county utilized to tabulate ballots for the elections that occurred between 2016-2022? ORS 246.565 (3) says that the County Clerk has to keep the logs for updates/maintenance, so aren't you able to provide those records?

3. If you are you stating that the County Clerk's office did not verify that the underlying OAR/ORS requirements were met for the SOS's Certification and that the County Clerk solely relied upon the Oregon SOS's Certification, then please provide the OR SOS Certificates that cover the captioned time period for all of the machines that were utilized.

The above requested records are more in form of questions.  I am left to assume the following records would be helpful in the information you are requesting.

Requested record #1, Baker County is not in custody of such documentation as no upgrades, changes or modifications have been done since purchase and implementation of our current system in January of 2021.

Requested record #2 is covered in the attached maintenance log which goes back to purchase and implementation of the ES&S DS450 in January of 2021.

Requested record #3, Baker County is not in custody of the requested records.  For certification information, you may fill out a records request through the Oregon Secretary of State's Office.

Baker County is waiving the fees for the records provided in this request due to the fact that minimal time was spent locating these documents.  Please note that any future requests will be subject to applicable fees.  This completes the public records request dated July 6, 2022 and received via e-mail July 6, 2022 as any requested records in Baker County custody have been provided.

Thank you,

Exhibit SB-34

**Stefanie Kirby / C.R.A., C.E.A.**
**County Clerk**
Baker County Clerk's Office
1995 Third St., Ste. 150 / Baker City, OR 97814
Office: 541.523.8207 / Fax: 541.523.8240
skirby@bakercounty.org / www.bakercounty.org

20220706155447536.pdf
3.8MB

20220706155504587.pdf
421.1kB

20220711152409984.pdf
43.7kB

Exhibit SB-34



Election Systems & Software, LLC
11208 John Galt Blvd
Omaha, NE 68137

# EVS 6.1.0.0 Reporting Standard, Standalone EMS

## System Purchase Order

November 23, 2020

### Baker County, Oregon

1995 3rd St  Ste 150
Baker City, OR 97814-3365

| Quantity | Part Number | Description | Price | Ext. Price |
|---|---|---|---|---|
| | | **EMS WORKSTATION** | | |
| 1 | 5587 | **TOSHIBA TECRA A50** | $1,806.00 | $1,806.00 |
| | | • Toshiba Tecra A50 <br> • Intel ULV Core i5-6300U <br> • TPM 2.0 Enabled <br> • 15.6" Display <br> • 16GB RAM - DDR3L 1600 <br> • 512GB M.2 SSD Hard Drive <br> • 1Gbps LAN <br> • USB 3.0 x 4 <br> • Windows 10 <br> • 5 Year On-Site Standard Warranty | | |
| 1 | F88871 | **WINDOWS 10 ENTERPRISE LTSC** | $128.00 | $128.00 |
| 1 | F88871 | **SYMANTEC ENDPOINT PROTECTION 14.2.0** | $61.00 | $61.00 |
| 1 | F88871 | **DELL EXTERNAL USB SLIM DRIVE +/- RW OPTICAL DRIVE** | $70.00 | $70.00 |
| 1 | F88871 | **Brother HL-L6400DW B/W Duplex Laser Printer (optional)** | $462.00 | $462.00 |
| 1 | F88871 | **LD 6' USB 2.0 A-B CABLE,T,IVOTR,RTAL 6' USB CABLE** | $4.00 | $4.00 |
| | | **SERVICES** | | |
| 1 | 510210 | Standalone EMS Installation Description <br><br> • Staging of EMS workstations at ES&S Technical Services lab. o Includes the installation, configuration, and testing of EMS workstation. <br><br> • Equipment is shipped to customer location. o Physical installation of workstation and related hardware (Printer, UPS, etc.) performed by customer. <br><br> • EMS installation summary documentation provided to customer upon completion of installation. | $1,300.00 | $1,300.00 |
| | | **ORDER TOTAL** | | **$3,831.00** |

**Invoicing and Payment Terms:**
100% of Order Total Due Thirty (30) Calendar Days after the later of (a) Equipment Delivery, or (b) Receipt of corresponding ES&S Invoice.

**Note 1:** Pricing of purchase order is valid for 30 days due to fluctuating pricing in 3rd party hardware and software. Agreements will need to be updated if not executed within 30 days.
**Note 2:** In no event shall Customer's payment obligations hereunder, or the due dates for such payments, be contingent or conditional upon Customer's receipt of federal and/or state funds.
**Note 3:** Any applicable (City & State) sales taxes have not been included in pricing and are the responsibility of the customer.
**Note 4:** Shipping and Handling is not included in the Order Total and will be invoiced separately.
**Note 5:** Network Cabling is not included.

Exhibit SB-34

Customer acknowledges that ES&S is purchasing the third-party items set forth herein ("Third Party Items") for resale to Customer, and that the proprietary and intellectual property rights to the Third-Party Items are owned by parties other than ES &S ("Third Parties"). Customer further acknowledges that except for the payment to ES& S for the Third-Party Items, all of its rights and obligations with respect thereto flow from and to the Third Parties. ES&S shall provide Customer with copies of all documentation and warranties for the Third-Party Items which are provided to ES &S.

_____    _____    12 - 23 - 2020
Customer Signature                                     Date

_____    _____
Title

Exhibit SB-34

Public Records Request, Received 07/01/2022

From:  Rochelle Long (rlong@co.klamath.or.us)

To:      smberlant@yahoo.com

Date:  Thursday, July 7, 2022 at 10:22 AM PDT

Dear Shannon Berlant,
We are in receipt of the attached public records request received July 1, 2022.

**Request:** Attached.

**Response:**

1. This document does not exist.

2. Portion of Contract/Agreement attached. The rest is exempt from public disclosure under ORS 192.345 (23)(c).

3. This/These document(s) do not exist.

**Cost:** $0.00

This request is closed. Any other requests asking for the same information will receive no response.

Our preferred for public records request is to use the public records request form provided in the link below:

Form Center • Klamath County, OR • CivicEngage

Regards,

Rochelle Long

Klamath County Clerk

305 Main St

Klamath Falls, OR  97601

P: 541.883.5134, F: 541.885.6757

DISCLOSURE NOTICE: Messages to and from this e-mail address may be subject to Oregon Public Records Law. The information contained herein does not constitute legal advice. Information provided herein should be verified with receiver's own legal counsel.

 Public_Records_Request_07-01-22.pdf
18.9kB

 Contract.pdf
4.3MB

Exhibit SB-34

CJ2015-000616
Klamath County, Oregon

# AGENDA REPORT
## BOARD OF COUNTY COMMISSIONERS

| **AGENDA CATEGORY:** Contract | **ITEM NO:** K 1 |
|---|---|

**ORIGINATING DEPARTMENT:** CLERK

**DATE ACTION REQUESTED:** 10/20/15      **DATE ACTION TAKEN:**

**ISSUE: Accepting the contract with Clear Ballot for the software and hardware for Klamath County's voting system.**

**BACKGROUND & CONCLUSIONS: Klamath County's vote tally system is in need of being upgraded. Multnomah County issued an RFP in 2015 that Klamath County is able to utilize. The company that provides the services that will be most beneficial to Klamath County is Clear Ballot. Clear Ballot will replace the County's current ES&S system and will be used to design and tally ballots.**

**FISCAL IMPACT:   $71,000 perpetual license agreement and $41,246.83 hardware purchase for a total of $112,246.83. The training fees will be determined and Klamath County will try to partner with other counties to share training costs. The annual maintenance fee will be $23,000.**

**RECOMMENDED MOTION:   Enter into a contract with Clear Ballot for the hardware and software for Klamath County's voting system. Fiscal impact in the amount of $112,246.83.** *Annual Maintenance fee of $23,000 and training fees to be determined. Authorize the chair to sign.*

**DEPARTMENT HEAD APPROVAL:** *Linda Smith*

**CONTRACT SPECIALIST APPROVAL:**

**BUDGET OFFICER APPROVAL:** *10/14/2015*

**COUNTY COUNSEL REVIEW:** *10/15/2015*

**COMMISSIONER LIAISON APPROVAL:** *James Bellet 10/15/15*

---

**APPROVED THIS _____ DAY OF _____**

_____
by the Klamath County Board
of Commissioners

*CERTIFIED by_____*
            Recording Secretary

| DISTRIBUTION: |
|---|
| **1 - ORIGINAL – CLERK** |
| - ORIGINAL –_____ |
| 1 - PROCEEDINGS |
| 1 - FILE |
| 1 - Department / Agency |
| 1 - |
| 1 - |
| 1 -            Total: _____ |

bluesheettemplate 03/08/13

Exhibit SB-34

**RECOMMENDED MOTION:**  Enter into a contract with Clear Ballot for the hardware and software for Klamath County's voting system.  Fiscal impact in the amount of $112,246.83 with an annual maintenance fee of $23,000 and training fees to be determined.  Authorize the chair to sign.

DONE AND DATED this _____20th_____ day of _October_, 2015.

☒ Approved
☐ Denied

_____
Chair

☒ Approved
☐ Denied

_____
Commissioner

☒ Approved
☐ Denied

_____
Commissioner

Exhibit SB-34



# Clear Ballot

**CLEAR BALLOT GROUP
SOFTWARE LICENSE
AND SERVICES AGREEMENT**

This Software License and Services Agreement ("Agreement") dated for reference purposes as of October 20 2015, ("Effective Date") is entered into between Clear Ballot Group, Inc., a Delaware corporation ("Clear Ballot") and Klamath County, Oregon, a political sub-division of the State of Oregon ("Customer").

## 1   DEFINITIONS

1.1   "Authorized Users" means Customer's employees and such other types of users, if any, as may be expressly authorized in an Order and who are performing services solely for the benefit of Customer. Unless expressly provided otherwise in the relevant Software Order, Authorized Users do not include Customer's vendors, contractors, or any other third parties, including technology service providers.

1.2   "Agreement" means this Agreement, all Software, Support and Service Orders and any exhibits attached hereto.

1.3   "Days" means calendar days, unless specified otherwise.

1.4   "Designated Jurisdiction" means the jurisdiction in which the Licensed Software and Services will be used, and includes all jurisdictions for which the Designated Jurisdiction administers elections on behalf of. The initial Designated Jurisdiction shall be identified in the applicable Software Order.

1.5   "Documentation" means the documentation made generally available by Clear Ballot to its customers for use of the Licensed Software, as updated from time-to-time by Clear Ballot in its discretion.

1.6   "Licensed Software" means the Object Code version of Clear Ballot's ClearVote Software ("CBG Software") and the Object Code version of any other computer programs to be licensed by Clear Ballot to Customer under a Software Order, including any bug fixes, updates and new releases thereof provided by Clear Ballot as part of Support Services or purchased by Customer under a subsequent Software Order. The Licensed Software shall be used solely for the purposes of defining an election and tabulating and reporting election results in the Designated Jurisdiction. The term "Licensed Software" also includes any and all Documentation applicable to such computer programs.

1.7   "Object Code" means computer programs assembled or compiled, which are readable and usable by machines, but not generally readable by humans without reverse-assembly, reverse compiling, or reverse-engineering.

1.8   "Order" means a request to license Licensed Software (a "Software Order") or purchase Services (a "Service Order") under this Agreement. Each Order will be sequentially numbered and specifically reference this Agreement.

1.9   "Services" means, collectively, any Support Services or Professional Services, both as defined below, purchased by Customer under an Order.

1.10   "Source Code" means computer programs written in higher-level programming languages, sometimes accompanied by English language comments. Source Code is intelligible to trained programmers and may be translated to Object Code for operation on computer equipment through the process of compiling.

1.10.1   "Source Code Escrow" means the storage of the Source Code in an account with an independent third-party escrow provider.

1.11   "Warranty Period" means three-hundred-sixty-five (365) calendar days for ClearVote Software from the completion of Final Acceptance (as defined in the SOW) testing by the Designated Jurisdiction.

## 2   SOFTWARE, SUPPORT AND SERVICE ORDERS

2.1   *Master Agreement.* This is a master agreement under which Customer may order software products, services and support from Clear Ballot. Clear Ballot's acceptance of any Order made by Customer under this Agreement shall be subject to all applicable provisions of this Agreement, as well as any additional provisions that may be set forth in the Order. In the event of conflicting terms or conditions, the terms of the Agreement shall govern.   Exhibits 1, A-1, B-2, 3, & 4, are attached to this contract and by reference incorporated herein

2.2   *Software Orders.* Customer may order software products by using a Software Order in the form shown in Exhibit A-1 (Software Order). Upon Clear Ballot's receipt of a Software Order from Customer, the software products described in the Software Order will be "Licensed Software" for purposes of this Agreement.

2.3   *Support.* Customer support will be accessible via phone, e-mail, and a secure web portal on the Clear Ballot website. Detail on support is set forth in the Service Level Agreement, attached hereto as Exhibit B-2.

2.4   *Service Orders.* Customer may order on-site support and services for the Licensed Software by signing and delivering to Clear Ballot an order in a form approved by Clear Ballot.

## 3   LICENSE AND RESTRICTIONS

3.1   *Grant of License.* Subject to the terms and conditions of this Agreement and provided Customer has paid all undisputed fees and costs due under this Agreement, Clear Ballot grants Customer a perpetual, nonexclusive, nontransferable license to use the Licensed Software during the term set forth in the applicable Software Order. Authorized Users may use the Licensed Software on Licensee's behalf for the purposes contemplated herein.  Customer shall ensure Authorized Users comply with all relevant terms of this Agreement and any failure to comply will constitute a breach by Customer. Customer may make a single copy of the Licensed Software for backup and archival purposes.

3.2   *Restrictions on Use.* Except as expressly authorized by this Agreement, Customer may not knowingly (i) use or permit the Licensed Software to be used in any manner, whether directly or indirectly, that would enable Customer's employees, agents,

Exhibit SB-34

or any other person or entity to use the Licensed Software in any jurisdiction other than the Designated Jurisdiction or for anyone's benefit other than Customer, (ii) rent, sell, assign, lease, sublicense, or otherwise transfer the Licensed Software, (iii) derive or attempt to derive the Source Code, source files, or structure of all or any portion of the Licensed Software by reverse engineering, disassembly, decompilation, or any other means, except to the extent permitted by applicable law, (iv) copy, translate, port, modify, or make derivative works based on the Licensed Software, (v) use the Licensed Software except as set forth in the Documentation, (vi) use the Licensed Software or Clear Ballot Confidential Information to contest the validity of any Clear Ballot intellectual property, including the Licensed Software; (vii) modify, remove, or destroy any proprietary markings or confidentiality legends placed upon or contained within the Licensed Software, the Documentation, or any related materials; (viii) use the Licensed Software in a manner to compete with Clear Ballot or to assist a third party in competing with Clear Ballot; (ix) except with Clear Ballot's prior written consent, use the Licensed Software outside the Designated Jurisdiction; (ix) operate a service bureau or other similar service for the benefit of third parties using the Licensed Software; (x) export, directly or indirectly, the Licensed Software from the United States; or (xi) disclose the Licensed Software to any non-U.S. national in the United States in violation of any United States export or other similar law (e.g., unauthorized "deemed exports"). Notwithstanding the foregoing, Clear Ballot expressly authorizes Customer to temporarily use or allow use of the software on behalf of or by other Clear Ballot Customers ("Other Customers") for purposes of continuity of operations of the Other Customer in the event of an emergency. ▓▓▓▓▓▓▓▓

3.3 *Minimum System Configuration*. The minimum hardware and software requirements for proper operation of the Licensed Software are set forth in the Software Order or the relevant Documentation. Such minimum requirements shall not be augmented or otherwise revised to significantly increase the requirements or render existing hardware or software unsupportable without Clear Ballot providing to Customer at least 180 days prior written notice of Clear Ballot's intent to do so. Customer shall be solely responsible for purchasing, providing and installing all other required equipment, networks, peripherals and hardware not included in the Statement of Work.

3.4 *Intellectual Property Ownership*. The Licensed Software contains material that is protected by United States copyright, trade secret law and other intellectual property law, and by international treaty provisions. All rights not expressly granted to Customer under this Agreement are reserved by Clear Ballot. All copyrights, patents, trade secrets, trademarks, service marks, tradenames, moral rights and other intellectual property and proprietary rights in the Licensed Software and Services will remain the sole and exclusive property of Clear Ballot or its licensors, as applicable. Customer agrees and acknowledges that (i) Except in the case of any work product

contracted for by Customer pursuant to a mutually agreed Statement of Work and specified in such Statement of Work as work-made-for-hire under Section 101 of Title 17 of the United States code, and developed by Clear Ballot under said Statement of Work, Clear Ballot will be the exclusive owner of all right, title and interest in and to all software, programming, tools, documentation, materials and other intellectual property of any kind used, developed, or delivered by Clear Ballot to Customer in connection with this Agreement; and (ii) this is not a work-made-for-hire agreement under Section 101 of Title 17 of the United States Code. Notwithstanding the foregoing, Customer and Clear Ballot will preserve all Licensed Software and Services owned by the other party from any liens, encumbrances and claims of any individual or entity.

3.5 *Feedback*. Customer may provide suggestions, comments, or other feedback (collectively, "Feedback") to Clear Ballot with respect to its products and services, including the Licensed Software. Feedback is voluntary and Clear Ballot is not required to hold it in confidence and may use Feedback for any purpose without obligation of any kind. To the extent a license is required under Customer's intellectual property rights to make use of the Feedback, Customer hereby grants Clear Ballot an irrevocable, non-exclusive, perpetual, royalty-free license to use the Feedback in connection with Clear Ballot's business, including enhancement of the Licensed Software.

3.6 *License Term*. The term of the license granted in Section 3.1 (Grant of License) will commence upon execution of the relevant Software Order and continue for the term specified in the Order, unless earlier terminated in accordance with the provisions of this Agreement.

**4 TERM**
This Agreement shall be effective as of the Effective Date and continue in effect until the expiration or termination of all Orders (the "Term").

**5 FEES, EXPENSES AND TAXES**
*Payment Terms*. Customer will pay the license, service and support fees required under the mutually executed Orders, all of which will be billed on an annual basis, payable in advance. Customer will reimburse Clear Ballot for reasonable special or unusual expenses incurred at Customer's specific written request. Provided that the work described in the invoice has been completed in accordance with the terms of the Order and accepted by County, all undisputed amounts to be paid by Customer are due and payable thirty (30) Days after Customer's receipt of the complete and accurate invoice. All payments not disputed in good faith by Customer and not made by Customer within ninety (90) days of when due will be subject to late charges of the lesser of (i) one percent (1.0%) per month of the overdue amount or (ii) the maximum amount permitted under applicable law. Customer will pay all sales, use and excise taxes relating to, or under, this Agreement, exclusive of taxes based on or measured by Clear Ballot's net income, unless Customer is exempt from the payment of such taxes and provides Clear Ballot with evidence of the exemption.

2

Exhibit SB-34

## 6    HARDWARE

6.1  *Hardware*. Although the Licensed Software may be used with scanners made by various manufacturers, the Licensed Software is only supported when used with scanners described in the Documentation.

6.2  *Hardware Discounts*. During the Term, and provided Customer is in compliance with this agreement and has paid all undisputed fees and costs due under this Agreement, Customer will be eligible to receive Clear Ballot's pricing when Customer purchases, leases, or rents scanners from the Hardware manufacturer described in the Documentation. Customer shall be responsible for negotiating all other terms of such rental, purchase, or support agreements with said manufacturer or their authorized reseller.

## 7    LIMITED WARRANTIES

7.1  *Licensed Software*. Clear Ballot warrants that during the Warranty Period and as additionally described and agreed in the Exhibit B-2, the Licensed Software will operate in substantial conformance with the Documentation. Except as described in Exhibit B-2, all warranty claims not made in writing within the Warranty Period will be deemed waived. This warranty is contingent on the proper installation and use of the Licensed Software as described in the Documentation. Clear Ballot further warrants it will use commercially reasonable efforts to screen the Licensed Software prior to delivery to Customer for viruses, Trojan horses and other malicious code (collectively "Malicious Code Breach").

7.2  *Services*. Clear Ballot warrants that any Services will be performed in a professional, workmanlike manner and shall substantially conform to the specifications set forth in the applicable Service Order for a period of thirty (30) Days from the date of completion, unless specified otherwise in the Service Order.

7.3  *Exclusive Remedy*. The foregoing warranties are solely for the benefit of Customer and Customer shall have no authority to extend such warranty to any third party. The sole and exclusive remedy of Customer and the sole and exclusive liability of Clear Ballot for breach of the foregoing warranties, shall be: (1) at Customer's sole discretion, to seek repair or replacement of the non-conforming Licensed Software, or (2) for Services performed by Clear Ballot or an authorized sub-contractor, re-performance of the relevant Services at no additional cost to Customer, or (3) In the case of Clear Ballots Malicious Code Breach of the County's systems, Clear Ballot shall be fully liable to County for any costs or expenses, including, but not limited to, any County staff time, that results from said breach. In the event of such an introduction into the County's systems, Clear Ballot shall fully cooperate, at its sole expense, with County's subsequent efforts to mitigate the effect of any such introduction. Clear Ballot shall not be responsible for use of the Licensed Software if not operated substantially in a manner recommended in the Documentation or any material failure by Customer to use due care in the use and validation of the results produced by the Licensed Software.

7.4  *Modification of Licensed Software*. Except as otherwise agreed in writing by the parties, any modification to the Licensed Software by Customer or any third party engaged by Customer, or failure by Customer to reasonably implement any improvements or updates to the Licensed Software as supplied by Clear Ballot, shall void Clear Ballot's support obligations under the relevant Support Order and Clear Ballot's warranties under this Section 7 (Limited Warranties), to the extent any failure or error results from such modification.

7.5  *Disclaimer of Other Warranties*. EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 7 (LIMITED WARRANTIES) AND CLEAR BALLOT'S OBLIGATIONS UNDER ANY CERTIFICATIONS WHICH CLEAR BALLOT IS REQUIRED TO MAINTAIN, THE LICENSED SOFTWARE AND ANY SERVICES ARE PROVIDED TO CUSTOMER "AS IS", WITH ALL FAULTS, AND WITHOUT WARRANTY OF ANY KIND.  EXCEPT FOR CLEAR BALLOT'S OBLIGATIONS UNDER ANY CERTIFICATIONS WHICH CLEAR BALLOT IS REQUIRED TO MAINTAIN, CLEAR BALLOT EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY OF INFORMATION, QUIET ENJOYMENT, AND FITNESS FOR A PARTICULAR PURPOSE. EXCEPT FOR CLEAR BALLOT'S OBLIGATIONS UNDER ANY CERTIFICATIONS WHICH CLEAR BALLOT IS REQUIRED TO MAINTAIN, CLEAR BALLOT DOES NOT WARRANT THAT THE LICENSED SOFTWARE AND ANY SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR THAT THE OPERATION OF THE LICENSED SOFTWARE WILL BE UNINTERRUPTED OR ERROR-FREE.. EXCEPT FOR CLEAR BALLOT'S OBLIGATIONS UNDER ANY CERTIFICATIONS WHICH CLEAR BALLOT IS REQUIRED TO MAINTAIN, CLEAR BALLOT DOES NOT WARRANT OR MAKE ANY REPRESENTATION REGARDING THE USE OR THE RESULTS OF THE USE OF THE LICENSED SOFTWARE OR RELATED DOCUMENTATION IN TERMS OF THEIR CORRECTNESS, ACCURACY, QUALITY, RELIABILITY, APPROPRIATENESS FOR A PARTICULAR TASK OR APPLICATION, OR OTHERWISE. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY CLEAR BALLOT OR CLEAR BALLOT'S AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THE WARRANTIES PROVIDED IN THIS SECTION 7 (LIMITED WARRANTIES). If applicable law affords Customer implied warranties, guarantees, or conditions despite these exclusions, those warranties will be limited to one (1) year and Customer's remedies will be limited to the maximum extent allowed by Sections 7.5 (Disclaimer of Other Warranties) and 10 (Limitations of Liability and Actions).

## 8    INDEMNIFICATION

8.1  *Clear Ballot Indemnity*. Clear Ballot will defend, indemnify and hold harmless Customer and its affiliates, officers, directors, employees and agents from any and all third party claims, losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising from; (a) a claim by a third party that Customer's licensed use of the Licensed Software infringes that third party's United States patent, copyright, or trade secret rights, or (b) Clear Ballot's breach of Confidential Data, or (c) Clear Ballot's Malicious Code Breach. The foregoing is contingent upon Customer promptly notifying Clear Ballot in writing of the claim, permitting Clear Ballot sole authority to control the defense or settlement of the claim and

3

Exhibit SB-34

providing Clear Ballot reasonable assistance (at Clear Ballot's expense) in connection with the defense and settlement. If a claim of infringement under this Section 8.1 (Clear Ballot Indemnity) occurs, or if Clear Ballot determines a claim of infringement is likely to occur, Clear Ballot will have the right, in its sole discretion, to either (i) procure for Customer the right or license to continue to use the Licensed Software, or (ii) modify the Licensed Software to make it non-infringing, providing that such modifications do not impair, diminish or otherwise reduce the functionality or value of the Licensed Software. If neither of these remedies is reasonably available to Clear Ballot, Clear Ballot may, in its sole discretion, terminate the relevant Orders and return the purchase price and any installation fees paid by Customer for the relevant Licensed Software. Notwithstanding the foregoing, Clear Ballot will have no obligation with respect to any claim of infringement that is based upon or arises out of (a) the use or combination of the Licensed Software with any hardware, software, products, data except Confidential Data, or other materials not provided by or authorized by Clear Ballot, (b) modification or alteration of the Licensed Software by anyone other than Clear Ballot or any party expressly authorized by Clear Ballot to modify the Licensed Software , (c) use of the Licensed Software in excess of the rights granted in this Agreement, (d) any specifications, data except Confidential Data, or intellectual property provided by Customer (collectively, the "Excluded Claims"). The provisions of this Section 8.1 (Clear Ballot Indemnity) state the sole and exclusive obligations and liability of Clear Ballot and its licensors and suppliers for any claim of intellectual property infringement arising out of or relating to the Licensed Software, Services, or this Agreement, and are in lieu of any implied warranties of non-infringement, Confidential Data breach, or Malicious Code Breach, all of which are expressly disclaimed.

8.2  *Customer Indemnity*. Customer will defend, indemnify and hold harmless Clear Ballot and its affiliates, officers, directors, employees and agents from any and all third party claims, losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) arising from (i) Customer's use of the Licensed Software in excess of the rights expressly granted in this Agreement, (ii) the Excluded Claims, and (iii) Customer's material breach of this Agreement. The foregoing indemnification obligation of Customer is contingent upon Clear Ballot promptly notifying Customer in writing of such claim, permitting Customer sole authority to control the defense or settlement of such claim and providing Customer reasonable assistance (at Customer's expense) in connection with the defense and settlement.

**9  AUDIT**

9.1  *Audit of Customer by Clear Ballot.* During the Term of this Agreement and for one (1) year thereafter, no more than once in any twelve (12) month period, Clear Ballot may audit Customer's use of the Licensed Software ("Audit"). An Audit may include the inspection and review of computers or servers on which the Licensed Software has been installed or hosted, and records, procedures, or business practices that relate to Customer's performance under and compliance with the terms of this Agreement. Clear Ballot shall provide Customer

reasonable advance notice of an Audit, which must be performed by Clear Ballot. Customer will reasonably cooperate with Clear Ballot in the conduct of the Audit. Audits will be conducted during Customer's normal business hours and shall in no event disrupt Customer's business. The cost of the Audit shall be borne by Clear Ballot. In the event that Customer is found by Clear Ballot to be out of compliance with the terms of this Agreement, Clear Ballot shall notify Customer of the Clear Ballot's findings, in detail. Customer shall have fifteen (15) days to review Clear Ballot's findings and respond to Clear Ballot and become compliant.

9.2  *Customer Access to Records*. Clear Ballot shall retain, maintain and keep accessible all records relevant to this Agreement ("Records") for a minimum of six (6) years, following Term of the Agreement, or as may be required by applicable law, or until the conclusion of any audit, controversy or litigation arising out of or related to this Agreement, whichever is later. Clear Ballot shall maintain all financial Records in accordance with generally accepted accounting principles. All other Records shall be maintained to the extent necessary to clearly reflect actions taken. During this record retention period, Clear Ballot shall permit the County's authorized representatives access to the Records at reasonable times and places for purposes of examination and copying.

**10  LIMITATIONS OF LIABILITY AND ACTIONS**

EXCEPT FOR CLEAR BALLOT'S BREACH OF CONFIDENTIAL INFORMATION, THIRD PARTY CLAIMS OF INTELLECTUAL PROPERTY INFRINGEMENT, OR MALICIOUS CODE, CLEAR BALLOT SHALL NOT BE LIABLE TO CUSTOMER OR TO ANY THIRD PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR OTHER SIMILAR DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, EVEN IF CLEAR BALLOT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (II) EXCEPT FOR CLEAR BALLOT'S BREACH OF CONFIDENTIAL INFORMATION, THIRD PARTY CLAIMS OF INTELLECTUAL PROPERTY INFRINGEMENT, OR MALICIOUS CODE, CLEAR BALLOT'S AGGREGATE LIABILITY TO CUSTOMER AND ANY THIRD PARTY FOR ALL DAMAGES, LOSSES AND CAUSES OF ACTION (WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE) SHALL NOT EXCEED THE TOTAL TWO (2) TIMES THE FEES PAID OR PAYABLE UNDER THE ORDER AS TO WHICH THE CLAIM ARISES. No action, regardless of form, arising out of any of the transactions under this Agreement may be brought by Customer more than one (1) year after such action accrued.

**11  CONFIDENTIALITY**

11.1  *Definition of Confidential Information*. "Confidential Information" means, with respect to a party hereto, all information or material which (i) gives the disclosing party (the "Disclosing Party") some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of the Disclosing Party, or (ii) is either (a) marked "Confidential," "Restricted," or "Proprietary Information" or other similar marking, (b) reasonably known by the receiving party (the "Receiving Party") to be considered by the Disclosing Party as confidential, or (c) from all the relevant circumstances should reasonably be

Exhibit SB-34

assumed to be confidential and proprietary Clear Ballot's Confidential Information includes any trade secrets related to the Licensed Software.

11.2 *Exclusions*. Except as required by law or statute, Confidential Information will not include any information or material, or any element thereof, to the extent any such information or material, or any element thereof (i) has previously become or is generally known, unless it has become generally known through a breach of this Agreement or a similar confidentiality or non-disclosure agreement, (ii) was already rightfully known to the Receiving Party prior to being disclosed by or obtained from the Disclosing Party as evidenced by written records kept in the ordinary course of business of or by proof of actual use by the Receiving Party, (iii) has been or is hereafter rightfully received by the Receiving Party from a third person (other than the Disclosing Party) without restriction or disclosure and without breach of a duty of confidentiality to the Disclosing Party, or (iv) has been independently developed by the Receiving Party without access to Confidential Information of the Disclosing Party. It will be presumed that any Confidential Information in a Receiving Party's possession is not within exceptions (ii), (iii) or (iv) above, and the burden will be upon the Receiving Party to prove otherwise by records and documentation.

11.3 *Treatment of Confidential Information*. Each party recognizes the importance of the other's Confidential Information. In particular, each party recognizes and agrees that the Confidential Information of the other is critical to their respective businesses and that neither party would enter into this Agreement without assurance that such information and the value thereof will be protected as provided in this Section and elsewhere in this Agreement. Accordingly, each party agrees as follows: (i) the Receiving Party will hold any and all Confidential Information it obtains in strictest confidence and will use and permit use of Confidential Information solely for the purposes of this Agreement; and (ii) without limiting the foregoing, the Receiving Party will use at least the same degree of care, but no less than reasonable care, to avoid disclosure or use of this Confidential Information as the Receiving Party employs with respect to its own Confidential Information of a like importance.

11.4 *Compelled Disclosures*. To the extent required by applicable law or by lawful order or requirement of a court or governmental authority having competent jurisdiction over the Receiving Party, the Receiving Party may disclose Confidential Information in accordance with such law or order or requirement, subject to the following conditions: (i) as soon as possible after becoming aware of such law, order, or requirement, and prior to disclosing Confidential Information pursuant thereto, the Receiving Party will so notify the Disclosing Party in writing and, if possible, the Receiving Party will provide the Disclosing Party notice not less than five (5) business days prior to the required disclosure; (ii) the Receiving Party will use reasonable efforts not to release Confidential Information pending the outcome of any measures taken by the Disclosing Party to contest, otherwise oppose, or seek to limit such disclosure by the Receiving Party, and any subsequent disclosure or use of Confidential Information that may result

from such disclosure; and (iii) the Receiving Party will reasonably cooperate with and provide assistance to the Disclosing Party regarding such measures. Notwithstanding any such compelled disclosure by the Receiving Party, such compelled disclosure will not otherwise affect the Receiving Party's obligations hereunder with respect to Confidential Information so disclosed.

11.5 *Non-Exclusive Equitable Remedy*. Each party acknowledges and agrees that due to the unique nature of the Confidential Information there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach or threatened breach may allow a party or third parties to unfairly compete with, or threaten or damage the reputation of the other party, resulting in irreparable harm to such party, and therefore, that upon any such breach or any threat thereof, each party will be entitled to appropriate equitable and injunctive relief from a court of competent jurisdiction without the necessity of proving actual loss, in addition to whatever remedies either of them might have at law or equity before an arbitrator in accordance with the arbitration provision of this Agreement.

## 12   TERMINATION

12.1 *Breach*. If either party fails to observe or perform any material obligation under this Agreement, the non-defaulting party may give written notice to the defaulting party specifying the material failure. If the material failure is not corrected or a mutually agreed plan to correct the failure has not been established by the parties working together in good faith within thirty (30) Days after the date of such notice, the non-defaulting party may terminate this Agreement upon written notice to the defaulting party. The right of the non-defaulting party to terminate this Agreement under this Section 12.1 (Breach) is in addition to all other rights that are available to it under this Agreement, at law, or in equity. Notwithstanding the foregoing, if Customer fails to make payments as required hereunder and such failure is not cured within fifteen (15) days of notice from Clear Ballot, Clear Ballot may immediately (i) terminate Customer's license to the Licensed Software and (ii) cease performing all Services hereunder, including Support Services. In the event the Clear Ballot solution is unable to meet the agreed upon Acceptance Criteria, at Customer's sole discretion, Clear Ballot shall pay to Customer two (2) times the fees paid to date, including licensing fees, support fees, hardware purchase price, and any fees relating to the implementation of the Licensed Software, not as a penalty but as liquidated damages.

12.2 *Termination for Convenience*. Customer may, at any time, elect to terminate this Agreement or an Individual Order at Customer's convenience (i.e., for any reason whatsoever or no reason at all) provided Customer provides Clear Ballot with ninety (90) Days prior written notice.

12.3 *Bankruptcy and Insolvency*. Either party may terminate this Agreement on written notice to the other party, if the other party becomes insolvent or bankrupt, admits its inability to pay its debts as they mature, or takes action for the purpose of entering into winding-up, dissolution, bankruptcy, reorganization, or similar proceedings that are analogous in purpose or effect, or an action has been instituted against the

Exhibit SB-34

other party. In the event that Clear Ballot is no longer solvent or no longer able to provide the agreed upon support for the Licensed Software, the Source Code Escrow shall be released to Customer and Customer shall receive all rights necessary to run and maintain the Licensed Software.

12.4 *De-certification.* If Clear Ballot fails to maintain any required certifications which are necessary to provide the Licensed Software, Customer may give written notice to the Clear Ballot of Customer's intent to terminate the Agreement or any Service Order. If Clear Ballot is unable to acquire the necessary certification within a reasonable, mutually agreed upon timeframe, at Customer's sole discretion, Customer may terminate the Agreement or any Service Order and be entitled to a refund of the fees paid during the prior twelve (12) months, as liquidated damages.

12.5 *Disposition of Licensed Software on Termination.* Upon the expiration or termination of this Agreement for any reason, the license and all other rights granted to Customer hereunder shall immediately cease, and Customer shall (i) return the Licensed Software to Clear Ballot together with all reproductions and modifications of the Licensed Software and all copies of any Documentation, notes and other materials respecting the Licensed Software, (ii) attest that Customer shall no longer use or allow to be used the Licensed Software, iii) provide Clear Ballot a written certification that Customer has ceased all use of the software and has complied with all of its obligations under this Section.

## 13  GENERAL

13.1 *Government Restricted Rights.* The Licensed Software is provided with Restricted Rights. Use, duplication, or disclosure by the Government is subject to restrictions set forth in subparagraphs (a) through (d) of the Commercial Computer Software Restricted Rights at FAR clause 52.227-19 or in subparagraph (c)(1)(ii) of the Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 et seq. or its successor. The Licensed Software constitutes proprietary data, all rights of which are reserved under the copyright laws of the United States.

13.2 *Waiver, Amendment, Or Modification.* The waiver, amendment, or modification of any provision of this Agreement, or any right, power, or remedy hereunder, shall not be effective unless made in writing and signed by the party against whom enforcement of such waiver is sought, or in the case of amendment, or modification unless signed by both parties.. The terms of this Agreement shall not be amended or changed by the terms of any purchase order or acknowledgement issued by Customer even though Clear Ballot may have accepted or signed such documents. No failure or delay by either party in exercising any right, power, or remedy with respect to any of its rights hereunder shall operate as a waiver thereof.

13.3 *Notice.* All notices, demands, or consents given under this Agreement will be in writing and will be deemed given when delivered personally, or three (3) Days after deposit in the mail (certified or registered mail), or one (1) Day after being sent by overnight courier, to the receiving party at the address set forth in this Agreement or at such other address given by either party

to the other in writing.

13.4 *Entire Agreement.* This Agreement, together with the Orders, and any exhibits attached hereto, constitutes the entire agreement between the parties in connection with the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and there are no warranties, representations, or agreements between the parties in connection with the subject matter hereof except as specifically set forth or referred to herein. In the event of any conflict between the body of this Agreement and any Orders or exhibits, the body of this Agreement shall control.

13.5 *Assignment.* Neither party may assign this Agreement without the express, written consent of the other party. With such written consent, the assigning party may assign this Agreement to any entity acquiring or merging with assigning party, or to whom assigning party transfers all or substantially all of its assets, provided the resulting use, functionality, and support of the Licensed Software remains consistent with the terms of this Agreement and with the scope of use made by assigning party immediately before the assignment. All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, and their successors and assigns and legal representatives.

13.5.1  *Sub-Contractors.* Clear Ballot shall not subcontract any of the work required by this Agreement without the prior written consent of Customer. If any subcontractors are authorized by Customer, Clear Ballot shall be responsible for the satisfactory completion of all requirements, deliverables, and services hereunder, and Clear Ballot shall remain liable for all acts and omissions of subcontractor

13.6 *Governing Law; Severability.* The validity, construction and performance of this Agreement and the legal relations among the parties to this Agreement shall be governed by and construed in accordance with the laws of the State of Oregon, excluding that body of law applicable to choice of law. If any provision of this Agreement or the application of any such provision shall be held by a court of competent jurisdiction to be contrary to law, the remaining provisions of this Agreement shall continue in full force and effect.

13.7 *Construction.* The section headings in this Agreement are for convenience of reference only, will not be deemed to a part of this Agreement, and will not be referred to in connection with the construction or interpretation of this Agreement. Unless otherwise expressly stated, the words "herein," "hereof," and "hereunder" and other words of similar import refer to sections of this Agreement as a whole and not to any particular section, subsection, or other subpart of this Agreement. The words "include" and "including" shall not be construed as terms of limitation and shall, in all instances, be interpreted as meaning "including, but not limited to."

13.8 *Relationship Of The Parties.* Clear Ballot is an independent contractor under this Agreement, and nothing herein shall be construed to create a partnership, joint venture, or agency relationship between the parties hereto. Neither party shall have authority to enter into agreements of any kind on behalf of the other party and shall have no power or authority to bind

Exhibit SB-34

or obligate the other party in any manner to any other third party.

13.9 *Survival.* The following Sections shall survive expiration or termination of this Agreement: 3.5 (Feedback); 5 (Fees, Expenses and Taxes) (to the extent of fees accrued prior to the date of termination), 7.5 (Disclaimer of Other Warranties); 8 (Indemnification); 9 (Audit); 10 (Limitations of Liability and Actions); 12.5 (Disposition of Licensed Software On Termination); and 13 (General).

13.10 *Force Majeure.* Except for Customer's payment obligations, neither party will be liable for any failure or delay in performance under this Agreement which is due to any event beyond the reasonable control of such party, including fire,

explosion, unavailability of utilities or raw materials, unavailability of components, labor difficulties, war, riot, act of God, export control regulation, laws, judgments, or government instructions.

13.11 *Counterparts.* This Agreement may be executed simultaneously in two (2) or more counterparts, each of which will be deemed an original, but all of which together will constitute the same Agreement.

13.12 *Agreement Drafted By All Parties.* This Agreement is the result of arm's length negotiations between the parties and shall be construed to have been drafted by all parties such that any ambiguities in this Agreement shall not be construed against either party.

The parties have executed this Agreement to become effective as of the Effective Date.

CUSTOMER

BY: _Tom Mallam_

_Tom MALLAMS_
(PRINTED NAME)

_County Commissioner_
(TITLE)

_10-20-15_
(DATE)

CLEAR BALLOT GROUP, INC.

BY: _____

_Stephen N. Trout_
(PRINTED NAME)

_Director of Election Innovation_
(TITLE)

_20 OCT 2015_
(DATE)

7

**Exhibit SB-34**

Re: Public Records Request

---

From:  Elections Mailbox (elections@multco.us)

To:      smberlant@yahoo.com

Date:   Wednesday, July 13, 2022 at 12:12 PM PDT

Hi Shannon,

On July 6, 2022, the Multnomah County Elections Division received your emailed revised public records request.  This email acknowledges receipt of your revised public records request. The County is the custodian of and does possess some of the requested records. The County will work to determine the costs to produce the requested records, if any costs are associated with the records request. Once those costs are determined, if any, the County will contact you with an estimate of costs to produce those records.

Thanks.

Eric Sample
Multnomah County Elections Division
1040 SE Morrison Street Portland, OR 97214
503.988.VOTE (8683) | Fax 503.988.3719
elections@multco.us | MultnomahVotes.gov
Follow Us: Facebook | Instagram | NextDoor | Twitter | Youtube
Sign up for our E-newsletter

On Wed, Jul 6, 2022 at 4:30 PM Shannon Berlant <smberlant@yahoo.com> wrote:

> Eric,
>
> While the Counties themselves do not issue the Oregon Secretary of State's certificate, I thought they are responsible
> to ensure that the machines meet the minimum requirements in the OAR and ORS. Additionally, the County's vote
> systems typically do receive component/software maintenance/updates/upgrades after initial purchase.
>
> As far as the records, again the covered time period I am seeking public records for - would be for vote systems /
> equipment in use for the 2016 primary election – through the 2022 Primary election. Please clarify and/or modify the
> original records request (letter dated Jun 23, 2022):
>
> 1. Since initial purchase have any upgrades, changes or modifications to the machines taken place?
>
> 2. Do you have records as to whom showed up and when they showed up and what modifications they made
> (including version numbers) to the voting systems that your county utilized to tabulate ballots for the elections that
> occurred between 2016-2022? ORS 246.565 (3) says that the County Clerk has to keep the logs for
> updates/maintenance, so aren't you able to provide those records?
>
> 3. If you are you stating that the County Clerk's office did not verify that the underlying OAR/ORS requirements were
> met for the SOS's Certification and that the County Clerk solely relied upon the Oregon SOS's Certification, then
> please provide the OR SOS Certificates that cover the captioned time period for all of the machines that were utilized.
>
>
> I look forward to receipt of the records in a timely fashion.
>
> Thank you,
> Shannon Berlant
>
> Sent from my iPhone
> On Jul 6, 2022, at 3:09 PM, Elections Mailbox <elections@multco.us> wrote:
>
> Dear Shannon Berlant,
>
> We are in receipt of your public records request letter dated June 23, 2022 and received June 29, 2022. You are asking for the
> following records.
>
> "For all below items, the covered time period for requested records, would be for vote systems / equipment in use for the 2016

Exhibit SB-34

primary election – through the 2022 Primary election:

1.  All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (6). This should include any log of modifications made: with date(s); name of persons and/or companies involved in making the modification; version number(s); and any other information that describes the modification or changes made.

2.  All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (1). This should include a copy of the EAC Certificate of the voting system itself; and/or the EAC Certification of the accredited VSTL.

3.  All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (3)(b)(A-C)

4.  All documentation submitted to the Oregon Secretary of State to comply with OAR 165-007-0350 (3)(c)(A-C)"

Multnomah County is not in custody of the documents you are seeking in your public records request.  For documents related to state certification of the vote system equipment in Oregon, please contact the Oregon Secretary of State's office. https://sos.oregon.gov/Pages/public-records-request.aspx

Because the County is not currently the custodian of these documents, this completes the County's response and the County will close this request.

Eric Sample
Multnomah County Elections Division
1040 SE Morrison Street Portland, OR 97214
503.988.VOTE (8683) | Fax 503.988.3719
elections@multco.us | MultnomahVotes.gov
Follow Us: Facebook | Instagram | NextDoor | Twitter | Youtube
Sign up for our E-newsletter

Exhibit SB-34

Re: [EXTERNAL] Fwd: Public Records Request

From:  Unger, Valerie (unger.valerie@co.polk.or.us)

To:    smberlant@yahoo.com

Cc:    smith.morgan@co.polk.or.us; steckley.cole@co.polk.or.us

Date:  Friday, July 22, 2022 at 02:25 PM PDT

I am not in possession of the records you are asking for.

Valerie Unger
Polk County Clerk
850 Main St
Dallas OR 97338

503-623-9217
503-623-0717 fax
www.co.polk.or.us
Register to Vote!

> On Fri, Jul 22, 2022 at 2:22 PM S M B <smberlant@yahoo.com> wrote:
>
> Valerie,
>
> I greatly appreciate your prompt response. But the unfulfilled part of my record request was that I would like records from your office that show the information:    (covering all vote systems used from the 2016 primary thru 2022 primary)
> 1) date any newer / upgraded vote system/version went into service in your office
> 2) the make/model/version of all of the vote systems that were used
>
> Some places where you might have that record:  certain pages of the user manuals; emails or signed receipt of goods with the vote system vendor; various certifications that your office might have one file; reports or emails that were made to the Secretary of State's office - maybe something where you had to inform them what vote system your office was utilizing for certain elections.
>
> I await the records.
>
> Thank you,
> Shannon Berlant
> 503.335.3453
>
> On Friday, July 22, 2022 at 08:26:31 AM PDT, Unger, Valerie <unger.valerie@co.polk.or.us> wrote:
>
>
> There have been no revisions to the contract.  Typically, when a new version is approved, our hardware and software is updated shortly after.
>
>
> Valerie Unger
> Polk County Clerk
> 850 Main St
> Dallas OR 97338
>
> 503-623-9217
> 503-623-0717 fax
> www.co.polk.or.us
> Register to Vote!
>
> On Thu, Jul 21, 2022 at 5:20 PM Shannon Berlant <smberlant@yahoo.com> wrote:
>
>> Hi Valerie.
>>
>> Thank you for that info. The last (so most current) vote system on the table sent by ES&S was the EVS 6.2.0.0.  From the table, it appears that ES&S is saying that it was certified on 2/14/2022.
>>
>> Obviously the EVS 6.2.0.0 can't have been what was used in the 2016, 2017, 2018, 2019 or 2020 elections if it wasn't certified prior to

Exhibit SB-34

1 of 4

2022… The purchase contract you had sent was from 2016. No newer purchase contract was provided. Do you have additional records that would show what vote system (and version) was used in the Nov 2020 general election? I hope the record provides the date of install or upgrade of that version used in the Nov 2020 election is on there too. Are there additional records of later purchase contracts?

Thanks again,
Shannon Berlant

Sent from my iPhone

On Jul 21, 2022, at 1:50 PM, Unger, Valerie <unger.valerie@co.polk.or.us> wrote:

Shannon,

Here is the reply from ES&S.  We are using the most current version.

Valerie Unger
Polk County Clerk
850 Main St
Dallas OR  97338

503-623-9217
503-623-0717 fax
www.co.polk.or.us
Register to Vote!

---------- Forwarded message ---------
From: **Clark, Nate** <nate.clark@essvote.com>
Date: **Thu, Jul 21, 2022 at 12:48 PM**
Subject: RE: FW: [EXTERNAL] Fwd: Public Records Request
To: Unger, Valerie <unger.valerie@co.polk.or.us>
Cc: Neubauer, Christopher <christopher.neubauer@essvote.com>, Mommaerts, Lori <lori.mommaerts@essvote.com>, Clark, Nate <nate.clark@essvote.com>

Hi Valerie-

Please find the information below that contains versions, dates certified and components of the ES&S voting systems used in Oregon.

Note that this information can also be found on the EAC website.

For future requests please consult your county attorney for guidance.

| EVS RELEASE VERSION | DATE CERTIFIED | COMPONENTS | | | |
|---|---|---|---|---|---|
| EVS 5.0.0.0 | 2/06/2014 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | DS850 | 1.0 | 2.4.0.0 | |
| | | ERM | | | 8.6.0.0 |
| | | Electionware | | | 4.1.0.0 |
| | | Event Log Service | | | 1.5.0.0 |
| | | Paperballot | | | 3.1.0.0 |
| | | Removable Media Service | | | 1.4.0.0 |
| | | VAT Previewer | | | 1.8.1.0 |
| | | | | | |
| EVS 5.2.0.0 | 8/28/2014 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | DS850 | 1.0 | 2.10.0.0 | |
| | | ERM | | | 8.11.0.0 |
| | | Electionware | | | 4.6.0.0 |
| | | Event Log Service | | | 1.5.5.0 |
| | | Paperballot | | | 4.6.0.0 |
| | | Removable Media Service | | | 1.4.5.0 |

Exhibit SB-34

| | | | HW VERSION(s) | FW VERSION | SW VERSION |
|---|---|---|---|---|---|
| | | VAT Previewer | | | 1.8.6.0 |
| EVS 5.2.2.0 | 3/31/2017 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | DS450 | 1.0 | 3.0.0.0 | |
| | | DS850 | 1.0 | 2.10.2.0 | |
| | | ERM | | | 8.12.1.1 |
| | | Electionware | | | 4.7.1.1 |
| | | Event Log Service | | | 1.5.5.0 |
| | | ExpressLink | | | 1.3.0.0 |
| | | ExpressVote | 1.0 | 1.4.1.2 | |
| | | ExpressVote Activation Card Printer | | | |
| | | ExpressVote Previewer | | | 1.4.1.2 |
| | | Paperballot | | | 4.6.1.0 |
| | | Removable Media Service | | | 1.4.5.0 |
| EVS 6.0.0.0 | 6/7/2018 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | DS450 | 1.0 | 3.1.0.0 | |
| | | DS850 | 1.0 | 3.1.0.0 | |
| | | Electionware | | | 5.0.0.0 |
| | | Event Log Service | | | 1.6.0.0 |
| | | ExpressLink | | | 1.4.0.0 |
| | | ExpressVote | 2.1 | 2.4.0.0 | |
| | | ExpressVote Activation Card Printer | | | |
| | | ExpressVote Previewer | | | 2.4.0.0 |
| | | Paperballot | | | 5.0.0.0 |
| | | Removable Media Service | | | 1.5.0.0 |
| | | Toolbox | | | 3.3.0.0 |
| EVS 6.0.4.0 | 8/1/2019 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | DS450 | 1.0 | 3.1.1.0 | |
| | | DS850 | 1.0 | 3.1.1.0 | |
| | | Electionware | | | 5.0.4.0 |
| | | Event Log Service | | | 1.6.0.0 |
| | | ExpressLink | | | 1.5.0.0 |
| | | ExpressVote | 2.1 | 2.4.5.0 | |
| | | ExpressVote Activation Card Printer | | | |
| | | ExpressVote Previewer | | | 2.4.5.0 |
| | | Paperballot | | | 5.0.4.0 |
| | | Removable Media Service | | | 1.5.1.0 |
| | | Toolbox | | | 3.5.0.0 |
| | | Expressrunoff | | | 1.0.0.0 |
| EVS 6.1.0.0 | 10/2/2019 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | DS450 | 1.0 | 3.4.0.0 | |
| | | DS850 | 1.0 | 3.4.0.0 | |
| | | Electionware | | | 6.0.0.0 |
| | | Event Log Service | | | 2.0.0.0 |
| | | ExpressLink | | | 2.0.0.0 |
| | | ExpressVote | 2.1 | 4.0.0.0 | |
| | | ExpressVote Activation Card Printer | | | |
| | | ExpressVote Previewer | | | 4.0.0.0 |
| | | Paperballot | | | 6.0.0.0 |
| | | Removable Media Service | | | 2.0.0.0 |
| | | Toolbox | | | 4.0.0.0 |
| | | Expressrunoff | | | 1.0.0.0 |
| EVS 6.1.1.0 | 8/7/2020 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | Electionware | | | 6.0.1.0 |
| EVS 6.2.0.0 | 2/14/2022 | PRODUCT | HW VERSION(s) | FW VERSION | SW VERSION |
| | | DS450 | 1.0 | 4.1.0.0 | |

Exhibit SB-34

| | | DS850 | 1.0 | 4.1.0.0 | |
| | | Electionware | | | 6.2.0.0 |
| | | Event Log Service | | | 3.0.0.0 |
| | | ExpressLink | | | 2.1.0.0 |
| | | ExpressVote | 2.1 | 4.2.0.0 | |
| | | ExpressVote Activation Card Printer | | | |
| | | ExpressVote Previewer | | | 4.2.0.0 |
| | | Paperballot | | | 6.2.0.0 |
| | | Removable Media Service | | | 3.0.0.0 |
| | | Toolbox | | | 4.2.0.0 |
| | | Expressrunoff | | | 1.0.2.0 |

Thanks,

**Nate Clark – Regional Account Manager**

**C: 402.619.6431 | Nate.Clark@essvote.com**

Exhibit SB-34



**United States Election Assistance Commission**

## Certificate of Conformance

### ClearVote 1.4



VVSG 2005 VER. I
**EAC**
CERTIFIED

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *2005 Voluntary Voting System Guidelines Version 1.0*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

Product Name:  **ClearVote**

Model or Version:  **1.4**

Name of VSTL: **Pro V&V**

EAC Certification Number:  **CBG-CV-14**

Date Issued:  **February 8, 2018**



Executive Director, U.S. Election Assistance Commission

Scope of Certification Attached

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

## ClearVote 1.5



VVSG 2005 VER. I

**EAC CERTIFIED**

**The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *2005 Voluntary Voting System Guidelines Version 1.0*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.**

Product Name:  **ClearVote**

Model or Version:  **1.5**

Name of VSTL: **Pro V&V**

EAC Certification Number:  **CBG-CV-15**

Date Issued:  **March 19, 2019**

Executive Director, U.S. Election Assistance Commission

Scope of Certification Attached

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**ClearVote 2.0**



VVSG 2005 VER. I

**EAC**

**CERTIFIED**

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *2005 Voluntary Voting System Guidelines Version 1.0*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

Product Name: **ClearVote**

Model or Version: **2.0**

Name of VSTL: **Pro V&V**

EAC Certification Number: **CBG-CV-20**

Date Issued: **October 21, 2019**

_____

Executive Director, U.S. Election Assistance Commission

Scope of Certification Attached

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**Clear Ballot ClearVote 2.2**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**   ClearVote

**Model or Version:**   2.2

**Name of VSTL:**   Pro V&V

*Mona Harrington*

*Executive Director*

**EAC Certification Number:**   CBG-CV-22

**Date Issued:**  December 23, 2021

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

**ES&S Unity 3.4.1.0**

**Election Systems & Software**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *2002 Voting System Standards (2002 VSS)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  Unity

**Model or Version:**  Version 3.4.1.0

**Name of VSTL:**  NTS

**EAC Certification Number:**  ESSUnity3410

**Date Issued:**  April 4, 2014

*Chief Operating Officer & Acting Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance



### ES&S Unity 3.4.1.4
**Election Systems & Software**

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *2002 Voting System Standards (2002 VSS)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

Product Name:  Unity

Model or Version:  Version 3.4.1.4

Name of VSTL:  NTS

EAC Certification Number:  ESSUnity3414

Date Issued:  August 26, 2016

*Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

### ES&S EVS 5.2.0.0



VVSG 2005 VER. I

EAC

CERTIFIED

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the 2005 *Voluntary Voting System Guidelines (2005 VVSG)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  EVS

**Model or Version:**  5.2.0.0

**Name of VSTL:**  NTS Huntsville

**EAC Certification Number:**  ESSEVS5200

**Date Issued:**  7/2/2014

*Chief Operating Officer & Acting Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

### ES&S EVS 5.2.2.0



VVSG 2005 VER. I

**EAC**

CERTIFIED

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the 2005 *Voluntary Voting System Guidelines (2005 VVSG)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  ES&S Voting System (EVS)

**Model or Version:**  5.2.2.0

**Name of VSTL:**  NTS Huntsville

**EAC Certification Number:**  ESSEVS5220

**Date Issued:**  February 27, 2017

*Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

### ES&S EVS 6.0.0.0



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  EVS

**Model or Version:**  6.0.0.0

**Name of VSTL:**  SLI Compliance

**EAC Certification Number:**  ESSEVS6000

**Date Issued:**  July 2, 2018

*Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

### ES&S EVS 6.0.4.0



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:** EVS

**Model or Version:** 6.0.4.0

**Name of VSTL:** SLI Compliance

**EAC Certification Number:** ESSEVS6040

**Date Issued:** May 3, 2019

*Executive Director*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**ES&S EVS 6.1.0.0**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

Product Name:  **EVS**

Model or Version:  **6.1.0.0**

Name of VSTL:  **Pro V&V**

EAC Certification Number:  **ESSEVS6100**

Date Issued:  September 24, 2019

*Executive Director*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

### ES&S EVS 6.1.1.0



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  EVS

**Model or Version:**  6.1.1.0

**Name of VSTL:**  Pro V&V

**EAC Certification Number:**  ESSEVS6110

**Date Issued:**  July 27, 2020

*Mona Harrington*

**Executive Director**

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**ES&S EVS 6.2.0.0**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**   EVS

**Model or Version:**   6.2.0.0

**Name of VSTL:**   Pro V&V

**EAC Certification Number:**   ESSEVS6200

**Date Issued:**  December 23, 2021

*Mona Harrington*

*Executive Director*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**Hart InterCivic Verity 2.0**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the 2005 *Voluntary Voting System Guidelines (2005 VVSG)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:** Verity

**Model or Version:** 2.0

**Name of VSTL:** SLI Global

**EAC Certification Number:** HRTVerity2.0

**Date Issued:** 4/27/2016



*Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**Hart Verity Voting 2.2.2**



VVSG 2005 VER. I

EAC

CERTIFIED

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the 2005 *Voluntary Voting System Guidelines (2005 VVSG)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  Verity Voting

**Model or Version:**  2.2.2

**Name of VSTL:**   SLI Compliance

**EAC Certification Number:**   HRT-VERITY-2.2.2

**Date Issued:**  May 22, 2018

*Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**Hart Verity Voting 2.3**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the 2005 *Voluntary Voting System Guidelines (2005 VVSG)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  Verity Voting

**Model or Version:**  2.3

**Name of VSTL:**  SLI Compliance

**EAC Certification Number:**  HRT-VERITY-2.3

**Date Issued:**  March 15, 2019

*Executive Director*
*U.S. Election Assistance Commission*

Scope of Certification Attached

Exhibit SB-40



**United States Election Assistance Commission**

## Certificate of Conformance

### Hart Verity Voting 2.3.3



VVSG 2005 VER. I

**EAC**

CERTIFIED

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the 2005 *Voluntary Voting System Guidelines (2005 VVSG)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  Verity Voting

**Model or Version:**  2.3.3

**Name of VSTL:**  SLI Compliance

**EAC Certification Number:**  **HRT-VERITY-2.3.3**

**Date Issued:**  May 3, 2019

*Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**Hart Verity Voting 2.3.4**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the 2005 *Voluntary Voting System Guidelines (2005 VVSG)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  Verity Voting

**Model or Version:**  2.3.4

**Name of VSTL:**  SLI Compliance

**EAC Certification Number:**  HRT-VERITY-2.3.4

**Date Issued:**  May 29, 2019

*Executive Director*
*U.S. Election Assistance Commission*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**Hart Verity Voting 2.4**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**   Verity Voting

**Model or Version:**   2.4

**Name of VSTL:**   SLI Compliance

**EAC Certification Number:**   **HRT-VERITY-2.4**

**Date Issued:**  **February 21, 2020**

*Mona Harrington*

*Acting Executive Director*

**Scope of Certification Attached**

Exhibit SB-40



**United States Election Assistance Commission**

**Certificate of Conformance**

**Hart Verity Voting 2.6**



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:**  Verity Voting

**Model or Version:**  2.6

**Name of VSTL:**  SLI Compliance

**EAC Certification Number:**  HRT-VERITY-2.6

**Date Issued:**  April 20, 2021

*Mona Harrington*

*Executive Director*

**Scope of Certification Attached**

Exhibit SB-40



# United States Election Assistance Commission

## Certificate of Conformance

## Hart Verity Voting 2.7



VVSG 2005 VER. I

EAC CERTIFIED

The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)*. Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing and Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

Product Name: **Verity Voting**

Model or Version:    **2.7**

Name of VSTL:    **SLI Compliance**

EAC Certification Number:    **HRT-Verity-2.7**

Date Issued: **June 7, 2022**

*Mark A. Robbins*

*Executive Director*

Scope of Certification Attached

Exhibit SB-40

RE: November 2020 general election

From:  Sen Thatcher (sen.kimthatcher@oregonlegislature.gov)

To:      smberlant@yahoo.com

Date:  Thursday, August 4, 2022 at 03:25 PM PDT

Linda Heimdahl,

Here is the information we have. If the constituent is asking further questions or needs further information, please refer them to our public records request page https://sos.oregon.gov/Pages/public-records-request.aspx. This form helps us ensure we have your complete request and can direct it to the appropriate records custodian.

| | | | | |
|---|---|---|---|---|
| Oregon | Coos County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Crook County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Curry County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Deschutes County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Douglas County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Harney County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Hood River County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Jackson COunty | Clear Ballot | ClearVote | 2.2 |
| Oregon | Josephine County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Klamath County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Lane County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Linn County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Wasco County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Washington County | Clear Ballot | ClearVote | 2.2 |
| Oregon | Baker County | ES&S | EVS | 6.1.0.0 |
| Oregon | Benton County | ES&S | EVS | 6.0.0.0 |
| Oregon | Clatsop County | ES&S | EVS | 6.0.4.0 |
| Oregon | Columbia County | ES&S | EVS | 6.1.0.0 |
| Oregon | Gilliam County | ES&S | EVS | 6.1.0.0 |
| Oregon | Grant County | ES&S | EVS | 6.1.0.0 |
| Oregon | Jefferson County | ES&S | EVS | 6.1.0.0 |
| Oregon | Lake County | ES&S | EVS | 6.1.0.0 |
| Oregon | Lincoln County | ES&S | EVS | 6.1.0.0 |
| Oregon | Malheur County | ES&S | EVS | 6.1.0.0 |
| Oregon | Morrow County | ES&S | EVS | 6.1.0.0 |
| Oregon | Polk County | ES&S | EVS | 6.1.0.0 |
| Oregon | Sherman County | ES&S | EVS | 6.1.0.0 |
| Oregon | Tillamook County | ES&S | EVS | 6.1.0.0 |
| Oregon | Umatilla County | ES&S | EVS | 6.1.0.0 |
| Oregon | Union County | ES&S | EVS | 6.1.0.0 |
| Oregon | Wallowa County | ES&S | EVS | 6.1.0.0 |
| Oregon | Wheeler County | ES&S | Unity | 3.4.1.0 |
| Oregon | Clackamas County | Hart | Verity | 2.3 |
| Oregon | Marion County | Hart | Verity | 2.3 |
| Oregon | Yamhill County | Hart | Verity | 2.3 |

Elections Division

Oregon Secretary of State

Exhibit SB-41

-----Original Message-----
From: Shannon Berlant <smberlant@yahoo.com>
Sent: Wednesday, August 3, 2022 9:01 AM
To: Sen Thatcher <Sen.KimThatcher@oregonlegislature.gov>
Subject: November 2020 general election


CAUTION: This email originated from outside the Legislature. Use caution clicking any links or attachments.



Hello, Do you happen to have a list of all the vote machines (with the exact version number) that were used in all the counties for the Nov 2020 election?


If yes, may I please have a copy?


Thank you,

Shannon Berlant


Sent from my iPhone

Exhibit SB-41

[Records Center] County :: C003081-072822

From:   Washington County Public Records Center (washingtoncountyor@govqa.us)

To:      smberlant@yahoo.com

Date:   Friday, August 12, 2022 at 09:06 AM PDT

--- Please respond above this line ---



Shannon,

Per our previous message, we are following up to provide further information on ClearBallot.

Washington County ClearBallot Version History:

1.3.3 - March 2017
1.4 - March 2018
2.1 - March 2020
2.2 - February 2022

Thank you,

Washington County Elections Division

To monitor the progress or update this request please log into the Public Records Center



Exhibit SB-41

## Public Records Request

From:  Oregon Secretary of State (notifications@cognitoforms.com)

To:  smberlant@yahoo.com

Date:  Thursday, August 18, 2022 at 10:35 AM PDT

# Oregon Secretary of State

## Public Records Request

Thank you for your request. This copy is for your records.

Please allow 5 business days for us to acknowledge your request and up to 15

Exhibit SB-43

EVS-6-1-1-0-Certification.pdf)
ES&S Unity 3.4.1.0 (listed as three separate
certs - https://sos.oregon.gov/elections
/Documents/vote-systems/ESS-
ExpressRunnOff-1-0-0-0-Certification.pdf and
https://sos.oregon.gov/elections/Documents
/vote-systems/ESS-850-Certification-
documents.pdf and https://sos.oregon.gov
/elections/Documents/vote-systems/ESS-650-
Optical-Central-Scanner-Groove-Fill.pdf)

Several documents are missing.

This is a request for public records. For all
above voting systems, the independent lab
(VSTL) reports are missing, so please forward
a copy of the VSTL inspection/test report which
the Oregon SOS office relied upon for each
voting system, in order to issue the Oregon
SOS Certificate of Approval. Also, the ES&S
Unity 3.4.1.0 is not actually a named voting
system on any of your office's issued
Certification of Approval. Please provide the
Oregon SOS Certificate of Approval for the
ES&S Unity 3.4.1.0 along with the VSTL
inspection/test report that your office relied
upon to issue that Certificate of Approval
(again for the ES&S Unity 3.4.1.0).

Please forward those documents at your
earliest convenience. Thank you

Exhibit SB-43

| | # | Status | Date Submitted | Name | Describe your request |
|---|---|---|---|---|---|
| | | | | | This is a public records request; |
| | | | | | As per sos web page here, |
| | | | | | https://sos.oregon.gov/voting/Pages/instructions-disabilities.aspx |
| | | | | | When did the secretary of state approve the use of "Alternate Format Ballots"? |
| | | | | | The sos website also describes a "ballot marking tool", **what is the official name of the Ballot marking tool/tools, **who and by what company and software is the ballot marking tool supplied and created through for the State of Oregon and the SOS. |
| | | | | | Please supply all the compliance laws surrounding this Ballot marking tool and all corresponding records for these topics and approvals by and from the SOS, testing, and federal and state compliance laws. |
| | | | | | Lastly how are these tools secure to ensure public safety, security, and secrecy of voters when voting? |
| | | | | | Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Elections offices of, and in, election trust and transparency benefitting all Oregon taxpayers and voters. |
| | 485 | Submitted | 8/18/2022 7:57 PM | Jennifer Gunter | Thank you, |
| | | | | | Your website (https://sos.oregon.gov/elections/Pages/voting-systems.aspx) has the following Hart Intercivic systems listed as "approved": |
| | | | | | Hart Verity 1.0  (https://sos.oregon.gov/elections/Documents/vote-systems/Hart-Verity-1-0-Certification.pdf) |
| | | | | | Hart Verity 2.0  (https://sos.oregon.gov/elections/Documents/vote-systems/Hart-Verity-2-0-Certification.pdf) |
| | | | | | Hart Verity 2.2.2  (https://sos.oregon.gov/elections/Documents/vote-systems/Hart-Verity-2-2-2-Certification.pdf) |
| | | | | | Hart Verity 2.3  (https://sos.oregon.gov/elections/Documents/vote-systems/Hart-Verity-2-3-Certification.pdf) |
| | | | | | Hart Verity 2.4  (listed as two separate certs - https://sos.oregon.gov/elections/Documents/vote-systems/Hart-Verity-2-4-Certification.pdf and https://sos.oregon.gov/elections/Documents/vote-systems/Hart-InterCivic-6-2-1-Certification.pdf) |
| | | | | | Several documents are still missing. |
| | | | | | This is a request for public records.  For all above mentioned voting systems, the independent lab (VSTL) reports are missing, please forward a copy of the VSTL inspection/test report which the Oregon SOS office relied upon for each voting system, in order to issue the Oregon SOS Certificate of Approval. |
| | | | | | Also, for the Hart Verity 2.4 system, SOS office had issued an additional approval, which is not currently on your website.  That one included Oregon SOS approval for Hart Verity 2.4 with ECO-01393 and was signed 8/25/2020.  Please provide a copy of the VSTL inspection/test report that your office relied upon to issue that Certificate of Approval as well. |
| | 481 | Submitted | 8/18/2022 7:06 PM | Jennifer Gunter | Please supply those documents requested above. |
| | | | | | Your website (https://sos.oregon.gov/elections/Pages/voting-systems.aspx) has the following ES&S systems listed as "approved": |
| | | | | | ES&S EVS 5.2.2.0 (https://sos.oregon.gov/elections/Documents/vote-systems/ESS-EVS-5-2-2-0-Certification.pdf) |
| | | | | | ES&S EVS 6.0.4.0 (https://sos.oregon.gov/elections/Documents/vote-systems/ESS-EVS-6-0-4-0-Certification.pdf) |
| | | | | | ES&S EVS 6.1.0.0 (https://sos.oregon.gov/elections/Documents/vote-systems/ESS-EVS-6-1-0-0-Certification.pdf) |
| | | | | | ES&S EVS 6.1.1.0 (https://sos.oregon.gov/elections/Documents/vote-systems/ESS-EVS-6-1-1-0-Certification.pdf) |
| | | | | | ES&S Unity 3.4.1.0  (listed as three separate certs - https://sos.oregon.gov/elections/Documents/vote-systems/ESS-ExpressRunnOff-1-0-0-0-Certification.pdf and https://sos.oregon.gov/elections/Documents/vote-systems/ESS-850-Certification-documents.pdf and https://sos.oregon.gov/elections/Documents/vote-systems/ESS-650-Optical-Central-Scanner-Groove-Fill.pdf) |
| | | | | | Several documents are still missing. |
| | | | | | This is a request for public records.  For all above voting systems, the independent lab (VSTL) reports are missing, so please forward a copy of the VSTL inspection/test report which the Oregon SOS office relied upon for each voting system, in order to issue the Oregon SOS Certificate of Approval.  Also, the ES&S Unity 3.4.1.0 is not actually a named voting system on any of your office's issued Certification of Approval.  Please provide the Oregon SOS Certificate of Approval for the ES&S Unity 3.4.1.0 along with the VSTL inspection/test report that your office relied upon to issue that Certificate of Approval (again for the ES&S Unity 3.4.1.0). |
| | 475 | Submitted | 8/18/2022 6:16 PM | Jennifer Gunter | |

Exhibit P

| | | | | |
|---|---|---|---|---|
| | | | | Your website (https://sos.oregon.gov/elections/Pages/voting-systems.aspx) lists the Clear Ballot Clear Vote 2.2 system.<br><br>The Oregon SOS issued approval (https://sos.oregon.gov/elections/Documents/vote-systems/Clear-Ballot-2-2-Certification.pdf) and the document properties show that the document was created 2/12/2022 at 6:14:56 PM; yet was modified on 8/8/2022 at 1:31:39 PM. The Voting System Test Report is missing.<br><br>This is a public record request. I would like a copy of the voting system inspection/test report that the Oregon SOS relied upon to issue their own Certificate of Approval. I would also like a copy of the Oregon Secretary of State Certificate of Approval, which is the earliest version in your records, closest to the purported document's date of signature -February 14, 2022.<br><br>Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Elections offices of, and in, election trust and transparency benefitting all Oregon taxpayers and voters.<br><br>This is my preferred form of communications.<br><br>Thank you!<br>Jennifer Gunter |
| | 472 | Submitted | 8/18/2022 5:59 PM | Jennifer Gunter | |
| | 458 | Submitted | 8/17/2022 1:43 PM | Jennifer Gunter | Pursuant to Oregons Public Records laws (ORS 192.314) and Oregonians right to know I am requesting the following;<br><br>****I am requesting copies of any state contract(s) for ENR (election night reporting) for the years of 2019-2022 election years, either entered into within those years or PRIOR contracts completed that may have caused the ENR contracts to go into effect for those election years.<br><br>Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Elections offices of, and in, election trust and transparency benefitting all Oregon taxpayers and voters.<br><br>Kindly,<br>Jennifer Gunter |
| 0 | 438 | Complete | 8/11/2022 3:45 AM | Jennifer Gunter | Pursuant to Oregons Public Records laws (ORS 192.314) and Oregonians right to know I am requesting the following<br><br>*******. Certificates of approval (also know as certifications) given by or from the SOS for all Clear Ballot/Clear Vote election Machines and Equipment used in Wasco County for the 2020 election year.<br><br>Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Offices trust and transparency to the public, benefitting all Oregon taxpayers and voters.<br>Kindly,<br>Jennifer Gunter<br>Oregon resident |
| | 433 | Submitted | 8/9/2022 2:46 AM | Jennifer Gunter | I am making a public records request for copies of;<br><br>All Election Law Summary Directives made from/by the Secretary of State for the 2020 election year.<br><br>Kindly,<br>Jennifer Gunter<br>Oregon Resident |
| 0 | 423 | Complete | 8/4/2022 12:38 PM | Jennifer Gunter | the following<br><br>Under ORS 246.550<br>Examination and approval of equipment by Secretary of State<br><br>(2) Any person owning or interested in a voting machine or vote tally system may submit it to the secretary for examination. For the purpose of assistance in examining the machine or system the secretary may employ not more than three individuals who are expert in one or more of the fields of data processing, mechanical engineering and public administration. The compensation of these assistants shall be paid by the person submitting the machine or system.<br><br>****** Please supply records under this Statute referencing "any person" owning or interested that submitted a voting machine or vote tally system to the Secretary of State for examination, to be used or considered for use in the election years of 2016 thru 2022.<br><br>Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Offices trust and transparency to the public, benefitting all Oregon taxpayers and voters.<br><br>Kindly,<br>Jennifer Gunter<br>Oregon Resident |

| | | | | | |
|---|---|---|---|---|---|
| | 395 | Submitted | 7/23/2022 6:06 AM | Jennifer Gunter | 1.) how long are election records to be held for a general election and or retained in the state of Oregon?<br><br>2.) please cite the state law reference and the Federal Law code for election record retention for a general election.<br><br>3.) what specific election records are to be retained/kept/saved during the time after a general election (example computer logs, paper ballots, receipts, software upgrades etc. as examples but not limited to.)<br><br>4.) If a specific person/office or affiliate is to retain certain records in Oregon, I request the name of the agency, or person, or office and or affiliate that retains them outside of the SOS elections division.<br><br><br>Thank you,<br>Jennifer Gunter<br>Oregon taxpayer and resident |
| 0 | 387 | Complete | 7/22/2022 5:18 PM | Jennifer Gunter | Hello-<br>I am seeking information under my right to know, from the SOS on bases of their certificate of approval on VSTL/VSTL's  inspection/testing.<br><br>I would like a copy/copies of the VSTL test /inspection reports for all machines believed were "used in" the Nov 2016 and 2020 election.<br>Specifically I cannot recall if there are any other VSTL names involved but the ones I do know:<br>Pro V&V<br>SLI<br>NTS (formerly Wyle)<br><br>Also and other VSTL  of record not listed by specific name above please also include that information via email pdf or a link to view them online.<br><br>Thank you,<br>Jennifer Gunter |
| 0 | 386 | Complete | 7/22/2022 4:24 PM | Jennifer Gunter | Good Day-<br>I request information under my right to know,<br><br>Our SOS  is required to ensure EAC certified machines are compliant federally, OR hire an EAC accredited lab to test/inspect.<br><br>I would like the information names, and locations of the  EAC accredited lab/labs companies/contractors that are/where used/hired to test and inspect ALL election machines utilized in the Nov 2016 election and the Nov 2020 election.<br><br>Thank You,<br>Jennifer Gunter<br>Oregon resident |
| | 358 | Submitted | 7/13/2022 12:26 AM | Jennifer Gunter | the following;<br><br>1.) Did the SOS received funds or assistance from HAVA for elections in the year 2020?<br><br>2.) if yes please supply a copy of the agreement/record and acceptance of funds or assistance stipulations and amount.<br><br>3.) If sos returned any unused funds or acceptance.<br><br>4.) if funds or assistance were sent unknowingly or knowingly to SOS please supply records of the funds for that assistance.<br><br>5.) please supply a itemized list on the HAVA funding spent or distributed if it was kept.<br><br>Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Elections offices of, and in, election trust and transparency benefitting all Oregon taxpayers and voters.<br><br>Jennifer Gunter |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | homeland security) |
| | | | | | Pursuant to Oregons Public Records laws (ORS 192.314) and Oregonians right to know I am requesting the following to please be answered; |
| | | | | | Did the SOS accept any help from the DHS (department of homeland security) In the calendar year of 2016? If answered yes, I would like to request the digital copy and or email of the amount offered and or contract accepted by the SOS with and to DHS and a digital copy of the contract surrounding this money exchange and acceptance by the SOS. |
| | | | | | Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Elections offices of, and in, election trust and transparency benefitting all Oregon taxpayers and voters. |
| | 354 | Complete | 7/12/2022 7:24 PM | Jennifer Gunter | Regards |
| | | | | | election system, machine records |
| | | | | | Good Day- |
| | | | | | Pursuant to Oregons Public Records laws (ORS 192.314) and Oregonians right to know I am requesting the following; |
| | | | | | Recorded or Digital copies from the Oregon SOS Elections dept. of the; |
| | | | | | "filed election equipment and software application/ or report for Oregon election equipment accreditation" that was sent and or filed to/with the (EAC) and or including (VSTL) and or"any" federally accredited voting system test laboratories applications. |
| | | | | | Additionally the "official certified Oregon accreditation report" given back to the Oregon SOS elections dept. from either the EAC or VSTL or "any federally accredited voting test laboratory" for Oregons accreditation certificate and report of Oregons election machines, and software after their test where performed and the reported results given/sent back to Oregon Departments for the election years of 5/30/2012 - 7/5/2022 |
| | | | | | Recap- application sent by Oregon SOS Election dept. and the final accreditation report given back to Oregon SOS elections dept. from EAC and VSTL or any federal voting system test laboratory, for the election years of 2012-2022. |
| | | | | | Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Elections offices of, and in, election trust and transparency benefitting all Oregon taxpayers and voters. |
| 0 | 353 | Complete | 7/12/2022 5:27 PM | Jennifer Gunter | |
| | | | | | Pursuant to Oregons Public Records laws (ORS 192.314) and Oregonians right to know I am requesting the following; all communications that Oregon SOS and affiliate offices has had with; |
| | | | | | Jeb Cameron Matthew witzke |
| | | | | | Additionally, according to ORS 192.324 Section 5, I request a waiver of all fees as this information is in the public interest, because making the records available will primarily benefit the general public and aide in the SOS Offices trust and transparency to the public, benefitting all Oregon taxpayers and voters. |
| | 367 | Complete | 7/17/2022 4:45 PM | Jennifer Gunter | |
| | | | | | I am a resident of Wasco County and I would like to know, if Oregon/SOS uses Scytl directly, while others contract with one of Scytl's subsidiaries or acquisitions like the below examples. |
| | | | | | 1.) Is it SCYTL that Oregon/SOS uses, or any of these below? Paragon Group Service Point Solutions Akira Systems Wavelength SOE (Supervisors of Elections) Gov2U Clarity Elections other Clarity names previously used. |
| | | | | | Additionally I would like to also know, |
| | | | | | 2.) Is the Commonwealth of Oregon using any foreign registered companies, or any foreign entities, or any companies that have a foreign registration participating in any format of our elections from the ballot machines, to the counting of votes, to the reporting of the votes. And if you are can you please cite the law that says it's legal. Please provide the information in a timely fashion. |
| | | | | | Kindly |
| | 365 | Complete | 7/16/2022 5:32 AM | Jennifer Gunter | Jennifer Gunter |

 Gmail

**Tina Milcarek <tina.milcarek@gmail.com>**

## Exhibit Q- Records Request- Public FOIA
1 message

**Jennifer Gunter** <jennof4@gmail.com>                                    Sun, Aug 21, 2022 at 5:34 PM
To: Tina Milcarek <tina.milcarek@gmail.com>

Attached email trail, will have to send the pdf acknowledgment separately.  I don't know why it's not showing up here.

Sent from my iPhone

Begin forwarded message:

> **From:** Camden Kelliher <ckelliher@eac.gov>
> **Date:** July 21, 2022 at 1:38:38 PM PDT
> **To:** Jennifer Gunter <jennof4@gmail.com>
> **Subject: Re: Records Request- Public FOIA**
>
>
> Hi Jennifer,
>
> As stated in the acknowledgment, your request for expedition was denied under 11 C.F.R. § 9405.7(h). The request, as submitted, demonstrates no evidence of a "compelling need". The text of 11 C.F.R. § 9405.7(h) implements FOIA's expedition requirements. 11 C.F.R. § 9405.7(h) states that the Commission shall consider requests for the expedited processing of requests in cases where the requester demonstrates a compelling need for such processing. The term "compelling need" means, with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal government activity. Requesters for expedited processing must include in their requests a statement setting forth the basis for the claim that a "compelling need" exists for the requested information, certified by the requester to be true and correct to the best of his or her knowledge and belief. Your request did not demonstrate that you are "a person primarily engaged in disseminating information" or that there is an "urgency to inform". Both elements must be satisfied to grant expedited processing.
>
> Should you feel that this was the incorrect determination, you may appeal that determination through the appeal process laid out in the acknowledgment letter.
>
> The EAC processes FOIAs in the order that they are received. However, another requester submitted an identical request, and the records will be produced to you upon completion of that request. We estimate sending a completed response by **October, 31 2022.** Note this is an estimate and subject to change.
>
> Sincerely,
>
> Camden Kelliher
>
>
> **Camden Kelliher** | Associate Counsel
> U.S. Election Assistance Commission
> 633 3rd Street NW, Suite 200 | Washington, DC 20001

Exhibit Q

**From:** Jennifer Gunter <jennof4@gmail.com>
**Sent:** Thursday, July 21, 2022 1:29 PM
**To:** Camden Kelliher <ckelliher@eac.gov>
**Subject:** Re: Records Request- Public FOIA

Thank you Camden for the reply,

Regarding -
Your request for expedited processing has been denied pursuant to 11 C.F.R. § 9405.7(h). The request, as submitted, demonstrates no evidence of a "compelling need" as defined by EAC regulations. While the public's right to know is a significant and important value, it is not sufficient by itself to satisfy this standard. Al–Fayed v. CIA, 254 F.3d 300, 310 (D.C.Cir. 2001)

I would kindly ask what governing body or specific person and position title within the department decides wether a expedited request may or may not get fulfilled? What are the weights and measures of that person's personal perspective to approve or deny our countries transparency to the people?

The urgency to inform me, the public, concerning actual and alleged Federal government activity within our federal processes is in question throughout this country!  As I can understand your position within the EAC and citing a 21-year-old case as directed, we are in the year 2022 respectfully, and the current issue of efficacy within our federal government is indeed a current compelling need to expedite these requests. (Current Court Cases, to date, sit in our countries courtrooms that is very compelling in nature indeed)

I did not notice on your email reply the guesstimated time that it will take to fulfill my request?

As coronavirus is certainly going to be here as well as all the new upcoming issues of opposing viruses within our country and globally, we cannot use this excuse for the decades to come for expedited request not being filled in a timely manner.

Please update me with a guesstimated turnaround time for my request, as well as advise if a new records request for my expedited service that is needed.


Kindly,
Jennifer Gunter
United States tax payer and Citizen

Sent from my iPhone

> On Jul 21, 2022, at 8:02 AM, Camden Kelliher <ckelliher@eac.gov> wrote:
>
>
> Good morning,
>
> Please find attached the EAC's acknowledgment of your submitted FOIA request.
>
> Sincerely,
>
> Camden Kelliher
>
>
> **Camden Kelliher |** Associate Counsel
> U.S. Election Assistance Commission
> 633 3rd Street NW, Suite 200 | Washington, DC 20001

**From:** Jennifer Gunter <jennof4@gmail.com>
**Sent:** Monday, July 11, 2022 1:05 PM
**To:** Camden Kelliher <ckelliher@eac.gov>
**Subject:** Records Request- Public FOIA

Good day-

This is a request for public records under FOIA and right to know. All information on vote system certification and the process that underlies vote system certification is in the interest of the entire United States Of America!!

I request that all the FOIA fees be waived and that this request be expedited with urgency.

The requested records are for both VSTLs Pro V&V, and SLI Compliance (and under their previous companies names) - please provide:

1) From 2016 thru December 2020 - all original emails, with official EAC-issued (unedited) Certificate of Accreditation as attachment to both listed VSTLs

2) From 2016 thru December 2020 -all original (unedited) EAC-issued Certificate of Accreditation for the listed VSTLs

3) From 2016 thru December 2020 - all EAC commissioner meeting minutes, where VSTL accreditation was discussed

4) From 2016 thru December 2020 - all applications for accreditation renewal or supplemental information the VSTLs provided to the EAC

Thank you,
Jennifer Gunter
United States taxpayer and resident

This is my preferred form of contact to this email listed.

Sent from my iPhone



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

VIA EMAIL

July 21, 2022

Jennifer Gunter
jennof4@gmail.com

Greetings:

This acknowledges the U.S. Election Assistance Commission's receipt of your Freedom of
Information Act request:

> "The requested records are for both VSTLs Pro V&V, and SLI Compliance (and under their
> previous companies names) - please provide:
>
> 1) From 2016 thru December 2020 - all original emails, with official EAC-issued (unedited)
> Certificate of Accreditation as attachment to both listed VSTLs
>
> 2) From 2016 thru December 2020 -all original (unedited) EAC-issued Certificate of
> Accreditation for the listed VSTLs
>
> 3) From 2016 thru December 2020 - all EAC commissioner meeting minutes, where VSTL
> accreditation was discussed
>
> 4) From 2016 thru December 2020 - all applications for accreditation renewal or supplemental
> information the VSTLs provided to the EAC"

Pursuant to 11 CFR § 9405.10 as a requester designated as "other," you will be charged search
and duplication fees. However, the first two hours of search time and the first 100 pages of
duplication are free. You will not be charged fees for review of documents. The EAC estimates
that this FOIA request will not require more than 2 free hours of search time. Therefore, the EAC
does not anticipate that there will be fees associated with this request.

Your request for expedited processing has been denied pursuant to 11 C.F.R. § 9405.7(h). The
request, as submitted, demonstrates no evidence of a "compelling need" as defined by EAC
regulations. While the public's right to know is a significant and important value, it is not
sufficient by itself to satisfy this standard. *Al–Fayed v. CIA*, 254 F.3d 300, 310 (D.C.Cir. 2001).

All Pro V&V certificates of accreditation are available here:
https://www.eac.gov/sites/default/files/foia/Pro_V%26V_Certificates_of_Accredidation.pdf. All
SLI certificates of accreditation are available here:
https://www.eac.gov/sites/default/files/foia/SLI_Certificates_of_Accredidation.pdf. Additionally,
a one page overview of the EAC certification process has been made available here:



U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

https://www.eac.gov/sites/default/files/foia/How_a_Voting_System_Becomes_EAC_Certified_Overview_of_the_EAC_Certification_Process.pdf.

We have determined we will process your request pursuant to the Freedom of Information Act and EAC regulations. This request has been assigned file number 22-00084. Please be advised that due to the coronavirus pandemic we are experiencing additional delays in processing Freedom of Information Act requests. You have the right to seek assistance from the EAC FOIA Public Liaison if you have questions regarding processing delays, transparency, request status, and dispute resolution.

Amanda Joiner, FOIA Public Liaison
ajoiner@eac.gov
301-563-3919

If you interpret any portion of this response as an adverse action, you may appeal this action to the Election Assistance Commission. Your appeal must be in writing and sent to the address set forth below. Your appeal must be postmarked or electronically transmitted within 90 days from the date of the response to your request. Please include your reasons for reconsideration and attach a copy of this and subsequent EAC responses.

U.S. Election Assistance Commission
FOIA Appeals
633 3rd Street NW, Suite 200
Washington, DC 20001

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you have any questions please contact my office at your convenience.

Sincerely,

*Camden Kelliher*

Camden Kelliher, Associate Counsel
U.S. Election Assistance Commission
ckelliher@eac.gov

 Gmail

Tina Milcarek <tina.milcarek@gmail.com>

**Re: Public Records Request - Tina Milcarek**
7 messages

**PublicRecords SOS * SOS** <SOS.PublicRecordsSOS@sos.oregon.gov>    Tue, Jul 12, 2022 at 5:48 PM
To: "Tina.milcarek@gmail.com" <Tina.milcarek@gmail.com>

Thank you for contacting the Oregon Secretary of State. I have forwarded your request to the Elections Division. A staff person will let you know if we have any additional questions or need additional time to fulfill the request. Otherwise, you will receive the documents responsive to this request via email.

--

Oregon Secretary of State
Public Records Inbox
Managed by the Public Records Officer or Deputy

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Sunday, July 10, 2022 6:27 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State

## Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

## Entry Details

| | |
|---|---|
| **NAME** | Tina Milcarek |
| **PHONE** | (708) 932-0959 |
| **EMAIL** | Tina.milcarek@gmail.com |
| **DESCRIBE YOUR REQUEST** | I understand that the United States Department of Homeland Security ("DHS") held a call with election officials to discuss cybersecurity concerning the election in August 2016. At the time, DHS offered assistance to any state that wanted help securing its electronic election infrastructure.<br><br>Did the State of Oregon accept assistance?<br><br>If so, please provide details on what was done. |

Exhibit R

If not, please provide a full explanation of why assistance was denied.

---

**Tina's GMail** <tina.milcarek@gmail.com>                                    Fri, Jul 15, 2022 at 10:33 AM
To: Elections.SOS@sos.oregon.gov

Dear Elections Division,

Please provide an update to my request.

Respectfully,

Tina Milcarek

Begin forwarded message:

> **From:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
> **Date:** July 12, 2022 at 5:48:14 PM PDT
> **To:** Tina.milcarek@gmail.com
> **Subject: Re: Public Records Request - Tina Milcarek**

Thank you for contacting the Oregon Secretary of State. I have forwarded your request to the Elections Division. A staff person will let you know if we have any additional questions or need additional time to fulfill the request. Otherwise, you will receive the documents responsive to this request via email.

--

Oregon Secretary of State
Public Records Inbox
Managed by the Public Records Officer or Deputy

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Sunday, July 10, 2022 6:27 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State

## Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

---

## Entry Details

| | |
|---|---|
| **NAME** | Tina Milcarek |
| **PHONE** | (708) 932-0959 |
| **EMAIL** | Tina.milcarek@gmail.com |

**DESCRIBE YOUR REQUEST**

I understand that the United States Department of Homeland Security ("DHS") held a call with election officials to discuss cybersecurity concerning the election in August 2016. At the time, DHS offered assistance to any state that
wanted help securing its electronic election infrastructure.

Did the State of Oregon accept assistance?

If so, please provide details on what was done.

If not, please provide a full explanation of why assistance was denied.

---

**SOS OCVRSupport * SOS** <OCVRSupport.SOS@sos.oregon.gov>                    Fri, Jul 15, 2022 at 4:20 PM
To: "Tina.milcarek@gmail.com" <Tina.milcarek@gmail.com>
Cc: PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>, SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>

Good Afternoon,

We have no responsive records for any applications for or receipt of funds from Department of Homeland Security in 2016.

Thank you,

## Greg Bergerson

Direct Line: 971-358-3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov



www.oregonvotes.gov

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Sunday, July 10, 2022 6:27 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State

Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

## Entry Details

| | |
|---|---|
| **NAME** | Tina Milcarek |
| **PHONE** | (708) 932-0959 |
| **EMAIL** | Tina.milcarek@gmail.com |
| **DESCRIBE YOUR REQUEST** | I understand that the United States Department of Homeland Security ("DHS") held a call with election officials to discuss cybersecurity concerning the election in August 2016. At the time, DHS offered assistance to any state that wanted help securing its electronic election infrastructure.<br><br>Did the State of Oregon accept assistance?<br><br>If so, please provide details on what was done.<br><br>If not, please provide a full explanation of why assistance was denied. |

---

**Tina Gmail** <tina.milcarek@gmail.com>                                                      Fri, Jul 15, 2022 at 5:05 PM
To: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>
Cc: PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>

Hi Greg,

You are referring to money.  My question is did the state of Oregon receive personnel or technical assistance (whether directly from DHS, a government contractor, or a private entity/charity) that was coordinated from the DHS conversation?

If so, I'd like a copy of those conversations, records, etc.

If the State if Oregon denied the assistance and there was correspondence relating to that conversation, I'd like that as well.

Tina Milcarek

> On Jul 15, 2022, at 4:20 PM, SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov> wrote:
>
> Good Afternoon,
>
> We have no responsive records for any applications for or receipt of funds from Department of Homeland Security in 2016.
>
> Thank you,

**Greg Bergerson**

Direct Line: 971-358-3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov

<image001.png>

www.oregonvotes.gov

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Sunday, July 10, 2022 6:27 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State

## Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

---

## Entry Details

| | |
|---|---|
| **NAME** | Tina Milcarek |
| **PHONE** | (708) 932-0959 |
| **EMAIL** | Tina.milcarek@gmail.com |
| **DESCRIBE YOUR REQUEST** | I understand that the United States Department of Homeland Security ("DHS") held a call with election officials to discuss cybersecurity concerning the election in August 2016. At the time, DHS offered assistance to any state that wanted help securing its electronic election infrastructure.<br><br>Did the State of Oregon accept assistance? |

If so, please provide details on what was done.

If not, please provide a full explanation of why assistance was denied.

---

**Tina's GMail** <tina.milcarek@gmail.com>
To: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>
Cc: PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>

Sat, Jul 16, 2022 at 7:51 AM

Hi Greg,

In order to help you find the records, let me be more specific.

DHS held a meeting on August 15, 2016 and the meeting noted:

Secretary Johnson offered the assistance of the Department's National Cybersecurity and Communications Integration Center (NCCIC) to conduct vulnerability scans, provide actionable information, and access to other tools and resources for improving cybersecurity.

https://www.p2016.org/integrity/dhs081516pr.html

Request 1:  Please provide all communications that the state of Oregon had as a result of this meeting in 2016.

It appears from documentation I found that Steve Trout was working with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall between 2017-2018 around election security.

Request 2: Please provide all communications and documentation between The SOS's Office (including the Elections Division and Steve Trout) with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall.

Tina Milcarek

> On Jul 15, 2022, at 5:05 PM, Tina Gmail <tina.milcarek@gmail.com> wrote:
>
> Hi Greg,
>
> You are referring to money.  My question is did the state of Oregon receive personnel or technical assistance (whether directly from DHS, a government contractor, or a private entity/charity) that was coordinated from the DHS conversation?
>
> If so, I'd like a copy of those conversations, records, etc.
>
> If the State if Oregon denied the assistance and there was correspondence relating to that conversation, I'd like that as well.
>
> Tina Milcarek
>
> > On Jul 15, 2022, at 4:20 PM, SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov> wrote:
> >
> >
> > Good Afternoon,
> >
> > We have no responsive records for any applications for or receipt of funds from Department of Homeland Security in 2016.
> >
> > Thank you,
> >
> > **Greg Bergerson**
> >
> > Direct Line: 971-358-3225
> >
> > OCVR Support Desk Analyst
> >
> > Oregon Secretary of State – Elections Division

Support Desk Phone: 503-986-2197

Support Email: OCVRSupport.SOS@Oregon.gov


<image001.png>

 www.oregonvotes.gov

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Sunday, July 10, 2022 6:27 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State

## Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

---

## Entry Details

| | |
|---|---|
| **NAME** | Tina Milcarek |
| **PHONE** | (708) 932-0959 |
| **EMAIL** | Tina.milcarek@gmail.com |
| **DESCRIBE YOUR REQUEST** | I understand that the United States Department of Homeland Security ("DHS") held a call with election officials to discuss cybersecurity concerning the election in August 2016. At the time, DHS offered assistance to any state that wanted help securing its electronic election infrastructure.

Did the State of Oregon accept assistance?

If so, please provide details on what was done.

If not, please provide a full explanation of why assistance was denied. |

**Tina's GMail** <tina.milcarek@gmail.com>                                                Sat, Jul 16, 2022 at 9:29 AM
To: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>
Cc: PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>

Hi Greg,

Sorry for the double email but I should have included the link to the article for Request 2.

Request 2: Please provide all communications and documentation between The SOS's Office (including the Elections Division and Steve Trout) with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall.

https://americanprogress.org/wp-content/uploads/2018/02/020118_ElectionSecurity-report11.pdf?_ga=2.29175612.1684813053.1657939815-2121424927.1657939815#page=153

I request all correspondence noted on page 234.

| 1235 | Ore. Admin. Law § 165-007-0290, available at http://arcweb.sos.state.or.us/pages/rules/oars_100/oar_165/165_007.html; Ore. Rev. Stat. § 254.529. |
| 1236 | Personal correspondence from Steve Trout, October 27, 2017; Ore. Rev. Stat. § 254.529. |
| 1237 | Smith and others, "Counting Votes 2012." |
| 1238 | Smith and others, "Counting Votes 2012." |

| 1258 | The Pew Charitable Trusts, "A Look at How—and How Many—States Adopt Electronic Poll Books." |
| 1259 | The Pew Charitable Trusts, "A Look at How—and How Many—States Adopt Electronic Poll Books"; Jonathan Marks, Michael Moser, Kalonji Johnson, and Jessica Myers, interview with author, September 11, 2017. |

231   Center for American Progress | Election Security in All 50 States

Tina Milcarek

On Jul 16, 2022, at 7:51 AM, Tina's GMail <tina.milcarek@gmail.com> wrote:

Hi Greg,

In order to help you find the records, let me be more specific.

DHS held a meeting on August 15, 2016 and the meeting noted:

Secretary Johnson offered the assistance of the Department's National Cybersecurity and Communications Integration Center (NCCIC) to conduct vulnerability scans, provide actionable information, and access to other tools and resources for improving cybersecurity.

https://www.p2016.org/integrity/dhs081516pr.html

Request 1:  Please provide all communications that the state of Oregon had as a result of this meeting in 2016.

It appears from documentation I found that Steve Trout was working with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall between 2017-2018 around election security.

Request 2: Please provide all communications and documentation between The SOS's Office (including the Elections Division and Steve Trout) with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall.

Tina Milcarek

On Jul 15, 2022, at 5:05 PM, Tina Gmail <tina.milcarek@gmail.com> wrote:

Hi Greg,

You are referring to money.  My question is did the state of Oregon receive personnel or technical assistance (whether directly from DHS, a government contractor, or a private entity/charity) that was coordinated from the DHS conversation?

If so, I'd like a copy of those conversations, records, etc.

If the State if Oregon denied the assistance and there was correspondence relating to that conversation, I'd like that as well.

Tina Milcarek

On Jul 15, 2022, at 4:20 PM, SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov> wrote:

Good Afternoon,

We have no responsive records for any applications for or receipt of funds from Department of Homeland Security in 2016.

Thank you,

## Greg Bergerson

Direct Line: 971–358–3225

OCVR Support Desk Analyst

Oregon Secretary of State – Elections Division

Support Desk Phone: 503–986–2197

Support Email: OCVRSupport.SOS@Oregon.gov

<image001.png>

www.oregonvotes.gov

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Sunday, July 10, 2022 6:27 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State

## Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

---

## Entry Details

| NAME | Tina Milcarek |
|------|---------------|
| PHONE | (708) 932-0959 |
| EMAIL | Tina.milcarek@gmail.com |

**DESCRIBE YOUR REQUEST**

I understand that the United States Department of Homeland Security ("DHS") held a call with election officials to discuss cybersecurity concerning the election in August 2016. At the time, DHS offered assistance to any state that wanted help securing its electronic election infrastructure.

Did the State of Oregon accept assistance?

If so, please provide details on what was done.

If not, please provide a full explanation of why assistance was denied.

---

Tina Milcarek <tina.milcarek@gmail.com>                                    Mon, Aug 22, 2022 at 6:06 AM
To: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>, PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>

Hi Greg,

It's been almost a full month and you have not yet responded with my records or a timeline.

Please provide an update on my request - 2 noted in below emails.

Additionally, I understand that you maintain a log of public record requests so please provide an extract for the ones I have placed so that I can check it against my list.

Respectfully,

Tina Milcarek

---------- Forwarded message ---------
From: **Tina's GMail** <tina.milcarek@gmail.com>
Date: Sat, Jul 16, 2022 at 9:29 AM
Subject: Re: Public Records Request - Tina Milcarek
To: SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov>
Cc: PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>

Hi Greg,

Sorry for the double email but I should have included the link to the article for Request 2.

Request 2: Please provide all communications and documentation between The SOS's Office (including the Elections Division and Steve Trout) with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall.

https://americanprogress.org/wp-content/uploads/2018/02/020118_ElectionSecurity-report11.pdf?_ga=2.29175612.1684813053.1657939815-2121424927.1657939815#page=153

I request all correspondence noted on page 234.

9:28 AM  Sat Jul 16                                    🔒 americanprogress.org                                    🛜 79% ⬛

230  Center for American Progress | Election Security in All 50 States

1212  Norden and Famighetti, "America's Voting Machines at Risk"; Norden and Vandewalker, "Securing Elections From Foreign Interference."

1213  Survey response from Mitchell Antle; 26 Okla. Stat. § 26-9-115 (2016), available at https://www.oscn.net/applications/oscn/DeliverDocument.asp?CiteID=78637.

1214  State law requires notification be sent to the county chair of each political party and a representative is permitted to observe the testing, but is silent on providing notice to the general public. Survey response from Mitchell Antle; 26 Okla. Stat. § 26-9-115.

1215  Norden and Vandewalker, "Securing Elections From Foreign Interference."

1239  Smith and others, "Counting Votes 2012."

1240  Smith and others, "Counting Votes 2012."

1241  Smith and others, "Counting Votes 2012."

1242  Smith and others, "Counting Votes 2012."

1243  Smith and others, "Counting Votes 2012."

1244  National Conference of State Legislatures, "Electronic Transmission of Ballots."

1245  Survey response from Steve Trout.

1246  Some counties purchased new voting machines last year. Personal correspondence from Steve Trout,

1216  Steve Trout, Elections Director, interview with author, September 15, 2017.

1217  Personal correspondence from Steve Trout, September 25, 2017.

1218  Personal correspondence from Steve Trout, September 25, 2017.

1219  Personal correspondence from Steve Trout, September 25, 2017.

1220  Personal correspondence from Steve Trout, September 25, 2017.

1221  Personal correspondence from Steve Trout, January 24, 2018.

1222  The Pew Charitable Trusts, "A Look at How—and How Many—States Adopt Electronic Poll Books."

1223  Bennett and others, "Cash-strapped states brace for Russian hacking fight."

1224  Verified Voting, "The Verifier—Polling Place Equipment—November 2016."

1225  Ore. Rev. Stat. § 254.529 (2015), available at http://law.justia.com/codes/oregon/2015/volume-06/chapter-254/section-254.529/.

1226  Verified Voting, "State Audit Laws – Oregon," March 2017, available at https://www.verifiedvoting.org/state-audit-laws/oregon/.

1227  Ore. Rev. Stat. § 254.529.

1228  Ore. Rev. Stat. § 254.529.

1229  Ore. Rev. Stat. § 254.529.

1230  Ore. Rev. Stat. § 254.529.

1231  Ore. Rev. Stat. § 254.529.

1232  Survey response from Steve Trout.

1233  Ore. Rev. Stat. § 254.529.

1234  Ore. Rev. Stat. § 254.529; Steve Trout, interview with author, September 15, 2017.

1235  Ore. Admin. Law § 165-007-0290, available at http://arcweb.sos.state.or.us/pages/rules/oars_100/oar_165/165_007.html; Ore. Rev. Stat. § 254.529.

1236  Personal correspondence from Steve Trout, October 27, 2017; Ore. Rev. Stat. § 254.529.

1237  Smith and others, "Counting Votes 2012."

1238  Smith and others, "Counting Votes 2012."

October 27, 2017; Norden and Famighetti, "America's Voting Machines at Risk"; Norden and Vandewalker, "Securing Elections From Foreign Interference."

1247  Ore. Rev. Stat. § 254.235 (2015), available at https://www.oregonlegislature.gov/bills_laws/ors/ors254.html; Ore. Rev. Stat. § 254.485 (2015), available at https://www.oregonlegislature.gov/bills_laws/ors/ors254.html.

1248  Steve Trout, interview with author, September 15, 2017.

1249  Ore. Rev. Stat. §§ 254.235, 254.485.

1250  Norden and Vandewalker, "Securing Elections From Foreign Interference."

1251  Jonathan Marks, Commissioner for the Bureau of Commissions of Elections and Legislation, Michael Moser, Deputy Commissioner for the Bureau of Commissions of Elections and Legislation, Kalonji Johnson, Director of Policy, Pennsylvania Department of State, and Jessica Myers, Deputy Director of Policy, Pennsylvania Department of State, interview with author, September 11, 2017.

1252  Pennsylvania Department of State, "Statement in Response to Harvard Study on Voter Registration Website Security" (2017), available at http://www.dos.pa.gov/Documents/9.7.17%20-%20DOS%20Statement%20-%20Harvard%20Study%20on%20VR%20Website%20Security.pdf.

1253  Pennsylvania Department of State, "Statement in Response to Harvard Study on Voter Registration Website Security."

1254  Pennsylvania Department of State, "Statement in Response to Harvard Study on Voter Registration Website Security."

1255  Pennsylvania Department of State, "Statement in Response to Harvard Study on Voter Registration Website Security."

1256  Personal correspondence from Jessica Myers, October 31, 2017.

1257  25 Pa. Cons. Stat. § 1402 (2016), available at http://law.justia.com/codes/pennsylvania/2016/title-25/chapter-14/section-1402/; The Pew Charitable Trusts, "A Look at How—and How Many—States Adopt Electronic Poll Books."

1258  The Pew Charitable Trusts, "A Look at How—and How Many—States Adopt Electronic Poll Books."

1259  The Pew Charitable Trusts, "A Look at How—and How Many—States Adopt Electronic Poll Books"; Jonathan Marks, Michael Moser, Kalonji Johnson, and Jessica Myers, interview with author, September 11, 2017.

1260  Personal correspondence from Jessica Myers, Octo-     1270  National Conference of State Legislatures, "Electronic

Tina Milcarek

On Jul 16, 2022, at 7:51 AM, Tina's GMail <tina.milcarek@gmail.com> wrote:

Hi Greg,

In order to help you find the records, let me be more specific.

DHS held a meeting on August 15, 2016 and the meeting noted:

Secretary Johnson offered the assistance of the Department's National Cybersecurity and Communications Integration Center (NCCIC) to conduct vulnerability scans, provide actionable information, and access to other tools and resources for improving cybersecurity.

https://www.p2016.org/integrity/dhs081516pr.html

Request 1:  Please provide all communications that the state of Oregon had as a result of this meeting in 2016.

It appears from documentation I found that Steve Trout was working with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall between 2017-2018 around election security.

Request 2: Please provide all communications and documentation between The SOS's Office (including the Elections Division and Steve Trout) with Danielle Root, Liz Kennedy, Michael Sozan, and Jerry Parshall.

Tina Milcarek

> On Jul 15, 2022, at 5:05 PM, Tina Gmail <tina.milcarek@gmail.com> wrote:
>
> Hi Greg,
>
> You are referring to money.  My question is did the state of Oregon receive personnel or technical assistance (whether directly from DHS, a government contractor, or a private entity/charity) that was coordinated from the DHS conversation?
>
> If so, I'd like a copy of those conversations, records, etc.
>
> If the State if Oregon denied the assistance and there was correspondence relating to that conversation, I'd like that as well.
>
> Tina Milcarek
>
>> On Jul 15, 2022, at 4:20 PM, SOS OCVRSupport * SOS <OCVRSupport.SOS@sos.oregon.gov> wrote:
>>
>>
>> Good Afternoon,
>>
>> We have no responsive records for any applications for or receipt of funds from Department of Homeland Security in 2016.
>>
>> Thank you,
>>
>> **Greg Bergerson**
>>
>> Direct Line: 971-358-3225
>>
>> OCVR Support Desk Analyst
>>
>> Oregon Secretary of State – Elections Division
>>
>> Support Desk Phone: 503-986-2197
>>
>> Support Email: OCVRSupport.SOS@Oregon.gov
>>
>>
>> <image001.png>
>>
>> www.oregonvotes.gov

---

**From:** Oregon Secretary of State <notifications@cognitoforms.com>
**Sent:** Sunday, July 10, 2022 6:27 AM
**To:** PublicRecords SOS * SOS <SOS.PublicRecordsSOS@sos.oregon.gov>
**Subject:** Public Records Request - Tina Milcarek

# Oregon Secretary of State

Public Records Request

This is a copy of a customer submitted Public Records Request that can be forwarded to Divisions or other Agencies to answer questions or provide feedback.

## Entry Details

| | |
|---|---|
| **NAME** | Tina Milcarek |
| **PHONE** | (708) 932-0959 |
| **EMAIL** | Tina.milcarek@gmail.com |
| **DESCRIBE YOUR REQUEST** | I understand that the United States Department of Homeland Security ("DHS") held a call with election officials to discuss cybersecurity concerning the election in August 2016. At the time, DHS offered assistance to any state that wanted help securing its electronic election infrastructure.<br><br>Did the State of Oregon accept assistance?<br><br>If so, please provide details on what was done.<br><br>If not, please provide a full explanation of why assistance was denied. |